FILED

1   ZIMMERMAN REED P.L.L.P.
    HART L. ROBINOVITCH (*Pro Hac Vice* Pending)
2   Email: Hart.Robinovitch@zimmreed.com
    14646 N. Kierland Blvd., Suite 145
3   Scottsdale, AZ 85254
    (480) 348-6400
4   (480) 348-6415 Facsimile

5   RIDOUT & LYON, LLP
    CHRISTOPHER P. RIDOUT (State Bar No. 143931)
6   Email: c.ridout@ridoutlyonlaw.com
    DEVON M. LYON (State Bar No. 218293)
7   Email: d.lyon@ridoutlyonlaw.com
    555 E. Ocean Blvd., Ste. 500
8   Long Beach, California  90802
    (562) 216-7380
9   (562) 216-7385 Fax

10  (Additional counsel listed below)

11  **Attorney for Plaintiffs and the Class**

12

13              **UNITED STATES DISTRICT COURT**

14          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

15

16  JANE DOE 1 AND JANE DOE 2,        ED CV09 1316   VAP (DTB)
    individually, and on behalf of all others     Case No.
17  similarly situated,                **CLASS ACTION**

18              Plaintiffs,            **COMPLAINT (Class Action)**

19  v.

20  SPEARMINT RHINO COMPANIES
    WORLDWIDE, INC., SPEARMINT        **Jury Trial Demanded**
21  RHINO CONSULTING WORLDWIDE,
    INC., K-KEL, INC., AND OXNARD
22  HOSPITALITY SERVICES, LP.

23  Defendants.

24                                     COPY

25

26

27

28

CLASS ACTION COMPLAINT
42407

2009 JUL 13  PM 1: 16

CLERK U S DISTRICT COURT
CENTRAL DIST. O CALIF
LOS ANGELES

BY_____

1

## I.   INTRODUCTION

2     1.     This is a class action brought by Plaintiffs Jane Doe 1 (hereinafter "Doe

3     1") and Jane Doe 2 (hereinafter "Doe 2")(Doe 1 and Doe 2 are referred to herein

4     collectively as "Plaintiffs") against Defendants Spearmint Rhino Companies

5     Worldwide, Inc., Spearmint Rhino Consulting Worldwide, Inc., K-Kel, Inc. and

6     Oxnard Hospitality Services, LP (hereinafter collectively referred to as

7     "Defendants"). The Plaintiff Class is composed of female employees who, during

8     the relevant time period, worked as exotic dancers for Defendants in the states of

9     California and Nevada and were denied their fundamental rights under applicable

10    state and federal wage and hour laws. Specifically, Plaintiffs complain that

11    Defendants misclassified Plaintiffs, and all other members of the Class as

12    independent contractors, as opposed to employees, at all times in which they worked

13    as dancers at Defendants' adult nightclubs located in California and Nevada. As a

14    result, Defendants failed to pay Plaintiffs and all other members of the Class the

15    minimum wages that they were entitled to under federal and state law. Plaintiffs

16    bring this class action seeking damages, backpay, restitution, liquidated damages,

17    civil penalties, prejudgment interest, injunctive relief, reasonable attorneys' fees and

18    costs, and all other relief that the Court deems just, reasonable and equitable in the

19    circumstances.

20    ## II.   JURISDICTION & VENUE

21    2.     This Complaint alleges causes of action under the laws of the United

22    States, including the Fair Labor Standards Act, 29 U.S.C. §201 *et. seq.* ("FLSA").

23    Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. §1331.

24    3.     The Court also has diversity jurisdiction pursuant 28 U.S.C. §1332 and

25    pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)("CAFA").

26    Diversity of citizenship between the parties exists and the amount-in-controversy

27    requirements under the above-referenced provisions are met.

28

COMPLAINT
42407

1

4.     A substantial part of the events and conduct giving rise to the claims in this action occurred in this Judicial District.   Defendants Spearmint Rhino - Worldwide, Spearmint Rhino - Consulting and Oxnard reside in and have their principal places of business in this district. The unlawful and fraudulent actions of Spearmint Rhino - Worldwide, Spearmint Rhino - Consulting and Oxnard, as described further within, occurred in and continue to occur in the State of California. Key decisions, agreements and activities regarding the unlawful, fraudulent and unconscionable actions of Defendants Spearmint Rhino - Worldwide and Spearmint Rhino - Consulting as described further within, were made in this district and emanated to other districts including those in California and Nevada where Spearmint Rhino Nightclubs were located.    All business policies and material decisions regarding the employment practices challenged in this case were made in significant part by Defendants Spearmint Rhino – Worldwide and Spearmint Rhino - Consulting from their offices in Norco, California and/or City of Industry, California.  Those unlawful policies emanated to and were applied in all Spearmint Rhino nightclubs, including all those located in the states of California and Nevada. As a result, venue is proper in this jurisdiction pursuant to 28 U.S.C. §1391.

### III.   PARTIES & STANDING

5.     Plaintiff Jane Doe 1 is a resident of Washoe County, Nevada.   At relevant times, Doe 1 has been an employee of Defendants Spearmint Rhino - Worldwide, Spearmint Rhino - Consulting and K-Kel, as defined in 29 U.S.C. §201 *et seq. and* N.R.S. 608.010, working as an exotic dancer at the Spearmint Rhino nightclub in Las Vegas, Nevada.

6.     Plaintiff Jane Doe 2 is a resident of San Bernardino County, California. At relevant times, Doe 2 has been an employee of Defendants Spearmint Rhino - Worldwide, Spearmint Rhino - Consulting and Oxnard, as defined in 29 U.S.C. §201 *et seq.* and Cal. Labor Code. §1194, working as an exotic dancer at the Spearmint Rhino nightclub in Oxnard, California.

7.     Pursuant to the principals set forth in *Does I through XXIII v. Advanced Textile Corp.*, 214 F.3d 1058 (9th Cir. 2000), Plaintiffs file this action under fictitious names and will request leave of the court to allow them to proceed anonymously because: (a) Plaintiffs wish to preserve their rights to privacy; (b) there is a significant social stigma attached to the Plaintiffs' occupations as exotic dancers; (c) there is an inherent amount of risk associated with Plaintiffs' profession and they fear that disclosure of their legal names and addresses may subject to them risk of injury by patrons and/or others; and (d) in addition to the fear of retaliation by the Defendants, they would be hesitant to maintain this action enforcing fundamental employment rights if their name were to be forever associated with the Defendants. Upon information and belief, it is Defendants' policy to retaliate against dancers who assert their statutory rights to be recognized as employees by, *inter alia*, imposing financial penalties, attempting to confiscate their tip income, and/or terminating them.

8.     It is customary in Defendants' business for employee-exotic dancers, like Plaintiffs, to use pseudonyms and stage names for both security and privacy purposes. The use of these names allays any reasonable fear that proceeding anonymously would offend the "customary and constitutionally-embedded presumption of openness in judicial proceedings." In *N.W. Enterprises, Inc. v. City of Houston*, 352 F.3d 162 (5th Cir. 2003), the Fifth Circuit addressed the need for adult entertainers to remain anonymous stating:

> Adult entertainers may anonymously (or through stage names) put their bodies on display in front of strangers, but these actions do not imply a willingness to publicize the entertainers' personal information through which customers or other private persons may trace the entertainers to their homes or otherwise invade their privacy without permission. The fact that an entertainer is willing to dance publicly or a manager is willing to be employed in a sexually oriented business that deals with the public, or the fact that a determined harasser or stalker might conceivably follow an entertainer home after she leaves work, does not mean that adult entertainers and managers have voluntarily sacrificed all privacy rights and need for safety protections.

1    9.    There is no prejudice to Defendants if Plaintiffs file this action under a

2    fictitious name and proceed anonymously in public records.  In the ordinary course

3    of business, Defendants themselves, identify the exotic dancers they employ through

4    stage names and/or employee codes.  Further, Defendants have or will be promptly

5    informed of Plaintiffs' true identities by their undersigned counsel so they can

6    prepare any defenses they have and for trial.  As a result, there are no due process

7    concerns if Plaintiffs proceeds anonymously.  Accordingly, Plaintiffs' actual names

8    and identities should be kept and maintained confidential until the Court has the

9    opportunity to rule on the issue.

10    10.    The Defendants in this matter are business entities that jointly employ

11    and control the work of members of the Class that work or have worked at the

12    various "Spearmint Rhino Gentlemen's Clubs" located in California and Nevada.

13    Specifically, there are Spearmint Rhino adult nightclubs in at least the following

14    cities: City of Industry, CA; Los Angeles, CA; Oxnard, CA; Rialto, CA; Santa

15    Barbara, CA; Santa Maria, CA; Torrance, CA; Van Nuys, CA; and Las Vegas, NV.

16    11.    Defendant Spearmint Rhino Companies Worldwide, Inc. (referred to

17    herein as "Spearmint Rhino – Worldwide") is a Nevada corporation located at 1875

18    Tandem Way, Norco, CA 92860 and/or 15423 East Valley Boulevard, City of

19    Industry, CA 91746.  The resident agent for Spearmint Rhino – Company is the

20    Corporation Service Company d/b/a "CSC – Lawyers Incorporating Service", which

21    maintains registered office addresses at 2730 Gateway Oaks Drive, Suite 100,

22    Sacramento, CA 95833 and 502 East John Street, Carson City, NV, 89706.  The

23    Chairman and Chief Executive Officer of Spearmint Rhino - Worldwide is John

24    Gray. The President of Spearmint Rhino - Worldwide is Kathy Vercher.

25    12.    Defendant Spearmint Rhino Consulting Worldwide, Inc. (referred to

26    herein as "Spearmint Rhino – Consulting") is a Delaware corporation located at 1875

27    Tandem Way, Norco, CA 92860 and/or 15423 East Valley Boulevard, City of

28    Industry, CA 91746.  The resident agent for Spearmint Rhino – Consulting is the

COMPLAINT                                                                                4
42407

Corporation Service Company d/b/a "CSC – Lawyers Incorporating Service", which maintains a registered office address of 2730 Gateway Oaks Drive, Suite 100, Sacramento, CA 95833. The Chairman and Chief Executive Officer of Spearmint Rhino - Consulting is John Gray. The President and Chief Operating Officer of Spearmint Rhino - Consulting is Kathy Vercher.

13. Defendant Oxnard Hospitality Services, LP d/b/a "Spearmint Rhino Gentlemen's Club" (referred to herein as "Oxnard" or "Spearmint Rhino – Oxnard") is a California Limited Partnership located at 630 Maulhardt Avenue, Oxnard, CA 93030. Upon information and belief, Defendant Oxnard maintains ownership, recruitment, management, and/or operational interests in at least one nightclub featuring exotic dancing by Class members, including the Spearmint Rhino Gentlemen's Club located at 630 Maulhardt Avenue, Oxnard, CA 93030 where members of the Class have been and are currently employed. The resident agent for Spearmint Rhino – Oxnard is the Corporation Service Company d/b/a "CSC – Lawyers Incorporating Service", which maintains a registered office address of 2730 Gateway Oaks Drive, Suite 100, Sacramento, CA 95833. Upon information and belief, officers and employees of Spearmint Rhino – Worldwide and Spearmint Rhino - Consulting are the *de facto* managers of Spearmint Rhino – Oxnard.

14. Defendant K-Kel, Inc. (referred to herein as "K-Kel" or "Spearmint Rhino – Las Vegas") is a Nevada Corporation located at 3344 S. Highland Dr. Las Vegas, NV 89109 and/or 330 S. Third Street, Suite 990, Las Vegas, NV 89101. Upon information and belief, Defendant K-Kel maintains ownership, recruitment, management, and/or operational interests in at least one nightclub featuring exotic dancing by Class members, including the Spearmint Rhino Gentlemen's Club located at 3344 S. Highland Dr. Las Vegas, NV 89109 where members of the Class have been and are currently employed. The resident agent for K-Kel is Sean P. Sullivan, Esq. a registered office address of 330 S. Third Street, Suite 990, Las Vegas, NV 89101. An officer of K-Kel is Kevin M. Kelly, Esq., 330 S. Third Street,

1  Suite 990, Las Vegas, NV 89101.  Upon information and belief, officers and

2  employees of Spearmint Rhino – Worldwide and Spearmint Rhino - Consulting are

3  the *de facto* managers of Spearmint Rhino – Las Vegas.

4    15. Upon, information and belief, both Spearmint Rhino - Worldwide and

5  Spearmint Rhino - Consulting either directly or indirectly own, manage, direct,

6  operate, and control the business operations at all of the "Spearmint Rhino

7  Nightclubs" located in California and Nevada and listed on the

8  www.spearmintrhino.com website, including but not limited to those doing business

9  at 15411 East Valley Boulevard, City of Industry, CA 91746 ("Spearmint Rhino-

10  City of Industry"); 2020 East Olympic Boulevard, Los Angeles, CA 90021

11  ("Spearmint Rhino- Los Angeles"); 630 Maulhardt Avenue, Oxnard, CA 93030

12  ("Spearmint Rhino – Oxnard"); 312 South Riverside Avenue, Rialto, CA 92376

13  ("Spearmint Rhino – Rialto"); 312 South Riverside Avenue, Rialto, CA 92376

14  ("Spearmint Rhino – Rialto II"); 22 East Montecito Street, Santa Barbara, CA 93101

15  ("Spearmint Rhino – Santa Barbara"); 505 South Broadway, Santa Maria, CA 93454

16  (Spearmint Rhino – Santa Maria"); 19900 Normandie Avenue, Torrance, CA 90502

17  ("Spearmint Rhino – Torrance"); 15004 Oxnard Street, Van Nuys, CA 91411

18  ("Spearmint Rhino – Van Nuys"); and 3344 S. Highland Dr. Las Vegas, NV 89109

19  ("Spearmint Rhino – Las Vegas") (the foregoing nightclubs are collectively referred

20  to herein as the "Spearmint Rhino Nightclubs").

21    16. Each of the Spearmint Rhino Nightclubs delegates its senior

22  management functions to Spearmint Rhino - Worldwide and Spearmint Rhino –

23  Consulting.  For instance, on January 31, 2008, Spearmint Rhino - Consulting issued

24  the following Press Release confirming that Spearmint Rhino - Worldwide and/or

25  Spearmint Rhino – Consulting oversee the management and operations at each

26  Spearmint Rhino Nightclub:

27    Brett Schuster has been promoted to Senior District Manager of
  Spearmint Rhino.

28

COMPLAINT
42407

6

1
2

Along with overseeing management and operations for each club, Brett will now also supervise the other two Spearmint Rhino District Managers.

3
4

With 17 Spearmint Rhino Gentlemen's Club locations in the United States, executives rely heavily on the District Managers to oversee all aspects of operations for all locations.

5
6

With many years of the service and hospitality industry under his belt, Brett will play a major role in helping streamline operations for each location. ...

7
8

"I am happy to be in this new position," says Brett Schuster. "It feels great to be in a position where I can play a major role in taking Spearmint Rhino to the next level.

9
10

Brett Schuster can be contacted at Spearmint Rhino's World Headquarters at (951) 371-3788 or bschuster@spearmintrhino.com.

11
12
13
14
15

About Spearmint Rhino Gentlemen's Clubs
Spearmint Rhino Gentlemen's Club is a chain of the most upscale gentlemen's clubs in the world. With Spearmint Rhino Gentlemen's Club and affiliate locations worldwide (including the United States, United Kingdom, Europe and Australia) and growing, guests are treated to the unique ambience, superior service and first class entertainment that only Spearmint Rhino can offer. For more information on Spearmint Rhino Gentlemen's Club, visit www.SpearmintRhino.com or www.myspace.com/spearmintrhinoworldwide.

16

http://www.free-press-release.com/news/print-1201826665.html.

17

17.   At all relevant times Spearmint Rhino - Worldwide and Spearmint

18

Rhino - Consulting jointly employed all exotic dancers working in the Spearmint

19

Rhino Nightclubs, managed, directed and controlled the operations in each

20

Spearmint Rhino Nightclub, and dictated the common employment policies

21

applicable in each Spearmint Rhino Nightclub, including but not limited to the

22

decisions: (1) to misclassify dancers as independent contractors, as opposed to

23

employees; (2) to require that dancers split their table dance tips with Defendants;

24

(3.) to not pay any dancers any wages; (4) to adopt and implement employment

25

policies which violate the FLSA, California Labor Code and/or Nevada Wage and

26

Hour Laws; (5) to threaten retaliation against any dancer attempting to assert her

27

statutory rights to be recognized as an employee.

28

18.    Upon information and belief, Defendants conspired among themselves, as well as with third-parties which own part of certain Spearmint Rhino Nightclubs: (1) to misclassify dancers as independent contractors, as opposed to employees; (2) to require that dancers split their table dance tips with Defendants; (3.) to not pay any dancers any wages; (4) to adopt and implement employment policies which violate the FLSA, California Labor Code and/or Nevada Wage and Hour Laws; (5) to threaten retaliation against any dancer attempting to assert her statutory rights to be recognized as an employee.

19.    At relevant times, inter alia, Spearmint Rhino - Worldwide and Spearmint Rhino - Consulting maintained a "corporate introduction video" on the www.spearmintrhino.com website describing their business operations and confirming the following facts:

"The business is about the girls; the business is about selling more dances..."
* * *

"...we, of course, have the most beautiful women in the world work for us as entertainers."
* * *

"We ensure that when we recruit the dancers and the workers in the club, that they have got good social skills; that they will sit with the customer and they won't hard-sell or pressurize him into a dance; that he can enjoy his experience."
* * *

"Another misnomer in the business is that it's that of a restaurant or a nightclub; that is to say, that the income stream is primarily that of door and drink or beverage sales. And while the income is certainly that, of the door and beverage sales, what makes these businesses go off the charts as regards to an income and profitability stream is the income made by these so-called couch dance or table dance.

A table dance lasts three minutes and costs typically $10- to $20, depending on the jurisdiction. One of the things that we preach to our people is if a small club of ours -- and this is a small club example -- has 30 dancers on a shift, if you can get every dancer -- a shift being eight hours -- to do just one more dance per eight-hour shift, it's over $10,000 a month additional income into the stream of the club.

What other business can you so easily increase those gross numbers by?"
* * *

"...delivering it to the executives so they can make the best business decisions possible in the shortest amount of time. We've been able to reach out and test facilities that are thousands and thousands of miles away from where we're at here in the U.S. corporate offices."
* * *

> "One of the other niceties, besides the business element itself, is the fact that the revenue stream is so egregiously higher than other types of investments, and multifaceted. That is to say, we have food sales, beverage sales, waitress sales, door admission sales. But we also have that dancer income stream, and the profitability of the dancer income stream is extremely high compared to cost of other goods sold. There is no innate cost to that; the dancers don't receive a payroll or a salary."
>
> * * *
>
> "Those offices, in turn, report to the United States to the Los Angeles County world headquarters."
>
> * * *
>
> "...over 2700 employees and 6,000 dancers operating in Russia, Europe, United Kingdom, the United States and Australia."

http://www.spearmintrhino.com/1corpvideo.html. (Copy of transcript of corporate video appearing on website on June 30, 2009 attached hereto as Exhibit 1).

20.    At all relevant times, Defendants have owned and operated a night club business engaged in interstate commerce and which utilized goods which moved in interstate commerce. Spearmint Rhino - Worldwide and Spearmint Rhino - Consulting own, manage and control the business operations at numerous nightclubs doing business under the "Spearmint Rhino" moniker. (*See* www.spearmintrhino.com). Upon information and belief, during the relevant time period the annual gross revenues of each Defendant exceeded $500,000.00 per annum.

21.    By reason of the foregoing, Defendants, along with the Spearmint Rhino Nightclubs, were at all relevant times enterprises engaged in commerce as defined in 29 U.S.C. §203(r) and §203(s). Defendants and the Spearmint Rhino Nightclubs constitute an "enterprise" within the meaning of 29 U.S.C. §203(r)(1), because they perform related activities through common control for a common business purpose. At relevant times, Plaintiffs were employed by Defendants, enterprises engaged in commerce within the meaning of 29 U.S.C. §206(a) and §207(a).

COMPLAINT
42407

9

## IV.   GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS

22.   The FLSA applied to Plaintiffs and the Class at all times in which they worked at the Spearmint Rhino Nightclubs.

23.   The California Labor Code and/or the Nevada Wage and Hour Law, N.R.S. § 608.005 *et seq.* ("NWHL") also applied to each Class member during the period they worked at the Spearmint Rhino Nightclubs. Under 29 U.S.C. § 218(a) if application of the FLSA results in a lower minimum wage than that provided by the state wage and hour laws, such as the California Labor Code and NWHL, the higher wages dictated by the state laws apply. At all relevant times, the minimum hourly wages under the FLSA have been lower than those provided by the California Labor Code and NWHL.

24.   No exceptions to the application of the FLSA, the California Labor Code or the NWHL apply to Plaintiffs and the Class. For example, no Class member has ever been a professional or artist exempt from the provisions of the FLSA, the California Labor Code or the NWHL. The exotic dancing performed by Class members while working at the Spearmint Rhino Nightclubs does not require invention, imagination or talent in a recognized field of artistic endeavor, and Class members have never been compensated by Defendants on a set salary, wage or fee basis. Rather, Class members' sole source of income while working at the Spearmint Rhino Nightclubs have been tips given to them by patrons, (i.e. table dance tips and stage dance tips).

25.   At relevant times, Plaintiffs and each member of the Class, defined below, were employees of Defendants under the FLSA, the California Labor Code and/or the NWHL. Upon information and belief, during the relevant time period over 1000 different women have worked as exotic dancers at the Spearmint Rhino Nightclubs without being paid any minimum wages.

26.   At relevant times, Defendants have been the employers of Plaintiffs and each member of the Class, defined below, under the FLSA, the California Labor

COMPLAINT
42407

1    Code and/or the NWHL.  Defendants suffered or permitted Class members to work.

2    Defendants directly or indirectly employed and exercised significant control over the

3    wages, hours and working conditions of the exotic dancers in the Class.

4         27.    At all relevant times, Defendants have been joint employers of Plaintiffs

5    and members of the Class under the FLSA, the California Labor Code and/or the

6    NWHL.  Plaintiffs' and Class members' employment for one Defendant is not

7    completely disassociated from their employment by the other Defendant.  Spearmint

8    Rhino – Worldwide, Spearmint Rhino – Consulting, Oxnard and K-Kel do not act

9    entirely independent of each other and are not completely dissociated with respect to

10   the employment of Plaintiffs and the Class.  Spearmint Rhino – Worldwide and

11   Spearmint Rhino – Consulting maintain significant control over Plaintiffs and other

12   Class members while working at the Spearmint Rhino Nightclubs.  Spearmint Rhino

13   – Worldwide and Spearmint Rhino – Consulting play significant roles in

14   establishing, maintaining and directing the employment policies that are to be

15   applied to Class members while working at the Spearmint Rhino Nightclubs.

16   Spearmint Rhino – Worldwide and Spearmint Rhino – Consulting benefit financially

17   from the work Class members perform while working at the Spearmint Rhino

18   Nightclubs.  Additionally, joint employers like Oxnard and K-Kel act directly or

19   indirectly in the interest of Spearmint Rhino – Worldwide and Spearmint Rhino –

20   Consulting in relation to any supervision they provide Plaintiffs and the other

21   dancers in the Class.  As joint employers of Plaintiffs and members of the Class,

22   Spearmint Rhino – Worldwide and Spearmint Rhino – Consulting are responsible

23   both individually and jointly for compliance with all of the applicable provisions of

24   the FLSA, the California Labor Code and the NWHL.  29 C.F.R. §791.2(a) and (b).

25        28.    During the relevant time period, the employment terms, conditions and

26   policies that applied to Plaintiffs were the same as those applied to the other Class

27   members who worked as exotic dancers at the Spearmint Rhino Nightclubs.

28

COMPLAINT
42407

11

29.   Throughout the relevant time period, Defendants' policies and procedures regarding the classification of all exotic dancers (including Plaintiffs) at the Spearmint Rhino Nightclubs and treatment of dance tips were the same.

30.   Plaintiffs and members of the Class incurred financial loss, injury and damage as a result of Defendants' common practices misclassifying them as independent contractors and failing to pay them minimum wages in addition to the tips that they were given by patrons. Plaintiffs' injury and financial loss was caused by Defendants' application of those common policies in the same manner as they were applied to absent Class members.

31.   As a matter of common business policy, Defendants systematically misclassified Plaintiffs and all Class members as independent contractors. Defendants' classification of Plaintiffs as independent contractors was not due to any unique factor related to their employment or relationship with Defendants. As a matter of common business policy, Defendants routinely misclassified all exotic dancers as independent contractors as opposed to employees. As a result of this uniform misclassification, Plaintiffs and the members of the Class were not paid the minimum wages required under the FLSA, the California Labor Code and/or the NWHL and therefore, suffered injury and incurred financial loss.

32.   During the relevant time period, no Class member received any wages or other compensation from Defendants. Members of the Class generated their income solely through the tips received from customers when they performed exotic table, chair, couch, lap and/or VIP room dances (hereinafter collectively referred to as "table dance tips").

33.   All monies Class members like Plaintiffs received from customers when they performed exotic dances were tips, not wages or service fees. Tips belong to the person they are given to. Table dance tips were given by patrons directly to dancers in the Class and therefore, belong to dancers in the Class, not Defendants. Cal.

1   Labor Code § 350(e) confirms that all monies given to dancers by patrons are

2   considered gratuities and therefore, are the property of the dancers.

3       34.    The full amount dancers in the Class are given by patrons in relation to

4   exotic dances they perform are not taken into Defendants' gross receipts, with a

5   portion then paid out to the dancers.  Neither Defendants nor any of their affiliated

6   companies issue 1099 nor W-2 forms to Class members indicating any amounts

7   being paid from their gross receipts to Class members as service fees or wages.

8       35.    Plaintiffs and members of the Class are tipped employees under the

9   FLSA as they are engaged in an occupation in which they customarily and regularly

10  receive more than $30 a month in tips.  No tip credits offsetting any minimum wages

11  due, however, are permitted under either the California Labor Code or the NWHL.

12  Cal. Labor Code § 351; N.R.S. § 608.160(1)(b).    Therefore, as employees of

13  Defendants, Class members are entitled to: (i) receive the full minimum wages due

14  under the California Labor Code or the NWHL, without any tip credit, and (ii) to

15  retain all table dance tips given to them by customers when they perform exotic

16  dances.

17      36.    Defendants' misclassification of Plaintiffs and other Class members as

18  independent contractors was designed to deny Class members their fundamental

19  rights as employees to receive minimum wages, to demand and retain portions of tips

20  given to Class member by customers, and done to enhance Defendants' profits.

21      37.    Defendants' misclassification of exotic dancers like Plaintiffs was

22  willful.  Defendants knew or should have known that Plaintiffs and the other dancers

23  performing the same job functions were improperly misclassified as independent

24  contractors.  For instance, in *Harrell v. Diamond A Entertainment, Inc.*, 992 F.Supp.

25  1343, 1347-48 (M.D. Fla. 1997) the United States District Court for the Middle

26  District of Florida confirmed:

27       Arrangements factually similar to the one in this case have been tested
         by federal courts in Texas, Indiana and Colorado. *See Reich v. Circle C.*
28       *Investments, Inc.*, 998 F.2d 324 (5th Cir.1993) (whether dancer was

COMPLAINT
42407

13

"employee" under FLSA); *Reich v. ABC/York-Estes Corp.*, 1997 WL 264379 (N.D.Ill.1997) (whether dance fees were "tips" under FLSA); *Reich v. Priba Corp.*, 890 F.Supp. 586 (N.D.Tex.1995) (whether dancer was "employee" under FLSA); *Reich v. ABC/York-Estes Corp.*, 157 F.R.D. 668 (N.D.Ill.1994) (whether dance fees were "tips" under FLSA), rev'd on other grounds,64 F.3d 316 (7th Cir.1995); *Martin v. Priba Corp.*, 1992 WL 486911 (N.D.Tex.) (whether dancer was "employee" under FLSA); *Martin v. Circle C Investments, Inc.*, 1991 WL 338239 (W.D.Tex.); *Donovan v. Tavern Talent & Placements, Inc.*, 1986 WL 32746 (D.Colo.) (whether "tips" could be used to offset completely the minimum wage requirement). Without exception, these courts have found an employment relationship and required the nightclub to pay its dancers a minimum wage.

38.     Employment is defined with "striking breadth" in the wage and hour laws. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 325-26, 112 S.Ct. 1344, 1349-50 (1992).    The determining factor as to whether dancers like Plaintiffs are employees or independent contractors under FLSA, the California Labor Code or the NWHL is not the dancer's election, subjective intent or any contract. *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 727 (1947); *Real v. Driscoll Strawberry Associates, Ltd.*, 603 F.2d 748, 755 (9th Cir. 1979). Rather, the test for determining whether an individual is an "employee" under the FLSA, California Labor Code and MWL is the economic reality test.  The economic realities test applicable to the wage and hour laws is far broader than other tests for employee status such as those under the tax laws or under the common law.  Under the economic reality test, employee status turns on whether the individual is, as a matter of economic reality, in business for herself and truly independent, or rather is economically dependent upon finding employment in others.

39.     Any contract which attempts to have workers in the Class waive, limit or abridge their statutory rights to be treated as an employee under FLSA, the California Labor Code or NWHL is void, unenforceable, unconscionable and contrary to public policy.  Workers in the Class cannot validly "elect" to be treated as employees or independent contractors under threat of adverse treatment.  Nor can workers in the Class agree to be paid less than the minimum wage.

40.   Despite this, Defendants unfairly, unlawfully, and unconscionably attempt to coerce dancers in the Class to waive their FLSA, California Labor Code and/or NWHL rights and elect to be treated as independent contractors. Defendants threaten to penalize dancers in the Class if they assert their FLSA, California Labor Code and/or NWHL rights such as through termination and the confiscation of all table dance tips, among other adverse conditions and retaliations.

41.   Under the applicable test, courts utilize several factors to determine economic dependence and employment status. They are: (i) the degree of control exercised by the alleged employer, (ii) the relative investments of the alleged employer and employee, (iii) the degree to which the employee's opportunity for profit and loss is determined by the employer, (iv) the skill and initiative required in performing the job, (v) the permanency of the relationship, and (vi) the degree to which the alleged employee's tasks are integral to the employer's business.

42.   The totality of circumstances surrounding the employment relationship between Defendants and the dancers in the Class working at the Spearmint Rhino Nightclubs establishes economic dependence by the dancers on Defendants and employee status. Here, as a matter of economic reality, Plaintiffs and all other Class members, are not in business for themselves and truly independent, but rather are economically dependent upon finding employment in others, namely Defendants. The dancers are not engaged in occupations or businesses distinct from that of Defendants. Rather, their work is the basis for Defendants' business. Defendants obtain the customers who desire exotic dance entertainment and provide the workers who conduct the exotic dance services on behalf of Defendants. Defendants retain pervasive control over the nightclub operation as a whole, and the dancer's duties are an integral part of the operation.

\ \ \

\ \ \

A.   *Degree Of Control – Plaintiffs And The Other Dancers Exercise No Control Over Their "Own" Or Their Employers' Business.*

43.   Plaintiffs, and the other members of the Class, do not exert control over a meaningful part of the nightclub business and do not stand as separate economic entities from Defendants.   Defendants exercise control over all aspects of the working relationship with Plaintiffs and the other dancers in the nightclubs.

44.   Class member's economic status is inextricably linked to those conditions over which Defendants have complete control.   Plaintiffs and the other dancers are completely dependent on the Spearmint Rhino Nightclubs for their earnings.   The club controls all of the advertising and promotion without which dancers like Plaintiffs could not survive economically. Moreover, Defendants create and control the atmosphere and surroundings at the Spearmint Rhino Nightclubs, the existence of which dictates the flow of customers into the club.   The dancers have no control over the customer volume or the atmosphere at each of the nightclubs.

45.   Defendants employ guidelines and rules dictating the way in which dancer like Plaintiffs must conduct themselves while working at the Spearmint Rhino Nightclubs.   Defendants set the hours of operation, length of shifts dancers must work, the show times during which a dancer may perform, minimum table dance tips, determine the sequence in which a dancer may perform on stage during her stage rotation, the format and themes of dancers' performances (including their costuming and appearances), theme nights, conduct while at work (i.e., that they be on the floor as much as possible when not on stage and mingle with patrons in a manner which supports Defendants' general business plan), tip splits, and all other terms and conditions of employment.

46.   Defendants require that Plaintiffs and the other dancers in the Class work a minimum number of shifts each week. Those shifts are required to be of a minimum number of hours.   Further, dancers like Plaintiffs are required to clock-in and clock-out (or otherwise report) at the beginning and end of each shift. If late or

1    absent for a shift, a dancer is subject to fine, penalty, or reprimand by Defendants.

2    Once a shift starts a dancer, like Plaintiffs, are required to complete the shift and

3    cannot leave early.

4        47.    While working at the Spearmint Rhino Nightclubs dancers like

5    Plaintiffs perform exotic table, chair, couch, lap and/or VIP room dances for patrons

6    offering them tips.  Defendants, not the dancers, set the minimum tip amount that

7    dancers must collect from patrons when performing exotic dances (i.e., "table dance

8    tips").  Defendants announce the minimum tip amounts to patrons in the nightclub

9    wishing to see table dances.

10       48.    Defendants dictate the manner and procedure in which table dance tips

11   are collected from customers and tracked.  Each time a dancer performs an exotic

12   table dance for a patron and receives a table dance tip, the dancer is required to

13   immediately account to Defendants for their time and any table dance tip given to

14   them by the patron.   Additionally, Defendants employ other employees called

15   "checkers" to watch dancers work, count private dances they perform, and record the

16   amount of any table dance tips received.  At the end of a work shift, dancers like

17   Plaintiffs are required to clock out and account to Defendants for all dances

18   performed for the patrons of the nightclub.  Then, in addition to a "base rent"

19   payment, the dancer is required pay a portion of each table dance tip given to them

20   by patrons over to Defendants as "rent."

21       49.    The entire sum a dancer receives from the patron in relation to the table

22   dance is not given to Defendants (and/or the nightclubs) and taken into their gross

23   receipts.  Rather, the dancers keep their share of the payment under the tip share

24   policy and only pay over to Defendants and the nightclub the portion they demand as

25   "rent." (e.g. $7 from each $20 table dance tip received).  As a result, there is no pay

26   out by Defendants to the dancer of any service fee or wage.  Defendants (and/or the

27   nightclubs) issue no 1099 or W-2 forms to any dancers characterizing showing any

28   sums being paid to dancers as service fees or wages.

COMPLAINT                                                                                    17
42407

50.   Defendants establish the split or percentage which each dancer is required to pay it for each type of dance they receive table dance tips for during the work shift.  In addition, per-dance amounts must be paid by dancers to the nightclub manager, dance checkers, disk-jockey, bouncers/door staff and/or other employees as part of Defendants' tip-splitting policy.   Further, dancers are required to help Defendants' sell a minimum amount of drinks to patrons during each work shift.  If the minimum drink quota is not met, the dancers face penalties.   The foregoing establishes that Defendants set the terms and conditions of all dancer's work.  This is the hallmark of economic dependence.

### B.   Skill and Initiative of a Person in Business for Themselves

51.   Plaintiffs, like all other dancers, do not exercise the skill and initiative of a person in business for themselves.

52.   Plaintiffs, like all other dancers, are not required to have any specialized or unusual skills to work at the Spearmint Rhino Nightclubs.  Prior dance experience is not required to perform at the Spearmint Rhino Nightclubs.  Dancers are not required to attain a certain level of skill in order to work at the Spearmint Rhino Nightclubs.   There are no dance seminars, no specialized training, no instruction booklets, and no choreography provided or required in order to work at any of the Spearmint Rhino Nightclubs.  The dance skills utilized are commensurate with those exercised by ordinary people who choose to dance at a disco or at a wedding.

53.   Plaintiffs, like all other dancers, do not have the opportunity to exercise the business skills and initiative necessary to elevate their status to that of independent contractors.  Dancers, like Plaintiffs, own no enterprise.  Dancers, like Plaintiffs, exercise no business management skills.  Dancers maintain no separate business structures or facilities.  Dancers exercise no control over customer volume or atmosphere at the Spearmint Rhino Nightclubs.   Dancers do not actively participate in any effort to increase the nightclub's client base, enhance goodwill, or establish contracting possibilities.  The scope of a dancer's initiative is restricted to

COMPLAINT
42407

18

1   decisions involving what clothes to wear (within Defendants' guidelines) or how

2   provocatively to dance which is consistent with the status of an employee opposed to

3   an independent contractor.

4        54.    Plaintiffs, like all other dancers, are not permitted to hire or subcontract

5   other qualified individuals to provide additional dances to patrons, and increase their

6   revenues, as an independent contractor in business for themselves would.

7   **C.    Relative Investment**

8        55.    Plaintiffs' relative investment is minor when compared to the

9   investment made by Defendants.

10       56.    Plaintiffs, like all other dancers, have made no capital investment in the

11  facilities, advertising, maintenance, sound system and lights, food, beverage and

12  other inventory, or staffing of the Spearmint Rhino Nightclubs.  All investment and

13  risk capital is provided by Defendants.    Dancers' investment is limited to

14  expenditures on costumes and make-up which they may choose to wear while

15  working, and their own labor.  But for Defendants' provision of the lavish nightclub

16  work environment the dancers would earn nothing.

17  **D.    Opportunity for Profit and Loss**

18       57.    Defendants, not dancers like Plaintiffs, manage all aspects of the

19  business operation including attracting investors, establishing the hours of operation,

20  setting the atmosphere, coordinating advertising, hiring and controlling the staff

21  (managers, waitresses, bartenders, bouncers/doormen, etc.).    Defendants, not the

22  dancers, take the true business risks for the Spearmint Rhino Nightclubs.    The

23  transcript attached hereto as Exhibit A shows that Defendants, not the dancers, are

24  responsible for attracting investors required to provide the capital necessary to open,

25  operate and expand the nightclub business.

26       58.    Dancers like Plaintiffs do not control the key determinants of profit and

27  loss of a successful enterprise.  Specifically, Plaintiffs are not responsible for any

28  aspect of the enterprises' on-going business risk.  For example, Defendants, not the

COMPLAINT                                                                                19
42407

dancers, are responsible for all financing, the acquisition and/or lease of the physical facilities and equipment, inventory, the payment of wages (for managers, bartenders, doormen, and waitresses), and obtaining all appropriate business' insurance and licenses.    Defendants, not the dancers, establish the minimum table dance tip amounts that should be collected from patrons when dancing.    Even with respect to "base rent" payments, the dancers do not truly pay the Club's "rent" for the exclusive use of space.  Rather, the term "rent" is a misnomer or subterfuge for tip-splitting.

59.    The extent of the risk that dancers like Plaintiffs are confronted with is the loss of the "base rent" fee due to Defendants when the employee clocks out after each shift.  Defendants, not the dancers, shoulder the risk of loss. The table dance tips the dancers receive are not a return for risk on capital investment.  They are a gratitude for services rendered.  From this perspective, it is clear that a dancers' "return on investment" (i.e. table dance tips) is no different than that of a waiter who serves food during a customer's meal at a restaurant.

### E.    Permanency

60.    Upon information and belief, certain dancers in the Class have worked at the Spearmint Rhino Nightclubs significant periods of time.

### F.    Integral Part of Employer's Business

61.    Dancers like Plaintiffs are essential to the success of the Spearmint Rhino Nightclubs.  See e.g., Exhibit A.  The continued success of the Spearmint Rhino Nightclubs depends to an appreciable degree upon the provision of exotic dances by dancers for patrons.  In fact, the primary reason the nightclubs exist is to showcase the dancers' physical attributes for customers.

62.    Many of the Spearmint Rhino Nightclubs do not serve alcohol and therefore, are not truly in direct competition with other enterprises in the nightclub, tavern or bar business.  Absent the provision of exotic dances by dancers for customers, a nightclub serving only non-alcoholic beverages would have difficulty remaining in business.  Moreover, Defendants are able to charge admission prices

1    and a much higher price for their drinks (e.g. $10 for soft drinks) than establishments

2    without exotic dancers because the dancers are the main attraction of the Spearmint

3    Rhino Nightclubs.  Moreover, Dancers must help sell Defendants' drink products to

4    customers.  As a result, the dancers are an integral part of the Spearmint Rhino

5    Nightclubs' business.

6       63.    The foregoing demonstrates that dancers like Plaintiffs are economically

7    dependent on Defendants and subject to significant control by Defendants.

8    Therefore, Plaintiffs were misclassified as independent contractors and should have

9    been paid minimum wages at all times they worked at the Spearmint Rhino

10   Nightclubs and otherwise been afforded all rights and benefits of an employee under

11   federal and state wage and hour laws.

12                      **V.  DEFENDANTS' INTENT**

13      64.    All actions and agreements by Defendants described herein were

14   willful, intentional and not the result of mistake or inadvertence.

15      65.    Defendants were aware that the FLSA, California Labor Code and/or

16   NWHL applied to their operation of the Spearmint Rhino Nightclubs at all relevant

17   times and that under the economic realities test applicable to determining

18   employment status under those laws the dancers were misclassified as independent

19   contractors.  Defendants and their affiliated companies, were aware of and/or the

20   subject of previous litigation and enforcement actions relating to wage and hour law

21   violations where the misclassification of exotic dancers as independent contractors

22   was challenged.  In the vast majority of those prior cases, exotic dancers working

23   under conditions similar to those employed at the Spearmint Rhino Nightclubs were

24   determined to be employees under the wage and hour laws, not independent

25   contractors.  *See e.g.*, *Harrell*, 992 F Supp 1343 (M.D. Fla. 1997)(quoted above,

26   citing cases).  Despite being on notice of their violations, Defendants intentionally

27   chose to continue to misclassify dancers like Plaintiffs and withhold payment of

28   minimum wages to them in effort to enhance their profits.

COMPLAINT                                                                    21
42407

## VI.  INJURY AND DAMAGE

66.    Plaintiffs and all Class members suffered injury, incurred damage and financial loss as a result of Defendants' conduct complained of herein.  Among other things, Plaintiffs and the Class were entitled to minimum wages and to retain all of the table dance tips and other tips they were given by patrons.  By failing to pay Plaintiffs and the Class minimum wages and interfering with their right to retain all of the table dance tips and other tips they were given by patrons, Defendants injured Plaintiffs and the members of the Class and caused them financial loss and damage.

## VII.  CLASS ALLEGATIONS

67.    Plaintiffs bring this action individually and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure as to Counts 2 through 4.  Count 1, in contrast, is brought as a representative action, as set forth in 29 U.S.C. § 216(b), on behalf of the same Class of people defined below.

68.    All requirements of Fed.R.Civ.P. 23 (a) and (b) are satisfied.

69.    The Class to be certified is defined as follows:

All individuals, who at any time from the date four years prior to the date the Complaint was originally filed continuing through the present, worked as an exotic dancer at any of the Spearmint Rhino Nightclubs in the states of California and Nevada, but were designated as an independent contractor and therefore, not paid any minimum wages.

(Referred to herein as the "Class").   Additionally, within the Class there are two subclasses:

a.    **California Subclass**

The "California Subclass" consists of the following class members:

All individuals, who at any time from the date four years prior to the date the Complaint was originally filed continuing through the present, worked as an exotic dancer at any of the Spearmint Rhino Nightclubs in the state of California, but were designated as an independent contractor and therefore, not paid any minimum wages.

b.    **Nevada Subclass**

The "Nevada Subclass" consists of the following Class members:

1   All individuals, who at any time from the date three years prior to the
2   date the Complaint was originally filed continuing through the present,
    worked as an exotic dancer at any of the Spearmint Rhino Nightclubs in
3   the state of Nevada, but were designated as an independent contractor
    and therefore, not paid any minimum wages.

4   70.   The individuals in the Class and each subclass are so numerous that

5   joinder of all members is impracticable. Although the precise number of such

6   individuals is currently unknown, Plaintiffs believes that the number of individuals

7   who have worked as exotic dancers at the Spearmint Rhino Nightclubs during the

8   relevant time period but who were not paid any minimum wages exceeds 1000

9   women. Each subclass has at least 500 members.

10   71.   There are questions of law and fact common to the Class that

11   predominate over any questions solely affecting individual members, including, but

12   not limited to:

13          a. whether Defendants violated the FLSA, the California Labor Code

14             and/or NWHL by classifying all exotic dancers at the Spearmint Rhino

15             Nightclubs as "independent contractors," as opposed to employees, and

16             not paying them any minimum wages;

17          b. whether the monies given to dancers by patrons when they perform

18             table dances are gratuities or "service fees;"

19          c. whose property the monies given to dancers when they perform table

20             dances is;

21          d. whether Defendants unlawfully required Class members to split their

22             tips with Defendants;

23          e. whether Defendants violated the UCL by unlawfully, unfairly and

24             unconsciously classifying all exotic dancers at the Spearmint Rhino

25             Nightclubs as "independent contractors" as opposed to employees, not

26             paying them any minimum wages, splitting their tips, and threatening to

27             terminate them and impose penalties if they ever tried to exercise their

28             statutory rights;

f. the amount of damages, restitution and/or other relief (including all applicable civil penalties, liquidated damages and injunctive/equitable relief) Plaintiffs and the Class are entitled to; and,

g. whether Defendants should be permanently enjoined from continuing to misclassify, and in turn, refusing to pay minimum wages, to the Class.

72.   Plaintiffs' claims are typical of those of the Class. Plaintiffs, like other members of the Class, were both misclassified as independent contractors and denied their rights to wages and gratuities under the wage and hour laws. The misclassification of Plaintiffs resulted from the implementation of a common business practice which affected all Class members in a similar way. Plaintiffs challenge Defendants' business practices under legal theories common to all Class members.

73.   Both Plaintiffs and the undersigned counsel are adequate representatives of the Class. Plaintiffs are members of the Class. Given Plaintiffs' injury and loss, Plaintiffs have the incentive and are committed to the prosecution of this action for the benefit of the Class. Plaintiffs have no interests that are antagonistic to those of the Class or that would cause them to act adversely to the best interests of the Class. Plaintiffs have retained counsel experienced in class action litigation, including wage and hour disputes.

74.   This action is maintainable as a class action under Fed.R.Civ.P. 23(b)(1), 23(b)(2), and 23(c)(4) because the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants.

75.   This action is maintainable as a class action under Fed.R.Civ.P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class and because a class action is superior to other methods for the fair and efficient adjudication of this action.

COMPLAINT
42407

24

### FIRST CAUSE OF ACTION
### VIOLATION OF THE FLSA
### (Failure to Pay Statutory Minimum Wages)
### (Against all Defendants)

76.   Plaintiffs hereby incorporate all of the preceding paragraphs by reference as if fully set forth herein.

77.   29 U.S.C. § 216(b) allows Plaintiffs to assert FLSA claims on behalf of themselves and other employees similarly situated.  Plaintiffs assert this claim on behalf of themselves and all the similarly situated employees in the Class defined above, who worked at a Spearmint Rhino Nightclub at any time from the date three years prior to the date the Complaint was originally filed continuing through the present. All requirements for a collective action are met.

78.   At relevant times, Defendants jointly employed Plaintiffs and other Class members within the meaning of the FLSA.

79.   29 U.S.C. § 206 requires that Defendants pay all employees minimum wages for all hours worked. 29 U.S.C. § 206(a) provides in pertinent part:

> Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following rates:

> (1) except as otherwise provided in this section, not less than--

> (A) $5.85 an hour, beginning on the 60th day after May 25, 2007;
> (B) $6.55 an hour, beginning 12 months after that 60th day; and
> (C) $7.25 an hour, beginning 24 months after that 60th day;

80.   Prior to 2007, 29 U.S.C. 206(a)(1) read: "except as otherwise provided in this section, not less than $4.25 an hour during the period ending on September 30, 1996, not less than $4.75 an hour during the year beginning on October 1, 1996, and not less than $5.15 an hour beginning September 1, 1997".

81.   29 U.S.C. § 207(a) provides in pertinent part:

> ... no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for

COMPLAINT
42407

25

commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate of not less than one and one-half times the regular rate at which he is employed.

82.   Defendants failed to pay Plaintiffs and the Class the minimum wages set forth in 29 U.S.C. §206 or §207, or any wages whatsoever.  In fact, Defendants required that Plaintiffs and the Class actually pay them in order to work.

83.   Defendants failed to pay Plaintiffs (or any other dancer in the Class) minimum wages throughout the relevant time period because it misclassified them as independent contractors.

84.   The amounts paid to Class members by customers in relation to private table dances performed were tips, not wages or service fees.  Those monies were not the property of Defendants.  The entire amount collected from customers in relation to table dances performed by Class members were not made part of any Defendants' gross receipts at any point.

85.   As a result, the amounts paid dancers by customers in relation to private table dances were tips, not wages or service fees, and no part of those amounts can be used to offset Defendants' obligation to pay Class members, like Plaintiffs, minimum wages due. *See e.g., Reich v. ABC/York-Estes Corp.*, 157 F.R.D. 668, 680 (N.D.Ill.1994), rev'd on other grounds, 64 F.3d 316 (7th Cir.1995); *Reich v. ABC/York-Estes Corp.*, 1997 WL 264379 at *5-7 (N.D.Ill.1997).

86.   Further, no tip credit applies to reduce or offset any minimum wages due. The FLSA only permits an employer to allocate an employee's tips to satisfy a portion of the statutory minimum wage requirement provided that the following conditions are satisfied: (1) the employer must inform the tipped employees of the provisions of § 3(m) of the FLSA, 29 U.S.C. § 203(m); and (2) tipped employees must retain *all the tips* received except those tips included in a tipping pool among employees who customarily receive tips. 29 U.S.C. § 203(m).

COMPLAINT
42407

26

87.    Neither of these conditions was satisfied. Defendants did not inform dancers like Plaintiffs of the provisions of § 3(m) of the FLSA, 29 U.S.C. § 203(m); and Plaintiffs did not retain all the tips received except those tips included in a tipping pool among employees who customarily receive tips. 29 U.S.C. § 203(m). Defendants never notified any dancers that their table dance tips were being used to reduce the minimum wages otherwise due under FLSA's tip-credit provisions and that they were still due the reduced minimum wage for tipped employees. Rather, Defendants maintained that no dancers were ever due any minimum wages due to their classification as independent contractors and, in turn, were paid none.

88.    Further, Defendants' requirement that dancers in the Class split their tips and (i) pay Defendants a portion of all table dance tips as "rent"; and (ii) also pay a percentage of their tips to a tip pool and to other employees who do not customarily receive tips, such as managers, checkers, disc-jockeys and bouncers/doormen, was not part of a valid tip pooling or tip sharing arrangement.

89.    Defendants also failed to provide Class members like Plaintiffs required meal breaks during shifts. Additional minimum wages are due for this time.

90.    Based on the foregoing, Plaintiffs and the Class are entitled to the full statutory minimum wages set forth in 29 U.S.C. §§206 and 207 for all periods in which they worked at the Spearmint Rhino Nightclubs.

91.    Defendants' conduct in misclassifying dancers like Plaintiffs as independent contractors was willful and done to avoid paying them minimum wages and the other benefits that they were legally entitled to.

92.    The FLSA provides that a private civil action may be brought for the payment of federal minimum wages and for an equal amount in liquidated damages in any court of competent jurisdiction by an employee on behalf of him/herself and other employees similarly situated pursuant to 29 U.S.C. §216(b) ("Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum

1   wages, or their unpaid overtime compensation, as the case may be, and in an

2   additional equal amount as liquidated damages."). Moreover, Plaintiffs and the

3   Class may recover attorneys' fees and costs incurred in enforcing their rights

4   pursuant to 29 U.S.C. §216(b).

5       93.   12 U.S.C. §211(c) provides in pertinent part:

6   (c) Records

7       Every employer subject to any provision of this chapter or of any order
        issued under this chapter shall make, keep, and preserve such records of
8       the persons employed by him and of the wages, hours, and other
        conditions and practices of employment maintained by him, and shall
9       preserve such records for such periods of time, and shall make such
        reports therefrom to the Administrator as he shall prescribe by
10      regulation or order as necessary or appropriate for the enforcement of
        the provisions of this chapter or the regulations or orders thereunder.
11

12      94.   29 C.F.R.§516.2 and 29 C.F.R. §825.500 further require that every

13  employer shall maintain and preserve payroll or other records containing, without

14  limitation, the total hours worked by each employee each workday and total hours

15  worked by each employee each workweek.

16      95.   29 U.S.C. §215(a)(5) provides in pertinent part:

17  ...[I]t shall be unlawful for any person—

18      (5) to violate any of the provisions of section 211(c) of this title...

19      96.   To the extent Defendants failed to maintain all records required by the

20  aforementioned statutes and regulations, and failed to furnish Plaintiffs and the

21  members of the Class comprehensive statements showing the hours that they worked

22  during the relevant time period, it also violated the aforementioned laws causing the

23  Class damage.

24      97.   When the employer fails to keep accurate records of the hours worked

25  by its employees, the rule in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680,

26  687-688 66 S.Ct. 1187 (1946) is controlling. That rule states:

27      ... where the employer's records are inaccurate or inadequate ... an
        employee has carried out his burden if he proves that he has in fact
28      performed work for which he was improperly compensated and if he

COMPLAINT                                                                          28
42407

produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

98.    The Supreme Court set forth this test to avoid placing a premium on an employer's failure to keep proper records in conformity with its statutory duty, thereby allowing the employer to reap the benefits of the employees' labors without proper compensation as required by the FLSA.    Where damages are awarded pursuant to this test, "[t]he employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with ... the Act."   *Id.*

99.    Based on the foregoing, on behalf of the Class, Plaintiffs seek unpaid minimum wages at the required legal rate for all of their working hours during the relevant time period, back pay, restitution, damages, reimbursement of any base rent and tip-splits, liquidated damages, prejudgment interest, attorneys' fees and costs, and all other costs, penalties and other relief allowed by law.

## SECOND CAUSE OF ACTION

### VIOLATION OF CALIFORNIA LABOR CODE
**(Failure to Pay Statutory Minimum Wage and Unlawful Tip Splitting)**
**(Against Defendants Spearmint Rhino – Worldwide, Spearmint Rhino – Consulting and Oxnard On Behalf of the California Subclass)**

100.   Plaintiffs hereby incorporate all of the preceding paragraphs by reference as if fully set forth herein.

101.   At relevant times, Doe 2 and all members of the California Subclass were employees of the Defendants within the meaning of the California Labor Code.

102.   At all relevant times, Defendants were the employers of all members of the California Subclass within the meaning of the California Labor Code.

103. The California Labor Code requires that all employees be paid minimum wages by their employers. Cal Labor Code §1194 provides:

> (a) Notwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorney's fees, and costs of suit.

104. The California Minimum Wage is higher than the minimum wage required by FLSA. Therefore, the higher California Minimum Wage applies to all members of the California Subclass. 29 U.S.C. §218(a).

105. Additionally, Cal. Labor Code §350(e) confirms that any amounts paid directly by a patron to a dancer is a gratuity or tip belonging to her. Therefore, the table dance tips that patrons gave directly to members of the California Subclass were tips belonging entirely to the dancer.

106. California law does not allow for any reduction or offset in the minimum age based on tips received. Cal. Labor Code §351 provides:

> No employer or agent shall collect, take, or receive any gratuity or a part thereof that is paid, given to, or left for an employee by a patron, or deduct any amount from wages due an employee on account of a gratuity, or require an employee to credit the amount, or any part thereof, of a gratuity against and as a part of the wages due the employee from the employer. Every gratuity is hereby declared to be the sole property of the employee or employees to whom it was paid, given, or left for.

107. Employers must pay premium or overtime rates when employees work beyond specific daily or weekly limits. For example, Cal. Labor Code §510(a) provides that employees shall receive compensation at not less than 1 ½ times the regular rate for employment in excess of 8 hours per day, 40 hours in a workweek or for working the first 8 hours on the seventh consecutive workday in one workweek.

108. Defendants Spearmint Rhino – Worldwide, Spearmint Rhino – Consulting and Oxnard failed to pay Doe 2, or any other member of the California Subclass Class, any minimum hourly wages for their labor during the relevant time

period.   Rather, those Defendants improperly classified all California Subclass members as independent contractors so as to attempt to avoid paying Class members any wages.  All unpaid wages must now be paid to the Class.

109.   Further, Cal. Labor Code §1194.2 provides:

> In any action under Section 1193.6 or Section 1194 to recover wages because of the payment of a wage less than the minimum wage fixed by an order of the commission, an employee shall be entitled to recover liquidated damages in an amount equal to the wages unlawfully unpaid and interest thereon.

110.   Additionally, Defendants Spearmint Rhino – Worldwide, Spearmint Rhino – Consulting and Oxnard violated Cal. Labor Code §350 and §351 by requiring members of the California Subclass to split their tips with them (and their managers and employees), claiming those amounts to be "rent."  All tips taken from the Class must now be paid back.

111.   All amounts paid to members of the California Subclass by customers in relation to dances performed were tips, not wages or "service fees," and cannot be used to offset Defendants' obligation to pay them minimum wages.

112.   Based on the foregoing, all members of the California Subclass were injured, damaged and incurred financial loss as a result of the conduct of Defendants Spearmint Rhino – Worldwide, Spearmint Rhino – Consulting and Oxnard.

113.   Cal. Labor Code § 1174.5. provides:

> Any person employing labor who willfully fails to maintain the records required by subdivision (c) of Section 1174 or accurate and complete records required by subdivision (d) of Section 1174, or to allow any member of the commission or employees of the division to inspect records pursuant to subdivision (b) of Section 1174, shall be subject to a civil penalty of five hundred dollars ($500).

114.   To the extent Defendants Spearmint Rhino – Worldwide, Spearmint Rhino – Consulting and Oxnard failed to maintain all records required by the aforementioned statutes and regulations, it also violated the aforementioned laws causing the Class damage.

COMPLAINT
42407

31

115.   As a result of the foregoing, Plaintiff Doe 2 seeks on behalf of herself and all members of the California Subclass unpaid minimum wages at the required legal rate for all of their working hours during the relevant time period, reimbursement of any base rent, liquidated damages in an amount equal to the wages unlawfully unpaid and interest thereon, a refund of all tip-splits, prejudgment interest, attorneys' fees and costs, and all other damages, restitution, costs and penalties allowed by law.   Plaintiffs further seeks injunctive relief to compel Defendants to recognize Class members' employee status, to provide all payments guaranteed by law, and for this Court's continuing jurisdiction to enforce compliance.

### THIRD CAUSE OF ACTION

**VIOLATION OF NEVADA WAGE AND HOUR LAW, N.R.S. § 608.005 *et seq.***
**(Failure to Pay Statutory Minimum Wage)**
**(Against Defendants Spearmint Rhino – Worldwide, Spearmint Rhino –**
**Consulting and  K-Kel On Behalf of the Nevada Subclass)**

116.   Plaintiffs hereby incorporate all of the preceding paragraphs by reference as if fully set forth herein.

117.   At relevant times, Doe 1 and all members of the Nevada Subclass were employees of the Defendants within the meaning of N.R.S. §608.010.

118.   At all relevant times, Defendants were the employers of all members of the Nevada Subclass within the meaning of N.R.S. §608.011.

119.   The Nevada Wage and Hour Law requires that all employees be paid minimum wages by their employers.  N.R.S. §608.016, 608.100, 608.140, 608.170, 608.190, 608.250-608.290

120.   The Nevada Wage and Hour Law provides for higher hourly minimum wages than FLSA.  Therefore, that wage applies to all members of the Nevada Subclass.  29 U.S.C. §218(a).

COMPLAINT
42407

32

121. Nevada law does not allow for any reduction or offset in any minimum wages based on tips received. N.R.S. §608.160(1)(b).   Further, employers cannot take any portion of an employee's tips.

122. Any agreement between an employee and employer to receive less than the minimum wage is invalid.

123. Employers must pay premium or overtime rates when employees work beyond specific daily or weekly limits.   For example, Nevada Law provides that employees shall receive compensation at not less than 1 ½ times the regular rate for employment in excess of 8 hours per day, or 40 hours in a workweek.

124. Defendants Spearmint Rhino – Worldwide, Spearmint Rhino – Consulting, and K-Kel failed to pay Doe 1, or any other member of the Nevada Subclass Class, any minimum hourly wages for their labor during the relevant time period.   Rather, those Defendants improperly classified all Nevada Subclass members as independent contractors so as to attempt to avoid paying Class members any wages. All unpaid wages must now be paid to the Class.

125. All amounts paid to members of the Nevada Subclass by customers in relation to dances performed were tips, not wages or "service fees," and cannot be used to offset Defendants' obligation to pay them minimum wages.

126. Based on the foregoing, all members of the Nevada Subclass were injured, damaged and incurred financial loss.

127. N.R.S. §608.115 also requires all employers to maintain records for the benefit of their employees show the number of hours worked in the pay period and each day along with any wages paid.

128. To the extent Defendants Spearmint Rhino – Worldwide, Spearmint Rhino – Consulting and K-Kel failed to maintain all records required by the aforementioned statutes and regulations, it also violated the aforementioned laws causing the Class damage.

1    129.   As a result of the foregoing, Plaintiff Doe 1 seeks on behalf of herself

2   and all members of the Nevada Subclass unpaid minimum wages at the required

3   legal rate for all of their working hours during the relevant time period, liquidated

4   damages if available, overtime, prejudgment interest, attorneys' fees and costs, and

5   all other relief, damages, restitution, costs and penalties allowed by law.  Plaintiff

6   Doe 1 further seeks injunctive relief to compel Defendants to recognize Class

7   members' employee status, to provide all payments guaranteed by law, and for this

8   Court's continuing jurisdiction to enforce compliance.

9                           **FOURTH CAUSE OF ACTION**

10                  **(VIOLATION OF BUS. & PROF. CODE §17200 *et seq.*)**
                **(Against All Defendants On Behalf of All Members of the Class)**
11

12    130.   Plaintiffs incorporate the allegations of all the foregoing paragraphs by

13   reference, as if fully set forth herein.

14    131.   Plaintiffs brings this action individually, on behalf of the Class, and on

15   behalf of the general public pursuant to § 17200 *et. seq.* of the Bus. & Prof. Code,

16   the Unfair Competition Act (the "UCL").

17    132.   The conduct of Defendants as described above, constituted unlawful,

18   unfair, unconscionable and/or fraudulent business acts or practices.

19    133.   Plaintiffs bring this claim on behalf of the Class pursuant to Bus. &

20   Prof. Code §17204 which prohibits unfair competition, defined as "any unlawful,

21   unfair or fraudulent business act or practice."  Plaintiffs seek compensation for the

22   loss of their property and the personal financial impacts they have suffered as a result

23   of Defendants' unfair business practices.  Defendants' conduct, as described above,

24   has been and continues to be deleterious to the Class and Plaintiffs are seeking to

25   enforce important rights affecting the public interest within the meaning of Code of

26   Civil Procedure §1021.5.

27    134.   Upon information and belief, the unlawful, unfair, unconscionable and

28   fraudulent business acts and practices being challenged were conducted in and from

COMPLAINT                                                                    34
42407

the principal offices of Defendants Spearmint Rhino – Worldwide, Spearmint Rhino – Consulting and Oxnard in California and emanated to and affected Class members in other districts, including those in California and Nevada where Spearmint Rhino Nightclubs are located.  Further, Defendants entered into agreements and conspired amongst themselves to engage in the above-described unlawful, unfair, unconscionable and/or fraudulent business acts and practices in California, and that conduct emanated to and affected Class members in other districts including those in California and Nevada where Spearmint Rhino Nightclubs are located.  As such, the UCL applies to all such transactions and dealings.

135. By failing to pay its employees minimum wages in violation of FLSA, the California Labor Code, NWHL and/or any other state or federal law, as described above, Defendants engaged in unlawful, unfair, unconscionable and/or fraudulent business acts or practices in violation of the UCL.

136. By requiring Class members to share their tips (e.g., table dance tips) with Defendants and /or their employees in violation of FLSA, the California Labor Code, NWHL and/or any other state or federal law, as described above, Defendants engaged in unlawful, unfair, unconscionable and/or fraudulent business acts or practices in violation of the UCL.

137. By attempting to have Class members waive, abridge or limit their rights under the FLSA, the California Labor Code, and/or NWHL to receive minimum wages and other benefits. Defendants engaged in unlawful, unfair, unconscionable and/or fraudulent business acts or practices in violation of the UCL.

138. By threatening to retaliate against and penalize Class members for asserting their rights under the FLSA, the California Labor Code, or the NWHL (such as by terminating them, confiscating their tips, or imposing other penalties), Defendants engaged in unlawful, unfair, unconscionable and/or fraudulent business acts or practices in violation of the UCL.

139. By failing to maintain employment records under the FLSA, the California Labor Code, and/or NWHL, Defendants engaged in unlawful, unfair, unconscionable and/or fraudulent business acts or practices in violation of the UCL.

140. The acts complained of herein, and each of them, constitute unfair, unlawful or fraudulent business practices in violation of Business and Professions Code §17200 *et. seq.* Such acts and violations have not abated and will continue to occur unless enjoined. Defendants' acts and practices described herein offend established public policies, including, but not limited to those set forth in the FLSA, the California Labor Code (including Cal. Labor Code §356) and/or the NWHL, and involve business practices that are immoral, unethical, oppressive, and/or unscrupulous.

141. The unfair business practices set forth above have and continue to injure the Class and the general public and cause the loss of money, as described further within. These violations have unjustly enriched the Defendants at the expense of the Class. As a result, Plaintiffs, the Class and the general public are entitled to injunctive relief, restitution, and other equitable relief. Wages constitute restitution of property earned by the employee.

142. By reason of the foregoing, Plaintiffs and each member of the Class are entitled to recover from Defendant restitution, backpay, injunctive relief, declaratory relief, the cost of bringing this action (including reasonable attorneys' fees and costs), and any other relief allowed by law and deemed just and equitable in the circumstances.

## XIII.  JURY DEMAND

Plaintiffs reserve their right to and hereby request a trial by jury on all matters so triable.

## IX.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of the Class, prays for an order for relief as follows:

1.    That all Defendants be found jointly and severally liable to Plaintiffs and the Class on the First and Fourth Causes of Action;

2.    That Defendants Spearmint Rhino – Worldwide, Spearmint Rhino – Consulting and Oxnard also be found jointly and severally liable to Plaintiff Jane Doe 2 and the California Subclass on the Second Cause of Action;

3.    That Defendants Spearmint Rhino – Worldwide, Spearmint Rhino – Consulting and K-Kel be found jointly and severally liable to Plaintiff Jane Doe 1 and the Nevada Subclass on the Third Cause of Action;

4.    For a declaration that Defendants violated the right of Plaintiffs and the Class under the FLSA, California Labor Code and/or NWHL.

5.    For nominal damages;

6.    For compensatory damages;

7.    For restitution of all monies due Plaintiffs and the Class and disgorged profits from the unlawful business practices of Defendants;

8.    For all backpay, unpaid wages, and a refund of all tips and "rent" paid by Class members to Defendants and their employees;

9.    For all statutory damages, liquidated damages, penalties and/or other relief allowed by federal and state wage and hour statutes and regulations and/or other laws;

10.    For accrued interest;

11.    For costs of suit and expenses incurred herein, including reasonable attorneys' fees allowed under relevant provision of law including those allowed under 29 U.S.C. §216(b), California Labor Code §218.5, §1194(a) and California Code of Civil Procedure §1021.5;

12.    For injunctive relief only on the claims that allow such relief, including an order restraining Defendants from continuing to fail to pay minimum wages to exotic dancers working at their clubs; and

13.   For all other relief that the Court may deem just, proper and equitable in the circumstances.

RIDOUT & LYON, LLP

Dated:   July 13, 2009

Christopher P. Ridout, CA Bar No. 143931
Devon M. Lyon CA Bar No. 218293
555 E. Ocean Boulevard, Suite 500
Long Beach, CA 90802
(562) 216-7380 Telephone
(562) 216-7385 Fax

**Attorney for Plaintiffs and the Class**

*Of Counsel:*

(Motions to be Admitted *Pro Hac Vice* to be Filed)

Hart L. Robinovitch, AZ Bar No. 020910
ZIMMERMAN REED P.L.L.P.
14646 N. Kierland Blvd., Suite 145
Scottsdale, Arizona 85254
(480) 348-6400
(480) 348-6415 Facsimile

Timothy J. Becker, MN Bar No. 256663
ZIMMERMAN REED, P.L.L.P.
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
(612) 341-0400
(612) 341-0844 Facsimile

Caleb LH Marker, MI Bar No. P70963
CONSUMER LAW CENTER, PLLC
P.O. Box 1110
408 Wildwood Avenue
Jackson, Michigan 49204-1110
(517) 998-7400
(888) 490-7755 Facsimile

Jason J. Thompson, MI Bar No. P47184
SOMMERS SCHWARTZ PC
2000 Town Center, Suite 1000
Southfield, MI 48075
(248) 355-0300
(248) 936-2143 Facsimile

EXHIBIT "A"

Page 1

```
 1
 2
 3
 4        SPEARMINT RHINO CORPORATE PROFILE 2003
 5
 6
 7
 8      (www.spearmintrhino.com/1corpvideo.html)
 9
10
11
12
13
14     "The intent of this video is to provide the
       viewer with general information regarding The
15     Spearmint Rhino Companies World Wide and its
       related operations and associated entities.
16     This video is not intended to be considered a
       part of any legal document or agreement and is
17     for information and entertainment purposes
       only and accordingly shall not be considered
18     binding on any party.  Any representation
       herein regarding any investment opportunity is
19     specifically made for example only.  Actual
       investment gains or losses in any Spearmint
20     Rhino related investment may be greater or far
       less than those examples contained herein and
21     in fact could result in a loss of the entire
       investment.   The contents of this video are
22     not legal advice, nor investment or tax
       advice.  Each prospective investor should
23     consult his counsel, accountants or other
       advisors as to the legal tax, economic and
24     related aspects of the contents of any
       Spearmint Rhino related investment and as to
25     its suitability for such investor."
```

Page 2

```
1       [Spearmint Rhino]
2       NARRATOR: Welcome to the Spearmint
3   Rhino, a global network of the most
4   opulent gentlemen's clubs on earth,
5   redefining elegance in adult
6   entertainment, combining the ambience
7   of a five-star hotel with the staff of
8   the world's most beautiful
9   entertainers.
10      MR. GRAINGER: The ambience that
11  you'll feel when you enter a Spearmint
12  Rhino, you'll get the feeling that
13  you're entering a Ritz Carlton, if you
14  like.
15      MS. MACDONALD: You go that extra
16  mile to treat people, you know, as they
17  should be treated.
18      MR. WHITEHOUSE: Customer care and
19  attention to detail are first and
20  foremost.
21      MR. GRAY: Each customer deserves
22  the ambience of a fresh club that was
23  just opened that evening for business.
24      MS. MACDONALD: We're over 30
25  locations strong, and are looking to be
    TSG Reporting - Worldwide   (877) 702-9580
```

Page 3

```
1       [Spearmint Rhino]
2   on every continent.
3       MR. WARR:  The business is about
4   the girls; the business is about
5   selling more dances; the business is
6   about installing value into a dance.
7       MR. GRAY:  Everything to us is a
8   number crunching business; it is a
9   money-making business to us.  We take
10  it very, very seriously.  We're in the
11  business to make money, and we're very
12  good at that what we do in that regard.
13      NARRATOR:  Now, this may seem like
14  the restaurant of a five-star hotel,
15  but in reality, this is one of the many
16  Spearmint Rhino gentlemen's clubs.
17  What you are seeing is the result of a
18  decade of hard work and experience.
19  This attention to every detail enhances
20  the club's atmosphere and gives the
21  Spearmint Rhino an edge on the
22  competition.
23      In a moment, you'll meet a few of
24  the key members of the company.  But
25  first I'd like to introduce you to the
    TSG Reporting - Worldwide   (877) 702-9580
```

Page 4

```
1       [Spearmint Rhino]
2   CEO and founder of the Spearmint Rhino
3   Companies, John Gray.
4       John, let me just say that the
5   ambiance of these clubs is unique, but
6   more than just the look of the place,
7   there seems to be a whole philosophy
8   behind your clubs.
9       MR. GRAY:  I think part of the
10  psyche of the business is understanding
11  what brings a customer into the club.
12  And it is an entertainment-oriented
13  business; we serve the finest food and
14  the finest beverages available; we, of
15  course, have the most beautiful women
16  in the world work for us as
17  entertainers.
18      Spearmint Rhino has gone from zero
19  to 2700 employees, over 6,000 dancers
20  operating in Russia, Australia, Central
21  Europe, England and the United States.
22      We excel at what we do, and there
23  isn't a club in the geographic location
24  that does more in terms of gross volume
25  and sales than we do.  It's a fabulous.
    TSG Reporting - Worldwide   (877) 702-9580
```

Page 5

```
1       [Spearmint Rhino]
2   fabulous money-making-opportunity
3   business. The longevity of the
4   business beats anything that I'm aware
5   of.  Sales typically don't vary more
6   than five percent per unit; that is,
7   per store location per week throughout
8   the year.  It's recession-proof.  And
9   again, the gross sales per square foot
10  exceed any retail unit of a comparable
11  size anywhere on the face of the
12  planet.
13      NARRATOR: John, every aspect of
14  your clubs from the design to the
15  management to the dancers is
16  impeccable.  How do you maintain a
17  level of quality on a worldwide scale?
18      MR. GRAY:  For us, attention to
19  detail is everything.  We inspect what
20  we expect.  We do everything that a
21  competitor could possibly ever think of
22  doing.
23      And then add from there, when you
24  walk into a Spearmint Rhino, you'll
25  find it of an ambience that competes
    TSG Reporting - Worldwide   (877) 702-9580
```

Page 6

1    [Spearmint Rhino]
2    with the finest hotels or casinos or
3    restaurants in the world tailored to
4    that specific location.
5        MR. WARR: Well, Spirit Rhino
6    chattered the illusion of a gentlemen's
7    club. Our clubs are opulent, there's
8    just elegance oozes from all of our
9    clubs. And the details, the level of
10   details that we have in our clubs from
11   the wall finishes to the pictures, to
12   the line of sight to the pictures, to
13   the finishings and, of course, to our
14   product, which is the girls. It just
15   exuberates elegance.
16       MR. GRAINGER: The commitment to
17   excellence that Spearmint Rhino has
18   within the designer-fit hat of our
19   clubs is one where we would use very
20   expensive materials; every attention to
21   detail is going to be taken care of
22   very, very precisely.
23       MS. MACDONALD: I think what
24   separates the Spearmint Rhino
25   Gentlemen's Club from our competitors

TSG Reporting - Worldwide   (877) 702-9580

Page 7

1    [Spearmint Rhino]
2    is the attention to the details, as far
3    as how lighting needs to be set, the
4    sound, every little piece of the
5    details make up the whole ambience of
6    what Spearmint Rhino is.
7        MR. WARR: All of the Spearmint
8    Rhino clubs are built to complement the
9    environment rather than to be in
10   conflict with the environment. People
11   know that a Spearmint Rhino club isn't
12   covered in neon by virtue of the fact
13   that a premises at Spearmint Rhino
14   means they walk up to a building where
15   there is a red carpet on the outside,
16   where there is brass railings with
17   roped-off areas, where the club itself
18   is, again, just -- it represents class.
19       MR. WHITEHOUSE: We ensure that
20   when we recruit the dancers and the
21   workers in the club, that they have got
22   good social skills; that they will sit
23   with the customer and they won't
24   hard-sell or pressurize him into a
25   dance; that he can enjoy his

TSG Reporting - Worldwide   (877) 702-9580

Page 8

1    [Spearmint Rhino]
2    experience.
3        MR. WARR: Even if the dancer
4    doesn't have a table dance, she made
5    friends with a customer that walked in
6    the club. If he's got a friend, then I
7    guarantee the next day he'll come back
8    to see the friend.
9        MR. GRAY: We understand the psyche
10   of the business, the male customer, the
11   female dancer better than anybody else,
12   which helps us get more per square foot
13   out as far as gross sales per unit, I
14   think, than anybody else in the world
15   has ever done historically.
16       MR. WARR: What John Gray has
17   brought to this industry is a clear
18   vision. And within the vision is an
19   understanding, it's almost a
20   psychology, and it's putting value into
21   the table dance.
22       MR. GRAY: Well, I think part of
23   understanding the business goes back to
24   20 years ago, or a little further than
25   that, it was all burlesque, that is to

TSG Reporting - Worldwide   (877) 702-9580

Page 9

1    [Spearmint Rhino]
2    say that the dancers performed on stage
3    and never came down off the stage and
4    interacted with customers. What has
5    come of age is the so-called lapdance
6    club. We hear it on TV programs or
7    movies at night that are mainstream
8    products on television. And the gist
9    of it is that there really is an
10   intrinsic value to a so-called
11   table-side dance or a couch dance.
12       I think one of the errors and
13   perceptions of this business is that
14   it's a sexual business. It's truly
15   not. It is a fantasy business. A
16   woman speaks to me at two or three
17   inches closer into my space than what
18   would be normal on the street, or she
19   if she touches my knee, not in a sexual
20   way, but just puts her hand on my knee
21   when she talks to me, or uses my first
22   name in the first few minutes of
23   conversation. As a male, we're taken
24   back by that attention. Men are
25   willing to pay for that type of

TSG Reporting - Worldwide   (877) 702-9580

Page 10

```
1       [Spearmint Rhino]
2    attention.  And that's not sexual
3    attention, that's fantasy attention,
4    and that's what the backbone of the
5    clubs are all about.
6       Another misnomer in the business is
7    that it's that of a restaurant or a
8    nightclub; that is to say, that the
9    income stream is primarily that of door
10   and drink or beverage sales.  And while
11   the income is certainly that, of the
12   door and beverage sales, what makes
13   these businesses go off the charts as
14   regards to an income and profitability
15   stream is the income made by these
16   so-called couch dance or table dance.
17      A table dance lasts three minutes
18   and costs typically 10- to $20,
19   depending on the jurisdiction.  One of
20   the things that we preach to our people
21   is if a small club of ours — and this
22   is a small club example -- has 30
23   dancers on a shift, if you can get
24   every dancer -- a shift being eight
25   hours -- to do just one more dance per
```
TSG Reporting - Worldwide   (877) 702-9580

Page 11

```
1       [Spearmint Rhino]
2    eight-hour shift, it's over $10,000 a
3    month additional income into the stream
4    of the club.
5       What other business can you so
6    easily increase those gross numbers by?
7       NARRATOR:  The Spearmint Rhino
8    Company is a business where everyone,
9    from its investors to company officers,
10   to the person behind the bar, share the
11   same commitment to quality.  With this
12   commitment to quality comes success,
13   and with success comes growth.
14      The Spearmint Rhino companies are
15   continuously expanding to create
16   opportunity for new investors such as
17   yourself.
18      MR. GRAY:  Historically, the
19   Spearmint Rhino clubs have been
20   developed utilizing our own monies.
21   That is to say, that the profit of
22   early-on stores built the next stores,
23   which built the next stores.  As we've
24   accelerated that growth rate, we've
25   looked towards outside financing to
```
TSG Reporting - Worldwide   (877) 702-9580

Page 12

```
1       [Spearmint Rhino]
2    continue an increased rate of growth.
3       We make it very tangible.  So that
4    in the operating agreements, we
5    actually have a land location locked
6    up, licensing secured and plans drawn.
7    We submit that to a potential investor.
8    They can drive, by touch and feel,
9    where the new Spearmint Rhino is going
10   to be, and then, by written documents,
11   decide whether or not the investment is
12   appropriate for them.
13      MS. MACDONALD:  I speak to our
14   current investors probably twice a
15   week.  Our financials are generated so
16   you don't have to be a CPA in order to
17   understand them.  They're very basic
18   format and they're very easy to
19   understand where everything is
20   itemized.  And any time they want to
21   come in and sit and have meetings, go
22   through the files, we welcome it.
23      NARRATOR:  One of the biggest
24   issues is accountability.  What
25   assurance of an accurate account does
```
TSG Reporting - Worldwide   (877) 702-9580

Page 13

```
1       [Spearmint Rhino]
2    an investor have?
3       MR. GRAY:  What we do is weekly and
4    monthly financial accounting, but we
5    also distribute shareholder
6    distributions on a monthly basis.  So
7    it becomes very, very tangible for an
8    investor to realize what he invested
9    in.  He is able to see financial
10   accounting weekly, and again monthly,
11   and he is able to realize a return on a
12   monthly basis.
13      But one of the things that we pride
14   ourselves on is managerial accounting;
15   it's realtime.  We pride ourselves on
16   our IT operations in particular.  Scott
17   Hale has been with us for a little over
18   two years, he heads the IT department,
19   and I'm very pleased that he's part of
20   our permanent team.
21      MR. HALE:  The information
22   technology is a tool that has allowed
23   the Spearmint Rhino as a company to
24   continue to expand on a global basis
25   and yet retain and maintain control of
```
TSG Reporting - Worldwide   (877) 702-9580

Page 14

```
1        [Spearmint Rhino]
2    business information, once again
3    delivering it to the executives so they
4    can make the best business decisions
5    possible in the shortest amount of
6    time. We've been able to reach out and
7    test facilities that are thousands and
8    thousands of miles away from where
9    we're at here in the U.S. corporate
10   offices.
11       MR. WARR: So it's not only good
12   controls and an interpretation of our
13   business and understanding our
14   business, it's reporting back and
15   having a transparency in our accounting
16   methods and a consistency within our
17   accounting methods that gives an
18   investor peace of mind.
19       MR. GRAY: Again, we crunch numbers
20   quite often, and the realtime
21   point-of-sale system allows us to
22   really see what's really happening in a
23   club, allows us to do inventory control
24   and have a very real sense of what's
25   going on without physically being in
```

Page 15

```
1        [Spearmint Rhino]
2    every location, which, of course, you
3    can't always do.
4        One of the other niceties, besides
5    the business element itself, is the
6    fact that the revenue stream is so
7    egregiously higher than other types of
8    investments, and multifaceted. That is
9    to say, we have food sales, beverage
10   sales, waitress sales, door admission
11   sales. But we also have that dancer
12   income stream, and the profitability of
13   the dancer income stream is extremely
14   high compared to cost of other goods
15   sold. There is no innate cost to that;
16   the dancers don't receive a payroll or
17   a salary.
18       The prior investment is primarily
19   structured by way of minority
20   ownership. Each one of the Spearmint
21   Rhino is a separate corporation or
22   equivalent type of entity whereby we
23   will typically sell 49 percent of a new
24   store's venture to a group of minority
25   investors. Traditionally what we have
```

Page 16

```
1        [Spearmint Rhino]
2    structured is ten minority shares, each
3    at 4.9 percent, for a total investment
4    approximating one million dollars.
5    Each investment would be a minimum of
6    $100,000 for a total maximum of ten
7    investment shares at one million
8    dollars, constituting the total of the
9    49 percent.
10       Most of these clubs don't build
11   over an elongated period of time. We
12   open strong right out of the gate. We
13   are in a profit position within just a
14   few weeks of opening, and typically our
15   investors are paid back their entire
16   investment within a year of opening.
17   While there's no guarantees of this, it
18   certainly is a quicker payback than
19   most other businesses.
20       NARRATOR: John, tell us about your
21   international expansion.
22       MR. GRAY: As we grew in the United
23   States and became a leading force in
24   the United States, it became apparent
25   to us that nobody had really replicated
```

Page 17

```
1        [Spearmint Rhino]
2    the systems or the type of business
3    that we had in the states elsewhere.
4    We went over to England, investigated
5    the possibilities there, and thought it
6    to be a good market for us. And in
7    fact, it has been an excellent market
8    for us. In less than two years, we've
9    opened 13 stores in England.
10       What was refreshing in England in
11   particular was, is we had found that it
12   was 20 years ago from that of the
13   licensing laws that we've experienced
14   in the United States. That is to say
15   that, most day place, it could be a
16   commercial business, it could be an
17   adult-related commercial business,
18   which allowed us to the opportunity to
19   make a closer of a cookie-cutter format
20   for our expansion and open much, much
21   quicker in England per month, per year
22   than we were able to do in the United
23   States. Consequently, we've gone over
24   there in a big way and have never
25   looked back. We expanded to Russia and
```

Page 18

```
1        [Spearmint Rhino]
2    Australia. From there we found the
3    same would be true.
4        And in hindsight, it very much
5    feels as though you have the United
6    States on the one hand and the rest of
7    the world on another. We are
8    structured in such a manner that in
9    England we have a free-standing
10   building that serves as a regional
11   office for European operations, and
12   then we maintain offices in Australia
13   and Russia as well. Those offices, in
14   turn, report to the United States to
15   the Los Angeles County world
16   headquarters.
17       MR. WHITEHOUSE: When I first met
18   John Gray two and a half years ago, I
19   had been operating in the U.K. in
20   table-dancing clubs for four and a half
21   years. I thought I knew pretty much
22   everything. I then had the experience
23   of being able to visit Spearmint Rhinos
24   over in the states, and I realized that
25   what we were doing over in the U.K.
```

TSG Reporting - Worldwide   (877) 702-9580

Page 19

```
1        [Spearmint Rhino]
2    just didn't get it. We weren't even
3    close.
4        It was absolutely fascinating. It
5    seemed the standard and the quality in
6    the clubs that Spearmint Rhino were
7    operating, and seeing where we were
8    missing out of the U.K. So I very much
9    took the view that there was absolutely
10   no way I was ever going to beat
11   Spearmint Rhino, so I thought I might
12   as well join them.
13       NARRATOR: With so many clubs in
14   the U.S. and Europe, how do you deal
15   with the local issues that are
16   particular to each venture?
17       MR. GRAY: From a strategy
18   perspective, when we go into a new
19   location, we'll typically hire local
20   prominent legal counsel. We find that
21   the political ties that those
22   individuals with local city
23   councils, or the equivalent, are very
24   helpful. Our team typically will also
25   retain a renown first amendment
```

TSG Reporting - Worldwide   (877) 702-9580

Page 20

```
1        [Spearmint Rhino]
2    attorney, and those two will pair up
3    and strategize a particular location
4    before we go in.
5        We assume that everybody that walks
6    through that front door is an elected
7    official or politician, so we have a
8    sense of responsibility to the
9    community that we're in.
10       MR. WHITEHOUSE: Part of our
11   training with our staff is to make them
12   aware of our needs to be perceived as
13   good corporate citizens, and no member
14   of the management team will be promoted
15   into a new unit until we are totally
16   comfortable that they have a proven
17   track record within one of our
18   businesses and are capable of taking on
19   the job of opening a new club.
20       MR. WARR: We've set up what we
21   call Spearmint Rhino corporate charter.
22   What that is is every single club
23   identifies a local charity, whether
24   that's the most charity. It doesn't
25   matter. It might be Guide Dogs for the
```

TSG Reporting - Worldwide   (877) 702-9580

Page 21

```
1        [Spearmint Rhino]
2    Blind. So we very much get involved
3    with the community spirit.
4        MR. WHITEHOUSE: We will join the
5    local Chamber of Commerce so that we
6    can be in touch with what our neighbors
7    are thinking. If they have got any
8    problems, if they have got any issues
9    and they can talk directly to us.
10       MR. GRAY: We try to be the
11   absolute best possible commercial
12   business operator and best citizen of a
13   business nature possible in the
14   communities that we have clubs in. And
15   consequently, I think that we are
16   appreciated as adult operator better
17   than anybody in our same industry ever
18   has been.
19       NARRATOR: John, you've really
20   expanded into the Internet world.
21   Could you give us some insight on that?
22       MR. GRAY: One of the benefits of
23   having our own in-house IT team is
24   building a state-of-the-art website.
25   The website is really multifunctional,
```

TSG Reporting - Worldwide   (877) 702-9580

| | Page 22 | | | Page 23 |
|---|---|---|---|---|

**Page 22**

1      [Spearmint Rhino]
2  and long time ago we realized it was a
3  lot more than just a directory of
4  sorts.
5      MR. HALE:  Actually, what we are
6  trying to do with the website is we are
7  trying to capture the essence of the
8  Spearmint Rhino gentlemen's clubs, the
9  opulence, the upscale nature, the five
10  star nature of our facilities, and
11  trying to project that out onto the
12  internet for people to see.
13      MR. GRAY:  In terms of
14  adult-related content, we methodically
15  have long ago decided not to have such
16  content on the website, and the website
17  is that for corporate information
18  purposes only.
19      MR. WHITEHOUSE:  Authorities and
20  local residents, local communities, if
21  they see something on the Internet that
22  they feel is distasteful, they will use
23  that against us and they will try and
24  judge our book by its cover.  So if we
25  have the smartest cover, if we have the

TSG Reporting - Worldwide    (877) 702-9580

**Page 23**

1      [Spearmint Rhino]
2  best presented cover, they can only
3  think that we are the best operators.
4      NARRATOR:  John, it's obvious that
5  you and your staff really know your
6  business.  So what's on the horizon for
7  your company?
8      MR. GRAY:  Over the recent years,
9  one of the ways that Spearmint Rhino is
10  diversifying its license and its
11  trademark for a variety of different
12  uses.  We've been approached by large
13  manufacturers of adult-related toys,
14  novelties, to license products for
15  them.  We have recently entered
16  contracts to provide such services.  We
17  started proprietary-related printed
18  magazines.  In England, we've done
19  several television shows and are
20  looking to produce our own cable
21  channel.
22      MS. MACDONALD:  We have the
23  Spearmint Rhino Adult Super Store,
24  which has show girl attire, videos,
25  adult toys.

TSG Reporting - Worldwide    (877) 702-9580

**Page 24**

1      [Spearmint Rhino]
2      MR. GRAINGER:  The Spearmint Rhino
3  Adult Super Stores are going to be
4  extremely upscale and be able to be
5  placed in mainstream America and very
6  well-respected by the general public,
7  and these stores all offer high-end
8  lingerie, leather and lace, lotions,
9  things of this nature.  We're very
10  excited about that prospect, and open
11  up -- open many more stores in the
12  coming months.
13      MR. WARR:  Our media presence in
14  the U.K. is enormous.  We have
15  television coverage.  We have media
16  coverage.  We are in magazines.  Quite
17  simply, our share of what's even
18  outside of our own industry is huge.
19      MR. GRAY:  The Spearmint Rhino name
20  has become even better and better
21  well-known.  This helps fuel the
22  backbone expansion of the clubs, which
23  is our foremost and most important
24  aspect of our business concern.
25      MR. WARR:  There's so many key

TSG Reporting - Worldwide    (877) 702-9580

**Page 25**

1      [Spearmint Rhino]
2  boast words you could associate with
3  Spearmint Rhino: excellence, opulent,
4  professionalism.  Perhaps the main one
5  is excellence.  Part of the reason
6  Spearmint Rhino is so successful is
7  John Gray's vision.
8      MS. MACDONALD:  The reason all of
9  our employees, myself included, have
10  been around for a long time is we truly
11  enjoy the business and we truly believe
12  in John's vision of where this company
13  is going.
14      MR. GRAY:  In a little more than a
15  decade, Spearmint Rhino has become the
16  world leader in the gentlemen club
17  arena with over 2700 employees and
18  6,000 dancers operating in Russia,
19  Europe, United Kingdom, the United
20  States and Australia.  We look forward
21  to maintaining our position as the
22  world leader and look forward to more
23  than a hundred clubs within the coming
24  years.
25      (Recording ends.)

TSG Reporting - Worldwide    (877) 702-9580

Page 26

```
 1        CERTIFICATE
 2  STATE OF NEW YORK    )
 3                 ) ss.:
 4  COUNTY OF NEW YORK    )
 5
 6        I, MAYLEEN CINTRON, a Registered
 7  Merit Reporter, Certified Realtime
 8  Reporter and Notary Public within and
 9  for the State of New York, do hereby
10  certify that the within is a true and
11  accurate transcription of the
12  www.spearmintrhino.com/1corpvideo.html
13  video as taken on June 30, 2009.
14        I further certify that I am not
15  related to any of the parties to this
16  action by blood or marriage; and that I
17  am in no way interested in the outcome
18  of this matter.
19        IN WITNESS WHEREOF, I have
20  hereunto set my hand this 30th day of
21  June 2009.
22
23
24  ------------------------------
25        MAYLEEN CINTRON, RMR, CRR
```

TSG Reporting - Worldwide    (877) 702-9580

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Virginia A. Phillips and the assigned discovery Magistrate Judge is David T. Bristow.

The case number on all documents filed with the Court should read as follows:

## EDCV09- 1316 VAP (DTBx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=================================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [X] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |
| --- | --- | --- |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)      NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

Name & Address:
RIDOUT & LYON LLP
CHRISTOPHER P. RIDOUT (State Bar No. 143931)
E-mail: c.ridout@ridoutlyonlaw.com
555 E. Ocean Boulevard, Suite 500
Long Beach, CA 90802

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE 1 AND JANE DOE 2, individually, and on behalf of all others similarly situated,<br><br>PLAINTIFF(S)<br><br>V.<br><br>SPEARMINT RHINO COMPANIES WORLDWIDE, INC., SPEARMINT RHINO CONSULTING WORLDWIDE, INC., K-KEL, INC., AND OXNARD HOSPITALITY SERVICES, LP.<br><br>DEFENDANT(S) | CASE NUMBER<br><br>EDCV09-1316 VAP (DTBx)<br><br><br>SUMMONS |

TO:   DEFENDANT(S):   SPEARMINT RHINO COMPANIES WORLDWIDE, INC., SPEARMINT RHINO CONSULTING WORLDWIDE, INC., K-KEL, INC., AND OXNARD HOSPITALITY SERVICES, LP.

A lawsuit has been filed against you.

**ORIGINAL**

Within __20__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, _Ridout & Lyon LLP_____, whose address is _555 E. Ocean Boulevard, Long Beach, California 90211_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: ___ JUL 1 3 2009 ___

By: _____
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)]*

CV-01A (12/07)                              SUMMONS

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| JANE DOE 1 AND JANE DOE 2, individually, and on behalf of all others similarly situated | SPEARMINT RHINO COMPANIES WORLDWIDE, INC., SPEARMINT RHINO CONSULTING WORLDWIDE, INC., K-KEL, INC., AND OXNARD HOSPITALITY SERVICES, LP |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| RIDOUT & LYON, LLP 555 E. Ocean Boulevard, Suite 500, Long Beach CA 90802 (562) 216-7380 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☑ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes  ☐ No         ☐ MONEY DEMANDED IN COMPLAINT: $ _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☑ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | **SOCIAL SECURITY** |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | **REAL PROPERTY** | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 210 Land Condemnation | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | **IMMIGRATION** | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | ☐ 462 Naturalization Application | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 240 Torts to Land | ☐ 463 Habeas Corpus-Alien Detainee | | **FEDERAL TAX SUITS** |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 245 Tort Product Liability | ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | | ☐ 871 IRS-Third Party 26 USC 7609 |

**FOR OFFICE USE ONLY:**   Case Number: **EDCV09-1316**

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☑No  ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☑No  ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)  ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D.  Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| San Bernardino, California-Jane Doe 2 | Nevada-Jane Doe 1 |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles-SPEARMINT RHINO COMPANIES WORLDWIDE, INC.<br>Los Angeles-SPEARMINT RHINO CONSULTING WORLDWIDE, INC.<br>Ventura-OXNARD HOSPITALITY SERVICES, LP | Nevada-K-KEL, INC. |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: **In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles<br>Ventura | Nevada |

* **Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved.

X.  SIGNATURE OF ATTORNEY (OR PRO PER):  _____    Date  July 13, 2009

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program.  (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability.  (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended.  (42 U.S.C. (g)) |