ZIMMERMAN REED P.L.L.P.
HART L. ROBINOVITCH (Admitted *Pro Hac Vice*)
Email: Hart.Robinovitch@zimmreed.com
14646 N. Kierland Blvd., Suite 145
Scottsdale, AZ 85254
(480) 348-6400
(480) 348-6415 Facsimile

RIDOUT & LYON, LLP
CHRISTOPHER P. RIDOUT (State Bar No. 143931)
Email: c.ridout@ridoutlyonlaw.com
DEVON M. LYON (State Bar No. 218293)
Email: d.lyon@ridoutlyonlaw.com
555 E. Ocean Blvd., Ste. 500
Long Beach, California  90802
(562) 216-7380
(562) 216-7385 Fax

(Additional counsel listed below)

**Attorney for Plaintiffs and the Class**

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRACY DAWN TRAUTH, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SPEARMINT RHINO COMPANIES WORLDWIDE, INC., SPEARMINT RHINO CONSULTING WORLDWIDE, INC., AND OXNARD HOSPITALITY SERVICES, LP.<br><br>Defendants. | Case No. EDCV09-1316 VAP (DTBx)<br><br>**SECOND AMENDED COMPLAINT**<br>(Class Action)<br><br><br>**Jury Trial Demanded**<br><br>ORIGINAL |

CLASS ACTION COMPLAINT
42407

## I.  INTRODUCTION

1.     This is a class action brought by Plaintiff Tracy Dawn Trauth (hereinafter "Plaintiff") against Defendants Spearmint Rhino Companies Worldwide, Inc., Spearmint Rhino Consulting Worldwide, Inc., and Oxnard Hospitality Services, LP (hereinafter collectively referred to as "Defendants"). The Class Plaintiff seeks to represent is composed of female employees who, during the relevant time period, worked as exotic dancers for Defendants in the state of California.   All class members were denied their fundamental rights under applicable state and federal wage and hour laws.  Specifically, Plaintiff complains that Defendants misclassified Plaintiff and all other members of the Class as independent contractors, as opposed to employees, at all times in which they worked as dancers at any of Defendants' adult nightclubs located in California. As a result, Defendants failed to pay Plaintiff and all other members of the Class the minimum wages and other benefits that they were entitled to under federal and state law.  Additionally, Defendants engaged in unlawful tip-splitting by requiring dancers in the Class to split and share gratuities given to them by patrons with Defendants and their employees, such as managers, doormen, and DJ's.  Plaintiff, therefore, brings this class action seeking damages, backpay, restitution, liquidated damages, civil penalties, prejudgment interest, reasonable attorneys' fees and costs, and all other relief that the Court deems just, reasonable and equitable in the circumstances.

## II.  JURISDICTION & VENUE

2.     This Complaint alleges causes of action under the laws of the United States, including the Fair Labor Standards Act, 29 U.S.C. §201 *et. seq.* ("FLSA"). Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. §1331.

3.     The Court also has diversity jurisdiction pursuant 28 U.S.C. §1332 and pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)("CAFA"). Diversity of citizenship between the parties exists and the amount-in-controversy requirements under the above-referenced provisions are met.

COMPLAINT
42407

1

4.     This action is also brought pursuant to Section 1194 of the California Labor Code and Section 17204 of the California Business and Professions Code. (the "UCL").

5.     A substantial part of the events and conduct giving rise to the claims in this action occurred in this Judicial District.  Defendants Spearmint Rhino - Worldwide, Spearmint Rhino - Consulting and Oxnard reside in and have their principal places of business in this district.  The unlawful and fraudulent actions of Spearmint Rhino - Worldwide, Spearmint Rhino - Consulting and Oxnard, as described further within, occurred in and continue to occur in the State of California.  Key decisions, agreements and activities regarding the unlawful, fraudulent and unconscionable actions of Defendants Spearmint Rhino - Worldwide and Spearmint Rhino - Consulting, as described further within, were made in this district and emanated to other districts including those in California where Spearmint Rhino Nightclubs were located.  Business policies and material decisions regarding the employment practices challenged in this case were made in significant part by Defendants Spearmint Rhino – Worldwide and Spearmint Rhino - Consulting from their offices in Norco, California and/or City of Industry, California.  Those unlawful policies and agreements emanated to and were applied in all Spearmint Rhino nightclubs, including all those located in the states of California where class members worked.  As a result, venue is proper in this jurisdiction pursuant to 28 U.S.C. §1391.

## III.   PARTIES & STANDING

6.     Plaintiff is a resident of San Bernardino County, California.  At relevant times, Plaintiff was an employee of Defendants Spearmint Rhino - Worldwide, Spearmint Rhino - Consulting and Oxnard, as defined in 29 U.S.C. §201 *et seq.* and Cal. Labor Code. §1194, working as an exotic dancer at the Spearmint Rhino nightclub in Oxnard, California.  Plaintiff worked as a female exotic dancer at the Spearmint Rhino nightclub in Oxnard, California during the class period (including

on August 18, 2005 and July 13, 2006) and is a member of the Class. Like other Class members, during the periods Plaintiff worked at the Spearmint Rhino nightclub Plaintiff was: (1) misclassified by Defendants as an independent contractor and as a result, was not paid any wages (and provided other benefits and rights) which she was entitled to as an employee; (2) required to split tip income with Defendants and their employees and described more fully below.

7.     The Defendants in this matter are business entities that jointly employ and control the work of members of the Class that work or have worked at the various "Spearmint Rhino Gentlemen's Clubs" located in California. Specifically, there are Spearmint Rhino adult nightclubs in at least the following cities: City of Industry, CA; Los Angeles, CA; Oxnard, CA; Rialto, CA; Santa Barbara, CA; Santa Maria, CA; Torrance, CA; and Van Nuys, CA.

8.     Defendant Spearmint Rhino Companies Worldwide, Inc. (referred to herein as "Spearmint Rhino – Worldwide") is a Nevada corporation located at 1875 Tandem Way, Norco, CA 92860 and/or 15423 East Valley Boulevard, City of Industry, CA 91746. The resident agent for Spearmint Rhino – Company is the Corporation Service Company d/b/a "CSC – Lawyers Incorporating Service", which maintains registered office addresses at 2730 Gateway Oaks Drive, Suite 100, Sacramento, CA 95833 and 502 East John Street, Carson City, NV, 89706. The Chairman and Chief Executive Officer of Spearmint Rhino - Worldwide is John Gray. The President of Spearmint Rhino - Worldwide is Kathy Vercher. Upon information and belief, Spearmint Rhino - Worldwide is (1) owned, directly or indirectly, and (2) controlled in principal part by John Gray, Mumtaz A. Ali, Lisa Shagufta Ali, SRC Holdings, Inc., Spearmint Rhino Clubs, a corporation, the John Leldon Gray Trust dated July 2, 2001, and/or the Lisa Shagufta Ali Family Trust dated June 29, 2005.

9.     Defendant Spearmint Rhino Consulting Worldwide, Inc. (referred to herein as "Spearmint Rhino – Consulting") is a Delaware corporation located at 1875

Tandem Way, Norco, CA 92860 and/or 15423 East Valley Boulevard, City of Industry, CA 91746.  The resident agent for Spearmint Rhino – Consulting is the Corporation Service Company d/b/a "CSC – Lawyers Incorporating Service", which maintains a registered office address of 2730 Gateway Oaks Drive, Suite 100, Sacramento, CA 95833.   The Chairman and Chief Executive Officer of Spearmint Rhino - Consulting is John Gray.  The President and Chief Operating Officer of Spearmint Rhino - Consulting is Kathy Vercher.  Upon information and belief, Spearmint Rhino - Consulting is (1) owned, directly or indirectly, and (2) controlled in principal part, by John Gray, Mumtaz A. Ali, Lisa Shagufta Ali, SRC Holdings, Inc., Spearmint Rhino Clubs, a corporation, the John Leldon Gray Trust dated July 2, 2001, and/or the Lisa Shagufta Ali Family Trust dated June 29, 2005.

10.    Defendant Oxnard Hospitality Services, LP d/b/a "Spearmint Rhino Gentlemen's Club" (referred to herein as "Oxnard" or "Spearmint Rhino – Oxnard") is a California Limited Partnership located at 630 Maulhardt Avenue, Oxnard, CA 93030.   Upon information and belief, Defendant Oxnard maintains ownership, recruitment, management, and/or operational interests in at least one nightclub featuring exotic dancing by Class members, including the Spearmint Rhino Gentlemen's Club located at 630 Maulhardt Avenue, Oxnard, CA 93030 where members of the Class have been and are currently employed.  The resident agent for Spearmint Rhino – Oxnard is the Corporation Service Company d/b/a "CSC – Lawyers Incorporating Service", which maintains a registered office address of 2730 Gateway Oaks Drive, Suite 100, Sacramento, CA 95833.  Upon information and belief, the officers and employees of Spearmint Rhino – Worldwide and Spearmint Rhino - Consulting are the *de facto* senior managers of all of the Spearmint Rhino Nightclubs in California, including Spearmint Rhino - Oxnard.

11.    Upon, information and belief, both Spearmint Rhino - Worldwide and Spearmint Rhino - Consulting either directly or indirectly own, manage, direct, operate, and control the business operations at all of the "Spearmint Rhino

Nightclubs" located in California and listed on the www.spearmintrhino.com website, including but not limited to those doing business at 15411 East Valley Boulevard, City of Industry, CA 91746 ("Spearmint Rhino- City of Industry"); 2020 East Olympic Boulevard, Los Angeles, CA 90021 ("Spearmint Rhino- Los Angeles"); 630 Maulhardt Avenue, Oxnard, CA 93030 ("Spearmint Rhino – Oxnard"); 312 South Riverside Avenue, Rialto, CA 92376 ("Spearmint Rhino – Rialto"); 312 South Riverside Avenue, Rialto, CA 92376  ("Spearmint Rhino – Rialto II"); 22 East Montecito Street, Santa Barbara, CA 93101 ("Spearmint Rhino – Santa Barbara"); 505 South Broadway, Santa Maria, CA 93454 (Spearmint Rhino – Santa Maria"); 19900 Normandie Avenue, Torrance, CA 90502 ("Spearmint Rhino – Torrance"); and, 15004 Oxnard Street, Van Nuys, CA 91411 ("Spearmint Rhino – Van Nuys"), (the foregoing nightclubs are collectively referred to herein as the "Spearmint Rhino Nightclubs"). As described more fully below, the Class consists of exotic dancers who worked at all of Spearmint Rhino Nightclubs during the relevant time period.

12. Each of the Spearmint Rhino Nightclubs delegates its senior management functions to Spearmint Rhino - Worldwide and Spearmint Rhino – Consulting. For instance, on January 31, 2008, Spearmint Rhino - Consulting issued the following Press Release confirming that Spearmint Rhino - Worldwide and/or Spearmint Rhino – Consulting oversee the management and operations at each Spearmint Rhino Nightclub in the United States:

> Brett Schuster has been promoted to Senior District Manager of Spearmint Rhino.
>
> Along with overseeing management and operations for each club, Brett will now also supervise the other two Spearmint Rhino District Managers.
>
> With 17 Spearmint Rhino Gentlemen's Club locations in the United States, executives rely heavily on the District Managers to oversee all aspects of operations for all locations.
>
> With many years of the service and hospitality industry under his belt,

1   Brett will play a major role in helping streamline operations for each
2   location. …

3   "I am happy to be in this new position," says Brett Schuster. "It feels
    great to be in a position where I can play a major role in taking
4   Spearmint Rhino to the next level.

5   Brett Schuster can be contacted at Spearmint Rhino's World
    Headquarters at (951) 371-3788 or bschuster@spearmintrhino.com.

6   About Spearmint Rhino Gentlemen's Clubs
    Spearmint Rhino Gentlemen's Club is a chain of the most upscale
7   gentlemen's clubs in the world. With Spearmint Rhino Gentlemen's
    Club and affiliate locations worldwide (including the United States,
8   United Kingdom, Europe and Australia) and growing, guests are treated
    to the unique ambience, superior service and first class entertainment
9   that only Spearmint Rhino can offer. For more information on
    Spearmint Rhino Gentlemen's Club, visit www.SpearmintRhino.com or
10  www.myspace.com/spearmintrhinoworldwide.

11  http://www.free-press-release.com/news/print-1201826665.html.

12          13.   At all relevant times Spearmint Rhino - Worldwide and Spearmint

13  Rhino - Consulting jointly employed all exotic dancers working in the Spearmint

14  Rhino Nightclubs, managed, directed and controlled the operations in each

15  Spearmint Rhino Nightclub, and dictated the common employment policies

16  applicable in each Spearmint Rhino Nightclub, including but not limited to the

17  decisions: (1) to misclassify dancers as independent contractors, as opposed to

18  employees; (2) to require that dancers split their table dance tips with Defendants; (3)

19  to require that dancers further split their table dance tips with Defendants' managers,

20  doormen, floor walkers, DJ's and other employees who do not usually receive tips,

21  by paying "tip-outs;" (4.) to not pay any dancers any wages; (5.) to demand improper

22  and unlawful payments from class members; (6.) to adopt and implement

23  employment policies which violate the FLSA, California Labor Code, UCL and/or

24  other laws; (7.) to threaten retaliation against any dancer attempting to assert her

25  statutory rights to be recognized as an employee.  Spearmint Rhino - Worldwide,

26  Spearmint Rhino - Consulting and their principals created the common business

27  model employed at each Spearmint Rhino Nightclub regarding dancer classification

28  and tip splitting and require that it continue to be employed.

COMPLAINT
42407

6

14. Upon information and belief, all named Defendants agreed and conspired among themselves, as well as with third-parties which own part of certain Spearmint Rhino Nightclubs, to unlawfully: (1) misclassify dancers as independent contractors, as opposed to employees; (2) require that dancers split their table dance tips with Defendants; (3) require that dancers further split their table dance tips with Defendants' managers, doormen, floor walkers, DJ's and other employees who do not usually receive tips, by paying "tip-outs;" (4.) not pay any dancers any wages; (5.) demand improper and unlawful payments from class members; (6.) adopt and implement employment policies which violate the FLSA, California Labor Code, UCL and/or other laws; (7.) threaten retaliation against any dancer attempting to assert her statutory rights to be recognized as an employee. The unlawful agreements between Defendants and third-parties in the enterprise were entered into as part of a strategy to maximize revenues and profits.

15. At relevant times, inter alia, Spearmint Rhino - Worldwide and Spearmint Rhino - Consulting maintained a "corporate introduction video" on the www.spearmintrhino.com website describing their business operations and confirming the following facts:

> "The business is about the girls; the business is about selling more dances..."
>
> * * *
>
> "...we, of course, have the most beautiful women in the world work for us as entertainers."
>
> * * *
>
> "We ensure that when we recruit the dancers and the workers in the club, that they have got good social skills; that they will sit with the customer and they won't hard-sell or pressurize him into a dance; that he can enjoy his experience."
>
> * * *
>
> "Another misnomer in the business is that it's that of a restaurant or a nightclub; that is to say, that the income stream is primarily that of door and drink or beverage sales. And while the income is certainly that, of the door and beverage sales, what makes these businesses go off the charts as regards to an income and profitability stream is the income made by these so-called couch dance or table dance.
>
> A table dance lasts three minutes and costs typically $10- to $20, depending on the jurisdiction. One of the things that we preach to our people is if a small club of ours -- and this is a small club example -- has 30 dancers on a shift, if you can get every dancer -- a shift being eight

hours -- to do just one more dance per eight-hour shift, it's over $10,000 a month additional income into the stream of the club.

What other business can you so easily increase those gross numbers by?"

\* \* \*

"...delivering it to the executives so they can make the best business decisions possible in the shortest amount of time.  We've been able to reach out and test facilities that are thousands and thousands of miles away from where we're at here in the U.S. corporate offices."

\* \* \*

"One of the other niceties, besides the business element itself, is the fact that the revenue stream is so egregiously higher than other types of investments, and multifaceted.   That is to say, we have food sales, beverage sales, waitress sales, door admission sales.  But we also have that dancer income stream, and the profitability of the dancer income stream is extremely high compared to cost of other goods sold.  There is no innate cost to that; the dancers don't receive a payroll or a salary."

\* \* \*

"Those offices, in turn, report to the United States to the Los Angeles County world headquarters."

\* \* \*

"...over 2700 employees and 6,000 dancers operating in Russia, Europe, United Kingdom, the United States and Australia."

http://www.spearmintrhino.com/1corpvideo.html.   (Copy of transcript of corporate video appearing on website on June 30, 2009 attached hereto as Exhibit A).

16.    Defendants knew or should have known that the "income and profitablility stream" and "dancer income stream" discussed in the video attached as Exhibit A was unlawful as, among other things, Cal. Labor Code §350(e) and §351 confirm that all money given to dancers by patrons is the sole property of the dancer. Despite this, Defendants continued to willfully engage in the acts described below misclassifying dancers and splitting tip income in violation of their legal duties.

17.    At all relevant times, Defendants have owned and operated a night club business engaged in interstate commerce and which utilized goods which moved in interstate commerce.  For example, goods sold at the Spearmint Rhino Nightclubs are moved in interstate commerce.  Spearmint Rhino - Worldwide and Spearmint Rhino - Consulting own, manage and control the business operations at numerous nightclubs in several states doing business under the "Spearmint Rhino" moniker. (*See* www.spearmintrhino.com listing locations in all states).  Upon information and

COMPLAINT
42407

8

belief, during the relevant time period the annual gross revenues of each Defendant exceeded $500,000.00 per annum.

18.    By reason of the foregoing, Defendants, along with the Spearmint Rhino Nightclubs and the persons who directly and indirectly hold ownership interest in those entities, were at all relevant times enterprises engaged in commerce as defined in 29 U.S.C. §203(r) and §203(s). Defendants, the Spearmint Rhino Nightclubs and their owners constitute an "enterprise" within the meaning of 29 U.S.C. §203(r)(1), because they perform related activities through common control for a common business purpose. At relevant times, Plaintiff was jointly employed by Defendants and enterprises engaged in commerce within the meaning of 29 U.S.C. §206(a) and §207(a).

## IV.  GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS

19.    The FLSA applied to Plaintiff and the Class at all times in which they worked at the Spearmint Rhino Nightclubs.

20.    The California Labor Code also applied to each Class member during the period they worked at the Spearmint Rhino Nightclubs. Under 29 U.S.C. § 218(a) if application of the FLSA results in a lower minimum wage than that provided by the state wage and hour laws, such as the California Labor Code, the higher wages dictated by the state laws apply. At all relevant times, the minimum hourly wages under the FLSA have been lower than those provided by the California Labor Code.

21.    No exceptions to the application of the FLSA or the California Labor Code apply to Plaintiff and the Class. For example, no Class member has ever been a professional or artist exempt from the provisions of the FLSA or the California Labor Code. The exotic dancing performed by Class members while working at the Spearmint Rhino Nightclubs does not require invention, imagination or talent in a recognized field of artistic endeavor, and Class members have never been compensated by Defendants on a set salary, wage or fee basis. Rather, Class

members' sole source of income while working at the Spearmint Rhino Nightclubs have been tips given to them by patrons, (i.e. table dance tips and stage dance tips).

22. At relevant times, Plaintiff and each member of the Class, defined below, were employees of Defendants under the FLSA and the California Labor Code. Upon information and belief, during the relevant time period over 500 different women have worked as exotic dancers at the Spearmint Rhino Nightclubs without being paid any minimum wages while also being denied the rights and benefits of an employee.

23. At relevant times, Defendants have been the employers of Plaintiff and each member of the Class, defined below, under the FLSA, the California Labor Code and other applicable law. Defendants suffered or permitted Class members to work. Defendants directly or indirectly employed and exercised significant control over the wages, hours and working conditions of the exotic dancers in the Class.

24. At all relevant times, all Defendants have been the joint employers of Plaintiff and members of the Class (and/or Subclass) under the FLSA, the California Labor Code and/or other applicable law. Plaintiff's and Class members' employment for one Defendant is not completely disassociated from their employment by the other Defendant. Spearmint Rhino – Worldwide, Spearmint Rhino – Consulting, and Oxnard do not act entirely independent of each other and are not completely dissociated with respect to the employment of Plaintiff and the Class. Spearmint Rhino – Worldwide and Spearmint Rhino – Consulting maintain significant control over Plaintiffs and other Class members while working at the Spearmint Rhino Nightclubs. Spearmint Rhino – Worldwide and Spearmint Rhino – Consulting play significant roles in establishing, maintaining and directing the employment policies that are to be applied to Class members while working at the Spearmint Rhino Nightclubs. Spearmint Rhino – Worldwide and Spearmint Rhino – Consulting benefit financially from the work Class members perform while working at the Spearmint Rhino Nightclubs. Additionally, joint employers like Oxnard (and

COMPLAINT
42407

10

the other nominal operators / partners in the other Spearmint Rhino Nightclubs) act directly or indirectly in the interest of Spearmint Rhino – Worldwide and Spearmint Rhino – Consulting in relation to any supervision they provided Plaintiff and the other dancers in the Class.  As joint employers of Plaintiff and members of the Class, Spearmint Rhino – Worldwide and Spearmint Rhino – Consulting are responsible both individually and jointly for compliance with all of the applicable provisions of the FLSA and the California Labor Code.  29 C.F.R. §791.2(a) and (b).

25.    During the relevant time period, the employment terms, conditions and policies that applied to Plaintiff were the same as those applied to the other Class members who worked as exotic dancers at the Spearmint Rhino Nightclubs.

26.    Throughout the relevant time period, Defendants' policies and procedures regarding the classification of all exotic dancers (including Plaintiff) at the Spearmint Rhino Nightclubs and treatment of dance tips were the same.

27.    As a matter of common business policy, Defendants systematically misclassified Plaintiff and all Class members as independent contractors, as opposed to employees.  Defendants' classification of Plaintiff as independent contractors was not due to any unique factor related to their employment or relationship with Defendants.  Rather, as a matter of common business policy, Defendants routinely misclassified all exotic dancers as independent contractors as opposed to employees.  As a result of this uniform misclassification, Plaintiff and the members of the Class were not paid the minimum wages required under the FLSA and the California Labor Code, deprived of other statutory rights and benefits, and therefore, suffered harm, injury and incurred financial loss.

28.    Plaintiff and members of the Class incurred financial loss, injury and damage as a result of Defendants' common practices misclassifying them as independent contractors and failing to pay them minimum wages in addition to the tips that they were given by patrons.  Plaintiff's injury and financial loss was caused

by Defendants' application of those common policies in the same manner as they were applied to absent Class members.

29.   During the relevant time period, no Class member received any wages or other compensation from Defendants.  Members of the Class generated their income solely through the tips received from customers when they performed exotic table, chair, couch, lap and/or VIP room dances (hereinafter collectively referred to as "table dance tips").

30.   All monies Class members like Plaintiff received from customers when they performed exotic dances were tips, not wages or service fees. Tips belong to the person they are given to. Table dance tips were given by patrons directly to dancers in the Class and therefore, belong to dancers in the Class, not Defendants.  Cal. Labor Code § 350(e) confirms that all monies given to dancers by patrons are considered gratuities and therefore, are the sole property of the dancers.

31.   The full amount dancers in the Class are given by patrons in relation to exotic dances they perform are not taken into Defendants' gross receipts, with a portion then paid out to the dancers.  Neither Defendants nor any of their affiliated companies issue W-2 forms, 1099 forms nor any other documents to Class members indicating any amounts being paid from their gross receipts to Class members as wages.

32.   Plaintiff and members of the Class are tipped employees as they are engaged in an occupation in which they customarily and regularly receive more than $30 a month in tips. No tip credits offsetting any minimum wages due, however, are permitted under the California Labor Code.  Cal. Labor Code § 351.  Therefore, as employees of Defendants, Class members are entitled to: (i) receive the full minimum wages due under the California Labor Code, without any tip credit, and (ii) to retain the full amount of any table dance tips and monies given to them by customers when they perform exotic dances.

33.   Defendants' misclassification of Plaintiff and other Class members as independent contractors was designed to deny Class members their fundamental rights as employees to receive minimum wages, to demand and retain portions of tips given to Class member by customers, and done to enhance Defendants' profits at the expense of the Class.

34.   Defendants' misclassification of exotic dancers like Plaintiff was willful. Defendants knew or should have known that Plaintiff and the other dancers performing the same job functions were improperly misclassified as independent contractors. For instance, in *Harrell v. Diamond A Entertainment, Inc.*, 992 F.Supp. 1343, 1347-48 (M.D. Fla. 1997) the United States District Court for the Middle District of Florida confirmed:

> Arrangements factually similar to the one in this case have been tested by federal courts in Texas, Indiana and Colorado. *See Reich v. Circle C. Investments, Inc.*, 998 F.2d 324 (5th Cir.1993) (whether dancer was "employee" under FLSA); *Reich v. ABC/York-Estes Corp.*, 1997 WL 264379 (N.D.Ill.1997) (whether dance fees were "tips" under FLSA); *Reich v. Priba Corp.*, 890 F.Supp. 586 (N.D.Tex.1995) (whether dancer was "employee" under FLSA); *Reich v. ABC/York-Estes Corp.*, 157 F.R.D. 668 (N.D.Ill.1994) (whether dance fees were "tips" under FLSA), rev'd on other grounds,64 F.3d 316 (7th Cir.1995); *Martin v. Priba Corp.*, 1992 WL 486911 (N.D.Tex.) (whether dancer was "employee" under FLSA); *Martin v. Circle C Investments, Inc.*, 1991 WL 338239 (W.D.Tex.); *Donovan v. Tavern Talent & Placements, Inc.*, 1986 WL 32746 (D.Colo.) (whether "tips" could be used to offset completely the minimum wage requirement). Without exception, these courts have found an employment relationship and required the nightclub to pay its dancers a minimum wage.

35.   Employment is defined with "striking breadth" in the wage and hour laws. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 325-26, 112 S.Ct. 1344, 1349-50 (1992).   The determining factor as to whether dancers like Plaintiff are employees or independent contractors under FLSA or the California Labor Code is not the dancer's election, subjective intent or any contract. *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 727 (1947); *Real v. Driscoll Strawberry Associates, Ltd.*, 603 F.2d 748, 755 (9th Cir. 1979); *Borello & Sons v. Dept of Industrial Relations* (1989) 48 Cal.3d 341. Rather, the test for determining whether an individual is an

"employee" under the FLSA and the California Labor Code is the economic reality test.    Under the economic reality test, employee status turns on whether the individual is, as a matter of economic reality, in business for herself and truly independent, or rather is economically dependent upon finding employment in others.

36.    Any contract which attempts to have workers in the Class waive, limit or abridge their statutory rights to be treated as an employee under FLSA or the California Labor Code is void, unenforceable, unconscionable and contrary to public policy.  Workers in the Class cannot validly "elect" to be treated as employees or independent contractors under threat of adverse treatment.  Nor can workers in the Class agree to be paid less than the minimum wage.

37.    Despite this, Defendants unfairly, unlawfully, fraudulently and unconscionably attempt to coerce dancers in the Class to waive their FLSA and/or California Labor Code rights and elect to be treated as independent contractors. Defendants threaten to penalize and discriminate against dancers in the Class if they assert their FLSA and/or California Labor Code rights such as through termination and the confiscation of all table dance tips, among other adverse conditions and retaliations. Any such retaliation based on the assertion of statutory rights under the wage and hour laws is unlawful. 29 U.S.C. §215(a)(3);   Cal. Labor Code §98.6. Further, Cal. Labor Code §98.6(b) makes it unlawful for an employer to even threaten to discharge, demote, terminate or  discriminate in the terms and conditions of employment because an employee has made a bona fide complaint against an employer for violation of the Labor Code.  This protection encompasses the exercise of statutory rights on the employees own behalf and on behalf of others.  Any actual or threatened retaliation against an employee for the assertion of wage and hour law claims violates the state's fundamental public policy to protect the payment of wages and employee's rights.

38.    Under the applicable test, courts utilize several factors to determine economic dependence and employment status.  They are: (i) the degree of control exercised by the alleged employer, (ii) the relative investments of the alleged employer and employee, (iii) the degree to which the employee's opportunity for profit and loss is determined by the employer, (iv) the skill and initiative required in performing the job, (v) the permanency of the relationship, and (vi) the degree to which the alleged employee's tasks are integral to the employer's business.

39.    The totality of circumstances surrounding the employment relationship between Defendants and the dancers in the Class working at the Spearmint Rhino Nightclubs establishes economic dependence by the dancers on Defendants and employee status.  Here, as a matter of economic reality, Plaintiff and all other Class members are not in business for themselves and truly independent, but rather are economically dependent upon finding employment in others, namely Defendants. The dancers are not engaged in occupations or businesses distinct from that of Defendants.  Rather, their work is the basis for Defendants' business.  *See e.g.,* Exhibit A. Defendants obtain the customers who desire exotic dance entertainment and provide the workers who conduct the exotic dance services on behalf of Defendants.  Defendants retain pervasive control over the nightclub operation as a whole, and the dancer's duties are an integral part of the operation.

**A.    Degree Of Control – Plaintiffs And The Other Dancers Exercise No Control Over Their "Own" Or Their Employers' Business.**

40.    Plaintiff and the other members of the Class do not exert control over a meaningful part of the nightclub business and do not stand as separate economic entities from Defendants.  Defendants exercise control over all aspects of the working relationship with Plaintiffs and the other dancers in the nightclubs.

41.    Class members' economic status is inextricably linked to those conditions over which Defendants have complete control.  Plaintiff and the other

1    dancers are completely dependent on the Spearmint Rhino Nightclubs for their

2    earnings.  The club controls all of the advertising and promotion without which

3    dancers like Plaintiff could not survive economically. Moreover, Defendants create

4    and control the atmosphere and surroundings at the Spearmint Rhino Nightclubs, the

5    existence of which dictates the flow of customers into the club.  The dancers have no

6    control over the customer volume or the atmosphere at each of the nightclubs.

7         42.    Defendants employ guidelines and rules dictating the way in which

8    dancers like Plaintiff must conduct themselves while working at the Spearmint Rhino

9    Nightclubs.  Defendants set the hours of operation; length of shifts dancers must

10    work; the show times during which a dancer may perform; minimum table dance

11    tips; determine the sequence in which a dancer may perform on stage during her

12    stage rotation; the format and themes of dancers' performances (including their

13    costuming and appearances); theme nights; conduct while at work (i.e., that they be

14    on the floor as much as possible when not on stage and mingle with patrons in a

15    manner which supports Defendants' general business plan); pay tip-splits;  pay "tip-

16    outs" to managers, doormen and other employees who do not normally receive tips

17    from patrons; require that dancers help sell a minimum number of drinks to patrons

18    (or be penalized and have to buy the drinks themselves); and all other terms and

19    conditions of employment.

20         43.    Defendants require that Plaintiff and the other dancers in the Class

21    schedule work shifts. Defendants require that each shift worked by a dancer be of a

22    minimum number of hours.  Further, Defendants require dancers like Plaintiff to

23    clock-in and clock-out (or otherwise check in or report) at the beginning and end of

24    each shift.  If late or absent for a shift, a dancer is subject to fine, penalty, or

25    reprimand by Defendants. Once a shift starts a dancer, like Plaintiff, are required to

26    complete the shift and cannot leave early without penalty or reprimand.

27         44.    While working at the Spearmint Rhino Nightclubs dancers like Plaintiff

28    perform exotic table, chair, couch, lap and/or VIP room dances for patrons offering

COMPLAINT                                      16
42407

them tips (referred to herein "table dance tips" or "tips"). Defendants, not the dancers, set the minimum tip amount that dancers must collect from patrons when performing exotic dances. Defendants announce the minimum tip amounts to patrons in the nightclub wishing to see table dances.

45.   Defendants dictate the manner and procedure in which table dance tips are collected from customers and tracked. Each time a dancer performs an exotic table dance for a patron and receives a table dance tip, the dancer is required to immediately account to Defendants for their time and any table dance tip given to them by the patron. Additionally, Defendants employ other employees called "checkers," doormen and/or floor walkers to watch dancers work, count private dances they perform, and record the amount of any table dance tips received. At the end of a work shift, dancers like Plaintiffs are required to clock out and account to Defendants for all dances performed for the patrons of the nightclub. Then, in addition to any base "rent" payment, the dancer is required pay a portion of each table dance tip given to them by patrons over to Defendants as "rent." The rent payment typically exceeds 30% of each table dance tip.

46.   The entire sum that a dancer receives from the patron in relation to the table dance is not given to Defendants (and/or the nightclubs) and taken into their gross receipts. Rather, the dancers keep their share of the payment under the tip share policy and only pay over to Defendants and the nightclub the portion they demand as "rent." (*e.g.* $7 from each $20 table dance tip received). As a result, there is no pay out by Defendants to the dancer of any wage. Defendants (and/or the nightclubs) issue no 1099 forms, W-2 forms or other documents to any dancers showing any sums being paid to dancers as wages.

47.   Defendants establish the split or percentage which each dancer is required to pay it for each type of dance they receive table dance tips for during the work shift. In addition, per-dance amounts or "tip-outs" must be paid by dancers (e.g. approx. $1 for each dance) to the nightclub manager, dance checkers, disk-

jockey, bouncers/door staff and/or other employees as part of Defendants' tip-splitting policy.  Further, dancers are required to help Defendants' sell a minimum amount of drinks to patrons during each work shift.  If the minimum drink quota is not met, the dancers face penalties (such as being forced to buy the drinks themselves from Defendants).  Dancers are also required to help sell goods (such as Spearmint Rhino t-shirts, hats, and calendars) bearing the Spearmint Rhino logo to patrons as part of their job duties performing table dances.   As part of these "logo special" dances where goods are sold as a package with a table dance, Defendants also require dancers to perform for patrons for a longer period of time.   The foregoing establishes that Defendants control and set the terms and conditions of all dancer's work.  This is the hallmark of economic dependence and control.

### B.   Skill and Initiative of a Person in Business for Themselves

48.   Plaintiff, like all other dancers, does not exercise the skill and initiative of a person in business for themselves.

49.   Plaintiff, like all other dancers, is not required to have any specialized or unusual skills to work at the Spearmint Rhino Nightclubs.  Prior dance experience is not required to perform at the Spearmint Rhino Nightclubs.  Dancers are not required to attain a certain level of skill in order to work at the Spearmint Rhino Nightclubs. There are no dance seminars, no specialized training, no instruction booklets, and no choreography provided or required in order to work at any of the Spearmint Rhino Nightclubs.   The dance skills utilized are commensurate with those exercised by ordinary people who choose to dance at a disco or at a wedding.

50.   Plaintiff, like all other dancers, does not have the opportunity to exercise the business skills and initiative necessary to elevate their status to that of independent contractors.  Dancers, like Plaintiff, own no enterprise.  Dancers, like Plaintiff, exercise no business management skills.  Dancers maintain no separate business structures or facilities.  Dancers exercise no control over customer volume or atmosphere at the Spearmint Rhino Nightclubs.   Dancers do not actively

participate in any effort to increase the nightclub's client base, enhance goodwill, or establish contracting possibilities.  The scope of a dancer's initiative is restricted to decisions involving what clothes to wear (within Defendants' guidelines) or how provocatively to dance which is consistent with the status of an employee opposed to an independent contractor.

51.   Plaintiff, like all other dancers, is not permitted to hire or subcontract other qualified individuals to provide additional dances to patrons, and increase their revenues, as an independent contractor in business for themselves would.

**C.   Relative Investment**

52.   Plaintiff's relative investment is minor when compared to the investment made by Defendants.

53.   Plaintiff, like all other dancers, had made no capital investment in the facilities, advertising, maintenance, sound system and lights, food, beverage and other inventory, or staffing of the Spearmint Rhino Nightclubs.  All investment and risk capital is provided by Defendants.   Dancers' investment is limited to expenditures on costumes and make-up which they may choose to wear while working, and their own labor. But for Defendants' provision of the lavish nightclub work environment the dancers would earn nothing.

**D.   Opportunity for Profit and Loss**

54.   Defendants, not dancers like Plaintiff, manage all aspects of the business operation including attracting investors, establishing the hours of operation, setting the atmosphere, coordinating advertising, hiring and controlling the staff (managers, waitresses, bartenders, bouncers/doormen, etc.).   Defendants, not the dancers, take the true business risks for the Spearmint Rhino Nightclubs.   The transcript attached hereto as Exhibit A shows that Defendants, not the dancers, are responsible for attracting investors required to provide the capital necessary to open, operate and expand the nightclub business.

55. Dancers like Plaintiff do not control the key determinants of profit and loss of a successful enterprise. Specifically, Plaintiff is not responsible for any aspect of the enterprises' on-going business risk. For example, Defendants, not the dancers, are responsible for all financing, the acquisition and/or lease of the physical facilities and equipment, inventory, the payment of wages (for managers, bartenders, doormen, and waitresses), and obtaining all appropriate business' insurance and licenses. Defendants, not the dancers, establish the minimum table dance tip amounts that should be collected from patrons when dancing. Even with respect to any "rent" payments, the dancers do not truly pay the Club's "rent" for the exclusive use of space. Rather, the term "rent" is a misnomer or subterfuge for tip-splitting as in reality, Defendants simply demand a set portion (approx. 35%) of each table dance tip given to a dancer.

56. The extent of the risk that dancers like Plaintiff are confronted with is the loss of any "base rent" fee due to Defendants when the employee clocks out after each shift. Defendants, not the dancers, shoulder the risk of loss. The table dance tips the dancers receive are not a return for risk on capital investment. They are a gratitude for services rendered. From this perspective, it is clear that a dancer's "return on investment" (i.e. table dance tips) is no different than that of a waiter who serves food during a customer's meal at a restaurant.

**E. Permanency**

57. Certain dancers in the Class have worked at the Spearmint Rhino Nightclubs significant periods of time.

**F. Integral Part of Employer's Business**

58. Dancers like Plaintiff are essential to the success of the Spearmint Rhino Nightclubs. The continued success of the Spearmint Rhino Nightclubs depends to an appreciable degree upon the provision of exotic dances by dancers for patrons. In fact, the primary reason the nightclubs exist is to showcase the dancers' physical attributes for customers. The primary "product" or "good" Defendants are

1   in business to sell patrons that come to their nightclubs are lap dances performed by

2   the exotic dancers in the Class that Defendants' recruit to work in their clubs and

3   instruct to work in a specific way. *See*, Transcript, Exhibit A at pp. 4, 6, 8, 9, 15:

4   "...we, of course, have the most beautiful women in the world *work for*
    *us* as entertainers.

5

6   ...And the details, the level of details that we have at our clubs from the
    wall finishes to the pictures, to the line of sight to the pictures, to the
    furnishings *and, of course, to our product, which is the girls*....

7

8   ...We ensure that when we recruit the dancers and the workers in the
    club that they have good social skills; that they will sit with the
    customer and they won't hard-sell or pressurize him into a dance; that he
    can enjoy his experience..

9

10  ...What John Gray has brought to this industry is a clear vision. And
    within the vision is an understanding, it's almost a psychology, and it's
    putting value into the table dance.

11

12  ...Men are willing to pay for that type of attention and that's not sexual
    attention, that's fantasy attention and that's what the backbone of the
    clubs are all about. Another misnomer in the business is that it's that of
    a restaurant or a nightclub; that is to say, that the income stream is
    primarily that of door and drink or beverage sales. And while the
    income is certainly that, of the door and beverage sales, what makes
    these businesses go off the charts as regards to an income and
    profitability stream is the income made by these so-called couch dance
    or table dance.

13

14

15

16

17  ...But we also have the dancer income stream and the profitability of the
    dancer income stream is extremely high compared to cost of other
    goods sold."

18

19  (emphasis added).

20      59.    Many of the Spearmint Rhino Nightclubs do not serve alcohol and

21  therefore, are not truly in direct competition with other enterprises in the nightclub,

22  tavern or bar business. Absent the provision of exotic dances by dancers for

23  customers, a nightclub serving only non-alcoholic beverages would have difficulty

24  remaining in business. Moreover, Defendants are able to charge admission prices

25  and a much higher price for their drinks (e.g. $10 for soft drinks) than establishments

26  without exotic dancers because the dancers are the main attraction of the Spearmint

27  Rhino Nightclubs. Moreover, dancers in the Class must help sell Defendants' drink

28  products to customers. If the dancer does not meet her quota for drink sales to

COMPLAINT
42407

1   patrons, she is penalized by Defendant and required to purchase or pay for the drinks

2   herself.   As a result, the dancers are an integral part of the Spearmint Rhino

3   Nightclubs' business.

4       60.   The foregoing demonstrates that dancers in the Class like Plaintiff are

5   economically dependent on Defendants and subject to significant control by

6   Defendants. Therefore, Plaintiff was misclassified as an independent contractor and

7   should have been paid minimum wages at all times she worked at any Spearmint

8   Rhino Nightclub and otherwise been afforded all rights and benefits of an employee

9   under federal and state wage and hour laws.

10   **V.  DEFENDANTS' INTENT**

11       61.   All actions and agreements by Defendants described herein were

12   willful, intentional and not the result of mistake or inadvertence.

13       62.   Defendants were aware that the FLSA and/or California Labor Code

14   applied to their operation of the Spearmint Rhino Nightclubs at all relevant times and

15   that under the economic realities test applicable to determining employment status

16   under those laws the dancers were misclassified as independent contractors.

17   Defendants and their affiliated companies, were aware of and/or the subject of

18   previous litigation and enforcement actions relating to wage and hour law violations

19   where the misclassification of exotic dancers as independent contractors was

20   challenged. In the vast majority of those prior cases, exotic dancers working under

21   conditions similar to those employed at the Spearmint Rhino Nightclubs were

22   determined to be employees under the wage and hour laws, not independent

23   contractors. *See e.g.*, *Harrell*, 992 F Supp 1343 (M.D. Fla. 1997)(quoted above,

24   citing cases). Further Defendants were aware, and on actual or constructive notice,

25   that Cal. Labor Code §350(e), §351 and AB 2509 rendered all table dance tips given

26   to class members by patrons when working in the Spearmint Rhino Nightclubs the

27   dancer/class member's sole property, rendering Defendants' tip-share, rent and tip-

28   out polices unlawful.   Despite being on notice of their violations, Defendants

COMPLAINT
42407

22

1  intentionally chose to continue to misclassify dancers like Plaintiffs, withhold
2  payment of minimum wages and require dancers to split their tips with Defendants
3  and their employees, to them in effort to enhance their profits.  Such conduct and
4  agreements were intentional, unlawful, fraudulent, deceptive, unfair and contrary to
5  public policy.

## VI.  INJURY AND DAMAGE

7  63.    Plaintiff and all Class members suffered injury, were harmed, incurred
8  damage and financial loss as a result of Defendants' conduct complained of herein.
9  Among other things, Plaintiff and the Class were entitled to minimum wages and to
10  retain all of the table dance tips and other tips they were given by patrons.  By failing
11  to pay Plaintiff and the Class minimum wages and interfering with their right to
12  retain all of the table dance tips and other tips they were given by patrons,
13  Defendants injured Plaintiff and the members of the Class and caused them financial
14  loss, harm, injury and damage.

## VII.  CLASS ALLEGATIONS

16  64.    Plaintiff brings this action individually and as a class action pursuant to
17  Rule 23 of the Federal Rules of Civil Procedure as to Counts 2, 3 and 4.  Count 1, in
18  contrast, is brought pursuant to 29 U.S.C. § 216(b).

19  65.    All requirements of Fed.R.Civ.P. 23 (a) and (b) are satisfied.

20  66.    The Class to be certified against Defendants Spearmint Rhino -
21  Worldwide and Spearmint Rhino - Consulting is defined as follows:

> All individuals, who at any time from the date four years prior to the
> date the Complaint was originally filed continuing through the present,
> worked as an exotic dancer at any of the Spearmint Rhino Nightclubs in
> the state of California, but were designated as an independent contractor
> and therefore, not paid any minimum wages.

(Referred to herein as the "Class").  Additionally, the Class contains a subclass
to be certified against Defendants Spearmint Rhino - Worldwide, Spearmint
Rhino - Consulting and Oxnard, defined as follows:

COMPLAINT
42407

23

All individuals, who at any time from the date four years prior to the date the Complaint was originally filed continuing through the present, worked as an exotic dancer at Spearmint Rhino - Oxnard, but were designated as an independent contractor and therefore, not paid any minimum wages.

(Referred to herein as the "Subclass").

67.    The individuals in both the Class and Subclass are so numerous that joinder of all members is impracticable. Although the precise number of such individuals is currently unknown, Plaintiff believes that the number of individuals who have worked as exotic dancers at each of the Spearmint Rhino Nightclubs during the relevant time period but who were not paid any minimum wages exceeds 500 women.

68.    There are questions of law and fact common to the Class and Subclass that predominate over any questions solely affecting individual members, including, but not limited to:

      a. whether Defendants violated the FLSA and/or the California Labor Code by classifying all exotic dancers at the Spearmint Rhino Nightclubs as "independent contractors," as opposed to employees, and not paying them any minimum wages;

      b. whether the monies given to dancers by patrons when they perform table dances are gratuities;

      c. whose property the monies given to dancers when they perform table dances is;

      d. whether Defendants unlawfully required Class members to split their tips with Defendants and Defendants' employees;

      e. whether Defendants are joint employers of the dancers in the Class;

      f. whether Defendants and certain third parties agreed and conspired to deny class member their rights under the wage and hour laws;

      g. whether Defendants failed to keep required employment records;

h. whether Defendants violated the UCL by engaging in unlawful, unfair fraudulent, and/or unconscious acts, including those classifying all exotic dancers at the Spearmint Rhino Nightclubs as "independent contractors" as opposed to employees, not paying them any minimum wages, splitting their tips, and threatening to terminate them and impose penalties and other discrimination if they ever tried to exercise their statutory rights;

i. the amount of damages, restitution and/or other relief (including all applicable civil penalties, liquidated damages and equitable relief) available which Plaintiff and the Class are entitled to.

69. Plaintiff's claims are typical of those of the Class and Subclass. Plaintiff, like other members of the Class, was misclassified as an independent contractor and denied her rights to wages and to keep all of her gratuities under the wage and hour laws. The misclassification of Plaintiff resulted from the implementation of a common business practice which affected all Class members in a similar way. Plaintiff challenges Defendants' business practices under legal theories common to all Class members.

70. Plaintiff and the undersigned counsel are adequate representatives of the Class. Plaintiff is a member of the Class. Given Plaintiff's injury and loss, Plaintiff has the incentive and is committed to the prosecution of this action for the benefit of the Class. Plaintiff has no interest that are antagonistic to those of the Class or that would cause them to act adversely to the best interests of the Class. Plaintiff has retained counsel experienced in class action litigation, including wage and hour disputes.

71. This action is maintainable as a class action under Fed.R.Civ.P. 23(b)(1) and 23(c)(4) because the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to

1    individual members of the Class which would establish incompatible standards of

2    conduct for Defendants.

3        72.    This action is maintainable as a class action under Fed.R.Civ.P. 23(b)(3)

4    because questions of law and fact common to the Class and Subclass predominate

5    over any questions affecting only individual members of the Class and because a

6    class action is superior to other methods for the fair and efficient adjudication of this

7    action.

### FIRST CAUSE OF ACTION
### VIOLATION OF THE FLSA
**(Failure to Pay Statutory Minimum Wages)**
**(Against all Defendants)**

11        73.    Plaintiff hereby incorporates all of the preceding paragraphs by

12    reference as if fully set forth herein, unless inconsistent.

13        74.    At relevant times, Defendants jointly employed Plaintiff within the

14    meaning of the FLSA.

15        75.    29 U.S.C. § 206 requires that Defendants pay all employees minimum

16    wages for all hours worked. 29 U.S.C. § 206(a) provides in pertinent part:

> Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following rates:

> (1) except as otherwise provided in this section, not less than--

> (A) $5.85 an hour, beginning on the 60th day after May 25, 2007;
> (B) $6.55 an hour, beginning 12 months after that 60th day; and
> (C) $7.25 an hour, beginning 24 months after that 60th day;

23        76.    Prior to 2007, 29 U.S.C. 206(a)(1) read: "except as otherwise provided

24    in this section, not less than $4.25 an hour during the period ending on September

25    30, 1996, not less than $4.75 an hour during the year beginning on October 1, 1996,

26    and not less than $5.15 an hour beginning September 1, 1997".

27        77.    29 U.S.C. § 207(a) provides in pertinent part:

28

---

COMPLAINT
42407

... no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate of not less than one and one-half times the regular rate at which he is employed.

78. Like other dancers working at the Spearmint Rhino Nightclubs, Defendants failed to pay Plaintiff the minimum wages set forth in 29 U.S.C. §206 or §207, or any wages whatsoever. In fact, Defendants required that dancers like Plaintiff actually pay them in order to work.

79. Defendants failed to pay dancers like Plaintiff minimum wages throughout the relevant time period because it misclassified her as an independent contractor.

80. The amounts paid to exotic dancers, like Plaintiff, by customers in relation to private table dances performed were tips, not wages. Those monies were not the property of Defendants. The entire amount collected from customers in relation to table dances performed by exotic dancers were not made part of any Defendants' gross receipts at any point.

81. As a result, the amounts paid dancers like Plaintiff by customers in relation to private table dances were tips, not wages or service fees, and no part of those amounts can be used to offset Defendants' obligation to pay dancers, like Plaintiff, minimum wages due. *See e.g.*, *Reich v. ABC/York-Estes Corp.*, 157 F.R.D. 668, 680 (N.D.Ill.1994), rev'd on other grounds, 64 F.3d 316 (7th Cir.1995); *Reich v. ABC/York-Estes Corp.*, 1997 WL 264379 at *5-7 (N.D.Ill.1997).

82. Further, no tip credit applies to reduce or offset any minimum wages due. The FLSA only permits an employer to allocate an employee's tips to satisfy a portion of the statutory minimum wage requirement provided that the following conditions are satisfied: (1) the employer must inform the tipped employees of the provisions of § 3(m) of the FLSA, 29 U.S.C. § 203(m); and (2) tipped employees

must retain *all the tips* received except those tips included in a tipping pool among employees who customarily receive tips. 29 U.S.C. § 203(m).

83. Neither of these conditions was satisfied. Defendants did not inform dancers like Plaintiff of the provisions of § 3(m) of the FLSA, 29 U.S.C. § 203(m); and Plaintiff did not retain all the tips received except those tips included in a tipping pool among employees who customarily receive tips. 29 U.S.C. § 203(m). Defendants never notified any dancers that their table dance tips were being used to reduce the minimum wages otherwise due under FLSA's tip-credit provisions and that they were still due the reduced minimum wage for tipped employees. Rather, Defendants maintained that no dancers were ever due any minimum wages due to their classification as independent contractors and, in turn, were paid none.

84. Further, Defendants' requirement that dancers like Plaintiff split their tips and (i) pay Defendants a portion of all table dance tips as "rent"; and (ii) also pay a percentage of their tips as "tip-outs" to other employees who do not customarily receive tips, such as managers, checkers, disc-jockeys and bouncers/doormen/floor walkers, was not part of a valid tip pooling or tip sharing arrangement.

85. Based on the foregoing, Plaintiff is entitled to the full statutory minimum wages set forth in 29 U.S.C. §§206 and 207 for all periods in which she worked at the Spearmint Rhino Nightclubs, along with all applicable penalties, liquidated damages, and other relief.

86. Defendants' conduct in misclassifying dancers like Plaintiff as independent contractors was intentional and willful and done to avoid paying them minimum wages and the other benefits that they were legally entitled to.

87. The FLSA provides that a private civil action may be brought for the payment of federal minimum wages and for an equal amount in liquidated damages in any court of competent jurisdiction by an employee pursuant to 29 U.S.C. §216(b) ("Any employer who violates the provisions of section 206 or section 207 of this title

1  shall be liable to the employee or employees affected in the amount of their unpaid

2  minimum wages, or their unpaid overtime compensation, as the case may be, and in

3  an additional equal amount as liquidated damages."). Moreover, Plaintiff may

4  recover attorneys' fees and costs incurred in enforcing her rights pursuant to 29

5  U.S.C. §216(b).

6      88.    12 U.S.C. §211(c) provides in pertinent part:

7      (c) Records

8      Every employer subject to any provision of this chapter or of any order
9  issued under this chapter shall make, keep, and preserve such records of
   the persons employed by him and of the wages, hours, and other
10 conditions and practices of employment maintained by him, and shall
   preserve such records for such periods of time, and shall make such
11 reports therefrom to the Administrator as he shall prescribe by
   regulation or order as necessary or appropriate for the enforcement of
12 the provisions of this chapter or the regulations or orders thereunder.

13     89.    29 C.F.R.§516.2 and 29 C.F.R. §825.500 further require that every

14 employer shall maintain and preserve payroll or other records containing, without

15 limitation, the total hours worked by each employee each workday and total hours

16 worked by each employee each workweek.

17     90.    29 U.S.C. §215(a)(5) provides in pertinent part:

18     ...[I]t shall be unlawful for any person—

19     (5) to violate any of the provisions of section 211(c) of this title...

20     91.    To the extent Defendants failed to maintain all records required by the

21 aforementioned statutes and regulations, and failed to furnish Plaintiff

22 comprehensive statements showing the hours that they worked during the relevant

23 time period, it also violated the aforementioned laws causing Plaintiff damage.

24     92.    When the employer fails to keep accurate records of the hours worked

25 by its employees, the rule in *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680,

26 687-688 66 S.Ct. 1187 (1946) is controlling. That rule states:

27     ... where the employer's records are inaccurate or inadequate ... an
28 employee has carried out his burden if he proves that he has in fact
   performed work for which he was improperly compensated and if he

COMPLAINT
42407

29

produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

93.    The Supreme Court set forth this test to avoid placing a premium on an employer's failure to keep proper records in conformity with its statutory duty, thereby allowing the employer to reap the benefits of the employees' labors without proper compensation as required by the FLSA.    Where damages are awarded pursuant to this test, "[t]he employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with ... the Act." *Id.*

94.    Based on the foregoing, Plaintiff seeks unpaid minimum wages at the required legal rate for all working hours during the relevant time period, back pay, restitution, damages, reimbursement of any base rent and tip-splits, liquidated damages, prejudgment interest calculated at the highest legal rate, attorneys' fees and costs, and all other costs, penalties and other relief allowed by law.

## SECOND CAUSE OF ACTION

**VIOLATION OF CALIFORNIA LABOR CODE**
**(Failure to Pay Statutory Minimum Wages)**
**(Against Defendants Spearmint Rhino – Worldwide, Spearmint Rhino – Consulting and Oxnard On Behalf of the Class and Subclass)**

95.    Plaintiff hereby incorporates all of the preceding paragraphs by reference as if fully set forth herein.

96.    At relevant times, Plaintiff and all members of the Class were employees of the Defendants within the meaning of California Labor Code §350(b).

97.    At all relevant times, all Defendants were the employers of Plaintiff and all members of the Class within the meaning of California Labor Code §350(a) and any other applicable laws and regulations. Each Defendant was "a person engaged in

1   any business or enterprise in this state that has one or more persons in service under

2   any appointment, contract of hire, or apprenticeship, express or implied, oral or

3   written, irrespective of whether the person is the owner of the business or is

4   operating on a concessionaire or other basis."

5       98.    Defendants Spearmint Rhino-Worldwide and Spearmint Rhino

6   Consulting were joint employers of Plaintiff and the Class, along with any other

7   nominal owners of the Spearmint Rhino Nightclubs where the dancers in the Class

8   worked (such as Oxnard).   The names of the individuals and/or entities which are

9   the nominal owners of the Spearmint Rhino Nightclubs other than Oxnard are

10   currently unknown and but will be obtained in discovery.

11       99.    Defendant failed to pay Plaintiff and the members of the Class required

12   minimum wages for the time they spent working at the Spearmint Rhino nightclubs.

13   Defendants paid no dancer in the class wages.   Instead, Defendants unlawfully

14   charged dancers in the class money to work by taking a portion of their tips; charging

15   "rent," "house-fees" or "stage fees;" requiring dancers to help sell beverages and

16   other goods to patrons or to personally buy them from Defendants; and/or collecting

17   fines and penalties, among other things.

18       100.  The California Labor Code requires that all employees be paid

19   minimum wages by their employers.   Cal. Labor Code §1194 provides:

20       (a) Notwithstanding any agreement to work for a lesser wage, any
21   employee receiving less than the legal minimum wage or the legal
    overtime compensation applicable to the employee is entitled to recover
22   in a civil action the unpaid balance of the full amount of this minimum
    wage or overtime compensation, including interest thereon, reasonable
23   attorney's fees, and costs of suit.

24   Cal. Labor Code §1197(a) further provides: that "the payment of a less wage that the

25   minimum so fixed is unlawful."

26       101.  California wage and hour laws provide greater protections for workers

27   than the FLSA.   The California Minimum Wage is higher than the minimum wage

28

COMPLAINT
42407

1    required by FLSA.  Therefore, the higher California Minimum Wage applies to all

2    members of the Class.  29 U.S.C. §218(a).

3        102.  Cal. Labor Code §350(e) confirms that any amounts paid directly by a

4    patron to a dancer is a gratuity or tip belonging solely and entirely to her.  Assembly

5    Bill 2509 further confirms this.  See Letter of Department of Industrial Relations,

6    Division of Labor Standards Enforcement, dated June 22, 2001 (true and correct

7    copy attached hereto as Exhibit B and incorporated herein).

8        103.  California law does not allow for any reduction or offset against

9    minimum wage due based on tips received.  Cal. Labor Code §351 provides:

> No employer or agent shall collect, take, or receive any gratuity or a
> part thereof that is paid, given to, or left for an employee by a patron, or
> deduct any amount from wages due an employee on account of a
> gratuity, or require an employee to credit the amount, or any part
> thereof, of a gratuity against and as a part of the wages due the
> employee from the employer. Every gratuity is hereby declared to be the
> sole property of the employee or employees to whom it was paid, given,
> or left for.

14

15        104.  All amounts paid to class members by customers in relation to dances,

16   goods sold and other work performed while working at the Spearmint Rhino

17   Nightclubs were tips and gratuities, not wages or service fees; belong solely to the

18   class member; and cannot be used to offset Defendants' obligation to pay them

19   minimum wages.  Exhibit B.

20        105.  Employers like Defendants must pay premium or overtime rates when

21   employees work beyond specific daily or weekly limits.  For example, Cal. Labor

22   Code §510(a) provides that employees shall receive compensation at not less than 1

23   ½ times the regular rate for employment in excess of 8 hours per day, 40 hours in a

24   workweek or for working the first 8 hours on the seventh consecutive workday in

25   one workweek.

26        106.  As a result of Defendants' conduct described above, members of the

27   Class were injured, damaged, harmed and incurred financial loss.

28

COMPLAINT
42407

107. Defendants Spearmint Rhino – Worldwide, Spearmint Rhino – Consulting and Oxnard failed to pay Plaintiff, or any other member of the California Subclass Class, any minimum hourly wages for their labor during the relevant time period. Rather, Defendants systematically misclassified all dancers in the Class as independent contractors, as opposed to employees, so as to attempt to avoid paying Class members any wages and other benefits due employees. All unpaid wages must now be paid to the Class, along with other relief appropriate under the circumstances.

108. Cal. Labor Code §1194.2 provides:

> In any action under Section 1193.6 or Section 1194 to recover wages because of the payment of a wage less than the minimum wage fixed by an order of the commission, an employee shall be entitled to recover liquidated damages in an amount equal to the wages unlawfully unpaid and interest thereon.

109. To the extent Defendants Spearmint Rhino – Worldwide, Spearmint Rhino – Consulting and Oxnard failed to maintain all records required by the aforementioned statutes and regulations, it also violated the applicable law causing the Class further damage.

110. The California Labor Code, including Cal. Labor Code § 226(a), required Defendants to maintain records regarding each Class member's employment, including hours worked and any deductions from wages.

111. To the extent Defendants failed to maintain complete records regarding each Class member's employment, including hours worked and any deductions from wages, Defendants violated applicable law.

112. None of the provisions of the Labor Code can be contravened, set aside abrogated, or waived by Class members. *See*, Cal. Labor Code § 219.

113. Plaintiff and the class allege that the Court in *Hernandez v. Mendoza* (1988) 199 Cal.App.3d 721 adopted the rule in *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687-688 66 S.Ct. 1187 (1946), stating:

> Although the employee has the burden of proving that he performed work for which he was not compensated, public policy prohibits making that burden an impossible hurdle for the employee. (*Anderson v. Mt.*

COMPLAINT
42407

33

*Clemens Pottery Co., supra*, 328 U.S. 687.) [W]here the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes a ... difficult problem arises. The solution, however, is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation .... In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

114.  As a result of the foregoing conduct, Plaintiff seeks on behalf of herself and all members of the Class unpaid minimum wages at the required legal rate for all of their working hours during the relevant time period; all other damages; attorneys' fees and costs; restitution; interest calculated at the highest legal rate; and all other relief allowed by law.

### THIRD CAUSE OF ACTION
### VIOLATION OF CALIFORNIA LABOR CODE
**(Unlawful Tip-Splitting and Acceptance of Other Payments from Dancers)**
**(Against Defendants Spearmint Rhino – Worldwide, Spearmint Rhino – Consulting and Oxnard On Behalf of the Class and Subclass)**

115.  Plaintiff hereby incorporates all of the preceding paragraphs by reference as if fully set forth herein.

116.  At relevant times, Plaintiff and all members of the Class (and Subclass) were employees of the Defendants within the meaning of the California Labor Code. At all relevant times, all Defendants were the joint employers of Plaintiff and all members of the Class within the meaning of the California Labor Code.

117.  Defendants are subject to Wage Order 10, 8 CCR 11000 which regulates "any industry, business or establishment operated for the purpose of furnishing entertainment or recreation to the public, including but not limited to

1    *theaters, dance halls,* bowling alleys, billiard parlors, skating rinks, riding

2    academies, racetracks, amusement parks, athletic fields, swimming pools,

3    gymnasiums, gold courses, tennis courts, carnivals, and *wired music studios*."

4    (Emphasis added)

5        118. In addition, and in the alternative, Defendants are subject to Wage

6    Order 5, 8 CCR 11050, which regulates, *inter alia*, "Public Housekeeping Industry"

7    embracing any industry, business or establishment which provides meals, housing, or

8    maintenance services whether operated as a primary business or when incidental to

9    other operations in an establishment not covered by an industry order of the

10   Commission, and includes, but is not limited to the following: (1) Restaurants, *night*

11   *clubs, taverns*, bars, cocktail lounges, lunch counters, cafeterias, boarding houses,

12   clubs, and all similar establishments where food in either solid or liquid form is

13   prepared and served to be consumed on the premises.

14       119. Cal. Labor Code §350(e) confirms that any amounts paid directly by a

15   patron to a dancer is a gratuity or tip belonging solely and entirely to the dancer:

16       "Gratuity" includes any tip, gratuity, money, or part thereof that has
17       been paid or given to or left for an employee by a patron of a business
         over and above the actual amount due the business for services rendered
18       or for goods, food, drink, or articles sold or served to the patron. *Any*
         *amounts paid directly by a patron to a dancer employed by an*
19       *employer subject to Industrial Welfare Commission Order No. 5 or 10*
         *shall be deemed a gratuity.*

20       120. Assembly Bill 2509 confirmed that the full amount given to or left for a

21   dancer (like Plaintiff and the Class) is a gratuity and the sole property of the dancer.

22   On June 22, 2001, the State of California, Department of Industrial relations.

23   Division of Labor Standards Enforcement published an opinion letter further

24   confirming this and stating:

25       By adding this provision, any amounts that are directly paid by a
         customer to a dancer, are defined as a gratuity and are sole property of
26       the dancer, notwithstanding "the actual amount due the business for
         services rendered." AB 2509 thus expanded the definition of a gratuity
27       for dancers. By way of illustration:

28

A customer in a restaurant leaves $60 for the waiter, on a bill for $50. The waiter is entitled to keep only $10, the amount of the gratuity. The underlying $50 is "the actual amount due the business for services rendered or for goods, food, drink . . . sold or served to the patron," and this amount is collected by the waiter for delivery to the employer. *In contrast, a patron at a striptease theater gives $30 to a dancer, consisting of $20 for the dance fee (which may have been pre-set by the employer) plus $10 as an additional amount for the dancer's services. Under AB 2509, the dancer is entitled to keep the entire $30.*

\* \* \*

As a caveat to this, however, please note that if the T-shirt sales are accomplished through dancing (e.g., while dancing, the dancer sells a shirt she is wearing to a customer so that the "sale of the shirt" is nothing more than a means of accomplishing a striptease dance) then the special definition would apply.

\* \* \*

Over the past seven or eight years, the State Labor Commissioner's office has received substantial numbers of complaints from dancers about being forced to pay "stage fees" to their employers in order to be granted the "privilege" of working. These "stage fees," often in the amount several hundred dollars per shift, were taken from the amounts that customers paid to dancers for their services. Dancers' organizations were instrumental in supporting the legislation that clearly prohibits this practice.

(Emphasis added).

121. All table dance tips and/or other amounts that patrons gave directly to members of the Class were tips / gratuities belonging entirely and solely to the Class member.

122. No part or portion of these sums should have been paid by any Class member to Defendants as rent, stage fees, house fees or otherwise.

123. No part or portion of these sums should have been paid by Plaintiff or any Class members to any other employees of Defendants (such as managers, doormen, floor walkers, checkers, or disk jockeys) as "tip-outs" or otherwise. This practice was not part of any valid tip-pool. Managers, doormen, floor walkers, checkers, and disk jockeys are not employees who typically receive tips.

124. California law does not allow for any reduction or offset in the minimum wages due based on tips received. Cal. Labor Code §351 provides:

No employer or agent shall collect, take, or receive any gratuity or a part thereof that is paid, given to, or left for an employee by a patron, or deduct any amount from wages due an employee on account of a gratuity, or require an employee to credit the amount, or any part

thereof, of a gratuity against and as a part of the wages due the employee from the employer. Every gratuity is hereby declared to be the sole property of the employee or employees to whom it was paid, given, or left for. An employer that permits patrons to pay gratuities by credit card shall pay the employees the full amount of the gratuity that the patron indicated on the credit card slip, without any deductions for any credit card payment processing fees or costs that may be charged to the employer by the credit card company. Payment of gratuities made by patrons using credit cards shall be made to the employees not later than the next regular payday following the date the patron authorized the credit card payment.

125.   Cal. Labor Code §221 and §224 further provide that it is unlawful for an employer to divert any part of an employee's wages to itself.

126.   Defendants violated the aforementioned laws by requiring Plaintiff and Class members: (a) to pay Defendants rent, stage fees, house-fees, or other amounts; (b) to pay Defendants a portion of each table dance tip received from patrons; (c) to pay tip-outs to Defendants' employees who do not normally receive tips (including managers, doormen, floor walkers and disk-jockeys); (d) to sell goods (drinks, t-shirts, novelties) for Defendants as part of a dance and pay Defendants' money; (e) to pay Defendants for drinks not sold to patrons.

127.   Based on the foregoing, all members of the Class were injured, damaged and incurred financial loss as a result of the conduct of Defendants.

128.   All monies Defendants collected from these practices must be refunded to Plaintiff and the Class, in addition to the minimum wages Defendant did not pay and other relief and amounts allowed by law.

129.   Cal. Labor Code §353 provides: "Every employer shall keep accurate records of all gratuities received by him, whether received directly from the employee or indirectly by means of deductions from the wages of the employee or otherwise. Such records shall be open to inspection at all reasonable hours by the department."

130.   The California Labor Code, including Cal. Labor Code § 226(a),
required Defendants to maintain records regarding each Class member's
employment, including hours worked and any deductions from wages.

131.   To the extent Defendants failed to maintain complete records regarding
each Class member's employment, including hours worked and any deductions from
wages, Defendants violated the law, causing the Class damage.

132.   As a result of the foregoing, Plaintiff seeks on behalf of herself and all
members of the Class unpaid minimum wages at the required legal rate for all of
their working hours during the relevant time period, reimbursement of any base rent,
liquidated damages in an amount equal to the wages unlawfully unpaid and interest
thereon, full refund of all tip-splits and other amounts paid Defendants, full refund of
all tip-outs or other amounts paid other employees, attorneys' fees and costs, and all
other damages, restitution, costs, interest calculated at the highest legal rate, and all
other relief and amounts allowed by law.

## FOURTH CAUSE OF ACTION

**(VIOLATION OF BUS. & PROF. CODE §17200 *et seq.*)**
**(Against Defendants Spearmint Rhino – Worldwide, Spearmint Rhino –
Consulting and Oxnard On Behalf of the Class and Subclass)**

133.   Plaintiff incorporates the allegations of all the foregoing paragraphs by
reference, as if fully set forth herein.

134.   Plaintiff brings this action individually, on behalf of the Class, and on
behalf of the general public pursuant to § 17200 *et. seq.* of the Bus. & Prof. Code,
the Unfair Competition Act (the "UCL").

135.   The conduct of Defendants, as described above, constituted unlawful,
unfair, unconscionable and/or fraudulent business acts or practices.

136.   Plaintiff brings this claim on behalf of the Class pursuant to Bus. &
Prof. Code §17204 which prohibits unfair competition, defined as "any unlawful,
unfair or fraudulent business act or practice." On behalf of the Class, Plaintiff seeks

COMPLAINT
42407

38

compensation for the loss of their property and the personal financial impacts they have suffered as a result of Defendants' unfair business practices. Defendants' conduct, as described above, has been and continues to be deleterious to the Class and Plaintiff are seeking to enforce important rights affecting the public interest within the meaning of Code of Civil Procedure §1021.5.

137. Upon information and belief, the unlawful, unfair, unconscionable and fraudulent business acts and practices being challenged were conducted in and from the principal offices of Defendants Spearmint Rhino – Worldwide, Spearmint Rhino – Consulting and Oxnard in California and emanated to and affected Class members in other districts, including those in California where Spearmint Rhino Nightclubs are located. Further, Defendants entered into agreements and conspired amongst themselves (and with certain third parties in the enterprise who own part of other Spearmint Rhino Nightclubs) to engage in the above-described unlawful, unfair, unconscionable and/or fraudulent business acts and practices in California and that conduct harmed Class members and caused them injury and financial loss. As such, the UCL applies to all such transactions and dealings.

138. By failing to pay its employees minimum wages in violation of FLSA and/or the California Labor Code and/or any other state or federal law or regulation, as described above, Defendants engaged in unlawful, unfair, unconscionable and/or fraudulent business acts or practices in violation of the UCL.

139. Unpaid wages constitute restitution of property earned by the employee.

140. By requiring Class members to share their tips (e.g., table dance tips) with Defendants and / or their employees (tip-outs) in violation of FLSA and/or the California Labor Code and/or any other state or federal law or regulation, as described above, Defendants engaged in unlawful, unfair, unconscionable and/or fraudulent business acts or practices in violation of the UCL.

141. By attempting to have Class members waive, abridge or limit their rights under the FLSA and/or the California Labor Code in order to work as exotic

1    dancers at the Spearmint Rhino Nightclubs, Defendants engaged in unlawful, unfair,

2    unconscionable and/or fraudulent business acts or practices in violation of the UCL.

3    142.   By threatening to retaliate against and penalize Class members for

4    asserting their rights under the FLSA or the California Labor Code (such as by

5    terminating them, confiscating their tips, and/or imposing other penalties and

6    discrimination), Defendants engaged in unlawful, unfair, unconscionable and/or

7    fraudulent business acts or practices in violation of the UCL.

8    143.   By failing to maintain employment records under the FLSA and/or the

9    California Labor Code, Defendants engaged in unlawful, unfair, unconscionable

10   and/or fraudulent business acts or practices in violation of the UCL.

11   144.   The acts complained of herein, and each of them, constitute unfair,

12   unlawful, unconscionable and/or fraudulent business practices in violation of

13   Business and Professions Code §17200 *et. seq.*   Defendants' acts and practices

14   described herein offend established public policies, including, but not limited to

15   those set forth in the FLSA and/or the California Labor Code (including Cal. Labor

16   Code §356), and involve business practices that are immoral, unethical, oppressive,

17   and/or unscrupulous.

18   145.   The unfair business practices set forth above have and continue to injure

19   the Class and the general public and cause injury and the loss of money, as described

20   further within.   These violations have unjustly enriched the Defendants at the

21   expense of the Class.   As a result, Plaintiff, the Class and the general public are

22   entitled to restitution.

23   146.   By reason of the foregoing, Plaintiff and each member of the Class are

24   entitled to recover from Defendants restitution, backpay, declaratory relief, the cost

25   of bringing this action (including reasonable attorneys' fees and costs), and any other

26   relief allowed by law and deemed just and equitable in the circumstances.

27

28

### XIII.  JURY DEMAND

Plaintiff reserves her right to and hereby request a trial by jury on all matters so triable.

### IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of the Class, prays for an order for relief as follows:

1.     That all Defendants be found jointly and severally liable to Plaintiffs and the Class and Subclass;

2.     For a declaration that Defendants violated the rights of Plaintiff and the Class under the FLSA, California Labor Code and/or any other applicable law;

3.     For nominal damages;

4.     For compensatory and actual damages;

5.     For restitution of all monies due Plaintiff and the Class and disgorged profits from the unlawful business practices of Defendants;

6.     For all backpay, unpaid wages, and a refund of all tips, "rent", tip-outs, fines and other amounts paid by Plaintiff and members of the Class to Defendants and their employees;

7.     For all statutory damages, liquidated damages, penalties and/or other relief allowed by federal and state wage and hour statutes and regulations and/or other laws;

8.     For accrued interest;

9.     For an order certifying the Class and Subclass under Fed.R.Civ.P. 23;

10.    For costs of suit and expenses incurred herein, including reasonable attorneys' fees allowed under relevant provision of law including those allowed under 29 U.S.C. §216(b), California Labor Code §218.5, §1194(a) California Code of Civil Procedure §1021.5 and/or other applicable provision of law;

1    11.    For any and all other relief that the Court may deem just, proper and

2    equitable in the circumstances.

3

4                                            RIDOUT & LYON, LLP

5    Dated:      10/27/09

6                                            Christopher P. Ridout, CA Bar No. 143931
                                             Devon M. Lyon CA Bar No. 218293
7                                            555 E. Ocean Boulevard, Suite 500
                                             Long Beach, CA  90802
8                                            (562) 216-7380 Telephone
                                             (562) 216-7385 Fax

9                                            Hart L. Robinovitch, AZ Bar No. 020910
                                             ZIMMERMAN REED P.L.L.P.
10                                           14646 N. Kierland Blvd., Suite 145
                                             Scottsdale, Arizona 85254
11                                           (480) 348-6400
                                             (480) 348-6415 Facsimile
12
                                             Timothy J. Becker, MN Bar No. 256663
13                                           ZIMMERMAN REED, P.L.L.P.
                                             651 Nicollet Mall, Suite 501
14                                           Minneapolis, MN  55402
                                             (612) 341-0400
15                                           (612) 341-0844 Facsimile

16                                           Caleb LH Marker, MI Bar No. P70963
                                             CONSUMER LAW CENTER, PLLC
17                                           P.O. Box 1110
                                             408 Wildwood Avenue
18                                           Jackson, Michigan 49204-1110
                                             (517) 998-7400
19                                           (888) 490-7755 Facsimile

20
                                             **Attorney for Plaintiffs and the Class**
21

22

23

24

25

26

27

28

COMPLAINT
42407

42

EXHIBIT "A"

1
2
3
4          SPEARMINT RHINO CORPORATE PROFILE 2003
5
6
7
8          (www.spearmintrhino.com/1corpvideo.html)
9
10
11
12
13
14         "The intent of this video is to provide the
           viewer with general information regarding The
15         Spearmint Rhino Companies World Wide and its
           related operations and associated entities.
16         This video is not intended to be considered a
           part of any legal document or agreement and is
17         for information and entertainment purposes
           only and accordingly shall not be considered
18         binding on any party.  Any representation
           herein regarding any investment opportunity is
19         specifically made for example only.  Actual
           investment gains or losses in any Spearmint
20         Rhino related investment may be greater or far
           less than those examples contained herein and
21         in fact could result in a loss of the entire
           investment.   The contents of this video are
22         not legal advice, nor investment or tax
           advice.  Each prospective investor should
23         consult his counsel, accountants or other
           advisors as to the legal tax, economic and
24         related aspects of the contents of any
           Spearmint Rhino related investment and as to
25         its suitability for such investor."

Page 2

```
 1       [Spearmint Rhino]
 2       NARRATOR:  Welcome to the Spearmint
 3   Rhino, a global network of the most
 4   opulent gentlemen's clubs on earth,
 5   redefining elegance in adult
 6   entertainment, combining the ambience
 7   of a five-star hotel with the staff of
 8   the world's most beautiful
 9   entertainers.
10       MR. GRAINGER:  The ambience that
11   you'll feel when you enter a Spearmint
12   Rhino, you'll get the feeling that
13   you're entering a Ritz Carlton, if you
14   like.
15       MS. MACDONALD:  You go that extra
16   mile to treat people, you know, as they
17   should be treated.
18       MR. WHITEHOUSE:  Customer care and
19   attention to detail are first and
20   foremost.
21       MR. GRAY:  Each customer deserves
22   the ambience of a fresh club that was
23   just opened that evening for business.
24       MS. MACDONALD:  We're over 30
25   locations strong, and are looking to be
```

TSG Reporting - Worldwide    (877) 702-9580

Page 3

```
 1   on every continent.
 2       MR. WARR:  The business is about
 3   the girls; the business is about
 4   selling more dances; the business is
 5   about installing value into a dance.
 6       MR. GRAY:  Everything to us is a
 7   number crunching business; it is a
 8   money-making business to us.  We take
 9   it very, very seriously.  We're in the
10   business to make money, and we're very
11   good at that what we do in that regard.
12       NARRATOR:  Now, this may seem like
13   the restaurant of a five-star hotel,
14   but in reality, this is one of the many
15   Spearmint Rhino gentlemen's clubs.
16   What you are seeing is the result of a
17   decade of hard work and experience.
18   This attention to every detail enhances
19   the club's atmosphere and gives the
20   Spearmint Rhino an edge on the
21   competition.
22       In a moment, you'll meet a few of
23   the key members of the company.  But
24   first I'd like to introduce you to the
25
```

TSG Reporting - Worldwide    (877) 702-9580

Page 4

```
 1       [Spearmint Rhino]
 2   CEO and founder of the Spearmint Rhino
 3   Companies, John Gray.
 4       John, let me just say that the
 5   ambiance of these clubs is unique, but
 6   more than just the look of the place,
 7   there seems to be a whole philosophy
 8   behind your clubs.
 9       MR. GRAY:  I think part of the
10   psyche of the business is understanding
11   what brings a customer into the club.
12   And it is an entertainment-oriented
13   business; we serve the finest food and
14   the finest beverages available; we, of
15   course, have the most beautiful women
16   in the world work for us as
17   entertainers.
18       Spearmint Rhino has gone from zero
19   to 2700 employees, over 6,000 dancers
20   operating in Russia, Australia, Central
21   Europe, England and the United States.
22       We excel at what we do, and there
23   isn't a club in the geographic location
24   that does more in terms of gross volume
25   and sales than we do.  It's a fabulous,
```

TSG Reporting - Worldwide    (877) 702-9580

Page 5

```
 1       [Spearmint Rhino]
 2   fabulous money-making-opportunity
 3   business.  The longevity of the
 4   business beats anything that I'm aware
 5   of.  Sales typically don't vary more
 6   than five percent per unit; that is,
 7   per store location per week throughout
 8   the year.  It's recession-proof.  And
 9   again, the gross sales per square foot
10   exceed any retail unit of a comparable
11   size anywhere on the face of the
12   planet.
13       NARRATOR:  John, every aspect of
14   your clubs from the design to the
15   management to the dancers is
16   impeccable.  How do you maintain a
17   level of quality on a worldwide scale?
18       MR. GRAY:  For us, attention to
19   detail is everything.  We inspect what
20   we expect.  We do everything that a
21   competitor could possibly ever think of
22   doing.
23       And then add from there, when you
24   walk into a Spearmint Rhino, you'll
25   find it of an ambience that competes
```

TSG Reporting - Worldwide    (877) 702-9580

Page 6

1      [Spearmint Rhino]
2    with the finest hotels or casinos or
3    restaurants in the world tailored to
4    that specific location.
5        MR. WARR: Well, Spirit Rhino
6    chattered the illusion of a gentlemen's
7    club. Our clubs are opulent, there's
8    just elegance oozes from all of our
9    clubs. And the details, the level of
10   details that we have in our clubs from
11   the wall finishes to the pictures, to
12   the line of sight to the pictures, to
13   the finishings and, of course, to our
14   product, which is the girls. It just
15   exuberates elegance.
16       MR. GRAINGER: The commitment to
17   excellence that Spearmint Rhino has
18   within the designer-fit hat of our
19   clubs is one where we would use very
20   expensive materials; every attention to
21   detail is going to be taken care of
22   very, very precisely.
23       MS. MACDONALD: I think what
24   separates the Spearmint Rhino
25   Gentlemen's Club from our competitors

TSG Reporting - Worldwide    (877) 702-9580

Page 7

1      [Spearmint Rhino]
2    is the attention to the details, as far
3    as how lighting needs to be set, the
4    sound, every little piece of the
5    details make up the whole ambience of
6    what Spearmint Rhino is.
7        MR. WARR: All of the Spearmint
8    Rhino clubs are built to complement the
9    environment rather than to be in
10   conflict with the environment. People
11   know that a Spearmint Rhino club isn't
12   covered in neon by virtue of the fact
13   that a premises at Spearmint Rhino
14   means they walk up to a building where
15   there is a red carpet on the outside,
16   where there is brass railings with
17   roped-off areas, where the club itself
18   is, again, just -- it represents class.
19       MR. WHITEHOUSE: We ensure that
20   when we recruit the dancers and the
21   workers in the club, that they have got
22   good social skills; that they will sit
23   with the customer and they won't
24   hard-sell or pressurize him into a
25   dance; that he can enjoy his

TSG Reporting - Worldwide    (877) 702-9580

Page 8

1      [Spearmint Rhino]
2    experience.
3        MR. WARR: Even if the dancer
4    doesn't have a table dance, she made
5    friends with a customer that walked in
6    the club. If he's got a friend, then I
7    guarantee the next day he'll come back
8    to see the friend.
9        MR. GRAY: We understand the psyche
10   of the business, the male customer, the
11   female dancer better than anybody else,
12   which helps us get more per square foot
13   out as far as gross sales per unit, I
14   think, than anybody else in the world
15   has ever done historically.
16       MR. WARR: What John Gray has
17   brought to this industry is a clear
18   vision. And within the vision is an
19   understanding, it's almost a
20   psychology, and it's putting value into
21   the table dance.
22       MR. GRAY: Well, I think part of
23   understanding the business goes back to
24   20 years ago, or a little further than
25   that, it was all burlesque, that is to

TSG Reporting - Worldwide    (877) 702-9580

Page 9

1      [Spearmint Rhino]
2    say that the dancers performed on stage
3    and never came down off the stage and
4    interacted with customers. What has
5    come of age is the so-called lapdance
6    club. We hear it on TV programs or
7    movies at night that are mainstream
8    products on television. And the gist
9    of it is that there really is an
10   intrinsic value to a so-called
11   table-side dance or a couch dance.
12       I think one of the errors and
13   perceptions of this business is that
14   it's a sexual business. It's truly
15   not. It is a fantasy business. A
16   woman speaks to me at two or three
17   inches closer into my space than what
18   would be normal on the street, or she
19   if she touches my knee, not in a sexual
20   way, but just puts her hand on my knee
21   when she talks to me, or uses my first
22   name in the first few minutes of
23   conversation. As a male, we're taken
24   back by that attention. Men are
25   willing to pay for that type of

TSG Reporting - Worldwide    (877) 702-9580

Page 10

[Spearmint Rhino]

1      [Spearmint Rhino]
2      attention. And that's not sexual
3      attention, that's fantasy attention,
4      and that's what the backbone of the
5      clubs are all about.
6          Another misnomer in the business is
7      that it's that of a restaurant or a
8      nightclub; that is to say, that the
9      income stream is primarily that of door
10    and drink or beverage sales. And while
11    the income is certainly that, of the
12    door and beverage sales, what makes
13    these businesses go off the charts as
14    regards to an income and profitability
15    stream is the income made by these
16    so-called couch dance or table dance.
17        A table dance lasts three minutes
18    and costs typically 10- to $20,
19    depending on the jurisdiction. One of
20    the things that we preach to our people
21    is if a small club of ours -- and this
22    is a small club example -- has 30
23    dancers on a shift, if you can get
24    every dancer -- a shift being eight
25    hours -- to do just one more dance per

TSG Reporting - Worldwide   (877) 702-9580

Page 11

1      [Spearmint Rhino]
2      eight-hour shift, it's over $10,000 a
3      month additional income into the stream
4      of the club.
5          What other business can you so
6      easily increase those gross numbers by?
7          NARRATOR: The Spearmint Rhino
8      Company is a business where everyone,
9      from its investors to company officers,
10    to the person behind the bar, share the
11    same commitment to quality. With this
12    commitment to quality comes success,
13    and with success comes growth.
14        The Spearmint Rhino companies are
15    continuously expanding to create
16    opportunity for new investors such as
17    yourself.
18        MR. GRAY: Historically, the
19    Spearmint Rhino clubs have been
20    developed utilizing our own monies.
21    That is to say, that the profit of
22    early-on stores built the next stores,
23    which built the next stores. As we've
24    accelerated that growth rate, we've
25    looked towards outside financing to

TSG Reporting - Worldwide   (877) 702-9580

Page 12

1      [Spearmint Rhino]
2      continue an increased rate of growth.
3          We make it very tangible. So that
4      in the operating agreements, we
5      actually have a land location locked
6      up, licensing secured and plans drawn.
7      We submit that to a potential investor.
8      They can drive, by touch and feel,
9      where the new Spearmint Rhino is going
10    to be, and then, by written documents,
11    decide whether or not the investment is
12    appropriate for them.
13        MS. MACDONALD: I speak to our
14    current investors probably twice a
15    week. Our financials are generated so
16    you don't have to be a CPA in order to
17    understand them. They're very basic
18    format and they're very easy to
19    understand where everything is
20    itemized. And any time they want to
21    come in and sit and have meetings, go
22    through the files, we welcome it.
23        NARRATOR: One of the biggest
24    issues is accountability. What
25    assurance of an accurate account does

TSG Reporting - Worldwide   (877) 702-9580

Page 13

1      [Spearmint Rhino]
2      an investor have?
3          MR. GRAY: What we do is weekly and
4      monthly financial accounting, but we
5      also distribute shareholder
6      distributions on a monthly basis. So
7      it becomes very, very tangible for an
8      investor to realize what he invested
9      in. He is able to see financial
10    accounting weekly, and again monthly,
11    and he is able to realize a return on a
12    monthly basis.
13        But one of the things that we pride
14    ourselves on is managerial accounting;
15    it's realtime. We pride ourselves on
16    our IT operations in particular. Scott
17    Hale has been with us for a little over
18    two years, he heads the IT department,
19    and I'm very pleased that he's part of
20    our permanent team.
21        MR. HALE: The information
22    technology is a tool that has allowed
23    the Spearmint Rhino as a company to
24    continue to expand on a global basis
25    and yet retain and maintain control of

TSG Reporting - Worldwide   (877) 702-9580

Page 14

1       [Spearmint Rhino]
2    business information, once again
3    delivering it to the executives so they
4    can make the best business decisions
5    possible in the shortest amount of
6    time. We've been able to reach out and
7    test facilities that are thousands and
8    thousands of miles away from where
9    we're at here in the U.S. corporate
10   offices.
11       MR. WARR: So it's not only good
12   controls and an interpretation of our
13   business and understanding our
14   business, it's reporting back and
15   having a transparency in our accounting
16   methods and a consistency within our
17   accounting methods that gives an
18   investor peace of mind.
19       MR. GRAY: Again, we crunch numbers
20   quite often, and the realtime
21   point-of-sale system allows us to
22   really see what's really happening in a
23   club, allows us to do inventory control
24   and have a very real sense of what's
25   going on without physically being in

TSG Reporting - Worldwide   (877) 702-9580

Page 15

1       [Spearmint Rhino]
2    every location, which, of course, you
3    can't always do.
4       One of the other niceties, besides
5    the business element itself, is the
6    fact that the revenue stream is so
7    egregiously higher than other types of
8    investments, and multifaceted. That is
9    to say, we have food sales, beverage
10   sales, waitress sales, door admission
11   sales. But we also have that dancer
12   income stream, and the profitability of
13   the dancer income stream is extremely
14   high compared to cost of other goods
15   sold. There is no innate cost to that;
16   the dancers don't receive a payroll or
17   a salary.
18       The prior investment is primarily
19   structured by way of minority
20   ownership. Each one of the Spearmint
21   Rhino is a separate corporation or
22   equivalent type of entity whereby we
23   will typically sell 49 percent of a new
24   store's venture to a group of minority
25   investors. Traditionally what we have

TSG Reporting - Worldwide   (877) 702-9580

Page 16

1       [Spearmint Rhino]
2    structured is ten minority shares, each
3    at 4.9 percent, for a total investment
4    approximating one million dollars.
5    Each investment would be a minimum of
6    $100,000 for a total maximum of ten
7    investment shares at one million
8    dollars, constituting the total of the
9    49 percent.
10       Most of these clubs don't build
11   over an elongated period of time. We
12   open strong right out of the gate. We
13   are in a profit position within just a
14   few weeks of opening, and typically our
15   investors are paid back their entire
16   investment within a year of opening.
17   While there's no guarantees of this, it
18   certainly is a quicker payback than
19   most other businesses.
20       NARRATOR: John, tell us about your
21   international expansion.
22       MR. GRAY: As we grew in the United
23   States and became a leading force in
24   the United States, it became apparent
25   to us that nobody had really replicated

TSG Reporting - Worldwide   (877) 702-9580

Page 17

1       [Spearmint Rhino]
2    the systems or the type of business
3    that we had in the states elsewhere.
4    We went over to England, investigated
5    the possibilities there, and thought it
6    to be a good market for us. And in
7    fact, it has been an excellent market
8    for us. In less than two years, we've
9    opened 13 stores in England.
10       What was refreshing in England in
11   particular was, is we had found that it
12   was 20 years ago from that of the
13   licensing laws that we've experienced
14   in the United States. That is to say
15   that, most day place, it could be a
16   commercial business, it could be an
17   adult-related commercial business,
18   which allowed us to the opportunity to
19   make a closer of a cookie-cutter format
20   for our expansion and open much, much
21   quicker in England per month, per year
22   than we were able to do in the United
23   States. Consequently, we've gone over
24   there in a big way and have never
25   looked back. We expanded to Russia and

TSG Reporting - Worldwide   (877) 702-9580

Page 18

1      [Spearmint Rhino]
2   Australia. From there we found the
3   same would be true.
4      And in hindsight, it very much
5   feels as though you have the United
6   States on the one hand and the rest of
7   the world on another. We are
8   structured in such a manner that in
9   England we have a free-standing
10  building that serves as a regional
11  office for European operations, and
12  then we maintain offices in Australia
13  and Russia as well. Those offices, in
14  turn, report to the United States to
15  the Los Angeles County world
16  headquarters.
17     MR. WHITEHOUSE: When I first met
18  John Gray two and a half years ago, I
19  had been operating in the U.K. in
20  table-dancing clubs for four and a half
21  years. I thought I knew pretty much
22  everything. I then had the experience
23  of being able to visit Spearmint Rhinos
24  over in the states, and I realized that
25  what we were doing over in the U.K.

TSG Reporting - Worldwide    (877) 702-9580

Page 19

1      [Spearmint Rhino]
2   just didn't get it. We weren't even
3   close.
4      It was absolutely fascinating. It
5   seemed the standard and the quality in
6   the clubs that Spearmint Rhino were
7   operating, and seeing where we were
8   missing out of the U.K. So I very much
9   took the view that there was absolutely
10  no way I was ever going to beat
11  Spearmint Rhino, so I thought I might
12  as well join them.
13     NARRATOR: With so many clubs in
14  the U.S. and Europe, how do you deal
15  with the local issues that are
16  particular to each venture?
17     MR. GRAY: From a strategy
18  perspective, when we go into a new
19  location, we'll typically hire local
20  prominent legal counsel. We find that
21  the political ties that those
22  individuals have with local city
23  councils, or the equivalent, are very
24  helpful. Our team typically will also
25  retain a renown first amendment

TSG Reporting - Worldwide    (877) 702-9580

Page 20

1      [Spearmint Rhino]
2   attorney, and those two will pair up
3   and strategize a particular location
4   before we go in.
5      We assume that everybody that walks
6   through that front door is an elected
7   official or politician, so we have a
8   sense of responsibility to the
9   community that we're in.
10     MR. WHITEHOUSE: Part of our
11  training with our staff is to make them
12  aware of our needs to be perceived as
13  good corporate citizens, and no member
14  of the management team will be promoted
15  into a new unit until we are totally
16  comfortable that they have a proven
17  track record within one of our
18  businesses and are capable of taking on
19  the job of opening a new club.
20     MR. WARR: We've set up what we
21  call Spearmint Rhino corporate charter.
22  What that is is every single club
23  identifies a local charity, whether
24  that's the most charity. It doesn't
25  matter. It might be Guide Dogs for the

TSG Reporting - Worldwide    (877) 702-9580

Page 21

1      [Spearmint Rhino]
2   Blind. So we very much get involved
3   with the community spirit.
4      MR. WHITEHOUSE: We will join the
5   local Chamber of Commerce so that we
6   can be in touch with what our neighbors
7   are thinking. If they have got any
8   problems, if they have got any issues
9   and they can talk directly to us.
10     MR. GRAY: We try to be the
11  absolute best possible commercial
12  business operator and best citizen of a
13  business nature possible in the
14  communities that we have clubs in. And
15  consequently, I think that we are
16  appreciated as adult operator better
17  than anybody in our same industry ever
18  has been.
19     NARRATOR: John, you've really
20  expanded into the Internet world.
21  Could you give us some insight on that?
22     MR. GRAY: One of the benefits of
23  having our own in-house IT team is
24  building a state-of-the-art website.
25  The website is really multifunctional,

TSG Reporting - Worldwide    (877) 702-9580

Page 22

1       [Spearmint Rhino]
2   and long time ago we realized it was a
3   lot more than just a directory of
4   sorts.
5       MR. HALE:  Actually, what we are
6   trying to do with the website is we are
7   trying to capture the essence of the
8   Spearmint Rhino gentlemen's clubs, the
9   opulence, the upscale nature, the five
10  star nature of our facilities, and
11  trying to project that out onto the
12  internet for people to see.
13      MR. GRAY:  In terms of
14  adult-related content, we methodically
15  have long ago decided not to have such
16  content on the website, and the website
17  is that for corporate information
18  purposes only.
19      MR. WHITEHOUSE:  Authorities and
20  local residents, local communities, if
21  they see something on the Internet that
22  they feel is distasteful, they will use
23  that against us and they will try and
24  judge our book by its cover.  So if we
25  have the smartest cover, if we have the

Page 23

1       [Spearmint Rhino]
2   best presented cover, they can only
3   think that we are the best operators.
4       NARRATOR:  John, it's obvious that
5   you and your staff really know your
6   business.  So what's on the horizon for
7   your company?
8       MR. GRAY:  Over the recent years,
9   one of the ways that Spearmint Rhino is
10  diversifying its license and its
11  trademark for a variety of different
12  uses.  We've been approached by large
13  manufacturers of adult-related toys,
14  novelties, to license products for
15  them.  We have recently entered
16  contracts to provide such services.  We
17  started proprietary-related printed
18  magazines.  In England, we've done
19  several television shows and are
20  looking to produce our own cable
21  channel.
22      MS. MACDONALD:  We have the
23  Spearmint Rhino Adult Super Store,
24  which has show girl attire, videos,
25  adult toys.

Page 24

1       [Spearmint Rhino]
2       MR. GRAINGER:  The Spearmint Rhino
3   Adult Super Stores are going to be
4   extremely upscale and be able to be
5   placed in mainstream America and very
6   well-respected by the general public,
7   and these stores all offer high-end
8   lingerie, leather and lace, lotions,
9   things of this nature.  We're very
10  excited about that prospect, and open
11  up -- open many more stores in the
12  coming months.
13      MR. WARR:  Our media presence in
14  the U.K. is enormous.  We have
15  television coverage.  We have media
16  coverage.  We are in magazines.  Quite
17  simply, our share of what's even
18  outside of our own industry is huge.
19      MR. GRAY:  The Spearmint Rhino name
20  has become even better and better
21  well-known.  This helps fuel the
22  backbone expansion of the clubs, which
23  is our foremost and most important
24  aspect of our business concern.
25      MR. WARR:  There's so many key

Page 25

1       [Spearmint Rhino]
2   boast words you could associate with
3   Spearmint Rhino: excellence, opulent,
4   professionalism.  Perhaps the main one
5   is excellence.  Part of the reason
6   Spearmint Rhino is so successful is
7   John Gray's vision.
8       MS. MACDONALD:  The reason all of
9   our employees, myself included, have
10  been around for a long time is we truly
11  enjoy the business and we truly believe
12  in John's vision of where this company
13  is going.
14      MR. GRAY:  In a little more than a
15  decade, Spearmint Rhino has become the
16  world leader in the gentlemen club
17  arena with over 2700 employees and
18  6,000 dancers operating in Russia,
19  Europe, United Kingdom, the United
20  States and Australia.  We look forward
21  to maintaining our position as the
22  world leader and look forward to more
23  than a hundred clubs within the coming
24  years.
25      (Recording ends.)

Page 26

```
1          C E R T I F I C A T E
2   STATE OF NEW YORK    )
3              ) ss.:
4   COUNTY OF NEW YORK    )
5
6       I, MAYLEEN CINTRON, a Registered
7   Merit Reporter, Certified Realtime
8   Reporter and Notary Public within and
9   for the State of New York, do hereby
10  certify that the within is a true and
11  accurate transcription of the
12  www.spearmintrhino.com/1corpvideo.html
13  video as taken on June 30, 2009.
14      I further certify that I am not
15  related to any of the parties to this
16  action by blood or marriage; and that I
17  am in no way interested in the outcome
18  of this matter.
19      IN WITNESS WHEREOF, I have
20  hereunto set my hand this 30th day of
21  June 2009.
22
23
24      ------------------------
25      MAYLEEN CINTRON, RMR, CRR
    TSG Reporting - Worldwide    (877) 702-9580
```

**A**

able (6)
13:9,11 14:6 17:22
18:23 24:4
absolute (1)
21:11
absolutely (2)
19:4,9
accelerated (1)
11:24
account (1)
12:25
accountability (1)
12:24
accountants (1)
1:23
accounting (5)
13:4,10,14 14:15,17
accurate (2)
12:25 26:11
action (1)
26:16
Actual (1)
1:19
add (1)
5:23
additional (1)
11:3
admission (1)
15:10
adult (5)
2:5 21:16 23:23,25
24:3
adult-related (3)
17:17 22:14 23:13
advice (2)
1:22,22
advisors (1)
1:23
age (1)
9:5
ago (5)
8:24 17:12 18:18 22:2
22:15
agreement (1)
1:16
agreements (1)
12:4
allowed (2)
13:22 17:18
allows (2)

14:21,23
ambiance (1)
4:5
ambience (5)
2:6,10,22 5:25 7:5
amendment (1)
19:25
America (1)
24:5
amount (1)
14:5
Angeles (1)
18:15
anybody (3)
8:11,14 21:17
apparent (1)
16:24
appreciated (1)
21:16
approached (1)
23:12
appropriate (1)
12:12
approximating (1)
16:4
areas (1)
7:17
arena (1)
25:17
aspect (2)
5:13 24:24
aspects (1)
1:24
associate (1)
25:2
associated (1)
1:15
assume (1)
20:5
assurance (1)
12:25
atmosphere (1)
3:20
attention (9)
2:19 3:19 5:18 6:20
7:2 9:24 10:2,3,3
attire (1)
23:24
attorney (1)
20:2
Australia (4)

4:20 18:2,12 25:20
Authorities (1)
22:19
available (1)
4:14
aware (2)
5:4 20:12

**B**

back (6)
8:7,23 9:24 14:14
16:15 17:25
backbone (2)
10:4 24:22
bar (1)
11:10
basic (1)
12:17
basis (3)
13:6,12,24
beat (1)
19:10
beats (1)
5:4
beautiful (2)
2:8 4:15
believe (1)
25:11
benefits (1)
21:22
best (5)
14:4 21:11,12 23:2,3
better (4)
8:11 21:16 24:20,20
beverage (3)
10:10,12 15:9
beverages (1)
4:14
big (1)
17:24
biggest (1)
12:23
binding (1)
1:18
Blind (1)
21:2
blood (1)
26:16
boast (1)
25:2
book (1)

22:24
brass (1)
7:16
brings (1)
4:11
brought (1)
8:17
build (1)
16:10
building (3)
7:14 18:10 21:24
built (3)
7:8 11:22,23
burlesque (1)
8:25
business (32)
2:23 3:3,4,5,8,9,11
4:10,13 5:3,4 8:10
8:23 9:13,14,15
10:6 11:5,8 14:2,4
14:13,14 15:5 17:2
17:16,17 21:12,13
23:6 24:24 25:11
businesses (3)
10:13 16:19 20:18

**C**

C (2)
26:1,1
cable (1)
23:20
call (1)
20:21
capable (1)
20:18
capture (1)
22:7
care (2)
2:18 6:21
Carlton (1)
2:13
carpet (1)
7:15
casinos (1)
6:2
Central (1)
4:20
CEO (1)
4:2
certainly (2)
10:11 16:18

Certified (1)
26:7
certify (2)
26:10,14
Chamber (1)
21:5
channel (1)
23:21
charity (2)
20:23,24
charter (1)
20:21
charts (1)
10:13
chattered (1)
6:6
CINTRON (2)
26:6,25
citizen (1)
21:12
citizens (1)
20:13
city (1)
19:22
class (1)
7:18
clear (1)
8:17
close (1)
19:3
closer (2)
9:17 17:19
club (17)
2:22 4:11,23 6:7,25
7:11,17,21 8:6 9:6
10:21,22 11:4 14:23
20:19,22 25:16
clubs (20)
2:4 3:16 4:5,8 5:14
6:7,9,10,19 7:8 10:5
11:19 16:10 18:20
19:6,13 21:14 22:8
24:22 25:23
club's (1)
3:20
combining (1)
2:6
come (3)
8:7 9:5 12:21
comes (1)
11:12,13

comfortable (1)
20:16
coming (2)
24:12 25:23
Commerce (1)
21:5
commercial (3)
17:16,17 21:11
commitment (3)
6:16 11:11,12
communities (2)
21:14 22:20
community (2)
20:9 21:3
companies (3)
1:15 4:3 11:14
company (6)
3:24 11:8,9 13:23
23:7 25:12
comparable (1)
5:10
compared (1)
15:14
competes (1)
5:25
competition (1)
3:22
competitor (1)
5:21
competitors (1)
6:25
complement (1)
7:8
concern (1)
24:24
conflict (1)
7:10
consequently (2)
17:23 21:15
considered (2)
1:16,17
consistency (1)
14:16
constituting (1)
16:8
consult (1)
1:23
contained (1)
1:20
content (2)
22:14,16

contents (2)
1:21,24
continent (1)
3:2
continue (2)
12:2 13:24
continuously (1)
11:15
contracts (1)
23:16
control (2)
13:25 14:23
controls (1)
14:12
conversation (1)
9:23
cookie-cutter (1)
17:19
corporate (5)
1:4 14:9 20:13,21
22:17
corporation (1)
15:21
cost (2)
15:14,15
costs (1)
10:18
couch (2)
9:11 10:16
councils (1)
19:23
counsel (2)
1:23 19:20
County (2)
18:15 26:4
course (3)
4:15 6:13 15:2
cover (3)
22:24,25 23:2
coverage (2)
24:15,16
covered (1)
7:12
CPA (1)
12:16
create (1)
11:15
CRR (1)
26:25
crunch (1)
14:19

crunching (1)
3:8
current (1)
12:14
customer (6)
2:18,21 4:11 7:23 8:5
8:10
customers (1)
9:4

---
**D**

dance (10)
3:6 7:25 8:4,21 9:11
9:11 10:16,16,17,25
dancer (5)
8:3,11 10:24 15:11,13
dancers (7)
4:19 5:15 7:20 9:2
10:23 15:16 25:18
dances (1)
3:5
day (3)
8:7 17:15 26:20
deal (1)
19:14
decade (2)
3:18 25:15
decide (1)
12:11
decided (1)
22:15
decisions (1)
14:4
delivering (1)
14:3
department (1)
13:18
depending (1)
10:19
deserves (1)
2:21
design (1)
5:14
designer-fit (1)
6:18
detail (4)
2:19 3:19 5:19 6:21
details (4)
6:9,10 7:2,5
developed (1)
11:20

different (1)
23:11
directly (1)
21:9
directory (1)
22:3
distasteful (1)
22:22
distribute (1)
13:5
distributions (1)
13:6
diversifying (1)
23:10
document (1)
1:16
documents (1)
12:10
Dogs (1)
20:25
doing (2)
5:22 18:25
dollars (2)
16:4,8
door (4)
10:9,12 15:10 20:6
drawn (1)
12:6
drink (1)
10:10
drive (1)
12:8

---
**E**

E (2)
26:1,1
early-on (1)
11:22
earth (1)
2:4
easily (1)
11:6
easy (1)
12:18
economic (1)
1:23
edge (1)
3:21
egregiously (1)
15:7
eight (1)

10:24
eight-hour (1)
11:2
elected (1)
20:6
elegance (3)
2:5 6:8,15
element (1)
15:5
elongated (1)
16:11
employees (3)
4:19 25:9,17
ends (1)
25:25
England (7)
4:21 17:4,9,10,21
18:9 23:18
enhances (1)
3:19
enjoy (2)
7:25 25:11
enormous (1)
24:14
ensure (1)
7:19
enter (1)
2:11
entered (1)
23:15
entering (1)
2:13
entertainers (2)
2:9 4:17
entertainment (2)
1:17 2:6
entertainment-orie...
4:12
entire (2)
1:21 16:15
entities (1)
1:15
entity (1)
15:22
environment (2)
7:9,10
equivalent (2)
15:22 19:23
errors (1)
9:12
essence (1)

22:7
Europe (3)
4:21 19:14 25:19
European (1)
18:11
evening (1)
2:23
everybody (1)
20:5
example (2)
1:19 10:22
examples (1)
1:20
exceed (1)
5:10
excel (1)
4:22
excellence (3)
6:17 25:3,5
excellent (1)
17:7
excited (1)
24:10
executives (1)
14:3
expand (1)
13:24
expanded (2)
17:25 21:20
expanding (1)
11:15
expansion (3)
16:21 17:20 24:22
expect (1)
5:20
expensive (1)
6:20
experience (3)
3:18 8:2 18:22
experienced (1)
17:13
extra (1)
2:15
extremely (2)
15:13 24:4
exuberates (1)
6:15

**F**

F (1)
26:1

fabulous (2)
4:25 5:2
face (1)
5:11
facilities (2)
14:7 22:10
fact (4)
1:21 7:12 15:6 17:7
fantasy (2)
9:15 10:3
far (3)
1:20 7:2 8:13
fascinating (1)
19:4
feel (3)
2:11 12:8 22:22
feeling (1)
2:12
feels (1)
18:5
female (1)
8:11
files (1)
12:22
financial (2)
13:4,9
financials (1)
12:15
financing (1)
11:25
find (2)
5:25 19:20
finest (3)
4:13,14 6:2
finishes (1)
6:11
finishings (1)
6:13
first (6)
2:19 3:25 9:21,22
18:17 19:25
five (2)
5:6 22:9
five-star (2)
2:7 3:14
food (2)
4:13 15:9
foot (2)
5:9 8:12
force (1)
16:23

foremost (2)
2:20 24:23
format (2)
12:18 17:19
forward (2)
25:20,22
found (2)
17:11 18:2
founder (1)
4:2
four (1)
18:20
free-standing (1)
18:9
fresh (1)
2:22
friend (2)
8:6,8
friends (1)
8:5
front (1)
20:6
fuel (1)
24:21
further (2)
8:24 26:14

**G**

gains (1)
1:19
gate (1)
16:12
general (2)
1:14 24:6
generated (1)
12:15
gentlemen (1)
25:16
gentlemen's (5)
2:4 3:16 6:6,25 22:8
geographic (1)
4:23
girl (1)
23:24
girls (2)
3:4 6:14
gist (1)
9:8
give (1)
21:21
gives (2)

3:20 14:17
global (2)
2:3 13:24
go (5)
2:15 10:13 12:21
19:18 20:4
goes (1)
8:23
going (6)
6:21 12:9 14:25 19:10
24:3 25:13
good (5)
3:12 7:22 14:11 17:6
20:13
goods (1)
15:14
GRAINGER (3)
2:10 6:16 24:2
Gray (20)
2:21 3:7 4:3,9 5:18
8:9,16,22 11:18
13:3 14:19 16:22
18:18 19:17 21:10
21:22 22:13 23:8
24:19 25:14
Gray's (1)
25:7
greater (1)
1:20
grew (1)
16:22
gross (4)
4:24 5:9 8:13 11:6
group (1)
15:24
growth (3)
11:13,24 12:2
guarantee (1)
8:7
guarantees (1)
16:17
Guide (1)
20:25

**H**

Hale (3)
13:17,21 22:5
half (2)
18:18,20
hand (3)
9:20 18:6 26:20

happening (1)
14:22
hard (1)
3:18
hard-sell (1)
7:24
hat (1)
6:18
headquarters (1)
18:16
heads (1)
13:18
hear (1)
9:6
helpful (1)
19:24
helps (2)
8:12 24:21
hereunto (1)
26:20
he'll (1)
8:7
high (1)
15:14
higher (1)
15:7
high-end (1)
24:7
hindsight (1)
18:4
hire (1)
19:19
historically (2)
8:15 11:18
horizon (1)
23:6
hotel (2)
2:7 3:14
hotels (1)
6:2
hours (1)
10:25
huge (1)
24:18
hundred (1)
25:23

**I**

identifies (1)
20:23
illusion (1)

6:6
impeccable (1)
5:16
important (1)
24:23
inches (1)
9:17
included (1)
25:9
income (7)
10:9,11,14,15 11:3
15:12,13
increase (1)
11:6
increased (1)
12:2
individuals (1)
19:22
industry (3)
8:17 21:17 24:18
information (5)
1:14,17 13:21 14:2
22:17
innate (1)
15:15
insight (1)
21:21
inspect (1)
5:19
installing (1)
3:6
intended (1)
1:16
intent (1)
1:14
interacted (1)
9:4
interested (1)
26:17
international (1)
16:21
internet (3)
21:20 22:12,21
interpretation (1)
14:12
intrinsic (1)
9:10
introduce (1)
3:25
inventory (1)
14:23

invested (1)
13:8
investigated (1)
17:4
investment (12)
1:18,19,20,21,22,24
12:11 15:18 16:3,5
16:7,16
investments (1)
15:8
investor (6)
1:22,25 12:7 13:2,8
14:18
investors (5)
11:9,16 12:14 15:25
16:15
involved (1)
21:2
in-house (1)
21:23
issues (3)
12:24 19:15 21:8
itemized (1)
12:20

_____

**J**

job (1)
20:19
John (9)
4:3,4 5:13 8:16 16:20
18:18 21:19 23:4
25:7
John's (1)
25:12
join (2)
19:12 21:4
judge (1)
22:24
June (2)
26:13,21
jurisdiction (1)
10:19

_____

**K**

key (2)
3:24 24:25
Kingdom (1)
25:19
knee (2)
9:19,20
knew (1)

18:21
know (3)
2:16 7:11 23:5

_____

**L**

lace (1)
24:8
land (1)
12:5
lapdance (1)
9:5
large (1)
23:12
lasts (1)
10:17
laws (1)
17:13
leader (2)
25:16,22
leading (1)
16:23
leather (1)
24:8
legal (4)
1:16,22,23 19:20
level (2)
5:17 6:9
license (2)
23:10,14
licensing (2)
12:6 17:13
lighting (1)
7:3
line (1)
6:12
lingerie (1)
24:8
little (4)
7:4 8:24 13:17 25:14
local (7)
19:15,19,22 20:23
21:5 22:20,20
location (7)
4:23 5:7 6:4 12:5 15:2
19:19 20:3
locations (1)
2:25
locked (1)
12:5
long (3)
22:2,15 25:10

longevity (1)
5:3
look (3)
4:6 25:20,22
looked (2)
11:25 17:25
looking (2)
2:25 23:20
Los (1)
18:15
loss (1)
1:21
losses (1)
1:19
lot (1)
22:3
lotions (1)
24:8

_____

**M**

MACDONALD (6)
2:15,24 6:23 12:13
23:22 25:8
magazines (2)
23:18 24:16
main (1)
25:4
mainstream (2)
9:7 24:5
maintain (2)
5:16 13:25 18:12
maintaining (1)
25:21
male (2)
8:10 9:23
management (2)
5:15 20:14
managerial (1)
13:14
manner (1)
18:8
manufacturers (1)
23:13
market (2)
17:6,7
marriage (1)
26:16
materials (1)
6:20
matter (2)
20:25 26:18

maximum (1)
16:6
MAYLEEN (2)
26:6,25
means (1)
7:14
media (2)
24:13,15
meet (1)
3:23
meetings (1)
12:21
member (1)
20:13
members (1)
3:24
Men (1)
9:24
Merit (1)
26:7
met (1)
18:17
methodically (1)
22:14
methods (2)
14:16,17
mile (1)
2:16
miles (1)
14:8
million (2)
16:4,7
mind (1)
14:18
minimum (1)
16:5
minority (3)
15:19,24 16:2
minutes (2)
9:22 10:17
misnomer (1)
10:6
missing (1)
19:8
moment (1)
3:23
money (1)
3:11
money-making (1)
3:9
money-making-opp...

5:2
monies (1)
11:20
month (2)
11:3 17:21
monthly (4)
13:4,6,10,12
months (1)
24:12
movies (1)
9:7
multifaceted (1)
15:8
multifunctional (1)
21:25

**N**

name (2)
9:22 24:19
NARRATOR (9)
2:3 3:13 5:13 11:7
12:23 16:20 19:13
21:19 23:4
nature (4)
21:13 22:9,10 24:9
needs (2)
7:3 20:12
neighbors (1)
21:6
neon (1)
7:12
network (1)
2:3
never (2)
9:3 17:24
new (9)
11:16 12:9 15:23
19:18 20:15,19 26:2
26:4,9
niceties (1)
15:4
night (1)
9:7
nightclub (1)
10:8
normal (1)
9:18
Notary (1)
26:8
novelties (1)
23:14

**O**

number (1)
3:8
numbers (2)
11:6 14:19

obvious (1)
23:4
offer (1)
24:7
office (1)
18:11
officers (1)
11:9
offices (3)
14:10 18:12,13
official (1)
20:7
once (1)
14:2
oozes (1)
6:8
open (4)
16:12 17:20 24:10,11
opened (2)
2:23 17:9
opening (3)
16:14,16 20:19
operating (5)
4:20 12:4 18:19 19:7
25:18
operations (3)
1:15 13:16 18:11
operator (2)
21:12,16
operators (1)
23:3
opportunity (3)
1:18 11:16 17:18
opulence (1)
22:9
opulent (3)
2:4 6:7 25:3
order (1)
12:16
outcome (1)
26:17
outside (3)
7:15 11:25 24:18
ownership (1)
15:20

**P**

paid (1)
16:15
pair (1)
20:2
part (6)
1:16 4:9 8:22 13:19
20:10 25:5
particular (4)
13:16 17:11 19:16
20:3
parties (1)
26:15
party (1)
1:18
pay (1)
9:25
payback (1)
16:18
payroll (1)
15:16
peace (1)
14:18
people (4)
2:16 7:10 10:20 22:12
perceived (1)
20:12
percent (4)
5:6 15:23 16:3,9
perceptions (1)
9:13
performed (1)
9:2
period (1)
16:11
permanent (1)
13:20
person (1)
11:10
perspective (1)
19:18
philosophy (1)
4:7
physically (1)
14:25
pictures (2)
6:11,12
piece (1)
7:4
place (2)
4:6 17:15

placed (1)
24:5
planet (1)
5:12
plans (1)
12:6
pleased (1)
13:19
point-of-sale (1)
14:21
political (1)
19:21
politician (1)
20:7
position (2)
16:13 25:21
possibilities (1)
17:5
possible (3)
14:5 21:11,13
possibly (1)
5:21
potential (1)
12:7
preach (1)
10:20
precisely (1)
6:22
premises (1)
7:13
presence (1)
24:13
presented (1)
23:2
pressurize (1)
7:24
pretty (1)
18:21
pride (2)
13:13,15
primarily (2)
10:9 15:18
printed (1)
23:17
prior (1)
15:18
probably (1)
12:14
problems (1)
21:8
produce (1)

23:20
product (1)
6:14
products (2)
9:8 23:14
professionalism (1)
25:4
PROFILE (1)
1:4
profit (2)
11:21 16:13
profitability (2)
10:14 15:12
programs (1)
9:6
project (1)
22:11
prominent (1)
19:20
promoted (1)
20:14
proprietary-related...
23:17
prospect (1)
24:10
prospective (1)
1:22
proven (1)
20:16
provide (2)
1:14 23:16
psyche (2)
4:10 8:9
psychology (1)
8:20
public (2)
24:6 26:8
purposes (2)
1:17 22:18
puts (1)
9:20
putting (1)
8:20

**Q**

quality (4)
5:17 11:11,12 19:5
quicker (2)
16:18 17:21
quite (2)
14:20 24:16

| R | | | | |
|---|---|---|---|---|
| **R** (1) | 1:15,20,24,24 26:15 | 16:12 | 11:10 24:17 | 12:1,9 13:1,23 14:1 |
| 26:1 | **renown** (1) | **Ritz** (1) | **shareholder** (1) | 15:1,20 16:1 17:1 |
| **railings** (1) | 19:25 | 2:13 | 13:5 | 18:1,23 19:1,6,11 |
| 7:16 | **replicated** (1) | **RMR** (1) | **shares** (2) | 20:1,21 21:1 22:1,8 |
| **rate** (2) | 16:25 | 26:25 | 16:2,7 | 23:1,9,23 24:1,2,19 |
| 11:24 12:2 | **report** (1) | **roped-off** (1) | **shift** (3) | 25:1,3,6,15 |
| **reach** (1) | 18:14 | 7:17 | 10:23,24 11:2 | **specific** (1) |
| 14:6 | **Reporter** (2) | **Russia** (4) | **shortest** (1) | 6:4 |
| **real** (1) | 26:7,8 | 4:20 17:25 18:13 | 14:5 | **specifically** (1) |
| 14:24 | **reporting** (1) | 25:18 | **show** (1) | 1:19 |
| **reality** (1) | 14:14 | | 23:24 | **spirit** (2) |
| 3:15 | **representation** (1) | S | **shows** (1) | 6:5 21:3 |
| **realize** (2) | 1:18 | **salary** (1) | 23:19 | **square** (2) |
| 13:8,11 | **represents** (1) | 15:17 | **sight** (1) | 5:9 8:12 |
| **realized** (2) | 7:18 | **sales** (10) | 6:12 | **ss** (1) |
| 18:24 22:2 | **residents** (1) | 4:25 5:5,9 8:13 10:10 | **simply** (1) | 26:3 |
| **really** (7) | 22:20 | 10:12 15:9,10,10,11 | 24:17 | **staff** (3) |
| 9:9 14:22,22 16:25 | **responsibility** (1) | **scale** (1) | **single** (1) | 2:7 20:11 23:5 |
| 21:19,25 23:5 | 20:8 | 5:17 | 20:22 | **stage** (2) |
| **realtime** (3) | **rest** (1) | **Scott** (1) | **sit** (2) | 9:2,3 |
| 13:15 14:20 26:7 | 18:6 | 13:16 | 7:22 12:21 | **standard** (1) |
| **reason** (2) | **restaurant** (2) | **secured** (1) | **size** (1) | 19:5 |
| 25:5,8 | 3:14 10:7 | 12:6 | 5:11 | **star** (1) |
| **receive** (1) | **restaurants** (1) | **see** (5) | **skills** (1) | 22:10 |
| 15:16 | 6:3 | 8:8 13:9 14:22 22:12 | 7:22 | **started** (1) |
| **recession-proof** (1) | **result** (2) | 22:21 | **small** (2) | 23:17 |
| 5:8 | 1:21 3:17 | **seeing** (2) | 10:21,22 | **State** (2) |
| **record** (1) | **retail** (1) | 3:17 19:7 | **smartest** (1) | 26:2,9 |
| 20:17 | 5:10 | **sell** (1) | 22:25 | **states** (10) |
| **Recording** (1) | **retain** (2) | 15:23 | **social** (1) | 4:21 16:23,24 17:3,14 |
| 25:25 | 13:25 19:25 | **selling** (1) | 7:22 | 17:23 18:6,14,24 |
| **recruit** (1) | **return** (1) | 3:5 | **sold** (1) | 25:20 |
| 7:20 | 13:11 | **sense** (2) | 15:15 | **state-of-the-art** (1) |
| **red** (1) | **revenue** (1) | 14:24 20:8 | **sorts** (1) | 21:24 |
| 7:15 | 15:6 | **separate** (1) | 22:4 | **store** (2) |
| **redefining** (1) | **Rhino** (59) | 15:21 | **sound** (1) | 5:7 23:23 |
| 2:5 | 1:4,15,20,24 2:1,3,12 | **separates** (1) | 7:4 | **stores** (7) |
| **refreshing** (1) | 3:1,16,21 4:1,2,18 | 6:24 | **so-called** (3) | 11:22,22,23 17:9 24:3 |
| 17:10 | 5:1,24 6:1,5,17,24 | **seriously** (1) | 9:5,10 10:16 | 24:7,11 |
| **regard** (1) | 7:1,6,8,11,13 8:1 | 3:10 | **space** (1) | **store's** (1) |
| 3:12 | 9:1 10:1 11:1,7,14 | **serve** (1) | 9:17 | 15:24 |
| **regarding** (2) | 11:19 12:1,9 13:1 | 4:13 | **speak** (1) | **strategize** (1) |
| 1:14,18 | 13:23 14:1 15:1,21 | **serves** (1) | 12:13 | 20:3 |
| **regards** (1) | 16:1 17:1 18:1 19:1 | 18:10 | **speaks** (1) | **strategy** (1) |
| 10:14 | 19:6,11 20:1,21 | **services** (1) | 9:16 | 19:17 |
| **regional** (1) | 21:1 22:1,8 23:1,9 | 23:16 | **Spearmint** (59) | **stream** (6) |
| 18:10 | 23:23 24:1,2,19 | **set** (3) | 1:4,15,19,24 2:1,2,11 | 10:9,15 11:3 15:6,12 |
| **Registered** (1) | 25:1,3,6,15 | 7:3 20:20 26:20 | 3:1,16,21 4:1,2,18 | 15:13 |
| 26:6 | **Rhinos** (1) | **sexual** (3) | 5:1,24 6:1,17,24 7:1 | **street** (1) |
| **related** (5) | 18:23 | 9:14,19 10:2 | 7:6,7,11,13 8:1 9:1 | 9:18 |
| | **right** (1) | **share** (2) | 10:1 11:1,7,14,19 | **strong** (2) |

2:25 16:12
structured (3)
15:19 16:2 18:8
submit (1)
12:7
success (2)
11:12,13
successful (1)
25:6
suitability (1)
1:25
Super (2)
23:23 24:3
system (1)
14:21
systems (1)
17:2

**T**

T (2)
26:1,1
table (4)
8:4,21 10:16,17
table-dancing (1)
18:20
table-side (1)
9:11
tailored (1)
6:3
take (1)
3:9
taken (3)
6:21 9:23 26:13
talk (1)
21:9
talks (1)
9:21
tangible (2)
12:3 13:7
tax (2)
1:22,23
team (4)
13:20 19:24 20:14
21:23
technology (1)
13:22
television (3)
9:8 23:19 24:15
tell (1)
16:20
ten (2)

16:2,6
terms (2)
4:24 22:13
test (1)
14:7
things (3)
10:20 13:13 24:9
think (8)
4:9 5:21 6:23 8:14,22
9:12 21:15 23:3
thinking (1)
21:7
thought (3)
17:5 18:21 19:11
thousands (2)
14:7,8
three (2)
9:16 10:17
ties (1)
19:21
time (5)
12:20 14:6 16:11 22:2
25:10
tool (1)
13:22
total (3)
16:3,6,8
totally (1)
20:15
touch (2)
12:8 21:6
touches (1)
9:19
toys (2)
23:13,25
track (1)
20:17
trademark (1)
23:11
Traditionally (1)
15:25
training (1)
20:11
transcription (1)
26:11
transparency (1)
14:15
treat (1)
2:16
treated (1)
2:17

true (2)
18:3 26:10
truly (1)
9:14 25:10,11
try (2)
21:10 22:23
trying (3)
22:6,7,11
turn (1)
18:14
TV (1)
9:6
twice (1)
12:14
two (5)
9:16 13:18 17:8 18:18
20:2
type (3)
9:25 15:22 17:2
types (1)
15:7
typically (6)
5:5 10:18 15:23 16:14
19:19,24

**U**

understand (3)
8:9 12:17,19
understanding (4)
4:10 8:19,23 14:13
unique (1)
4:5
unit (4)
5:6,10 8:13 20:15
United (9)
4:21 16:22,24 17:14
17:22 18:5,14 25:19
25:19
upscale (1)
22:9 24:4
use (2)
6:19 22:22
uses (2)
9:21 23:12
utilizing (1)
11:20
U.K (4)
18:19,25 19:8 24:14
U.S (2)
14:9 19:14

**V**

value (3)
3:6 8:20 9:10
variety (1)
23:11
vary (1)
5:5
venture (2)
15:24 19:16
video (4)
1:14,16,21 26:13
videos (1)
23:24
view (1)
19:9
viewer (1)
1:14
virtue (1)
7:12
vision (5)
8:18,18 25:7,12
visit (1)
18:23
volume (1)
4:24

**W**

waitress (1)
15:10
walk (2)
5:24 7:14
walked (1)
8:5
walks (1)
20:5
wall (1)
6:11
want (1)
12:20
WARR (9)
3:3 6:5 7:7 8:3,16
14:11 20:20 24:13
24:25
way (5)
9:20 15:19 17:24
19:10 26:17
ways (1)
23:9
website (5)
21:24,25 22:6,16,16
week (2)

5:7 12:15
weekly (2)
13:3,10
weeks (1)
16:14
welcome (2)
2:2 12:22
well-known (1)
24:21
well-respected (1)
24:6
went (1)
17:4
weren't (1)
19:2
we'll (1)
19:19
we're (7)
2:24 3:10,11 9:23
14:9 20:9 24:9
we've (9)
11:23,24 14:6 17:8,13
17:23 20:20 23:12
23:18
WHEREOF (1)
26:19
WHITEHOUSE (6)
2:18 7:19 18:17 20:10
21:4 22:19
Wide (1)
1:15
willing (1)
9:25
WITNESS (1)
26:19
woman (1)
9:16
women (1)
4:15
words (1)
25:2
work (2)
3:18 4:16
workers (1)
7:21
world (9)
1:15 4:16 6:3 8:14
18:7,15 21:20 25:16
25:22
worldwide (1)
5:17

| | |
|---|---|
| **world's (1)** | **4.9 (1)** |
| 2:8 | 16:3 |
| **written (1)** | **49 (2)** |
| 12:10 | 15:23 16:9 |
| **www.spearmintrhi...** | |
| 1:8 26:12 | **6** |
| | **6,000 (2)** |
| **Y** | 4:19 25:18 |
| **year (3)** | |
| 5:8 16:16 17:21 | |
| **years (8)** | |
| 8:24 13:18 17:8,12 | |
| 18:18,21 23:8 25:24 | |
| **York (3)** | |
| 26:2,4,9 | |
| | |
| **Z** | |
| **zero (1)** | |
| 4:18 | |
| | |
| **$** | |
| **$10,000 (1)** | |
| 11:2 | |
| **$100,000 (1)** | |
| 16:6 | |
| **$20 (1)** | |
| 10:18 | |
| | |
| **1** | |
| **10 (1)** | |
| 10:18 | |
| **13 (1)** | |
| 17:9 | |
| | |
| **2** | |
| **20 (2)** | |
| 8:24 17:12 | |
| **2003 (1)** | |
| 1:4 | |
| **2009 (2)** | |
| 26:13,21 | |
| **2700 (2)** | |
| 4:19 25:17 | |
| | |
| **3** | |
| **30 (3)** | |
| 2:24 10:22 26:13 | |
| **30th (1)** | |
| 26:20 | |
| | |
| **4** | |

EXHIBIT "B"

STATE OF CALIFORNIA GRAY DAVIS, Governor

DEPARTMENT OF INDUSTRIAL RELATIONS
**DIVISION OF LABOR STANDARDS ENFORCEMENT**
*LEGAL SECTION*
455 Golden Gate Avenue, 9th Floor
San Francisco, CA 94102
(415)703-4863



MILES E. LOCKER, Chief Counsel

June 22, 2001

Kat Sunlove, Legislative Affairs Director
Free Speech Coalition
Office of Legislative Affairs
P.O. Box 907
Cool, CA 95614

Re: Gratuities to Dancers Employed Under IWC Orders 5 or 10

Dear Ms. Sunlove:

This is in response to your letter to Labor Commissioner Art Lujan dated
December 20, 2000, in which you inquired as to meaning of the provisions in
.B 2509 which amended Labor Code section 350(e) to provide that: "Any amounts
paid directly by a patron to a dancer employed by an employer subject to
Industrial Welfare Commission Order No. 5 or 10 shall be deemed a gratuity."
Specifically, you asked whether, as a result of this amendment, moneys
collected by a dancer for (1) drinks sold, (2) T-shirts sold, or (3) dances
sold to a customer, would "be deemed a gratuity" so as to entitled the dancer
to keep said amounts.

In your letter, you argue that it would be unfair to the business owner
to treat any of these amounts as gratuities, and that you believe the intent
behind AB 2509 was merely to prohibit the employers of dancers from taking
all or part of a dancer's gratuity, and that there was no intent to change
the pre-existing definition of "gratuity." For the reasons discussed below,
we believe you are incorrect as to the legislative intent. But although AB
2509 undoubtedly expanded the definition of a gratuity with respect to
dancers, the expansion of the definition is limited to situations where the
dancer receives money from a customer for *dancing*, as opposed to situations
where someone employed as a dancer receives money from a customer for
activities unrelated to dancing, such as selling T-shirts, serving drinks or
food, etc.
In order to understand the distinction between these activities, it is
important to understand the history behind both the law and the enforcement
problems in the adult entertainment/exotic dance industry which led to the
"mendment of the term "gratuity."
at Sunlove
June 22, 2001

2001.06.22

First, prior to the enactment of AB 2509, Labor Code section 351 provided (and continues to provide) that "no employer or agent shall collect, take, or receive any gratuity or part thereof that is paid, given to, or left for an employee by a patron , or deduct any amount from wages dues an employee on account of a gratuity, or require an employee to credit the amount, or any part thereof, of a gratuity against and a part of the wages due the employee from the employer. Every gratuity is hereby declared to be the sole property of the employee or employees to whom it was paid, given or left for."

Prior to AB 2509, Labor Code section 350(d) defined gratuity to include "any tip, gratuity, money or part thereof that has been paid or given to or left for an employee by a patron of a business over and above the actual amount due the business for services rendered or for goods, food, drink, or articles sold or served to the patron." AB 2509 left this basic definition untouched, but added the above-referenced provision specific to dancers employed under IWC Orders 5 and 10. By adding this provision, *any amounts that are directly paid by a customer to a dancer*, are defined as a gratuity and are sole property of the dancer, notwithstanding "the actual amount due the business for services rendered." AB 2509 thus expanded the definition of a gratuity for dancers. By way of illustration:

A customer in a restaurant leaves $60 for the waiter, on a bill for $50. The waiter is entitled to keep only $10, the amount of the gratuity. The underlying $50 is "the actual amount due the business for services rendered or for goods, food, drink . . . sold or served to the patron," and this amount is collected by the waiter for delivery to the employer. In contrast, a patron at a  striptease theater gives $30 to a dancer, consisting of $20 for the dance fee (which may have been pre-set by the employer) plus $10 as an additional amount for the dancer's services. Under AB 2509, the dancer is entitled to keep the entire $30.

If this same dancer also sells T-shirts at the theater, or also serves drinks or food to customers, she is then not functioning as a dancer, in which case the basic definition of gratuity under Labor Code section 350, rather than the special definition for dancers, would apply. As a caveat to this, however, please note that if the T-shirt sales are accomplished through dancing (e.g., while dancing, the dancer sells a shirt she is wearing to a customer so that the "sale of the shirt" is nothing more than a means of accomplishing a striptease dance) then the special definition would apply.

June 22, 2001
Page 3

We must disagree with your contention that AB 2509's special treatment of dancer gratuities is "unfair to business owners." First, there are many

ways that an employer can still charge customers for the opportunity to view
the employer's dancers. Admission fees, both as to the premises in general
and as to that portion of the premises where dancing takes place, remain
lawful, as long as the money is not paid directly to a dancer.  Second, the
enforcement history behind this legislation must be understood in order to
reach a conclusion about what is fair.  Over the past seven or eight years,
the State Labor Commissioner's office has received substantial numbers of
complaints from dancers about being forced to pay "stage fees" to their
employers in order to be granted the "privilege" of working.  These "stage
fees," often in the amount several hundred dollars per shift, were taken from
the amounts that customers paid to dancers for their services.   Dancers'
organizations were instrumental in supporting the legislation that clearly
prohibits this practice.

Which brings us to our final point: the determination about what is fair
or not, with respect to matters of employee compensation, rests soundly
within the discretion of the California Legislature.  Having considered this
issue, the Legislature decided how the law should be changed.   It is our
mandate, as a labor law enforcement agency, to enforce these laws as they are
written, regardless of any person's view of whether they are fair to business
or labor.   The public should never expect any less from our Division, and
your concerns would best be directed to the Legislature.

Sincerely,


Miles E. Locker
Chief Counsel


cc:   Art Lujan
      Tom Grogan
      Greg Rupp
      Roger Miller
      Nance Steffen
      All DLSE Attorneys


2001.06.22