```
 1  Peter E. Garrell, Esq. (SBN: 155177)
        pgarrell@linerlaw.com
 2  Kim Zeldin, Esq. (SBN: 135780)
        kzeldin@linerlaw.com
 3  LINER GRODE STEIN YANKELEVITZ
    SUNSHINE REGENSTREIF & TAYLOR LLP
 4  1100 Glendon Avenue, 14th Floor
    Los Angeles, California 90024-3503
 5  Telephone:  (310) 500-3500
    Facsimile:  (310) 500-3501
 6
    Attorneys for Defendants,
 7  SPEARMINT RHINO COMPANIES
    WORLDWIDE, INC., SPEARMINT RHINO
 8  CONSULTING WORLDWIDE, INC., and
    OXNARD HOSPITALITY SERVICES, INC.
 9  (erroneously sued herein as Oxnard Hospitality
    Services, LP)
10
```

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRACY DAWN TRAUTH, individually, and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>    vs.<br><br>SPEARMINT RHINO COMPANIES WORLDWIDE, INC., SPEARMINT RHINO CONSULTING WORLDWIDE, INC., AND OXNARD HOSPITALITY SERVICES, INC.,<br><br>    Defendants. | Case No. EDCV09-1316 VAP (DTBx)<br><br>Honorable Virginia A. Phillips<br><br>**DECLARATION OF PETER E. GARRELL IN SUPPORT OF DEFENDANTS' MOTION TO STAY**<br><br>Date:         April 19, 2010<br>Time:         2:00 p.m.<br>Courtroom:  2<br><br>Date Action Filed: July 13, 2009 |

# DECLARATION OF PETER E. GARRELL

I, Peter E. Garrell, declare as follows:

1.  I am a member in good standing of the Bar of the State of California, duly licensed to practice before all the courts of the State of California and the United States District Court for the Central District of California. I am a partner with the law firm of Liner Grode Stein Yankelevitz Sunshine Regenstreif & Taylor LLP, attorneys for Defendants Spearmint Rhino Companies Worldwide, Inc. ("Companies"), Spearmint Rhino Consulting Worldwide, Inc. ("Consulting"), and Oxnard Hospitality Services, Inc. (erroneously sued herein as Oxnard Hospitality Services, LP) ("Oxnard Hospitality") (collectively "Defendants"). The facts set forth herein are of my own personal knowledge, except for those matters set forth on information and belief, and as to those matters I am informed and believe them to be true. I submit this declaration in support of Defendants' Motion to Stay.

2.  On March 15, 2010, pursuant to Local Rule 7-3, I telephoned Christopher P. Ridout, one of the attorneys for Plaintiff, to "meet and confer" regarding Defendants' motion to stay based upon the recent execution of a settlement agreement in a parallel state court putative class action entitled *Omlor v. City of Industry, et al.*, Case No. BC418020. The *Omlor* action is currently pending in Department 15 of the Los Angeles Superior Court, the Honorable Richard L. Fruin presiding. (On February 17, 2010, Defendants filed a Notice of Pendency of Other Actions or Proceedings Pursuant to L.R. 83-1.4, a true and correct copy of which is attached as Exhibit "1.")

3.  I informed Mr. Ridout that on Friday, March 12, 2010, the parties in *Omlor* had obtained the final signatures and fully executed a comprehensive settlement agreement and that a motion for preliminary approval of the settlement agreement is set to be heard on April 30, 2010 in the Los Angeles Superior Court. I explained to Mr. Ridout that the *Omlor* Settlement encompassed and resolved all of the claims at issue in the present action filed by Ms. Trauth. I requested that Mr.

Ridout stipulate to staying this action in order to prevent any waste of judicial resources, as well as the resources of the parties.

4.  I informed Mr. Ridout that, absent a stipulated stay, Defendants would file a motion for a stay based upon the fact that *Omlor* would settle and moot all claims at issue in this case.

5.  I also asked Mr. Ridout that, in the event Plaintiff would not stipulate to a stay, to agree to the immediate filing of Defendants' motion for a stay before the expiration of the 20 day waiting period set forth in Local Rule 7-3. I made this request because, as Mr. Ridout is aware, certain pending deadlines in this action are imminent. Pursuant to this Court's Civil Trial Scheduling Order entered on February 8, 2010, the parties are to conduct discovery limited to class certification and standing. Plaintiff's motion for class certification must be filed by April 26, 2010, with a hearing on June 14, 2010. In addition, Plaintiff served written discovery (requests for production and interrogatories) and deposition notices. Defendants' responses were served on March 15, 2010. In light of the *Omlor* Settlement, Defendants only served objections. Plaintiff also noticed depositions for each Defendant pursuant to Federal Rule of Civil Procedure 30(b)(6) (which the parties have agreed will be rescheduled at mutually convenient times), as well as four individual depositions. Defendants have also served document requests and a deposition notice on Plaintiff. Plaintiff's deposition was postponed at her request and a new date has not yet been scheduled.

6.  During the March 15, 2010 telephonic meet and confer, Mr. Ridout informed me that he would have to discuss this development with his co-counsel before responding. He also asked that I send him a copy of the *Omlor* Settlement Agreement so that he could review it and determine Plaintiff's course of action.

7.  The following day I emailed Mr. Ridout a copy of the *Omlor* Settlement Agreement, a true and correct copy of which is attached hereto as Exhibit "2." Exhibit "2" includes the attachments to the *Omlor* Settlement Agreement: (1) a class

1  action claim form; (2) notice of proposed class action settlement; (3) a proposed
2  judgment; (4) a [proposed] order granting preliminary approval of the settlement; and
3  (5) the First Amended Complaint.

4      8.    On March 17, 2010, Mr. Ridout emailed me that Plaintiff would not
5  agree to stay this action based upon the *Omlor* settlement, and requested the
6  scheduling of a meet and confer conference to discuss Defendants' written discovery
7  responses.  Mr. Ridout did not state one way or another whether Plaintiff would
8  object to the filing of the Motion to Stay prior to expiration of the 20 day waiting
9  period set forth in Local Rule 7-3.  (Attached hereto as Exhibit "3" is a true and
10 correct copy of Mr. Ridout's March 17, 2010 email.)  That same day, I sent Mr.
11 Ridout a follow-up email again asking about foregoing any objections related to the
12 20 day waiting period.  I also inquired whether Plaintiff will oppose an ex parte
13 application to stay the matter pending a hearing on the noticed motion for a stay.
14 (Attached hereto as Exhibit "4" is my March 17, 2010 response to Mr. Ridout's
15 email.)  On March 18, 2010, Mr. Ridout responded that Plaintiff would not stipulate
16 to a stay pending the hearing on Defendants' noticed motion for a stay, and indicated
17 that Plaintiff would oppose Defendants' ex parte application.  In addition, despite
18 two requests on my behalf, Mr. Ridout did not respond as to whether Plaintiff would
19 oppose the filing of the noticed motion for a stay prior to expiration of the 20 day
20 waiting period in Local Rule 7-3.  Mr. Ridout did respond that he would not agree to
21 an expedited hearing, which I never requested, as the Motion to Stay is being filed
22 with more than minimum statutory notice pursuant to Local Rule 6-1. (A true and
23 correct copy of Mr. Ridout's March 18, 2010 email is attached hereto as Exhibit
24 "5.")

25     9.    The *Omlor* settlement negotiations commenced shortly after the *Omlor*
26 class action was filed on July 17, 2010.  I had litigated and settled a case with
27 counsel in that action, Robert L. Starr and Stephen M. Harris, in prior litigation,
28 entitled *Melissa Arfat v. Blue Zebra Entertainment, Inc.*, Case No. BC367741 (the

"Farmdale Lawsuit"), involving the Farmdale club. Because of that case, Messrs. Starr and Harris were familiar with the records and organization of nightclubs that were clients of Consulting. On September 19, 2007, we settled the Farmdale Lawsuit. Copies of the *Arfat* complaint and the final order settling the Farmdale Lawsuit are attached to contemporaneously filed Request for Judicial Notice as Exhibits "3" and "4."

    10. I was also willing to discuss settlement with Messrs. Starr and Harris because the records and files of the *Omlor* defendants reflected that the plaintiffs, Ms. Omlor and Ms. Wright, actually performed at Spearmint Rhino Clubs (and therefore have standing). By contrast, Oxnard Hospitality's records reflect that Ms. Trauth never worked at the Spearmint Rhino Club in Oxnard, California as alleged in the Second Amended Complaint in this case, which was the only club where she claimed she performed.

    11. During the settlement discussions in *Omlor*, Mr. Harris informed me that he was also preparing additional complaints involving other nightclubs in addition to the one owned by the City of Industry at issue in *Omlor*. Mr. Harris also informed me that he had class representatives for multiple other nightclubs doing business as Spearmint Rhino, Rouge and Blue Zebra.

    12. Notably, on September 1, 2009, Messrs. Starr and Harris filed an action entitled *Victoria Omlor and Anicia Vintimila v. The Spearmint Rhino Companies Worldwide, Inc.*, case No. BC 420882 in Los Angeles Superior Court. This case involves the Spearmint Rhino club owned by Inland Restaurant Venture I, Inc. in Van Nuys, California. A copy of the *Vintimila* complaint is attached to the contemporaneously filed Request for Judicial Notice as Exhibit "5." The complaint names as defendants Inland Restaurant Venture I, Inc., Farmdale Hospitality Services, Inc., the Oxnard Hospitality Services, Inc., Spearmint Rhino Van Nuys and Midnight Sun Enterprises, all of which do business as Spearmint Rhino, Rouge or Blue Zebra.

13. Given the likelihood of additional lawsuits being filed as to each of the clubs, as well as other cases filed by other counsel, which are also identified in the contemporaneously filed Request for Judicial Notice, and this pending federal action, Defendants agreed to a negotiation of a global settlement involving eleven clubs in the State of California, which are or were marketed under the name "Spearmint Rhino," "Rouge" and/or "Blue Zebra," and specifically owned by the following entities: (1) City of Industry Hospital Venture, Inc., (2) Downtown LA Club Venture, Inc., (3) Farmdale Hospitality Services, Inc., (4) Inland Restaurant Venture I, Inc., (5) Midnight Sun Enterprises, Inc., (6) Olympic Avenue Venture, Inc., (7) The Oxnard Hospitality Services, Inc., (8) Rialto Pockets, Inc., (9) Rouge Gentlemen's Club, Inc. (closed prior to the commencement of the *Trauth* and the *Omlor* actions), (10) Santa Barbara Hospitality Services, Inc., and (11) Santa Maria Restaurant Enterprises, Inc.  See Exhibit "2" [Recital, section G].

14. Consulting and Companies were also included as part of the settlement discussions in *Omlor*.  Following several informal settlement meetings and discussions amongst counsel, the parties in *Omlor* engaged in two full days of mediation at ADR Services, Inc. with mediator Eugene C. Moscovitch on November 3 and November 11, 2009.  Informal discovery was provided to Plaintiffs' counsel at the mediation.  The parties reached a settlement in principle following the mediation. The parties then engaged in protracted and difficult negotiations lasting approximately four months in which the actual terms of the settlement documents were negotiated.

15. As provided in the global settlement agreement, the settlement class in *Omlor* consists of: "the group of individuals who worked as exotic dancers and who have provided nude, semi-nude, and/or bikini entertainment for customers at one or more of the Clubs owned by the following entities at some point during the period of time from July 13, 2005 up to and including the entry of the Preliminary Approval Order: City of Industry Hospitality Venture, Inc., Downtown LA Club Venture, Inc.,

Inland Restaurant Venture I, Inc., Midnight Sun Enterprises, Inc., Olympic Avenue Venture, Inc., The Oxnard Hospitality Services, Inc., Rialto Pockets, Inc., Rouge Gentlemen's Club, Inc., Santa Barbara Hospitality Services, Inc., and Santa Maria Restaurant Enterprises, Inc." See Exhibit "2" [Section 1.5].

16. In addition, the *Omlor* Settlement Agreement includes a separate subclass which includes: "The group of individuals who worked as exotic dancers and who provided nude, semi-nude, and/or bikini entertainment for customers of Farmdale Hospitality Services, Inc." The class period for those individuals in the subclass (and the corresponding releases) date back to the prior settlement of July 1, 2007 in the Farmdale Litigation. See Exhibit "2" [Sections 1.20-1.22].

17. As part of the *Omlor* Settlement Agreement, the parties also stipulated to the filing of an amendment of the *Omlor* complaint, which First Amended Complaint was filed on March 15, 2010, a true and correct copy of which is attached hereto and as Exhibit "2" to the Request for Judicial Notice. The First Amended Complaint (pursuant to the *Omlar* Settlement Agreement) adds ten clubs as Defendants (thus expanding the class definition), and adds claims pursuant to the Federal Labor Standards Act ("FLSA") and the Private Attorney General Act ("PAGA"). The class period is for a period of four years dating back to the date of the filing of the *Trauth* Action or July 13, 2005.

18. With respect to the terms, the *Omlor* Settlement Agreement requires Defendants to pay up to $5 million on a claims-made basis in exchange for a release and judgment of dismissal with prejudice of all Released Claims. In particular, the settlement provides that there will be a minimum payment of thirty percent of the Net Settlement Amount (defined as the $5 million gross settlement amount, minus attorney fees and costs of up to one third of the Gross Settlement amount, and the settlement administrator's fees). See Exhibit "2" [Sections 4.1-4.4].

19. As provided in the *Omlor* Settlement Agreement, the "Released Claims" include: "any and all claims, liabilities, demands, causes of action, or lawsuits,

known or unknown (including Unknown Claims), whether legal, statutory, equitable or of any other type or form, whether under federal or state law, and whether brought in an individual, representative or any other capacity, that in any way relate to or arise out of or in connection with acts, omissions, facts, statements, matters, transactions, or occurrences that have been or could have been alleged in the Action, including but not limited to overtime, minimum wages, missed or inadequate meal periods and rest breaks, unpaid tip income, reimbursement for uniform costs, itemized wage statement violations, record keeping violations, and waiting time penalties, claims under Labor Code §§ 201, 202, 203, 204, 212, 218, 218.6, 221, 224, 226, 226.7, 350, 351, 353, 402, 435, 510, 512, 1174, 1194, 1197, 1199, 2802, and 2968, and Wage Commission Orders 5 and 10, and Business & Professions Code §§ 17200, et seq. as it relates to the underlying California Labor Code claims, and interest, attorneys' fees and costs arising from Defendants' treatment of the Members of the Settlement Class as independent contractors." See Exhibit "2" [Section 1.34.] In addition, those individuals who make claims will, pursuant to the terms of the settlement agreement, also release the FLSA claims. *Ibid.*

20.  The *Omlor* Settlement Agreement also requires a payment to the California Labor and Workforce Development Agency of $15,000 for the PAGA claim from the attorney fee award. See Exhibit "2" [Section 7.4].

21.  To the extent that the claims made do not total 30% of the Net Settlement Amount, that amount shall be divided equally between a charity or charities chosen by the parties and re-distributed on a pro rata basis to the class members who made claims. See Exhibit "2" [Section 4.2].

22.  In addition to the monetary payments, the *Omlor* Settlement Agreement requires injunctive relief in the form of changes in the practices at all of the existing nightclubs. In particular, the nightclubs are required to stop the practice of charging dancers stage fees. See Exhibit "2" [Section 3].

23. The *Omlor* Settlement Agreement also contains various terms to help ensure that there will be a significant number of claims. For example, Defendants are required to provide addresses and other identifying information from their files, a settlement administrator is required to conduct certain address searches to update those addresses, there is a mail notice to all class members, there is an internet notice, and there is a provision for a second mailing upon receipt of a returned envelope with a forwarding address. See Exhibit "2" [Section 5].

24. The *Omlor* Settlement Agreement also provides a mechanism to allow the class members to challenge the data upon which the individual's settlement payment is calculated. Further, it provides a mechanism for objecting to the Settlement Agreement and allowing class members to opt out of the settlement. See Exhibit "2" [Sections 5.7 & 6.3.1]

25. As part of the settlement, the *Omlor* plaintiffs will conduct confirmatory discovery relating to the existence of common facts and law, the number of shifts, the composition of the class and the types of records maintained by the clubs to substantiate the identity of the class members. The defendants in *Omlor* also agreed to make a person most knowledgeable from each club available for deposition. See Exhibit "2" [Section 14].

26. As noted above, the Los Angeles Superior Court is scheduled to hold its preliminary approval hearing regarding the *Omlor* Settlement Agreement on April 30, 2010. Pursuant to the Settlement Agreement, the Final Approval Hearing must be heard within 120 days following entry of the order granting preliminary approval. See Exhibit "2" [Section 2.5].

I declare under penalty of perjury that the foregoing is true and correct. Executed this 18th day of March, 2010, at Los Angeles, California.

                     */s/ Peter E. Garrell*
                     Peter E. Garrell