**SEND**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

<u>CIVIL MINUTES -- GENERAL</u>

Case No.   EDCV 09-1316-VAP (DTBx)                    Date: April 4, 2011

Title:   TRACY DAWN TRAUTH, et al., individually, and on behalf of all others
similarly situated -v- SPEARMINT RHINO COMPANIES WORLDWIDE,
INC., et al.
===============================================================
PRESENT:        HONORABLE VIRGINIA A. PHILLIPS, U.S. DISTRICT JUDGE

        Marva Dillard                                   None Present
        Courtroom Deputy                                Court Reporter

ATTORNEYS PRESENT FOR                    ATTORNEYS PRESENT FOR
PLAINTIFFS:                              DEFENDANTS:

        None                                   None

PROCEEDINGS:        MINUTE ORDER GRANTING AMENDED MOTION FOR
                    PRELIMINARY APPROVAL OF CLASS ACTION
                    SETTLEMENT (IN CHAMBERS)

        The amended motion for preliminary approval of class action settlement
("Motion) came before the Court for hearing on November 30, 2010.  The parties
thereafter submitted supplemental briefing on December 29, 2010, and an endorsed
"Amendment to the Stipulation and Settlement Agreement" ("Settlement Agreement
Amendment" or "Amendment") on February 10, 2011.  On March 7, 2011, the Court
conducted a second hearing and took the matter under submission.  After
considering the papers filed in support of the Motion, as well as the arguments
advanced by counsel at the hearings, the Court GRANTS the Motion.

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

# I. BACKGROUND

## A.   Procedural History

On July 13, 2010, Plaintiffs Jane Doe 1 and Jane Doe 2 filed a putative class action complaint against Defendants Spearmint Rhino Companies Worldwide, Inc. ("Spearmint Rhino Co."), Spearmint Rhino Consulting Worldwide, Inc. ("Spearmint Rhino Consulting"), K-Kel, Inc. ("K-Kel"), and Oxnard Hospitality Services, Inc. ("Oxnard"), alleging four claims: (1) violation of the Fair Labor Standards Act ("FLSA") for failure to pay statutory minimum wages; (2) violation of the California Labor Code for failure to pay statutory minimum wages; (3) violation of the California Labor Code for unlawful tip splitting and acceptance of other payments from employees; and (4) violation of California Business and Profession Code § 17200, the Unfair Competition Act ("UCL").  (Doc. No. 1.)  On July 13, 2009, Plaintiffs filed a motion to proceed anonymously and request to file declarations under seal, which the Court denied.   (Doc. Nos. 4, 8.)

On October 7, 2009, Plaintiff D. Trauth ("Trauth") filed a first amended complaint against Defendants Spearmint Rhino Co., Spearmint Rhino Consulting, and Oxnard.  (Doc. No. 53.)  The FAC no longer named Jane Doe I and Jane Doe 2 as plaintiffs, nor K-Kel as a defendant.  On November 20, 2009, Plaintiff Trauth filed a second amended complaint.  (Doc. No. 61.)  On December 10, 2009, Defendants filed a motion to dismiss the second amended complaint and to strike allegations in the second amended complaint, which the Court denied.  (Doc. No. 63.)  On May 14, 2010, Plaintiffs Trauth, Christeen Rivera ("Rivera"), and Jennifer Blair ("Blair") filed a third amended complaint.  (Doc. No. 121.)

On May 17, 2010, Plaintiffs Trauth, Rivera, and Blair filed a motion for preliminary approval of class action settlement, (Doc. No. 119), accompanied by the declaration of Plaintiffs' counsel Christopher Ridout ("Ridout") (Doc. No. 120).  On June 16, 2010, the Court denied the motion without prejudice, noting that the motion was moot in light of changes to material terms of the Settlement Agreement.  (See Doc. No. 130.)

On June 24, 2010, Plaintiffs Trauth, Rivera, and Blair filed an amended motion

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

and the declaration of Stephen M. Harris in support of the amended motion.  (Doc
Nos. 131-32.)  On July 8, 2010, several objectors, through counsel, filed an ex parte
application to stay the hearing on the amended motion for 90 days, which the Court
denied on July 15, 2010.  (Doc. Nos. 140, 145.)  The Court denied the amended
motion, without prejudice, on July 26, 2010.  (Doc. No. 148.)

     On August 19, 2010, Plaintiffs Trauth, Rivera, Blair, Marsha Ellington
("Ellington"), Victoria Omlor ("Omlor"), Selena Pelaez ("Pelaez"), Tami Sanchez
("Sanchez"), Reah Navarro ("Navarro"), Anicia Vintimilla ("Vintimilla"), and Jasmine
Wright ("Wright") (collectively, "Plaintiffs") filed a fourth amended complaint.  (Doc.
No. 153.)  On September 17, 2010, Plaintiff filed the Motion (Doc. No. 159), and the
declarations of Ridout ("Ridout Decl.") (Doc. No. 160), Hart L. Robinovitch
("Robinovitch Decl.") (Doc. No. 161), Caleb Marker ("Marker Decl.") (Doc. No. 162),
Timothy J. Becker ("Becker Decl.") (Doc. No. 163), Tracy Dawn Trauth ("Trauth
Decl.") (Doc. No. 164), Christeen Rivera ("Rivera Decl.") (Doc. No. 165), Jennifer
Blair ("Blair Decl.") (Doc. No. 166), Nicole Garcia ("Garcia Decl.") (Doc. No. 167),
Marsha Ellington ("Ellington Decl.") (Doc. No. 168), Victoria Omlor ("Omlor Decl.")
(Doc. No. 169), Selena Pelaez ("Pelaez Decl.") (Doc. No. 170), Tami Sanchez
("Sanchez Decl.") (Doc. No. 171), Reah Navarro ("Navarro Decl.") (Doc. No. 172),
Anicia Vintimilla ("Vintimilla Decl.") (Doc. No. 173), Jasmine Wright ("Wright Decl.")
(Doc. No. 174), Robert L. Starr ("Starr Decl.") (Doc. No. 175), and Stephen M. Harris
("Harris Decl.") (Doc. No. 176).  On November 10, 2010, Plaintiffs filed the fifth
amended complaint ("FAC").  (Doc. No. 183.)

     Following the November 24, 2010, hearing on the Motion, the parties filed: (1)
the declaration of Robert L. Starr ("Starr Decl. II") on December 29, 2010 (Doc. No.
189); (2) the declaration of Victoria Omlor ("Omlor Decl. II") on December 29, 2010
(Doc. No. 190); (3) the declaration of Peter E. Garrell and lodging of the Class Action
Fairness ("CAFA") letters sent to the United States Attorney General and state
attorneys general on December 29, 2010 (Doc. No. 191); (4) Supplement to the
Motion ("Supplement") on December 29, 2010 (Doc. No. 192); (5) the declaration of
Kathy Vercher ("Vercher Decl.") (Doc. No. 193); and (6) the

declaration of Christopher P. Ridout ("Ridout Decl. II") with Exhibit A, the Settlement
Agreement Amendment on February 10, 2011 (Doc. No. 195).  On March 31, 2011,

the parties filed a "Stipulation re: Class Action Settlement Scheduling Order." (Doc. No. 202.)

## B.   Settlement Terms

The proposed Settlement creates a common fund or "Gross Settlement Amount" of $10,000,000.00, from which class members' claims will be paid on a claims-made basis after deducting (1) attorneys' fees and costs of up to 25% of the Gross Settlement Amount; and (2) settlement administration costs of $55,000.00. (See Mot. at 12; Settlement Agreement ¶¶ 6.7.4, 7.2, 9.1.) The parties refer to the remaining amount as the "Net Settlement Amount," from which they propose to deduct (1) $20,000.00[1] in penalties to be paid to the State of California pursuant to the Labor Code Private Attorneys General Act of 2004, Cal. Lab. Code. §§ 2698-99 (Settlement Agreement ¶ 7.4), and (2) incentive awards of up to $75,000.00[2] total for eleven named Plaintiffs. (Id. ¶ 10.1.)

The parties also agree to the following injunctive relief: (1) existing Clubs[3]

_____

[1] 75%, or $15,000.00, of this amount will be paid "to the [Labor and Workforce Development Agency] for penalties under the Private Attorneys General Act"; 25%, or $5,000.00, will remain a part of the pool allocated to payment of claims for the Oxnard and Farmdale classes. (Settlement Agreement ¶ 7.4.)

[2] The parties propose Plaintiff Trauth receive an incentive award of $15,000.00, and the other named plaintiffs receive incentive awards of up to $6,250.00. (Settlement Agreement ¶ 10.1.)

[3] "Clubs" refers to "[c]lubs owned by City of Industry Hospitality Venture, Inc., Downtown LA Club Venture, Inc., Farmdale Hospitality Services, Inc., High Expectations Hospitality, LLC, Inland Restaurant Venture I, Inc., K-Kel Inc., Kentucky Hospitality Venture LLC, LCM, LLC, Midnight Sun Enterprise, Inc., Olympic Avenue Venture, Inc., Rialto Pockets, Inc., Rouge Gentlmen's Club, Inc., Santa Barbara Hospitality Services, Inc., Santa Maria Restaurant Enterprises, Inc., The Oxnard Hospitality Services, Inc., and WPB Hospitality, LLC." (Settlement Agreement § 1.14.)

within the State of California will stop charging dancers "stage fees"[4] within 30 days of the final settlement approval (Settlement Agreement ¶ 3.1); (2) all Existing Clubs agree to "discontinue the practice of treating dancers as independent contractors or lessees and shall likewise discontinue using any Dancer Performance Lease with Class Members" within six months of final settlement approval.  (Supplemental Briefing, Ex. A (Settlement Agreement Amendment) ¶ 3.2.)  Defendants may opt out of this requirement in certain defined situations.  (Settlement Agreement Amendment ¶ 3.2)

## 1.    Monetary Relief

To receive payment under the Settlement Agreement, a dancer must opt in to the Class by submitting a valid claim form ("Claim Form").  (Settlement Agreement ¶¶ 6.1, 7.1.1.)  Potential class members who do not submit a valid Claim Form will not be entitled to payment but nevertheless will be bound by the terms of the Agreement.  (Id. ¶ 7.1.1.)

Following the deductions listed above, the Net Settlement Amount will be allocated into three pools, as follows:

- **Pool 1**: 70% of the Net Settlement Amount will be allocated to dancers who worked at the eleven nightclubs in California (the Oxnard and Farmdale Classes).  (Settlement Agreement ¶ 7.2.1.)  Class members who submit valid claims will be paid a pro rata share of the fund based on the number of shifts worked in relation to the total number of work shifts of the Oxnard and Farmdale subclasses as a whole.  The Settlement Agreement allocates 30% of the payment as compensation for alleged unlawful tip sharing practices, and the remainder for unpaid minimum wages.  The amount of this pool is higher than Pool 2 and Pool 3 to account for "larger number of members in this sub-class and the arguably stronger claims that these sub-class members may have had

_____

[4] "Stage Fees" are "any fees paid by a dancer to any of the Clubs for the purpose of allowing the dancer entrance to the Club(s) for purposes of performing at the Club(s)."  (Settlement Agreement ¶ 1.72.)

under California law with respect to tip-splitting practices under California Labor Code §§ 350 and 250 and the UCL."  For example, most dancers in the Oxnard and Farmdale subclasses paid a portion of each dance fee to the Club as "rent."  (Mot. at 12-13, n.8; Settlement Agreement ¶ 7.2.2.)

- **Pool 2:** 20% of the Net Settlement Amount will be allocated to dancers who worked at the Spearmint Rhino nightclub in Las Vegas.  (Id. ¶ 7.2.2.)  Class members who submit valid claims will be paid on a pro rata share of the fund based on the number of shifts worked in relation to the total number of shifts worked by the Nevada class as a whole.   (Id.)
- **Pool 3:** 10% shall be allocated to the Texas Settlement Class, the Florida Settlement Class, the Idaho Settlement Class, and the Kentucky Settlement Class (Id. ¶ 7.2.3).  Class members shall be paid by dividing the amount in the pool by the total number of dance shifts performed by all members of the pool and then multiplying that number by the number of dance shifts performed by the individual pool member who submits a valid claim.  (Id.)

Within all classes, payments to class members will be allocated as follows: 50% to actual damages claims and 50% to liquidated damages claims.  (Settlement Agreement ¶ 4.4.)

## 2.    Minimum Payment / Cy Pres Fund

The parties propose that Defendants will pay each Class member who submits a valid Claim Form a pro rata share, based on the number of shifts worked within the applicable pool.  (Settlement Agreement ¶¶ 6.3-6.4, 7.1-7.2.)

If class members' total claims amount to less than $2,100,000.00, Defendants will distribute the difference between $2,100,000.00 and the total claims as follows: (1) 10% to class members who file valid claims on a pro rata basis; and (2) 90% to be distributed over a five-year period "to one or more charitable, non-profit organization(s) existing pursuant to Internal Revenue Code section 501(c)(3) and/or 501(c)(3) and/or 501(c)(4)."  (Mot. at 15; Supplemental Briefing, Ex. A (Settlement Agreement Amendment) ¶ 4.4.)  Defendants will choose the non-profit, charitable organization or organizations, subject to Plaintiffs' approval.  (Id.)  Under the Settlement Agreement, "Plaintiffs shall not unreasonably withhold consent to any

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

Internal Revenue Code section 501(c)(3) and/or 501(c)(4) non-profit, charitable organization(s) selected by Defendants.  Lead Counsel through Christopher P. Ridout, Esq.[,] shall have authority to approve in writing the recipient(s) of the Charitable Payment(s)."  (Id.)  Any unclaimed Net Settlement Amount "in excess of $2,100,000 will be kept by Defendants."  (Id.)

### 3.    Injunctive Relief

The Settlement Agreement provides for two forms of injunctive relief: (1) existing Clubs within the State of California will stop charging dancers stage fees within 30 days of the final settlement approval (Settlement Agreement ¶ 3.1); and (2) all Existing Clubs agree to "discontinue the practice of treating dancers as independent contractors or lessees and shall likewise discontinue using any Dancer Performance Lease with Class Members" within six months of final settlement approval.  (Supplemental Briefing, Ex. A (Settlement Agreement Amendment) ¶ 3.2.)

As to the second form of relief, Defendants will reclassify dancers either as employees or "as owners (e.g. shareholder, limited partner, partner, member or other type of ownership stake)."  (Id.)  Defendants may opt out of this requirement "[t]o the extent that the laws change in any particular jurisdiction where an Existing Club is operating which supports dancers being treated in a manner other than employee or owner, the Existing Club in that jurisdiction may change its practices consistent with the change in the law."  (Id.)

### 4.    Payment of Penalties

The parties agree Defendants will pay $20,000.00 in penalties to the State of California pursuant to the Labor Code Private Attorneys General Act of 2004, Cal. Lab. Code. §§ 2698-99.  (Settlement Agreement ¶ 7.4.)  Of that amount, 75%, or $15,000.00, will be paid "to the [Labor and Workforce Development Agency] for penalties under the Private Attorneys General Act," and 25%, or $5,000.00, will

remain a part of the pool allocated to payment of claims for the Oxnard and Farmdale classes.  (Settlement Agreement ¶ 7.4.)

### 5.    Incentive Payments and Attorneys' Fees and Costs

The Settlement Agreement provides that the total incentive fees will be

MINUTES FORM 11                                        Initials of Deputy Clerk __md__
CIVIL -- GEN                      Page 7

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

distributed as follows: (1) Trauth will receive up to $15,000.00; and (2) the other
class representatives will receive up to $6,250.00 each.  (Supplemental Briefing, Ex.
A (Settlement Agreement Amendment) ¶ 10.1.)  If the total claims amount to less
than $2,100,000.00, the incentive fee awards will be distributed from the difference
between $2,100,000.00 and the total claims, before any amount is distributed to the
charity or charities (90%) and on a pro rata basis to class members who submit valid
claims (10%).

### 6.    Settlement Administrator Awards

Defendants agree to pay a fixed amount of $55,000.00 to settlement
administrator Girlardi & Co., LLC.  (Mot. at 17; Settlement Agreement ¶¶ 6.7.4, 7.2,
9.1, 9.5.)

### 7.    Release of Claims

In exchange for the monetary and injunctive relief, class members agree to
release "any and all claims, liabilities, demands, causes of action, or lawsuits, known
or unknown, including Unknown Claims, whether legal, statutory, equitable or of any
other type or form, whether under federal or state law, and whether brought in an
individual, representative or any other capacity, that in any way relate to or arise out
of or in connection with acts, omissions, facts, statements, matters, transactions, or
occurrences that have been or could have been alleged in the Action, including but
not limited to overtime, minimum wages, missed or inadequate meal periods and
rest breaks, unpaid tip income, reimbursement for uniform costs, itemized wage
statement violations, record keeping violations, and waiting time penalties . . . ."  (Id.
¶¶ 8.1-8.6.)  The release for the Nevada subclass also discharges claims related to
conversion and unjust enrichment.  (Id. ¶ 8.2.)  The FLSA release discharges
Defendants "from any and all wage-related claims of any kind, including but not
limited to claims pursuant to FLSA that any of [the FLSA class members] has, had,
might have or might have had against any of the [Defendants] based on any act or
omission that occurred, during the FLSA Class Period, in any way related to any of
the facts or claims alleged or could have been alleged in the Action or by reason of
the negotiations leading to this settlement, even if presently unknown and/or un-
asserted."  (Id. ¶ 8.7.)

## II. LEGAL STANDARDS

MINUTES FORM 11                                          Initials of Deputy Clerk __md__
CIVIL -- GEN                         Page 8

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

## A.    Class Certification

Parties seeking class certification for settlement purposes must satisfy the requirements of Federal Rule of Civil Procedure 23 ("Rule 23").  Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620 (1997).  A court considering such a request should give the Rule 23 certification factors "undiluted, even heightened, attention in the settlement context."  Id.

To bring a class action under Rule 23(a), a plaintiff must demonstrate:

(1) the class is so numerous that joinder of all members is impracticable ["numerosity"], (2) there are questions of law or fact common to the class ["commonality"], (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ["typicality"]; and (4) the representative parties will fairly and adequately protect the interests of the class ["adequacy of representation"].

In addition to these requirements, a plaintiff must satisfy one of the Rule 23(b) prongs to maintain a class action.  Here, Plaintiffs move for class certification under Rule 23(b)(3), or Rule 23(b)(2) in the alternative.

Where a plaintiff moves for class certification under Rule 23(b)(3), the plaintiff must prove:

the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum.[5]

---

[5] The Court need not consider a fourth factor – the likely difficulties in managing a class action – in the context of a class action settlement.

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

Where a plaintiff moves for class certification under Rule 23(b)(2), the plaintiff must prove:

the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## B.   Preliminary Approval of Settlement Under Rule 23

Rule 23(e) provides, "The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed[,] or compromised only with the court's approval." The court must hold a hearing and find that the settlement "is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  Review of a proposed settlement generally proceeds in two stages, a hearing on preliminary approval followed by a final fairness hearing.  See Federal Judicial Center, Manual for Complex Litigation, § 21.632 (4th ed. 2004).

At the preliminary approval stage, a court determines whether a proposed settlement is "within the range of possible approval" and whether or not notice should be sent to class members.  Vasquez v. Coast Valley Roofing, Inc., 670 F. Supp. 2d 1114, 1125 (E.D. Cal. 2009); In re Tableware Antitrust Litig., 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007); In re Corrugated Container Antitrust Litig., 643 F.2d 195, 205 (5th Cir. 1981); Gautreaux v. Pierce, 690 F.2d 616, 621 n.3 (7th Cir. 1982) (stating the purpose of a preliminary approval hearing is "to ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing."); Manual for Complex Litigation, § 21.632.  "In addition, the court may find that the settlement proposal contains some merit, is within the range of reasonableness required for a settlement offer, or is presumptively valid."  In re Tableware Antitrust Litig., 484 F. Supp. 2d at 1079 (citing Newberg on Class Actions § 11.25 (1992)).

## III. DISCUSSION

## A.   Rule 23 Class Certification

In the Motion, Plaintiffs seek certification of a nationwide settlement class, described as: "individuals who performed as exotic dancers and who have provided

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

nude, semi-nude and/or bikini entertainment for customers at one or more of the Clubs owned, managed or controlled by Defendants."  (Mot. at 10; Settlement Agreement ¶¶ 1.70, 2.3.)

The Settlement Agreement defines the subclasses as follows:

- **Oxnard Settlement Class:** "[T]he individuals who performed as exotic dancers and who have provided nude, semi-nude[,] and/or bikini entertainment for customers at one or more of the Clubs owned by the following entities at some point during the period of time from July 13, 2005 up to and including the [date of] entry of the Preliminary Approval Order ('Oxnard Class Period'): City of Industry Hospitality Venture, Inc., Downtown LA Club Venture, Inc., Inland Restaurant Venture I, Inc., Midnight Sun Enterprises, Inc., Olympic Avenue Venture, Inc., Rialto Pockets, Inc., Rouge Gentlemen's Club, Inc., Santa Barbara Hospitality Services, Inc., Santa Maria Restaurant Enterprises, Inc. and The Oxnard Hospitality Services, Inc."   (Settlement Agreement ¶¶ 1.60, 1.62.)
- **Farmdale Settlement Class:** "[T]he individuals who performed as exotic dancers and who have provided nude, semi-nude, and/or bikini entertainment for customers of Farmdale Hospitality Services, Inc. from July 13, 2006 to the [date of] entry of the Preliminary Approval Order."  (Settlement Agreement ¶¶ 1.25, 1.28.)
- **<u>Florida Settlement Class</u>**: "[T]he individuals who performed as exotic dancers and who have provided nude, semi-nude, and/or bikini entertainment for customers at the Club owned [by] WPB Hospitality, LLC from May 3, 2006 to the [date of] entry the the Preliminary Approval Order."  (Settlement Agreement ¶¶ 1.31, 1.33.)
- **<u>Idaho Settlement Class</u>**: "[T]he individuals who performed as exotic dancers and who have provided nude, semi-nude, and/or bikini entertainment for customers at the Club owned by LCM, LLC from May 3, 2006 to the [date of] entry of the Preliminary Approval Order."  (Settlement Agreement ¶ 1.42.)
- **Kentucky Settlement Class:** "[T]he individuals who performed as exotic dancers and who have provided nude, semi-nude, and/or bikini entertainment for customers at the Club owned by Kentucky Hospitality Venture, LLC from May 3, 2005 to the [date of] entry of the Preliminary Approval Order."

MINUTES FORM 11                                    Initials of Deputy Clerk __md__
CIVIL -- GEN                    Page 11

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

(Settlement Agreement ¶¶ 1.46, 1.48.)

- **Texas Settlement Class**: "[T]he individuals who performed as exotic dancers and who have provided nude, semi-nude, and/or bikini entertainment for customers at the Club owned by High Expectations Hospitality Venture, LLC from May 3, 2007 to the [date of] entry of the Preliminary Approval Order." (Settlement Agreement ¶¶ 1.73, 1.75.)

- **Nevada Settlement Class**: "[T]he individuals who performed as exotic dancers and who have provided nude, semi-nude, and/or bikini entertainment for customers at the Club owned by K-Kel Inc. from July 13, 2006 to the [date of] entry of the Preliminary Approval Order."  (Settlement Agreement ¶¶ 1.56, 1.58.)

- **FLSA Settlement Class**: "[T]hose individuals who are members of the Oxnard, Farmdale, Kentucky, Idaho, Texas, Nevada[,] and/or Florida Settlement Classes who elect to participate in the Settlement and timely submit a [v]alid Claim Form."  (Settlement Agreement ¶¶ 1.36, 1.38.)

As discussed below, Plaintiffs satisfy the factors required for class certification under Rule 23(a).

### 1.   Numerosity

To satisfy the numerosity requirement under Rule 23(a)(1), joinder of all class members must be "impracticable," but not necessarily impossible.  Parkinson v. Hyundai Motor Am., 258 F.R.D. 580, 588 (C.D. Cal. 2008).  "Plaintiffs need not identify with precision the number of class members and may instead rely on reasonable inferences."  Id.  Furthermore, there is no specific number requirement, as the court may examine the specific facts of each case.  Ballard v. Equifax Check Servs., Inc., 186 F.R.D. 589, 594 (E.D. Cal. 1999).  Indeed, courts have not required evidence of specific class size or identity of class members to satisfy the requirements of Rule 23(a)(4).  Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993).

Here, Plaintiffs' counsel avers the settlement class consists of more than eleven thousand members. (Mot. at 33; see Robinovitch Decl., Ex. V (Deposition of Kathy Joanne Vercher, President of Spearmint Rhino Companies Worldwide) at 89-91.)  Plaintiffs need not provide the specific class size, but must at least show they

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

arrived at this number on the basis of a reasonable inference.  Parkinson, 258
F.R.D. at 588.  Vercher, Defendants' Federal Rule of Civil Procedure 30(b)(6)
corporate designee, provided the estimate of ten to eleven thousand class members
based upon reasonable inferences.  A settlement class of ten or eleven thousand
satisfies the requirement for numerosity.  Thus, Plaintiffs meet their burden of
establishing numerosity.

### 2.    Commonality

Courts have construed Rule 23(a)(2)'s commonality requirement permissively.
Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998).  As the Ninth Circuit
explained:

> All questions of fact and law need not be common to satisfy the rule. The
> existence of shared legal issues with divergent factual predicates is
> sufficient, as is a common core of salient facts coupled with disparate legal
> remedies within the class.

Id. at 1019.  Additionally, this Court, Pfaelzer, J., has stated "the commonality
requirement is interpreted to require very little."  In re Paxil Litig., 212 F.R.D. 539,
549 (C.D. Cal. 2003).  "[F]or the commonality requirement to be met, there must only
be one single issue common to the proposed class."  Haley v. Medtronic, Inc., 169
F.R.D. 643, 648 (C.D. Cal. 1996).

Though recognizing that class members have disparate claims as to their
individual state law claims, Plaintiffs identify the following common questions:

> (1) whether dancers have been misclassified as independent contractors,
> as opposed to employees; (2) whether Defendants' tip-sharing practices are
> unlawful; and (3) whether common Defendants Spearmint Rhino Consulting
> and Spearmint Rhino Companies are joint employers of the dancers in the
> class.

(Mot. at 34.)  Likewise, Plaintiffs argue that Defendants' defenses that (1) class
members are bound to resolve their claims in individual arbitration proceedings,
instead of collectively as part of a class action, and (2) offsets apply to negate any
recovery of lost wages, "are entirely common, having been based on a standard for

MINUTES FORM 11                                    Initials of Deputy Clerk __md__
CIVIL -- GEN                      Page 13

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

'lease' contract applicable to each dancer in the class."  (Id.)

To support this assertion, Plaintiffs point to Vercher's deposition testimony. According to Vercher, Defendants classified all class members as independent contractors instead of employees. (Robinovitch Decl., Ex. V at 60-61, 67-68.) Further, Vercher confirmed that all class members were required to sign a standard "lease" contract that designated them as "tenants" or more broadly, independent contractors.  (Robinovitch Decl., Ex. V at 58, 60-61, 67-68; Ex. W (Sample "Dancer Performance Lease" Agreement).)  Moreover, class members were not paid wages by Defendants, and were required to pay "rent."  (Robinovitch Decl. ¶ 35; Ex. V at 68-72, 93; Ex. W ¶ 7(A),(B); Ex. E (transcription of Spearmint Rhino Corporate video) ("[T]he profitability of the dancer income stream is extremely high compared to the cost of other goods sold.  There is no innate cost to that; the dancers don't receive a payroll or a salary.").)

Additionally, Plaintiffs contend "common evidence establishes whether the tip sharing practices employed at the nightclubs were unlawful." (Mot. at 35.)  Plaintiffs identify this common evidence – the Vercher deposition, the corporate materials, and the Dancer Performance Lease – which supports Plaintiffs' argument that dancers were required to pay "rent" and "stage fees" and were not paid minimum wage, in violation of California and federal law.  (Id. at 35-36).

Furthermore, Plaintiffs argue common questions of fact and law exist regarding whether Defendants were common joint employers of the class.  (See Robinovitch Decl., Ex. E; Ex. F (Spearmint Rhino Press Release); Ex. V at 44-47 (Vercher testifying she serves as President or a board member of almost all the Clubs); FAC, Ex. B.)

Finally, common factual and legal issues exist as to Defendants' affirmative defenses.  For example, each Dancer Performance Lease contains (1) a provision disavowing any employment relationship between the dancer and the Club (Robinovitch Decl., Ex. W ¶ 7(A)); (2) a provision requiring the dancer to reimburse the Club for "all net Dance Performance Fees" if a court or agency finds that the relationship between the dancer and Club is "other than that of landlord/tenant and that the [dancer] is entitled to monetary consideration from" the Club (id. ¶ 7(C)); (3)

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

a provision providing that a dancer who "[c]laim[s] the status of the relationship with [the Club is] other than that of a landlord and a tenant" is in material breach (id. ¶ 11(G)); (4) an arbitration clause (id. ¶ 18); and (5) a provision within the arbitration clause providing that any claims not brought by dancers within one year are absolutely waived (id.).

Accordingly, Plaintiffs have met their burden of establishing the Class shares a common core of salient facts and legal issues, which satisfies commonality under Rule 23(a)(2).

### 3.    Typicality

The Ninth Circuit in Hanlon explained that "representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical."  150 F.3d at 1020.  Thus, to find typicality, a "court does not need to find that the claims of the purported class representative are identical to the claims of the other class members."  Haley, 169 F.R.D. at 649.  The class representatives "must be able to pursue [their] claims under the same legal or remedial theories as the unrepresented class members."  Paxil, 21 F.R.D. at 549.

Here, each named Plaintiff provides details to support the typicality of her claims, i.e., the club(s) where she worked, the dates she worked at the club(s), and the type of dancing she performed.  The declarations reveal that each named Plaintiff worked as a nude or semi-nude dancer at one of Defendants' Clubs, was classified as an independent contractor, and signed a dancer performance "lease" agreement.  (See Trauth Decl. ¶¶ 3-9; Rivera Decl. ¶¶ 3-9; Blair Decl. ¶¶ 3-9; Omlor Decl. ¶¶ 3-9; Wright Decl. ¶¶ 3-9; Vintimilla Decl. ¶¶ 3-9; Ellington Decl. ¶¶ 3-9; Pelaez Decl. ¶¶ 3-9; Garcia Decl. ¶¶ 3-9; Navarro Decl. ¶¶ 3-9; Sanchez Decl. ¶¶ 3-9.)  Though the class representatives do not share every claim, i.e., class members from different states have individual state law claims, the declarations demonstrate the representative claims are reasonably co-extensive with those of other class members.  Nine class representatives are members exclusively of the Oxnard subclass, one class representative is a member of the Nevada subclass, and one is a member of both the Oxnard and Nevada subclasses.  There are no representatives from the Farmdale, Florida, Idaho, Kentucky, or Texas subclasses.  For the most part, however, the class representatives are pursuing their claims

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

under the same legal theories as the unrepresented class members.

Thus, Plaintiffs establish typicality under Rule 23(a)(3).

### 4.      Adequacy of Representation

Rule 23(a)(4) demands that "representative parties will fairly and adequately protect the interests of the class."  The determination that representative parties would adequately protect the interests of the class "is a question of fact that depends on the circumstances of each case."  In re Nat'l W. Life Ins. Deferred Annuities Litig., No. 05-1018, 2010 WL 2735732, at *5 (S.D. Cal. July 12, 2010) (citing McGowan v. Faulkner Concrete Pipe Co., 659 F.2d 554, 559 (5th Cir. 1981)). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members[,] and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  Hanlon, 150 F.3d at 1020.

### a.      Adequacy of Class Counsel

Plaintiffs seek to appoint as class counsel Christopher R. Ridout of Ridout & Lyon, LLP, Hart Robinovitch ("Robinovitch") and Tim Becker ("Becker") of Zimmerman Reed, P.L.L.P., Stephen Harris ("Harris") of Knapp, Petersen & Clarke, Robert L. Starr ("Starr") of the Law Offices of Robert L. Starr, and Caleb Marker ("Marker") of the Consumer Law Center.  (Settlement Stip ¶ 1.9; Mot. at 40-41.)


To evaluate the adequacy of counsel, courts "must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class."  Fed. R. Civ. P. 23(g)(1); Fed. R. Civ. P. 23 Advisory Committee Notes; see, e.g., Hill v. Merrill Gardens, L.L.C., No. 04-248, 2005 WL 2465250, at *3 (N.D. Ind. Oct. 6, 2005).

Plaintiffs' counsel submitted substantial evidence of their experience with class action, complex, and other large-scale litigation, including substantial trial

MINUTES FORM 11                                         Initials of Deputy Clerk __md__
CIVIL -- GEN                         Page 16

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

experience, as detailed below.  For the reasons discussed below, the Court finds all
proposed counsel have established they can represent the class adequately.

## Christopher Ridout

Christopher Ridout is a partner at Ridout & Lyon, LLP, and has practiced law
since 1989.  (Ridout Decl. ¶¶ 1, 15.)  Ridout has experience in the prosecution and
settlement administration of mass tort actions and class actions.  (Id. at 16.)  He has
been appointed class counsel in two class actions in the Central District of
California, and was appointed a member of the Plaintiffs' Executive Committee in a
wage and hour class action in the District of Minnesota.  (Id. at 17.)  Ridout has
served as class co-counsel or on the plaintiff's steering committee in six other class
actions in the Central District and one in the California Superior Court.  (Id. at 16-17)
He also was appointed as plaintiffs' liaison counsel in a mass toxic tort proceeding in
the California Superior Court.  (Id.)  Furthermore, he has served as defense counsel
in employment and labor law actions in the Central District of California and the
California Superior Court.  (Id. at 18.)  Finally, Ridout describes what he has done to
prosecute and reach a settlement in this action.  (Id. ¶¶ 3-10.)  The Court finds the
parties have established that Ridout can represent the class adequately.

## Hart Robinovitch

Hart Robinovitch has practiced law since 1993 and is a partner of Zimmerman
Reed P.L.L.P.  (Robinovitch Decl. ¶¶ 1, 2.)  Robinovitch was one of the court-
appointed class counsel in three district court class actions and seven state court
class actions.  (Id. ¶ 9.)  He also served as co-counsel on a series of class actions –
15 in district court, 7 in state court –  challenging mortgage lenders' escrow account
servicing practices.  (Id. ¶ 10.)  Furthermore, he has experience litigating cases
involving FLSA and state wage and hour laws.  (Id. ¶ 13.)  Since 2008, Robinovitch
has been one of the lead plaintiffs' counsel handling more than five putative class
actions brought by nude or semi-nude dancers alleging labor violations.  (Id. ¶¶ 14,
15.)

In this action, Robinovitch has assisted in "investigating the facts and
applicable law, developing Plaintiffs' case strategy and litigation theories, drafting
pleadings and motion papers, conducting discovery, arguing motions, attending
court hearings, negotiating the proposed class action settlement with Defendants

and drafting/editing the settlement papers."  (Id. ¶ 16.)  To date, Robinovitch
estimates he has "devoted more than 800 hours to investigating, litigating and
handling settlement in this case."  (Id.)  Thus, the parties have established that
Robinovitch can represent the class adequately.

## Tim Becker

Tim Becker was admitted to practice law in 1995 and is a partner of the law
firm of Zimmerman Reed P.L.L.P. (Becker Decl. ¶¶ 1, 2.)  Since at least 2004,
Becker has worked with Zimmerman Reed's wage and hour group prosecuting
complex wage and hour actions.  (Id. ¶ 3.)  He has acted as lead counsel or lead
trial counsel in three wage and hour class action cases, one of which was
prosecuted in federal district court.  (Id. at 3-6.)  Becker also served as lead counsel
or co-lead counsel in numerous complex consumer litigation cases.  (Id.)  Becker
served the national co-chair of the Wage and Hour Litigation Group for the American
Association of Justice from 2009-10.  (Id.)

"While [Becker] was not the primary attorney from [Zimmerman Reed P.L.L.P.]
involved in this litigation, [Becker] routinely worked with Mr. Robinovitch to discuss
pertinent legal issues and strategy including those involving resolution of this case . .
. . [Becker] was involved in settlement discussion in general, participating in multiple
email discussions and evaluating the agreement in both specific and general terms,
and ultimately, reviewing the settlement agreement itself.  Additionally, [Becker]
participated in multiple phone conversations with both . . . Robinovitch and Ridout
regarding the litigation and settlement."  (Becker Decl. ¶ 12.)  Thus, the parties have
established that Becker can represent the class adequately.

## Stephen Harris

Stephen Harris is a member of the law firm Knapp, Petersen & Clarke.  (Harris
Decl. ¶ 1.)  He has participated in over ten wage and hour class actions on behalf of
nude and semi-nude dancers in both state and federal courts.  (See id. ¶¶ 3(a)-(s)
(listing cases).)

 Harris is co-counsel of record with Robert Starr for the Omlor action; the
plaintiffs from that action have joined in this action.  (Id. ¶ 2.)  In his capacity as
counsel in Omlor, Harris attended two days of mediation and participated in months

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

of negotiations after the mediation, ultimately reaching an agreement.  (Id.)  After joining this case, Harris negotiated significant modifications to the then-existing agreement, attended a deposition of Defendants' Rule 30(b)(6) designee, and reviewed documentation produced at the deposition.  (Id. ¶¶ 4-6.)  Thus, the parties have established that Harris can represent the class adequately.

## Robert Starr

Robert Starr has practiced law for more than ten years, owns The Law Office of Robert L. Starr, and is co-counsel of record with Stephen Harris for plaintiffs in the Omlor action.  (Starr Decl. ¶ 10.)  Starr has been involved in "at least fifteen other wage and hour cases involving class action allegations, several of which have settled, one of which is in the process of settlement, and the remainder of which are at different states, some of which are in litigation, and some of which are not yet in litigation."  (Id. ¶ 2.)   Starr is co-counsel with Knapp, Petersen & Clarke in two certified class actions asserting dancers were misclassified as independent contractors.  (Id.)  Starr also is involved in five other pending class action matters, and is the class counsel in several wage and hour cases, without the assistance of co-counsel.  (Starr Decl. ¶¶ 4-5.)


Starr's supplemental declaration describes in detail the work he personally has done in previous class actions over the last six years, including being the primary contact for the plaintiffs, drafting complaints and oppositions to the motions to dismiss, taking depositions, defending depositions, drafting class certification motions, drafting mediation briefs, attending mediation, interviewing experts, formulating settlement agreements, and drafting motions for preliminary and final approval of class action settlement agreements.  (Starr Decl. II ¶¶ 3.)  Thus, the parties have established that Starr can represent the class adequately.

## Caleb Marker

Caleb Marker is an of-counsel attorney with Ridout & Lyon, LLP and an attorney with Consumer Law Center, P.L.L.C., in East Lansing Michigan.  (Marker Decl. ¶ 2.)  He has practiced law since 2007.  (Id.)  He has assisted with four class action cases involving nude and semi-nude dancers – two in federal court, and two

in state court.  (Id. ¶ 7.)  In total, Marker spent over 1,000 hours on those cases.  (Id. ¶ 8.)

In this action, Marker was the primary attorney responsible for communicating with Plaintiffs Trauth, Rivera, and Blair.  (Id. ¶ 4.)  He investigated the claims contained in the FAC, drafted pleadings, performed legal research, drafted discovery requests, reviewed approximately 3,500 pages of discovery, attended Trauth's deposition, participated in discussions with opposing counsel, and attended hearings before this Court.  (Marker ¶¶ 4-6.)  Thus, the parties have established that Marker can represent the class adequately.

In summary, Plaintiffs have provided sufficient evidence to establish that Ridout, Robinovitch, Becker, Harris, Starr, and Marker are able "to fairly and adequately represent the interests of the class."  Fed. R. Civ. P. 23(g)(1)(B).

### b.    Adequacy of Named Plaintiffs

The parties propose a total of $77,500.00 in incentive fees to be paid to class representatives.  The proposed class representatives have various levels of involvement with the litigation in this case, as summarized below.

**Tracy Dawn Trauth**

The parties propose the Court award an incentive fee of up to $15,000.00 to Trauth for her efforts in representing the class.  (Settlement Agreement ¶ 10.1.) Trauth is a member of the Oxnard subclass and worked at the Defendants' Oxnard Club on two occasions.  (Trauth Decl. ¶ 3.)  Despite her limited work as a dancer for Defendants, Trauth estimates she has spent over 163.5 hours "for the benefit of the class" on this matter, including: (1) consulting with counsel in the initial investigation of putative class claims, (2) "[p]roviding factual data" to counsel regarding her work as a dancer and the working conditions and rules at Defendants' Clubs; (3) reviewing the Complaint and other pleadings; (4) discussing research on dancers' legal rights; (5) following up regularly with counsel regarding the status of the case; (6) discussing settlement proposals and negotiations with counsel; (7) preparing declarations; (8) preparing for and attending her deposition; and (9) performing independent research and contacting other dancers and activists before retaining

counsel.  (Id. ¶¶ 17, 18, 20-26, 27.)  Dividing the proposed incentive fee by the total
hours Trauth expended to benefit the class, she would receive approximately $91.74
per hour if the Court were to approve the amount sought.

## Christeen Rivera

        The parties propose the Court award Rivera an incentive fee of up to
$6,250.00 for her efforts in representing the class.  (Settlement Agreement ¶ 10.1.)
Rivera is a member of the Oxnard subclass and has worked at the Oxnard Club from
June 2002 to the present.  (Rivera Decl. ¶ 3.)  Rivera initially became involved in this
matter in July 2009.  (Rivera Decl. ¶ 16.)  Rivera estimates she spent a total of 40
hours on this matter, including: (1) consulting with counsel regarding the
misclassification of dancers at her Club; (2) reviewing pleadings; (3) communicating
with counsel via electronic mail message ("e-mail") and telephone regarding the
progress of the case; (4) discussing research on dancers' legal rights with counsel;
and (5) preparing declarations.  (Rivera Decl. ¶¶ 18-19, 20.)  Furthermore, Rivera,
who currently works as a dancer for Defendants, has faced a fear of retaliation as a
result of her participation in this action.  (Rivera Decl. ¶¶ 12-15.)  Dividing the
proposed incentive fee by the total hours she expended to benefit the class, Rivera
would receive approximately $156.25 per hour  if the Court were to approve the
amount sought.

## Jasmine Wright

        The parties propose the Court award Rivera an incentive fee of up to
$6,250.00 for her efforts in representing the class.  (Settlement Agreement ¶ 10.1.)
Wright is a member of the Oxnard subclass and has worked 458 shifts at various
Spearmint Rhino locations since October 2006.  (Wright Decl. ¶ 4.)  Wright initially
became involved in this matter in July 2009 through her participation as class
representative in the Omlor action.  (Id. ¶ 17.)  Wright estimates she has spent a
total of 35 hours on this matter, including: (1) consulting with counsel in the initial
investigation of putative class claims; and (2) communicating with counsel regularly.
(Id. ¶¶ 17, 20.)  Furthermore, Wright, who worked as a dancer for Defendants after
the filing of this action, faced a fear of retaliation as a result of her participation in
this action.  (Id. ¶¶ 12-15.)  Dividing the proposed incentive fee by the total hours
she expended to benefit the class, Wright would receive approximately $178.57 per
hour.

## Victoria Omlor

The parties propose the Court award Omlor an incentive fee of up to $6,250.00 for her efforts in representing the class.  (Settlement Agreement ¶ 10.1.)  Omlor is a member of the Oxnard subclass and has worked 354 shifts at various Spearmint Rhino locations since December 2005.  (Omlor Decl. ¶ 4.)  Omlor initially became involved in this matter in July 2009 through her participation as a class representative in the <u>Omlor</u> action.  (<u>Id.</u> ¶¶ 17, 18.)  Omlor estimates she has spent a total of 35 hours on this matter, including: (1) consulting with counsel in the initial investigation of putative class claims; (2) communicating with counsel regularly; (3) "[p]roviding factual data" to counsel regarding her work as a dancer and the working conditions and rules at Defendants' Clubs; (4) reviewing "relevant material related to Omlor and the present matter"; and (5) discussing settlement prospects and negotiations.  (<u>Id.</u> ¶¶ 17, 20, 21.)  In addition, Plaintiff Omlor filed a second declaration following the hearing stating she was "blacklisted" by Defendant because of her participation in this action.  (Omlor Decl. II ¶ 3-4.)  She explained that she is no longer allowed to perform at any Spearmint Rhino Clubs.  (<u>Id.</u>)
Dividing the proposed incentive fee by the total hours she expended to benefit the class, Omlor would receive approximately $178.57 per hour if the Court were to approve the amount sought.

## Anicia Vintimilla

The parties propose the Court award Vintimilla an incentive fee of up to $6,250.00 for her efforts in representing the class.  (Settlement Agreement ¶ 10.1.)  Vintimilla is a member of the Oxnard subclass and has worked 36 shifts at Defendants' Van Nuys location since December 2007.  (Vintimillia Decl. ¶ 4.)  Vintimilla initially became involved in this matter in July 2009 through her participation as a class representative in the <u>Omlor</u> action.  (<u>Id.</u> ¶¶ 17, 18.)  Vintimilla estimates she has spent a total of 35 hours on this matter, including: (1) consulting with counsel in the initial investigation of the putative class claims; (2) communicating with counsel regularly; (3) "[p]roviding factual data" to counsel regarding her work as a dancer and the working conditions and rules at Defendants' Clubs; (4) reviewing "relevant material related to Omlor and the present matter;" and (5) discussing settlement prospects and negotiations.  (<u>Id.</u> ¶¶ 17, 20, 21.)  Dividing the proposed incentive fee by the total hours she expended to benefit the class, Vintimilla would receive approximately $178.57 per hour if the Court were to approve

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

the amount sought.

## Marsha Ellington

The parties propose the Court award Ellington an incentive fee of up to $6,250.00 for her efforts in representing the class.  (Settlement Agreement ¶ 10.1.)  Ellington is a member of the Oxnard subclass and has worked 12 shifts at Defendants' Rogue location in Los Angeles, California since June 2008.  (Ellington Decl. ¶ 4.)  Ellington initially became involved in this matter in July 2009 through her participation as a class representative in the Omlor action.  (Id. ¶¶ 17, 18.)  Ellington estimates she has spent a total of 25 hours on this matter, including: (1) consulting with counsel in the initial investigation of the putative class claims; (2) communicating with counsel regularly; (3) "[p]roviding factual data" to counsel regarding her work as a dancer and the working conditions and rules at Defendants' Clubs; (4) reviewing "relevant material related to Omlor and the present matter;" and (5) discussing settlement prospects and negotiations.  (Id. ¶¶ 17, 20, 21.)  Dividing the proposed incentive fee by the total hours she expended to benefit the class, Ellington would receive approximately $250.00 per hour if the Court were to approve the amount sought.

## Tami Sanchez

The parties propose the Court award Sanchez an incentive fee of up to $6,250.00 for her efforts in representing the class.  (Settlement Agreement ¶ 10.1.)  Sanchez is a member of the Oxnard subclass and has worked approximately 558 shifts at Defendants' Santa Maria location from February 2008 to the present.  (Sanchez Decl. ¶ 4.)  Sanchez initially became involved in this matter in July 2009 through her participation as a class representative in the Omlor action.  (Id. ¶¶ 17, 18.)  Sanchez estimates she has spent a total of 20 hours on this matter, including: (1) consulting with counsel in the initial investigation of the putative class claims; (2) communicating with counsel regularly; (3) "[p]roviding factual data" to counsel regarding her work as a dancer and the working conditions and rules at Defendants' Clubs; (4) reviewing "relevant material related to Omlor and the present matter;" and (5) discussing settlement prospects and negotiations.  (Id. ¶¶ 17, 20, 21.)  Furthermore, Sanchez, who currently works as a dancer for Defendants, has faced a fear of retaliation as a result of her participation in this action.  (Id. ¶¶ 12-15.)

Dividing the proposed incentive fee by the total hours she expended to benefit the class, Sanchez would receive approximately $312.00 per hour if the Court were to approve the amount sought.

## Reah Navarro

The parties propose the Court award Navarro an incentive fee of up to $6,250.00 for her efforts in representing the class.  (Settlement Agreement ¶ 10.1.) Navarro is a member of the Oxnard subclass and has worked approximately 728 shifts at Defendants' Santa Barbara location from August 2006 to the present. (Navarro Decl. ¶ 4.)  Navarro initially became involved in this matter in July 2009 through her participation as a class representative in the Omlor action.  (Id. ¶¶ 17, 18.)  Navarro estimates she has spent a total of 20 hours on this matter, including: (1) consulting with counsel in the initial investigation of the putative class claims; (2) communicating with counsel regularly; (3) "[p]roviding factual data" to counsel regarding her work as a dancer and the working conditions and rules at Defendants' Clubs; (4) reviewing "relevant material related to Omlor and the present matter;" and (5) discussing settlement prospects and negotiations.  (Id. ¶¶ 17, 20, 21.) Furthermore, Navarro, who currently works as a dancer for Defendants, has faced a fear of retaliation as a result of her participation in this action.  (Id. ¶¶ 12-15.)

Dividing the proposed incentive fee by the total hours she expended to benefit the class, Navarro would receive approximately $312.00 per hour if the Court were to approve the amount sought.

## Nicole Garcia

The parties propose the Court award Garcia an incentive fee of up to $6,250.00 for her efforts in representing the class.  (Settlement Agreement ¶ 10.1.) Garcia is a member of the Oxnard subclass and has worked approximately 520 shifts at Defendants' Rialto location from 2008 to the present.  (Garcia Decl. ¶ 4.) Garcia initially became involved in this matter in July 2009 through her participation as a class representative in the Omlor action.  (Id. ¶¶ 17, 18.)  Garcia estimates she has spent a total of 20 hours on this matter, including: (1) consulting with counsel in the initial investigation of the putative class claims; (2) communicating with counsel regularly; (3) "[p]roviding factual data" to counsel regarding her work as a dancer and the working conditions and rules at Defendants' Clubs; (4) reviewing "relevant

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

material related to Omlor and the present matter;" and (5) discussing settlement
prospects and negotiations.  (Id. ¶¶ 17, 20, 21.)  Furthermore, Garcia, who currently
works as a dancer for Defendants, has faced a fear of retaliation as a result of her
participation in this action.  (Id. ¶¶ 12-15.)   Dividing the proposed incentive fee by
the total hours she expended to benefit the class, Garcia would receive
approximately $312.00 per hour if the Court were to approve the amount sought.

## Selena Pelaez

        The parties propose the Court award Pelaez an incentive fee of up to
$6,250.00 for her efforts in representing the class.  (Settlement Agreement ¶ 10.1.)
Palaez is a member of the Oxnard and Nevada subclasses and has worked
approximately 9 shifts at Defendants' Torrance, California, location from May 2009
to the present, and various shifts at Defendants' Las Vegas location from September
2006 to the present.  (Pelaez Decl. ¶ 4.)  Pelaez initially became involved in this
matter in July 2009 through her participation as a class representative in the Omlor
action.  (Id. ¶¶ 17, 18.)  Pelaez estimates she has spent a total of 25 hours on this
matter, including: (1) consulting with counsel in the initial investigation of the putative
class claims; (2) communicating with counsel regularly; (3) "[p]roviding factual data"
to counsel regarding her work as a dancer and the working conditions and rules at
Defendants' Clubs; (4) reviewing "relevant material related to Omlor and the present
matter;" and (5) discussing settlement prospects and negotiations.  (Id. ¶¶ 17, 20,
21.)  Furthermore, Pelaez, who currently works as a dancer for Defendants, has
faced a fear of retaliation as a result of her participation in this action.  (Id. ¶¶ 12-15.)
Dividing the proposed incentive fee by the total hours she expended to benefit the
class, Pelaez would receive approximately $250.00 per hour if the Court were to
approve the amount sought.

## Jennifer Blair

        The parties propose the Court award Blair an incentive fee of up to $6,250.00
for her efforts in representing the class.  (Settlement Agreement ¶ 10.1.)  Blair is a
member of the Nevada subclass and worked at Defendants' Las Vegas location in
August 2008.  (Blair Decl. ¶ 3.)  Blair initially became involved in this matter in May
2009.  (Id. ¶ 16.)  Blair estimates she has spent a total of 30 hours on this matter,
including: (1) consulting with counsel in the initial investigation of the putative class
claims; (2) communicating with counsel regularly; (3) "[p]roviding factual data" to

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

counsel regarding her work as a dancer and the working conditions and rules at Defendants' Clubs; (4) discussing legal research on dancers' legal rights with counsel; (5) preparing declarations; and (5) discussing settlement prospects and negotiations.  (Id. ¶¶ 17-19.)   Dividing the proposed incentive fee by the total hours she expended to benefit the class, Blair would receive approximately $208.00 per hour if the Court were to approve the amount sought.

At the November 30, 2010, hearing, the Court expressed misgivings about the proposed class representatives' adequacy as representatives, as all but one are members of Pool 1, which stands to receive 70% of the funds distributed.  "To represent adequately a class, class representatives' interests must align with all putative class members' interests . . . ."  Andrews Farms v. Calcot, Ltd., No. CV-F-07-0464 LJO, 2009 WL 1211374, at *11 (E.D. Cal. May 1, 2009).  See also Amchem, 521 U.S. at 627; Hanlon, 150 F.3d at 1021; Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1190 (9th Cir. 2001).  In the Supplemental Briefing, the parties explain the basis for the Pools proposed receipt of different percentages of the Net Settlement Amount, how they computed the percentage to be distributed to

each Pool, and how they evaluated the relative strength of the Class Members' claims.

The Court also stated at that November 30, 2010, hearing that it would not be inclined to approve the proposed incentive amounts for the Class Representatives, which range from $91.74 to $312 per hour expended to benefit the Class, because these amounts appear high, in light of the effort expended and the risk involved. While each class representative discussed a fear of retaliation and "blacklisting" because of her participation as a class representative, each also failed to describe what specific retaliation she feared.  Those dancers who continue to work in the industry may face a fear of retaliation in the form of personnel action or harassment at the workplace, but the Court should not have to speculate about such scenarios.

In response, Plaintiff Omlor filed a second declaration following the November 30, 2010, hearing in which she described what she meant when she said she was "blacklisted," as follows:

MINUTES FORM 11                                      Initials of Deputy Clerk __md__
CIVIL -- GEN                    Page 26

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

Spearmint Rhino maintains a list with my stage name on it and the stage names of other dances.  Based on that list[,] I am to be denied admission to any Spearmint Rhino[-]affiliated club.  I have come to an understanding that I am blacklisted at Spearmint Rhino clubs since I have attempted to enter onto the premises of a Spearmint Rhino club in Van Nuys on several occasions subsequent to the time I filed the State Court lawsuit against Spearmint Rhino challenging my misclassification as an independent contractor and the misappropriate of tip income by Spearmint Rhino, among other matters.  On the occasions when I attempted to enter the Spearmint Rhino Club, I was advised by management personnel that Spearmint Rhino maintained a list with my stage name on it and that an dancer on that list could not work at or be allowed admission to any Spearmint Rhino Clubs.  Therefore, I was instructed by club management that I could not enter or remain at the Spearmint Rhino club in Van Nuys since my name was on this list . . . .

(Omlor Decl. II ¶¶ 3-4.)  This information assists in assessing the risks and adverse employment actions Omlor faced in representing the Class, and accordingly assists in evaluating the reasonableness of her award.

While the proposed representatives appear able to represent the interests of the Class adequately , as discussed more fully below, the Court will evaluate each individual award at the final fairness hearing and may not be inclined to approve awards at the current levels.

Next, the inquiry as to whether there is an absence of collusion, "addresses the possibility the agreement is the result of either overt misconduct by the negotiators or improper incentives for certain class members at the expense of other members of the class."  In re M.L. Stern Overtime Litig., No. 07-CV-0118-BTM, 2009 WL 995864, at *5 (S.D. Cal. Apr. 13, 2009) (citing Staton v. Boeing Co., 327 F.3d 938, 960 (9th Cir. 2003)).

As mentioned above, the Settlement Agreement allocates different percentages of the Net Settlement to each Pool: Pool 1 receives 70%, Pool 2

MINUTES FORM 11                                        Initials of Deputy Clerk __md__
CIVIL -- GEN                    Page 27

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

receives 20%, and Pool 3 receives 10%.  In their Motion, the parties argue the
greater percentage for Pool 1 is justified because Pool 1 includes: (1) the most
Clubs, (2) dancers who paid stage fees, and (3) Clubs in California, which has
stricter labor laws than the other states.  As to the disparity between Pool 2, which
has one class representative and includes only one Club, and Pool 3, which has no
class representatives and includes four Clubs, the parties argue the disparity is
warranted because the four Clubs in Pool 3 have not operated as long as the Club in
Pool 2.  The Court pointed out at the November 30, 2010, hearing that the parties
failed to state how long each of the Clubs were in operation.

In their Supplemental Briefing, the parties clarified that the Las Vegas Club
opened in May 1998, whereas the Florida Club opened in May 2005, the Kentucky
Club in May 2006, the Idaho Club in September 2001, and the Texas Club in
January 2008.  (Supplemental Briefing at 10; Vercher Decl. ¶ 5.)

In their Supplemental Briefing, the parties detail how they evaluated the
relative strength of each Pool's claims and calculated the percentages allocated to
each Pool in the Settlement Agreement.  First, the parties explain that Pool 1, which
consists of class members in California, has stronger claims because: (1) "California
has had the highest average minimum wage of any state at issue during the class
periods;" (2) "California law does not allow for a tip credit against the minimum
wages owed to employees;" and (3) "California Labor Code § 350(e) specifically
defines monies paid to class members for private dancers as gratuity."
(Supplemental Briefing at 4.)  By contrast, in other states covered by the Settlement
Agreement, Defendants might argue successfully that the amounts paid to class
members for private dances were "service fees" that can offset minimum wages
owed.  (Id.)  Moreover, "Plaintiffs believe that Class Members in Nevada [Pool 2]
have less damages than those in California [Pool 1] because dancers at the Nevada
club did not pay a percentage of their fees or tips to the [Club] as 'rent'[,] and
numerous dancers [in Pool 2] worked at the Las Vegas [C]lub on a more freelance
basis, flying in for periodic and sporadic work shifts as opposed to being on a firm
schedule, making their misclassification[ ] claims under the economic reality test
arguably more difficult to prove."  (Id.)

MINUTES FORM 11                                    Initials of Deputy Clerk __md__
CIVIL -- GEN                    Page 28

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

As to the difference between Pools 2 and 3, the parties explain, "Class
Members in Nevada [Pool 2] are likely to have greater damages than those in the
remaining states [Pool 3] . . . because Nevada does not allow a tip credit against
minimum wage.  Class members in Texas, Florida, Kentucky, and Idaho [Pool 3]
work in tip[-]credit states that allow employees to be paid much less than the full
minimum wage."  (Supplemental Briefing at 3-4.)  The parties provide a table
illustrating the current minimum wage, the maximum tip credit, and minimum wage
for tipped employees in each of the states covered by the Settlement Agreement.
(See id. at 5.)

Plaintiffs also explain how they calculated the percentages to be distributed to
each Pool.  Plaintiffs first computed the "aggregate amount of unpaid minimum
wages, using shift-related data provided by Defendants and calculating a 'blended
minimum wage' for each of the states covered in the Settlement Agreement."  (Id. at
6-7.)  The "blended minimum wage" is a weighted average of the various minimum
wages in effect within the states during the Class Periods.  To determine the total
estimated unpaid minimum wages for each Pool, Plaintiffs then multiplied the
"blended minimum wage" by the estimated total number of shifts and then by an
average shift-length of five hours.  (Id. at 8-9.)  Plaintiffs then computed the
percentage of total unpaid minimum wages for each Pool, with the following results:
(1) Pool 1: Approximately 68.5%; (2) Pool 2: Approximately 22%; and (3) Pool 3:
Approximately 9.5%.  (Id. at 9.)  As the Settlement Agreement closely mirrors this
distribution (Pool 1: 70%, Pool 2: 20%, Pool 3: 10%) and the relative strength of the
claims also appears to mirror the distribution of funds, the Court finds the distribution
among the three Pools "within the range of possible approval."  See In re Tableware
Antitrust Litig., 484 F. Supp. 2d at 1079.

Finally, at the November 30, 2010, hearing, the Court requested that the
parties provide an estimate of the amount of recovery per shift (see Ridout Decl., Ex.
A to Ex. B at 3 (Class Notice was left blank as to an estimate of the amount to be
paid per shift)), as such an estimate would help demonstrate whether the separation
of the three Pools is both fair and absent collusion.  In the Supplemental Briefing, the
parties estimate the recovery, as of November 24, 2010, will be between $4.28 and
$10.85 per shift, depending on the Pool.  (Supplemental Briefing at 2.)  Specifically,
as of November 24, 2010, Pool 1 Class Members are projected to receive $10.85

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

per shift, Pool 2 Class Members are projected to receive $8.84 per shift, and Pool 3 Class Members are projected to receive $4.28 per shift.  (Supplemental Briefing at 3; Vercher Decl. ¶ 4.)  As noted above, the parties believe Pools create a fairer settlement because of, inter alia, the strength of the claims of the respective Class Members.  In light of the parties' detailed explanation regarding how they reached these distributions, the Court finds the Settlement Agreement does not appear to be the result of either overt misconduct by the negotiators or improper incentives for certain class members at the expense of other members of the class.  See In re M.L. Stern Overtime Litig., 2009 WL 995864, at *5 (citing Staton, 327 F.3d at 960).

Accordingly, the parties establish "adequacy of representation" under Rule 23, though the Court will review the amount of Attorneys' Fees and Class Representative awards at the final approval hearing.

### 5.    Rule 23(b)

Plaintiffs request class certification under Rule 23(b)(3).  Rule 23(b)(3) applies where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Pertinent matters to consider include: (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class.  Fed. R. Civ. P. 23(b)(3).

The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation" and "focuses on the relationship between the common and individual issues."  Hanlon, 150 F.3d at 1022 (internal quotation marks and citation omitted).  "When common questions represent a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is a clear justification for handling the dispute on a representative rather than on an individual basis."  Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 1778.  When one or more of the central issues in the action are common to the class and can be deemed to predominate, certification

may be proper under Rule 23(b)(3) even though other important matters, such as damages or affirmative defenses, will have to be tried separately.  Id.

As discussed above, Plaintiffs have established that commonality exists among class members.  As such, the Court determines common and central issues predominate over questions affecting individual members.  Thus, Plaintiffs satisfy Rule 23(b)(3).

## B.   FLSA Class Certification

Plaintiffs seek certification of an FLSA subclass along with their Rule 23 certification.  The FLSA provides that an aggrieved employee may bring a collective action on behalf of himself and other employees "similarly situated" based on an employer's failure to pay minimum wage.  29 U.S.C. § 216(b).  The FLSA limits participation in a collective action to  those parties who opt in to the suit.  See id. ("No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought"); see also Wright v. Linkus Enters., 259 F.R.D. 468, 475 (E.D. Cal. 2009).

To maintain a collective action under the FLSA a plaintiff must demonstrate that the putative collective action members are similarly situated.  29 U.S.C. § 216(b); Adams v. Inter-Con Sec. Sys., 242 F.R.D. 530, 535-36 (N.D. Cal. 2007); Leuthold v. Destination Am., Inc., 224 F.R.D. 462, 466 (N.D. Cal. 2004).

In its July 16, 2010 Order, the Court noted a split among courts as to whether a plaintiff may bring a FLSA collective action simultaneously with a Rule 23 class action.  Despite concerns raised by certain courts, the Court concluded a hybrid action may be appropriate at this preliminary stage, especially because this Court has independent jurisdiction over these claims under CAFA, thereby eliminating any jurisdictional concerns.  See Ellison v. Autozone Inc., No. 06-07522, 2007 WL 2701923, at *2 (N.D. Cal. Sept. 13, 2007); see also Wright, 259 F.R.D. at 475 (certifying a hybrid action where opting in to the FLSA claim also opted plaintiffs into the Rule 23 class action).  While it is possible that many potential class members could do nothing and be bound solely by the Rule 23 certification, resulting in a larger Rule 23 subclass than the FLSA subclass, the court may review these

concerns, if necessary, at the final fairness hearing.  See Murillo, 266 F.R.D. at 473.  Furthermore, rather than being burdensome, the Court finds simultaneous "certification (1) will prevent duplicative, wasteful[,] and inefficient litigation . . . (2) will eliminate the risk that the question of law common to the class will be decided differently . . . and (3) will not create any difficult case management issues." Id. at 473 (citing Lindsay, 251 F.R.D. at 57).  Accordingly, the Court will permit conditional certification of Plaintiffs' FLSA subclass, provided Plaintiffs meet the substantive requirements for certification.

As to the substantive requirements for certification, neither the FLSA nor the Ninth Circuit have defined "similarly situated."  Adams, 242 F.R.D. at 536; Leuthold, 224 F.R.D. at 466.  "A majority of courts have adopted a two-step approach for determining whether a class is 'similarly situated.'"  "  Misra v. Decision One Mortgage Co., 673 F. Supp. 2d 987, 992-93 (C.D. Cal. 2008); see Leuthold, 224 F.R.D. at 466 (compiling district court cases following the two-step approach); Pfohl v. Farmers Ins. Group, No. 03-3080, 2004 WL 554834, at *2 (C.D. Cal. Mar. 1, 2004) (same).

Under the two-step approach, a district court first determines, based on the submitted pleadings and affidavits, whether the proposed class should be notified of the action.  Leuthold, 224 F.R.D. at 467.  At the first stage, the determination of whether the putative class members will be similarly situated "is made using a fairly lenient standard, and typically results in 'conditional certification' of a representative class." Mooney, 54 F.3d at 1214.  District courts have held that conditional certification requires only that "'plaintiffs make substantial allegations that the putative class members were subject to a single illegal policy, plan or decision.'" Adams, 242 F.R.D. at 536 (citing Leuthold, 224 F.R.D. at 468); see also Thiessen, 267 F.3d at 1102.

The second step usually occurs after discovery is complete, at which time the defendants may move to decertify the class.  Leuthold, 224 F.R.D. at 467.  In this step, the court makes a factual determination about whether the plaintiffs are similarly situated by weighing such factors as "(1) the disparate factual and employment settings of the individual plaintiffs, (2) the various defenses available to the defendant which appeared to be individual to each plaintiff, and (3) fairness and

procedural considerations." Misra, 673 F. Supp. 2d at 992-93.  If the district court determines that the plaintiffs are not similarly situated, the court may decertify the class and dismiss the opt-in plaintiffs' action without prejudice.  Leuthold, 224 F.R.D. at 467.

Where the parties settle, as here, the court "must make some final class certification finding before approving a collective action settlement."  Carter v. Anderson Merchs., LP, Nos. 08-025, 09-0216, 2010 WL 144067, at *3 (C.D. Cal. Jan. 7, 2010) (citations omitted).

Plaintiffs make "substantial allegations that the putative class members were subject to a single illegal policy, plan[,] or decision," as required for certification of a FLSA subclass.  See Leuthold, 224 F.R.D. at 468.  As such, the Court conditionally certifies Plaintiffs' FLSA subclass, for the purposes of settlement approval.

## C.   Fairness and Adequacy of Settlement Agreement

In determining whether or not the settlement is fair, reasonable, and adequate, courts balance several factors, including: (1) whether the proposed settlement appears to be the product of serious, informed, noncollusive negotiations; (2) the strength of plaintiffs' case; (3) the risk, expense, complexity, and likely duration of further litigation; (4) the risk of maintaining class action status throughout the trial; (5) the amount offered in settlement; (6) the extent of discovery completed, and the stage of the proceedings; (7) the experience and views of counsel; (8) the presence of a governmental participant;[6] and (9) the reaction of the class members to the proposed settlement.  Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1291 (9th Cir. 1992); In re Tableware Antitrust Litig., 484 F. Supp. 2d at 1079 (citing Manual for Complex Litigation, Second § 30.44 (1985)).

### 1.   Settlement Agreement Terms

The Court describes the terms in more detail above, but provides a brief summary here.  The Settlement Agreement requires Defendants to pay a total

---

[6] As this factor does not apply to this case, the Court does not address it.

MINUTES FORM 11                                Initials of Deputy Clerk __md__
CIVIL -- GEN                    Page 33

settlement consideration of $10,000,000.00 ("Gross Settlement Amount"),[7] from which the parties propose to deduct (1) an amount not to exceed 25% for attorney's fees and costs (Settlement Agreement ¶ 9) and (2) claims administration costs of $55,000.00 (Id. ¶ 10).  From the resulting Net Settlement Amount, the parties propose to deduct (1) incentive awards for class representatives of up to $77,500.00 and (2) $20,000.00 as a penalty under the California Labor Code § 2699 claim.[8]  (Id. ¶¶ 6.7.4, 7.4).

### a.   Minimum Recovery

If class members' claims amount to less than $2,100,000.00, Defendants propose to distribute the difference between $2,100,000.00 and the total claims as follows: (1) 10% to class members who file claims, on a pro rata basis; and (2) 90%, by way of cy pres, to an "I.R.C. 501(c)(3) and/or [four] charitable organizations." (Supplemental Briefing at 11; Ex. A (Settlement Agreement Amendment) ¶ 4.4.)

---

[7] The following entities will contribute to the Gross Settlement Amount as follows:

- A maximum of $500,000.00 of the Gross Settlement Amount: City of Industry Hospitality Venture, Inc.; Farmdale Hospitality Services, Inc.; Inland Restaurant Venture I, Inc.; Midnight Sun Enterprises; Olympic Avenue Venture, Inc.; The Oxnard Hospitality Services, Inc.; Rialto Pockets, Inc.; Rouge Gentlemen's Club, Inc.; Santa Barbara Hospitality Services, Inc.; and Santa Maria Restaurant Enterprises, Inc.
- A maximum of $250,000.00 of the Gross Settlement Amount: High Expectations Hospitality, LLC; Kentucky Hospitality Venture, LLC; and LCM, LLC.
- A maximum of $1,500,000.00 of the Gross Settlement Amount: K-Kel, Inc.
- A maximum of $2,500,000.00 of the Gross Settlement Amount over $7,500,000.00: Spearmint Rhino Consulting.

(Settlement Agreement ¶¶ 4.2-4.3.)

[8] 75%, or $15,000, of this amount will be distributed to the State of California Labor and Workforce Development Agency for penalties under the Private Attorneys General Act, and 25%, or $5,000, will be distributed to Pool 1.

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

During the hearing, the Court requested supplemental briefing as to how the recovery could amount to less than $2,100,000.00, because the Settlement Agreement contains no provision setting forth a certain amount to be paid per claim or per shift, though the Class Notice mentions a per shift amount. The Court suggested that as the Settlement Agreement currently reads, the remaining amount after deducting attorneys fees, class representative incentive fees, administration costs, and the civil penalty, should be split among the pools and divided on a pro rata basis.

The parties' Supplemental Briefing clarifies that the $10,000,000.00 settlement amount assumes a claim rate of 100%. That is, the parties compute the per shift amount on the basis of the total number of shifts worked by all potential class members during the class period. The parties will pay class members who respond according to the shifts those class members actually worked. Defendants, however, must pay a minimum of $2,100.000.00.

The parties provide the following example as an illustration, assuming a claim rate of 19.3%, and using a per-shift amount as set forth above.

| Gross Settlement Amount | $10,000,000.00 |
|---|---|
| (Less Attorneys' Fees) | ($2,500,000.00) |
| (Less Administrative Fees) | ($55,000.00) |
| Net Settlement Amount | $7,445,000.00 |
| Total Claims for Pool 1 | $651,000.00 |
| Total Claims for Pool 2 | $530,400.00 |
| Total Claims for Pool 3 | $256,800.00 |
| Total Claims Submitted | $1,438,200.00 |
| Minimum Settlement Floor | $2,100,000.00 |

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

| Difference Between Claims and Floor | $661,800.00 |
|---|---|
| (Less Incentive Awards) | ($77,500.00) |
| **Remaining Floor** | **$584,300.00** |
| Amount to be Distributed to Charities (90%) | $525,870.00 |
| Amount Reverted to Class Members (10%) | $58,430.00 |

According to this example, for Defendants to pay more than the $2,100,000.00 floor, the claims rate must exceed 28.5%. The Court is concerned that the class members are paid on a per-shift, claims-made basis, while the attorneys' fees are taken from the maximum Gross Settlement Amount. That is, under the scenario above, class members would receive only $1,438,200.00, while the attorneys would receive $2,500,000.00. In other words, the attorneys would receive more than $1,000,000.00 more than the class members. Thus, while the minimum recovery is within the possible approval, the Court will evaluate the actual Gross Settlement Amount and request for attorneys' fees at the final fairness hearing.

### b.    Three Settlement Pools

The Settlement Agreement proposes to divide the net settlement amount ("Net Settlement Fund") as follows: (1) **Pool 1**: 70% of the Net Settlement Fund shall be allocated to the Oxnard and Farmdale Classes (Settlement Agreement ¶ 7.2.1);[9] (2) **Pool 2:** 20% shall be allocated to the Nevada Settlement Class; and (Id. ¶ 7.2.2); and (3) **Pool 3:** 10% shall be allocated to the Texas Settlement Class, the Florida Settlement Class, the Idaho Settlement Class, and the Kentucky Settlement Class (Id. ¶ 7.2.3). Class members shall be paid by dividing the amount in the Pool by the total number of dance shifts performed by all members of the Pool and then

---

[9] Of the total paid to Pool 1, 50% of that payment shall be earmarked as compensation for any claimed tip sharing procedures. (Settlement Agreement ¶ 7.2.1.)

MINUTES FORM 11                                    Initials of Deputy Clerk __md__
CIVIL -- GEN                    Page 36

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

multiplying that number by the number of dance shifts performed by the individual
pool member who submits a valid claim.  Within all Pools, payments to class
members will be allocated as follows: 50% to actual damages claims and 50% to
liquidated damages claims.  (Settlement Agreement ¶ 4.4.)  As discussed above, the
Court finds the distribution between the Settlement Pools fair.

### c.    Injunctive Relief

The Settlement Agreement provides for two forms of injunctive relief: (1)
existing Clubs within the State of California will stop charging dancers stage fees
within 30 days of the final settlement approval (Settlement Agreement ¶ 3.1); (2) all
Existing Clubs agree to "discontinue the practice of treating dancers as independent
contractors or lessees and shall likewise discontinue using any Dancer Performance
Lease with Class Members" within six months of final settlement approval.
(Supplemental Briefing, Ex. A (Settlement Agreement Amendment) ¶ 3.2.)

As to the second form of relief, Defendants will reclassify dancers either as
employees or "as owners (e.g. shareholder, limited partner, partner, member or
other type of ownership stake)."  (Id.)  Defendants may opt out of this requirement
"[t]o the extent that the laws change in any particular jurisdiction where an Existing
Club is operating which supports dancers being treated in a manner other than
employee or owner, the Existing Club in that jurisdiction may change its practices
consistent with the change in the law."  (Id.)

The Court finds the injunctive relief provided to the Class Members fair.

### d.    Cy Pres Distribution

As noted above, if class members' total claims amount to less than
$2,100,000.00, Defendants will distribute the difference between $2,100,000.00 and
the total claims as follows: (1) 10% to class members who file valid claims on a pro
rata basis; and (2) 90% to be distributed over a five-year period "to one or more
charitable, non-profit organization(s) existing pursuant to Internal Revenue Code
section 501(c)(3) and/or 501(c)(3) and/or 501(c)(4)."  (Mot. at 15; Supplemental
Briefing, Ex. A (Settlement Agreement Amendment) ¶ 4.4.)  Defendants will choose
the non-profit, charitable organization or organizations, subject to Plaintiffs' approval.
(Id.)  Under the Settlement Agreement, "Plaintiffs shall not unreasonably withhold

consent to any Internal Revenue Code section 501(c)(3) and/or 501(c)(4) non-profit, charitable organization(s) selected by Defendants.  Lead Counsel through Christopher P. Ridout, Esq.[,] shall have authority to approve in writing the recipient(s) of the Charitable Payment(s)."  (Id.)

The Court generally approves the creation of a <u>cy pres</u> fund, but orders the following procedure to supplement the parties' agreement.  Defendants must provide Plaintiffs' counsel with a list of non-profit organizations to receive the <u>cy pres</u> funds within six months from the date when claims are paid to class members.  Plaintiffs' counsel then must notify Defendants within ten days whether they consent to the proposed <u>cy pres</u> recipients.  If Plaintiffs' counsel consents, the parties will submit a joint order for the Court's approval.  If a dispute arises regarding how to distribute the funds, the parties must meet and confer.  If the parties are unable to resolve the dispute, Defendants must file a motion to resolve the matter within ten court days following the meet-and- confer session.

### 2.    Whether the Settlement Agreement Appears to be the Product of Serious, Informed, Noncollusive Negotiations

The Settlement Agreement was reached after negotiations between the parties.  Before beginning serious negotiations, the parties conducted expedited discovery, exchanging approximately 3,500 pages of documents.  (Ridout Decl. ¶ 3.)  Furthermore, the parties conducted the deposition of Plaintiff Trauth and Defendants' CEO and President, Vercher.  (Id. ¶ 4; Robinovich, Ex. V.)

Defendants and the plaintiffs in the <u>Omlor</u> action reached a settlement after two days of mediation before a third-party mediator.  (Harris Decl. ¶ 2.)  Following that agreement, the original counsel in this action contacted the <u>Omlor</u> counsel regarding a global settlement.  (Ridout Decl. ¶¶ 5-6.)  After "nearly two months of aggressive arms length negotiations" the parties reached a settlement, but "continued to vigorously negotiate and adjust certain terms.  (Id. ¶¶ 7-8.)

During the negotiations, the parties focused on "disputed questions of law and fact which placed the ultimate outcome of the litigation in doubt."  (Mot. at 23.)  Through these negotiations the parties amended many terms to the original agreement.

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

Here, the Settlement Agreement was not reached with the assistance of a third-party mediator, but this fact is not necessarily fatal.  This fact, however, combined with the additional fact that counsels' recovery could be more than the Class Members' recovery, could lead the Court to find the parties have failed to meet their burden of showing the Settlement Agreement is not collusive.  As noted above in Section III(C)(1)(a), under the example provided by the parties, the attorneys' fees are calculated from the maximum Gross Settlement Amount, instead of the actual Gross Settlement Amount.  As class members are paid on a claims-made basis, attorneys' fees could be greater – in the parties' example, more than $1,000,000.00 greater – than the total recovery for the class members.  (<u>See</u> Section III(C)(1)(a), <u>supra</u>.)  Examining the same example from the total amount the Defendants must pay, the Defendants would pay $2,100,000.00 to class members, the <u>cy</u> <u>pres</u> charity or charities, the class administrator, and the class representatives, while paying $2,500,000.00 to Plaintiffs' counsel.  (<u>See</u> <u>id.</u>)

The Court is not inclined to approve attorneys' fees computed as 25% of the maximum Gross Settlement Amount if that amount exceeds the total amount be distributed to class members and <u>cy</u> <u>pres</u> recipients.  Instead, attorneys' fees should be computed from the actual Gross Settlement Amount.  While the amount to be paid to class members and <u>cy</u> <u>pres</u> recipients is unclear at this juncture, the Court finds the Settlement is within the range of possible approval.

Thus, the Court finds this factor slightly weighs in favor of approval.

### 3.      Strength of Plaintiffs' Case

Plaintiffs note that several courts have (1) found dancers to be misclassified as independent contractors, (2) determined "consultants" and owners of adult entertainment clubs are joint employers of the dancers working there, and (3) certified classes consisting these workers.  (Mot. at 23-24, nn. 16-18 (citing cases).)  If Plaintiffs were to prevail on all their claims, the parties estimate class members could recover approximately $108,000,000.00 million.  (Mot. at 30-31.)

Plaintiffs' ability to prevail on their claims is still uncertain, however.  While some courts have held dancers should be classified as employees, others have not.  (Mot. at 23-24, nn.16-18 (citing cases); Robinovitch Decl., Exs. G-M.)  Further,

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

Defendants contend they "are entitled to offsets, negating any recovery." (Id.)  Each class member also signed a contract containing an arbitration agreement.  (See Robinovitch Decl., Ex. W.)  The Court notes courts have held similar arbitration agreements unenforceable under California law, however.  See, e.g., Jackson v. S.A.W. Enmnt. Ltd., 629 F. Supp. 2d 1018, 1027 (N.D. Cal. 2009).  On balance, however, the Court finds this factor weighs in favor of the proposed settlement.

### 4.   Risk, Expense, Complexity, and Likely Duration of Further Litigation

First, Plaintiffs face the risk that they will not succeed on the merits of their claims.  As noted above, courts are split as to whether dancers should be classified as employees. (Mot. at 23-24.)  Plaintiffs also note the risks inherent in litigation of class actions. (Mot. at 25.)  It thus is possible that Plaintiffs will not succeed on the merits of their claims.

Furthermore, Plaintiffs note that even if they eventually prevail on the merits of their claims, the amount of recovery is unclear because, as noted above, Defendants allege they "are nevertheless entitled to offsets, negating any recovery." (Mot. at 24.)  The Court notes this claim by Defendants appears weak, however, to the extent it is based upon the Dancer Performer Lease, which may well be unconscionable under California law.  (See Robinovitch Decl., Ex. W.)

Finally, to litigate this action to its conclusion likely would be expensive and time consuming.  (See Mot. at 25 ("if the case progressed to trial and appeal, those procedures may not be completed for several years, delaying any recovery[, and resulting in] protracted and expensive litigation.").)

For these reasons, this factor weighs in favor of the proposed settlement.

### 5.   Amount Offered in Settlement

The amount offered in settlement is $10,000,000.00.  (Settlement Agreement ¶ 4.1.)  In exchange for the payment, class members agree to release "any and all claims, liabilities, demands, causes of action, or lawsuits, known or unknown, including Unknown Claims, whether legal, statutory, equitable or of any other type or form, whether under federal or state law, and whether brought in an individual, representative or any other capacity, that in any way relate to or arise out of or in

MINUTES FORM 11                                    Initials of Deputy Clerk __md__
CIVIL -- GEN                    Page 40

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

connection with acts, omissions, facts, statements, matters, transactions, or
occurrences that have been or could have been alleged in the Action, including but
not limited to overtime, minimum wages, missed or inadequate meal periods and
rest breaks, unpaid tip income, reimbursement for uniform costs, itemized wage
statement violations, record keeping violations, and waiting time penalties . . . ."  (Id.
¶¶ 8.1-8.6.)  The Nevada release also releases claims related to conversion and
unjust enrichment.  (Id. ¶ 8.2.)  The FLSA release discharges Defendants "from any
and all wage-related claims of any kind, including but not limited to claims pursuant
to FLSA that any of [the FLSA Class Members] has, had, might have or might have
had against any of the [Defendants] based on any act or omission that occurred,
during the FLSA Class Period, in any way related to any of the facts or claims
alleged or could have been alleged in the Action or by reason of the negotiations
leading to this settlement, even if presently unknown and/or un-asserted."  (Id. ¶
8.7.)

      The amount of the settlement "was not the result of any specific mathematical
formula but rather, arrived at through a series of negotiations between Class
[C]ounsel and Defendants, where the possible damage pool, other settlement
benefits and risk factors were discussed, resulting [in] the creation of a valuable pool
of common benefits for the class."  (Mot. at 26; Robinovitch ¶ 41.)

      While the Gross Settlement Amount appears reasonable, the Settlement
Agreement provides for a minimum payment of $2,100,000.00.  To receive more
than $2,100,000.00, the claim rate must exceed 28.5%.  The parties do not estimate
what they anticipate the claim rate will be.  As noted above in Section III(C)(1(a),
class members' total recovery accordingly could be significantly less than the
attorneys' recovery because the attorneys' fees award is based upon the maximum
Gross Settlement Amount of $10,000,000.00, while the class members' recovery is
paid on a claims-made basis.  As noted above, according to the parties' example
provided in the Supplemental Briefing, under a claim rate of 19.3% , the attorneys
would receive $2,500,000.00, while the Class Members would receive only
$1,496,630.00 (total claims submitted of $1,438,200.00 plus $58,430.00, or 10% of
difference between claims made and $2,100,000.00).  Thus, the attorneys would
receive around $1,000,000.00 more than the class members.  This is true even
when including the incentive awards at the full amounts for the named Plaintiffs.

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

As noted above, the Court will determine an appropriate attorneys' fees award at the final fairness hearing, and, as such, the Court finds the Settlement is within the range of possible approval.

Accordingly, this factor is neutral towards approval.

### 6. Extent of Discovery Completed, and Stage of Proceedings

Plaintiffs argue the stage of litigation "favors preliminary approval and ultimate, final approval of the settlement[,] because Class Counsel has conducted extensive investigation into the facts of this Class Action." (Mot. at 25 (citing Ridout Decl. ¶¶ 3-10; Robinovitch Decl. ¶¶ 19-33, 41).) Plaintiffs' counsel served written discovery and deposition notices, from which they reviewed approximately 3,500 pages of documents. (Ridout Decl. ¶ 3.) Further, Plaintiff Trauth participated in a one-day deposition and the parties conducted the deposition of Defendants' President and CEO, Vercher. (Id. ¶ 4; Robinovitch, Ex. V.) After Defendants entered into a settlement agreement in a similar class action, Plaintiffs' counsel entered into "nearly two months of aggressive arms[-]length negotiations," during which "Defendants provided additional financial and statistical information regarding the putative class members." (Id. ¶¶ 6-7.)

These facts, as well as the information in the revised Settlement Agreement, the Motion, and the Supplemental Briefing, establish that Plaintiffs' counsel has conducted a minimal, but sufficient, investigation into the claims alleged in the FAC to warrant an informed settlement. Thus, this factor weighs in favor of approval.

### 7. Experience and Views of Counsel

As explained above, Plaintiffs' counsel has demonstrated sufficient experience with wage and hour class actions and federal practice and has provided a sufficient description of the steps each proposed class counsel undertook in the litigation of this action. (See Section III(A)(4) (discussing adequacy of representation under Rule 23(a)).) In each declaration, proposed class counsel expresses his views that the settlement is fair and was reached as a result of arms length negotiations. Thus, this  factor weighs in favor of approval.

### 8. The Reaction of the Class Members to the  Proposed Settlement

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

As no formal objections will be filed until the approach of final approval, this factor is neutral as to the proposed settlement.

On balance, the Court concludes the Settlement Agreement is fair and adequate.

## D.    Attorneys' Fees and Incentive Payment for Named Plaintiffs

The Motion and Settlement Agreement indicate Plaintiffs will seek allocation of settlement funds for attorneys' fees and costs, and for incentive awards payment for Plaintiffs; the Court also must evaluate the fairness and reasonableness of these allocations.

### 1.    Attorneys' Fees

Plaintiffs' counsel will request an attorneys' fees award of up to 25% of the Gross Settlement Amount.  (Mot. at 18; Settlement Agreement ¶ 9.1.)  Under both California and Ninth Circuit precedent, a court may exercise discretion to award attorneys' fees from a common fund by applying either the lodestar method[10] or the percentage-of-the-fund method.[11]  Wershba v. Apple Computer, Inc., 91 Cal. App. 4th 224, 254 (2001); Fischel v. Equitable Life Assurance Soc'y of U.S., 307 F.3d 997, 1006 (9th Cir. 2002) (citing Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1047 (9th Cir. 2002)).  "Irrespective of the chosen method, 'the district court should be guided by the fundamental principle that fee awards out of common funds be 'reasonable under the circumstances.'"  Alberto v. GMRI. Inc., 252 F.R.D. 652, 667 (E.D. Cal. 2008) (citations omitted).

--------

[10] Under the lodestar method, the court calculates the fee award by multiplying the number of hours reasonably spent by a reasonable hour rate and then enhancing that figure, if necessary to account for the risks associated with representation.  Paul, Johnson, Alston & Hunt v. Graulty, 886 F.2d 268, 272 (9th Cir. 1989).

[11] Under the percentage-of-the-fund method, the court calculates the fee award by designating a percentage of the total common fund.  Six Mexican Workers v. Ariz. Citrus Growers, 904 F.2d 1301, 1311 (9th Cir. 1990).

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

For the purposes of preliminary approval, Plaintiffs' requested percentage of attorneys' fees appears reasonable; under the common fund method, the applicable benchmark is 25%, and any adjustment to this benchmark must clearly be supported by unusual circumstances.  See Hanlon, 150 F.3d at 1029 ("This circuit has established 25% of the common fund as a benchmark award for attorney fees."); Graulty, 886 F.2d at 272 (the 25% benchmark can be adjusted upward or downward "to account for any unusual circumstances[,]" but the justification for adjustment must be clear).

As explained more fully above, however, Plaintiffs' counsel seeks 25% of the maximum Gross Settlement Amount instead of 25% the actual Gross Settlement Amount.  (See Section III(C)(1)(a), supra.)  In other words, the total recovery for class members could be significantly less than the amount of attorneys's fees.  (Id.) Though this will not prevent preliminary approval of the Settlement Agreement,[12] the Court will determine an appropriate amount of attorneys' fees at the final fairness hearing and will not approve attorneys' fees in an amount that exceeds the total amount paid to class members and cy pres recipients.

## 2.    Incentive Payment for Class Representatives

The Motion prescribes incentive payments of "$77,500[.00] [to be distributed from the Gross Settlement] to the eleven class representatives for their time, efforts[,] and risk helping to secure the settlement benefits for the class."  (See Mot. at 18; Settlement Agreement ¶ 10.1.)  The Settlement provides that the total incentive fees will be distributed as follows: (1) Trauth will receive up to $15,000.00; and (2) the other class representatives will receive $6,500.00 each.  (Settlement Agreement ¶ 10.1.)

"The criteria courts may consider in determining whether to make an incentive award include: 1) the risk to the class representative in commencing suit, both financial and otherwise; 2) the notoriety and personal difficulties encountered by the

---

[12] This analysis relates to the method selected by Plaintiffs for calculating attorneys' fees, and the percentage sought.  At the final approval and fairness stage, the Court examines what counsel actually has done to prosecute the action and negotiate the settlement, to determine if the percentage sought is fair.

class representative; 3) the amount of time and effort spent by the class
representative; 4) the duration of the litigation; and 5) the personal benefit (or lack
thereof) enjoyed by the class representative as a result of the litigation." Van
Vranken v. Atl. Richfield Co., 901 F. Supp. 294, 299 (N.D. Cal. 1995).

As summarized above, Plaintiffs submit declarations from each proposed class
representative detailing the amount of time each spent on this case.  Each class
representative stands to recover approximately $91-$312 per hour for her efforts on
behalf of the class.  The Court again notes that Plaintiff Omlor described how she
was blacklisted and retaliated against by Spearmint Rhino for her participation in this
action.  This supports her request for an incentive award.  While the Court approves
the award of incentive payments to the class representatives, the Court will
determine, at the final approval and fairness hearing, the reasonable amount for
each class representative in light of the time she expended, any experienced risks,
and the awards other class members will receive.  This will not prevent preliminary
approval, however, as the amount of the awards is within the within the range of
reasonableness required for a settlement offer.

## E.   Notice and Administrative Procedures

Under Rule 23(e), the Court must "direct notice in a reasonable manner to all
class members who would be bound" by the proposed settlement.  Fed. R. Civ. P.
23(e)(1).  Plaintiff must provide notice that is "timely, accurate, and informative."
See Hoffmann-La Roche Inc. v. Sperling, 493 U.S. 165, 172 (1989).  Likewise,
claims forms must be informative and accurate.  Id. at 172; Churchill Village, LLC v.
Gen. Elec., 361 F.3d 566, 575 (9th Cir. 2004) (notice is satisfactory if it "generally
describes the terms of the settlement in sufficient detail to alter those with adverse
viewpoints to investigate and to come forward and be heard.").

### 1.   Claim Forms

Claim forms must be timely, accurate, and informative.  Hoffman-LaRouche,
493 U.S. at 172.  The parties attach the proposed form of class notice ("Class
Notice") as Exhibit A to the Settlement Agreement, as well as the proposed class
action Claim Form.

According to the Claim Form, to receive payment, a class member must submit a signed Claim Form and a W-9 Form, and return both forms with supporting documentation to the settlement administrator ("Settlement Administrator") before the expiration of the claims period.  (Settlement Agreement ¶ 6.2, Ex. A.)

Where a class member submits a Claim Form that contains a number of dance shifts that does not exceed the total number of dance shifts reflected in the clubs' records by less than 10%, payment will be calculated using the number of dance shifts on the class member's Claim Form.  (Settlement Agreement ¶ 6.4.)  If, however, the number of dance shifts exceeds the total number of dance shifts reflected in the clubs' records by more than 10%, the Settlement Administrator will mail the class member a notice informing her of this fact and giving her the option of (1) accepting the number of dance shifts contained in the clubs' records; or (2) submitting supporting documentation and evidence.  (Id.)

The Court notes that the parties have complied with its July 26, 2010, Order to provide a convenient way for class members to opt out by attaching a "Request for Exclusion" to the Class Notice.  (See Ridout Decl., Ex. E to Ex. B.)

Thus, the Court finds the Claim Form a reasonable form of directing Class Notice.

## 2. Administrative Procedures

The parties have agreed to retain Gilardi & Co., LLC, as the Settlement Administrator over the claim proceedings for a fixed cost of $55,000.00.  (Settlement Agreement § 6.7.4.)

### a. Notice via Mail

The parties propose that within fifteen days of preliminary approval of the settlement, Defendants and the Clubs will provide the Settlement Administrator a list of class members ("Class List") that contains the following information from the club's records: (1) the class member's name, (2) the class members' last known home address, (3) the class member's Social Security number, (4) the class member's driver's license number, and (5) the club(s) where the class member performed.  (Settlement Agreement ¶ 5.1.1.)  Within 30 days of preliminary approval,

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

the Settlement Administrator will update the Class List using the United States Postal Service's National Change of Address database and mail each class member a copy of the Class Notice.  (Id. ¶ 5.1.2.)

 If a Class Notice is returned within thirty days of the initial mailing with a forwarding address, the Settlement Administrator will re-mail the Class Notice within ten days to the forwarding address provided.  (Settlement Agreement ¶ 5.1.3.)  If a Class Notice is returned within thirty days and without a forwarding address, the Settlement Administrator will perform a trace for those individuals.  (Id.)  If the Settlement Administrator successfully obtains a new address, it will re-mail the Class Notice within ten days.  (Id.)  These re-mailed notices will be due within sixty days of the mail of the original notice, or within twenty-five days of the re-mailed notice, whichever is later.  (Id.)  If a Class Notice is returned after a second mailing, the Settlement Administrator will have no further obligation to take steps to locate that class member's address.  (Id. ¶ 5.1.4.)

### b.   Internet Notice
 The Settlement Administrator will place on its website within five days after entry of the Court's Preliminary Approval Order: (1) the Class Notice, (2) the FAC, (3) the Settlement Agreement, (4) the Preliminary Approval Order, and (5) reference to the United States District Court for the Central District's PACER website.  (Settlement Agreement ¶ 5.2.)  These documents will remain the Settlement Administrator's website through final settlement approval.  (Id.)  The Class Notice will refer to the website.  (Id.)  In their Supplemental Briefing, the parties also agree to post the Class Notice documents on the Spearmint Rhino website via a "clickable tab" within five days of the entry of the Preliminary Approval Order.  (Supplemental Briefing, Ex. A ¶ 5.2.)  The Class Notice will remain posted until two weeks after the Class Noticed is initially mailed by the Settlement Administrator.  (Id.)

### c.   Notice Posted in Existing Clubs
 Existing clubs shall post a copy of the Class Notice in each of the Club's dressing rooms within one week of entry of the Preliminary Approval Order.  (Settlement Agreement ¶ 5.4.)  The Class Notice will remain posted until two weeks after the Settlement Administrator first mails the Class Notices.  (Id.)

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

The Court finds the notice and administrative procedures adequate.

### 3.      Compliance with CAFA

Pursuant to the Class Action Fairness Act, Defendants are required to provide notice of the proposed settlement to appropriate state and federal officials within ten days of its filing with the Court.  28 U.S.C. § 1715(b).  The parties provided the Court evidence regarding their notification of the United States and individual state attorneys general, which complies with the statutory requirements.  Thus, the Court finds that Defendants have met their obligations under CAFA.

## IV. CONCLUSION

For the foregoing reasons, the Court:

(1)     GRANTS the Amended Motion for Preliminary Approval of the Settlement Agreement;

(2)     preliminarily APPROVES the Settlement Agreement and the Amendment, as provided above;

(3)     DIRECTS dissemination of the Class Notice and Claim Form to the class;

(4)     SCHEDULES the final fairness hearing for Monday, August 1, 2011, at 2:00 p.m. in Courtroom 2 of the District Court, Central District of California, located at 3470 Twelfth Street, Riverside, California, 92501; and

(5)     SCHEDULES related deadlines as set forth below:

| Event | Agreement | Date |
|-------|-----------|------|

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

| | | |
|---|---|---|
| Deadline for Defendants and Settlement Administrator to post internet notice | Within five days after entry of Preliminary Approval Order. (Amendment ¶ 5.) | April 11, 2011 |
| Deadline for Defendants to post dressing room notices | Within five days after entry of Preliminary Approval Order. (Amendment ¶ 5.3.) | April 11, 2011 |
| Deadline for Defendants to provide class data to Settlement Administrator | Within 15 days after entry of Preliminary Approval Order. (Settlement Agreement ¶ 5.1.1.) | April 19, 2011 |
| Deadline to mail Class Notice to Class Members | Within 30 days after entry of Preliminary Approval Order. (Settlement Agreement ¶ 5.1.2.) | May 4, 2011 |
| Deadline to file Motion for Approval of Attorneys' Fees | Within 80 days after entry of Preliminary Approval Order. (Amendment ¶ 6.) | June 23, 2011 |
| Deadline for Class Counsel to file Settlement Administrator declaration re: mailing of Class Notice | 30 days prior to Final Approval Hearing.  (Settlement Agreement ¶ 5.5.) | July 4, 2011 |
| Deadline for submission of opt-out request | Within 90 days after entry of Preliminary Approval Order. (Amendment ¶ 5.8.1.) | July 4, 2011 |
| Deadline for objections | Within 90 days after entry of Preliminary Approval Order. (Amendment ¶ 5.7.) | July 4, 2011 |

EDCV 09-1316-VAP (DTBx)
TRACY DAWN TRAUTH, et al. v. SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al.
MINUTE ORDER of April 4, 2011

| | | |
|---|---|---|
| Deadline for submission of Claim Forms | Must be postmarked within 60 days after Class Notification (90 days after entry of Preliminary Approval Order).  (Amendment ¶ 1.8.) | July 4, 2011 |
| Deadline to file Motion for Final Approval | 28 days prior to Final Approval Hearing. | July 4, 2011 |
| Deadline to file Motion for Incentive Awards | 21 days[13] before prior to Final Approval Hearing.   (Amendment ¶ 7.) | July 11, 2011 |
| Deadline to file reply brief responding to objections | 14 days[14] prior to Final Approval Hearing.  (Settlement Agreement ¶ 5.7.) | July 18, 2011 |
| Final Approval Hearing | No later than 120 days after entry of Preliminary Approval Order. (Settlement Agreement ¶ 2.7.) | August 1, 2011 |

**IT IS SO ORDERED.**

---

[13] Though the parties stipulated to a deadline of only 10 days before the Final Approval Hearing and the Amendment so provides, given the number of named Plaintiffs in this action, the Court has amended this date.

[14] As in note 13, underline supra, though the parties stipulated to a deadline of only 5 days before the Final Approval Hearing and the Amendment so provides, the Court has amended this date to allow sufficient time to review the filings.