1  RIDOUT & LYON, LLP
   CHRISTOPHER P. RIDOUT (State Bar No. 143931)
2  Email: c.ridout@ridoutlyonlaw.com
   CALEB LH MARKER (State Bar No. 269721)
3  Email: c.marker@ridoutlyonlaw.com
   555 E. Ocean Blvd., Ste. 500
4  Long Beach, California  90802
   (562) 216-7380
5  (562) 216-7385 Fax

6  (Additional counsel listed below)

7  **Attorney for Plaintiffs**

8  **UNITED STATES DISTRICT COURT**

9  **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 10  TRACY DAWN TRAUTH,  CHRISTEEN RIVERA, JENNIFER BLAIR, VICTORIA OMLOR, JASMINE WRIGHT, ANICIA VINTIMILLA, MARSHA ELLINGTON, SELENA DENISE PELAEZ, NICOLE GARCIA, REAH NAVARRO, and, TAMI SANCHEZ, individually, and on behalf of all others similarly situated, | Case No. EDCV09-1316 VAP (DTBx) |
| | Honorable Virginia A. Phillips |
| | **NOTICE OF MOTION AND MOTION FOR APPROVAL OF THIRD AMENDMENT TO SETTLEMENT AGREEMENT; APPROVAL OF SUPPLEMENTAL NOTICE; AND APPROVAL OF PROPOSED CLASS ACTION SCHEDULING ORDER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| Plaintiffs, | |
| v. | |
| SPEARMINT RHINO COMPANIES WORLDWIDE, INC., SPEARMINT RHINO CONSULTING WORLDWIDE, INC., THE OXNARD HOSPITALITY SERVICES, LP, CITY OF INDUSTRY HOSPITALITY VENTURE, INC., DOWNTOWN LA CLUB VENTURE, INC., FARMDALE HOSPITALITY SERVICES, INC., HIGH EXPECTATIONS HOSPITALITY, LLC, INLAND RESTAURANT VENTURE I, INC., K-KEL, INC., KENTUCKY HOSPITALITY VENTURE, LLC, LCM, LLC, MIDNIGHT SUN ENTERPRISES, INC., OLYMPIC AVENUE VENTURE, INC., RIALTO POCKETS, INC., ROUGE GENTLEMEN'S CLUB, INC., SANTA BARBARA HOSPITALITY SERVICES, INC., SANTA MARIA RESTAURANT ENTERPRISES, INC., and WPB HOSPITALITY, LLC | Date:            March 5, 2012 Time:            2:00 p.m. Courtroom:   2 |
| | Date Action Filed:   July 13, 2009 Trial Date:              TBD |
| Defendants. | |

**TO ALL PARTIES AND THEIR RESPECTIVE COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on March 5, 2012 at 2:00 p.m., or as soon thereafter as the matter can be heard, in Courtroom 2 of this Court, located at 3470 Twelfth Street, Riverside, California, Plaintiffs Tracy Dawn Trauth,  Christeen Rivera, Jennifer Blair, Victoria Omlor, Jasmine Wright, Anicia Vintimilla, Marsha Ellington, Selena Denise Pelaez, Nicole Garcia, Reah Navarro, and, Tami Sanchez ("Plaintiffs"), each individually and on behalf of all others similarly situated, will move for approval of the Third Amendment to Class Action Settlement, approval of supplemental long-form notice and claim forms, approval of supplemental notice, and approval of the parties' proposed class action scheduling order.

This motion is based upon this notice and the accompanying documents listed below:

1.     Memorandum of Points and Authorities; and

2.     Declaration of Caleb Marker and the exhibits attached thereto.

Through this Motion, Plaintiffs request the following relief:

A.     Approval of the Third Amendment to the Stipulation and Settlement Agreement dated September 17, 2010 (attached hereto as Exhibit "A" to the Marker Declaration), which has been reached between Plaintiffs and Defendants;

B.     A determination that the dissemination of the Second Class Notice Documents to the Second Class Notice Recipients, via United States Mail, in the form attached as Exhibit "G" to Exhibit "A" of the Marker Declaration is fair, adequate and reasonable to the Class, and fully satisfies the requirements of Fed. R. Civ. P. 23 and the requirements of due process;

C.     A determination that the dissemination of the additional notice to Settlement Class Members who previously submitted claims, via United States Mail, in the form attached as Exhibit "G" to Exhibit "A" of the Marker Declaration is fair,

adequate and reasonable to the Class, and fully satisfies the requirements of Fed. R.

Civ. P. 23 and the requirements of due process;

     D.     Approval of the parties' proposed Class Action Scheduling Order; and

     E.     Any other relief deemed just and equitable in the circumstances.

                              Respectfully submitted,

                              RIDOUT & LYON, LLP

Dated:  January 31, 2012        /s/ Christopher P. Ridout
                              Christopher P. Ridout
                              Caleb LH Marker
                              555 E. Ocean Boulevard, Suite 500
                              Long Beach, CA  90802
                              (562) 216-7380

                              Hart L. Robinovitch
                              ZIMMERMAN REED, PLLP
                              14646 N. Kierland Blvd., Suite 145
                              Scottsdale, Arizona 85254
                              (480) 348-6400

                              Stephen M. Harris
                              KNAPP PETERSEN & CLARKE
                              550 N. Brand Blvd., Suite 1500
                              Glendale, CA  91203-1922
                              (818) 547-5149

                              Robert L. Starr
                              LAW OFFICES OF ROBERT L. STARR
                              23277 Ventura Blvd.
                              Woodland Hills, CA  91364-1002
                              (818) 225-9040

                              **Attorneys for Plaintiffs and the Class**

# MEMORANDUM OF POINTS AND AUTHORITIES

## Table of Contents

Table of Authorities .................................................................................................. ii

I.    INTRODUCTION ....................................................................................... 1

II.   PROCEDURAL BACKGROUND ............................................................. 2

III.  SUMMARY OF THE PARTIES' EFFORTS SINCE DISCOVERING THE UNDERREPORTING ERROR.......................... 5

      A.   The Las Vegas Spearmint Rhino's Policies and Procedures Ensure That All Nevada Class Members Are Contained In Its ClubTrax Database ....................................................... 7

      B.   The Las Vegas Spearmint Rhino's Check In/Check Out Procedures Ensure That The ClubTrax Shift Data Is Extremely Accurate ........................................................ 10

      C.   Defendants Audited Its Electronic Database With Thousands of Paper Files To Improve Accuracy ................... 12

      D.   The ClubTrax Data and Resulting Spreadsheet Are Accurate ......................................................................... 16

      E.   The Resulting Nevada Subclass Spreadsheet Is Accurate ................... 21

      F.   The Non-Nevada Nightclubs Confirmed The Original Class Member/Shift List Was Complete and Supplemented Its Database With Its Paper Records .......................................... 22

      G.   The Settlement Administrator Updated and Supplemented Defendants' Records With Commercial Databases ............................. 23

V.    OVERVIEW OF CLASS MEMBER AND SHIFT UNDERREPORTING .............................................................................. 24

VI.   THE THIRD AMENDMENT TO CLASS ACTION SETTLEMENT PRESERVES THE CONSISTENCY OF THE SETTLEMENT ........................................................................................ 24

VII.  THE PARTIES' PROPROSED SUPPLEMENTAL NOTICE WILL ADEQUATELY APPRISE ALL PREVIOUSLY UNIDENTIFIED CLASS MEMBERS OF THE SETTLEMENT ................ 28

VIII. CLASS MEMBERS WHO RECEIVED NOTICE AND DID NOT SUBMIT CLAIMS WILL NOT RECEIVE SUPPLEMENTAL NOTICE.................................................................... 29

IX.   THE PARTIES' PROPOSED CLASS ACTION SCHEDULE ...................... 30

X.    CONCLUSION........................................................................................ 31

1

## **Table of Authorities**

2

**Cases**

3  *Chavez v. Netflix, Inc.*, 162 Cal. App. 4th 43 (Cal. App. 1st Dist. 2008) .................. 29

4  *Denney v. Deutsche Bank AG*, 443 F.3d 253, 271 (2d Cir. 2006) ............................. 29

5  *In re Integra Realty Resources, Inc.*, 262 F.3d 1089, 1111 (10th Cir. 2001) ............ 29

6  *Iorio v. Allianz Life Insurance Company of North America*, Case No.: 05-cv-
7      00633-JLS-CAB (S.D. Cal. 2010) ........................................................................ 28

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.     INTRODUCTION

As the Court is aware, the parties reached a settlement in this class action, alleging that persons who performed as exotic dancers at the adult cabarets known as "Spearmint Rhino," "Rouge" and "Blue Zebra" in the States of California, Nevada, Florida, Texas, Idaho and Kentucky should have been treated as employees rather than independent contractors, and as a result were entitled to, but did not receive minimum wages and benefits in exchange for the services they provided to the nightclubs.

After the Court preliminarily approved the Settlement and the approved notice was mailed to class members, Defendants discovered that a significant number of class members who had worked at the Spearmint Rhino in Las Vegas, Nevada ("SRLV") had been unintentionally omitted from the data reviewed by Class Counsel and from the mailing database provided to the Settlement Administrator.  As a result, almost two-thirds of the Nevada subclass members did not receive notice of the Settlement and in fact notices were sent to others who were not Nevada Settlement Class Members.  Moreover, the per-dance shift settlement amount for the Nevada subclass was no longer accurate.

Due to the fact that SRLV operates on a different computer system from the rest of the clubs doing business as Rouge, Blue Zebra and Spearmint Rhino (collectively "SR") nightclubs in the United States, Class Counsel has confirmed that the mailing lists and shift counts for class members in California, Florida, Idaho, Kentucky, and Texas provided in April 2011 were accurate. The parties have been unable to specifically identify the cause of the error; however Class Counsel now believes that the underreporting was a result of a miscommunication regarding the parameters of the class and a resulting error in SRLV's database query.[1]

---

[1] Marker Decl., at ¶4.

1    Since the discovery of the error, the parties have worked diligently to

2    investigate and remedy the error in the Nevada Settlement Class, identify and

3    confirm the number of shifts, identity every class member using both electronic and

4    paper records, and have negotiated an increase in the amount in benefits to be made

5    available to the Class that is in direct proportion to the terms of the settlement

6    preliminarily approved by this Court.    While the confirmation process was time

7    consuming, the parties now believe that the number of class members and shifts for

8    all subclasses is correct and that the settlement can move forward.  Plaintiffs request

9    that the court enter an order approving the procedure for disseminating notice to the

10   newly identified Nevada Settlement Class Members and setting a new date for the

11   final fairness hearing.

12                        **II.    PROCEDURAL BACKGROUND**

13   By Order dated April 4, 2011, this Court granted Plaintiffs' Motion for Entry

14   of Proposed Preliminary Approval of Class Action Settlement, certified the Class for

15   purposes of settlement, appointed Class Counsel, directed that the class settlement

16   notice be disseminated to the class and set a date for the fairness hearing (Doc. 203).

17   On September 2, 2011, the parties filed a joint report (Doc. 256) indicating the

18   following:

19   1.    On August 28, 2011, Class Counsel were informed that the number of

20   class members and number of shifts of the Nevada Settlement Class had been

21   mistakenly underreported to them;

22   2.    Defense Counsel had identified that the underreporting was due to a

23   miscommunication of database search parameters and was not intentional;

24   3.    Defense Counsel confirmed that the underreporting error was limited to

25   the Nevada Settlement Class  (and not class members in California, Florida, Idaho,

26   Kentucky, or Texas Settlement Classes); and,

27

28

4.      The parties agreed that the Settlement would need to be renegotiated and adjusted proportionally to adjust for the underreporting and that new notices would need to be issued to Nevada Settlement Class  Members who did not previously receive them.   The parties further agreed to have the Settlement Administrator do further searches for all Class Members whose notices had been returned as undeliverable.

On September 6, 2011, the Court took the Fairness Hearing and the due date for responding to the objections off-calendar (Doc. 257).

On September 12, 2011, the parties filed their second joint report (Doc. 258), indicating that:

1.      The parties had conducted meetings to determine the appropriate course of conduct to investigate and determine the scope of the error;

2.      The parties agreed to increase the Settlement by an amount proportional to the underreporting;

3.      The parties agreed to increase the non-reversionary amount of the Settlement by an amount proportional to the underreporting;

4.      Class Counsel would conduct supplemental investigation and discovery; and

5.      Further notice would be mailed to class members who did not previously receive notice.

On September 26, 2011, the parties filed their third joint report (Doc. 259), indicating that Defendants had been retrieving all of the relevant computer data on Nevada Settlement Class Members and comparing it with Defendants' paper files. After completing this task, Defendants believed it would know the full extent of the underreporting and be able to identify the mistakenly excluded class members.

On October 11, 2011, the parties filed their fourth joint report (Doc. 260), indicating that Defendants had reviewed their records to confirm the correct number

of Nevada subclass members and shifts, and that this information had been conveyed orally to Class Counsel.  The parties also indicated that the Settlement Administrator was reviewing the project and determining an appropriate schedule for its involvement.

On October 28, 2011, the parties filed their fifth joint report (Doc. 261) indicating that they were nearing completion of a Second Amendment to the Settlement which would guide further resolution of the error.

On November 4, 2011, the parties filed their sixth joint report (Doc. 262), submitting their Second Amendment to Class Action Settlement to the Court (Doc. 262-1).  The parties agreed to file a Third Amendment to the Settlement Agreement to the Court for approval by January 31, 2012.

In general, the Second Amendment stated that:

1.     Defendants would supplement non-Nevada Settlement Class Member information (e.g., addresses) from their paper records;

2.     The Settlement Administrator would prepare and refine a Nevada subclass spreadsheet based on Defendants revised data and further supplemental it with data from third-party commercial vendors (NCOA and Accurint);

3.     The Settlement Administrator would prepare, update, and refine a spreadsheet of class members whose Class Notice Documents were returned as undeliverable ("RUM") without a forwarding address and further supplemental it with data from Defendants' paper records and that information would be provide to third-party commercial vendors to obtain better addresses (NCOA and Accurint);

4.     Class Counsel would conduct confirmatory discovery to confirm the accuracy of the revised Nevada data, including review of the new spreadsheets, review of pertinent documents, and depositions of persons most knowledgeable;

5.     The Parties agreed to execute a Third Amendment to incorporate the final results of their investigation and negotiations, including:

a. increasing Pool 2 (Nevada) of the Settlement and the non-reversionary pool of the Settlement proportionally to the underreporting;

b. mailing supplemental long form class notice documents to unreported Nevada subclass members;

c. mailing supplemental long form class notice documents to class members whose previous notice was returned RUM; and

d. mailing supplemental notice to class members who had submitted claims.

On January 30, 2012, the parties executed the Third Amendment to the Stipulation and Settlement Agreement dated September 17, 2010 ("Third Amendment"), a copy of which is attached as Exhibit "A" to the Marker Declaration.

## III.   SUMMARY OF THE PARTIES' EFFORTS SINCE DISCOVERING THE UNDERREPORTING ERROR

In August 2011, after learning of the underreporting error, Defendants had its outside vendor for SRLV's dancer registration software (i.e., ClubTrax) compile a spreadsheet of all Nevada Settlement Class Members.

At the same time, SR confirmed the accuracy of the non-Nevada lists and audited its Aloha database against more than 12,000 paper records, which took six of its full-time employees five weeks to complete.

From September through October, 2011, SRLV supplemented the newly-generated spreadsheet, which consisted of up to 8,503 Nevada Settlement Class Members (subject to elimination of duplicates by the Settlement Administrator), with its paper records. This task was very labor-intensive, with Sharon Rosen, the SRLV office manager, supervising as many as 12 full-time temporary employees over the course of a month.

By the end of October 2011, all of the additional information obtained from SRLV's paper files had been incorporated into the revised spreadsheet. On November 4, 2011, Defendants provided the revised spreadsheet to the Settlement Administrator to eliminate duplicates and to supplement address information using the Accurint and NCOA databases.

On November 11, 2011, Defendants provided the supplemental spreadsheet including RUM-class members to the Settlement Administrator. On November 29, 2011, the Settlement Administrator provided Defendants' Counsel and Class Counsel with the total number of shifts, class members, and the revised Nevada Settlement Class Member data as it had completed its task of completing the data processing of the supplemental spreadsheets.

On November 30, 2011, Class Counsel met with Defendants' Counsel to review the revised spreadsheets and coordinate the necessary confirmatory discovery as outlined and discussed below relating to the accuracy of the revised Nevada Settlement Class data.

On December 19, 2011, Class Counsel deposed Sharon Rosen, the SRLV's office manager, and Charles De La Paz, the SRLV's club manager, in Las Vegas, Nevada.

On January 5, 2012, Class Counsel deposed Dena Hernandez, Spearmint Rhino Consulting's ("SR Consulting") CFO, and Juan Rivera, a systems analyst in SR Consulting's IT department, in Los Angeles, California.[23]

On January 19, 2012, Class Counsel deposed Mark Garnica, the computer programmer who wrote ClubTrax and Kyriacos Kalfas, the owner of the software

---

[2] Hernandez Depo., at 7.
[3] Rivera Depo., at 5.

vendor, in Las Vegas, Nevada.[4]   The last two confirmatory depositions did not occur until this date due to Garnica's unavailability.[5]

After completing all of these tasks, as further described below, the parties are now satisfied that the spreadsheets provided to the Settlement Administrator include all class members and account for all dance shifts.

## IV.   THE PARTIES ARE SATISFIED THAT THE REVISED NEVADA DATA IS ACCURATE

### A.   The Las Vegas Spearmint Rhino's Policies and Procedures Ensure That All Nevada Class Members Are Contained In Its ClubTrax Database

SRLV has used the ClubTrax software to manage all of the exotic dancers performing at the nightclub throughout the Nevada Settlement Class Period.[6]   Its day-to-day usage and related nightclub procedures were confirmed by Charles De La Paz, the Club Manager at the Las Vegas Spearmint Rhino.[7]   De La Paz has worked at SRLV throughout the entire Class Period and has been Club Manager since 2007.[8]  Prior to working for Defendants, De La Paz studied computer science and worked in the IT field.[9]

Before an exotic dancer can apply to work at SRLV, she has to possess a valid business license from the State of Nevada.[10]   If she does, SRLV requires that she obtain a SCOPE background check, which is a criminal background check conducted by the Las Vegas Metropolitan Police Department ("Sheriff").[11]   If the SCOPE check is satisfactory, SRLV issues her a Sheriff's card application for the dancer to submit to the Sheriff to obtain a Sheriff's card.   If approved for a Sheriff's card (a work

---

[4] Garnica Depo., at 12, Kalfas Depo., at 7.
[5] Garnica Depo., at 7.
[6] ClubTrax has been in use since 2005. Garnica Depo., at 13.
[7] De La Paz Depo, at 5.
[8] De La Paz Depo, at 9.
[9] De La Paz Depo, at 11-13.
[10] De La Paz Depo, at 12.
[11] De La Paz Depo, at 12.

permit required for any individual working in Clark County, Nevada), the exotic dancer returns to SRLV and is visually reviewed by a manager.[12]  If approved to work by a manager, the exotic dancer then completes a new hire packet[13] and certain personal identification information is recorded, both on paper and in the ClubTrax software (including full name, date of birth, mailing address, Sheriff's card number, and driver's license number and state of issue).[14]  All paper documents are forwarded to Sharon Rosen, SRLV's office manager, who verifies that the documents are complete and files them accordingly.[15]

In sum, SRLV's new hire process is four-fold: 1) a prospective dancer must comply with local rules and licensure ordinances; 2) complete an appearance audition; 3) complete necessary forms and paperwork; and 4) complete an orientation.[16]

All dancers are required to enter and exit SRLV using a designated entrance at the rear of the building.[17]  This mandatory, single point of entry ensures that exotic dancers do not enter from another entrance and then become confused as a customer. Upon entering SRLV, an always-present back door host clocks in the exotic dancer using ClubTrax software.[18]  ClubTrax is operated by a keyboard and a touch screen and resembles Aloha, a commonly used point-of-sale system used in restaurants and bars.[19]  The back door host types in the exotic dancer's name to clock her in, but can

---

[12] De La Paz Depo, at 15.
[13] The new hire packet consists of a application, lease agreement, Sheriff's department change of employment verification, and relevant Clark County rules. De La Paz Depo, at 17.
[14] De La Paz Depo, at 15.
[15] De La Paz Depo, at 23.
[16] De La Paz Depo, at 16.
[17] De La Paz Depo, at 37, 40-41 (no dancer has ever attempted to enter through the front door during De La Paz's tenure).
[18] De La Paz Depo, at 37.
[19] De La Paz Depo, at 32.

also search for her Sheriff's card ID number.[20]   The backdoor host can verify the exotic dancer's identity using her Sheriff's card, or reviewing the digital photo of the exotic dancer stored in ClubTrax.   ClubTrax then displays the amount of the stage fee due and records that the fee is paid in cash.[21]    At the end of their shift, each dancer is logged out (clocked out) of ClubTrax as they leave SRLV.[22]

In addition to clocking exotic dancers in and out and accounting for stage fees, ClubTrax also tracks exotic dancers during their shift and Sheriff's card expirations. For instance, if a class member and a customer enter the "VIP Room", they are checked into the room by the room host using ClubTrax.[23]  After leaving the area, they are checked out using ClubTrax.  A dancer cannot check into any of the various VIP rooms without being logged into ClubTrax.  Should a customer or manager so inquire, a host can use ClubTrax to determine if a particular exotic dancer is working or not.[24]  The software also verifies that an exotic dancer's Sheriff's card has not expired.[25]

Given the numerous per-shift interactions a class member has with the ClubTrax system, it is virtually impossible for an exotic dancer to perform a shift and evade being clocked in.  To be logged in or out of a shift, or be checked into a particular area of SRLV, exotic dancers state their name or present their Sheriff's card to the appropriate employee, who then compares their appearance with the digital picture stored in ClubTrax.[26]

---

[20] De La Paz Depo, at 39-40; Garnica Depo., at X
[21] De La Paz Depo, at 37.
[22] De La Paz Depo, at 40.
[23] De La Paz Depo, at 33.
[24] De La Paz Depo, at 29.
[25] De La Paz Depo, at 22-23.
[26] De La Paz Depo, at 33-34.

Sharon Rosen, SRLV's office manager, stated that she is very confident that all class members are contained within new spreadsheet based on her knowledge of the nightclub's procedures, and confirmed that an exotic dancer cannot check-in for work without having a record in ClubTrax:[27]

> Q. Okay. It's not possible for a woman to check in and perform her shift without appearing in the Club Trax database, correct?
> A. Exactly.
> Q. And to the best of your knowledge, information and belief that's been the case since July 13th, 2006, correct?
> A. Yes.

Mr. De La Paz confirmed the same:[28]

> Q. Okay. It is not possible to perform as an exotic dancer at the Spearmint Rhino Nightclub without being in Club Trax?
> A. That's correct.

SRLV's procedures are clearly designed to eliminate that very possibility (that dancers could report to work without checking in) to ensure that each exotic dancer pays the per-shift stage fee and to better manage their establishment. As such, it is not possible for a Nevada Settlement Class Member to have worked at SRLV without having a corresponding record of her in ClubTrax. Quite simply, there are too many checks and balances and too many SRLV employees involved in the process for any dancer to perform without being logged into ClubTrax.

**B.     The Las Vegas Spearmint Rhino's Check In/Check Out Procedures Ensure That The ClubTrax Shift Data Is Extremely Accurate**

Every shift worked by a Nevada Settlement Class Member was recorded by her being checked in and out of the ClubTrax software by a back door host who is monitored by a surveillance camera.[29]   Mr. De La Paz confirmed that each class

---

[27] Rosen Depo., at 89-90
[28] De La Paz Depo, at 71
[29] De La Paz Depo, at 75-76.

member is checked in and out of every shift and every instance is recorded by ClubTrax:[30]

> Q. Okay. To the best of your knowledge since July 13th, 2006, every time a dancer has performed at the Spearmint Rhino Nightclub in Las Vegas, they have been checked into Club Trax, correct?
> A. Yes.
> Q. And every time they left they've been checked out of Club Trax, correct?
> A. Yes.
> Q. And to the best of your knowledge Club Trax keeps records of those check ins and check outs, correct?
> A. Yes.

Mr. De La Paz confirmed that it isn't possible for a class member to not check in for a shift, even through potential bribery of a back door host.[31]

> A. She has to be in Club Trax in order to work.
> Q. Why is that?
> A. Because she has to go on stage for one. If she checks into a room and she's not in Club Trax, why isn't she in Club Trax?
> Q. Okay.
> A. When she asks if she's okay to leave and we check how much time she's done and she's not in Club Trax, it comes up. There's too many checks and balances within Club Trax. We use Club Trax in every room that they go into besides the floor. So if she goes into a room and she's not in there, there's going to be the question why isn't she in Club Trax.
>                              * * *
> Q. To your knowledge is there any other way [the bribery hypothetical] a dancer couldn't work a particular shift without being checked into Club Trax?
> A. No.

The ClubTrax software can then generate a "fee history" report, which lists every stage fee ever paid by a particular class member.[32]  Each stage fee equates to a shift worked (with limited exceptions discussed below).  Regular ClubTrax users are not able to create or export a list of all dancers, but the ClubTrax programmers are able to do so using a custom query.  De La Paz contacted ClubTrax owner Kyriacos Kalfas and requested a list of all active and inactive dancers at SRLV during the

---

[30] De La Paz Depo, at 71
[31] De La Paz Depo, at 74-76.
[32] De La Paz Depo, at 53.

---

Class Period.[33] Kalfas e-mailed the requested list to De La Paz in Excel spreadsheet format.[34]

There is no alternative to using the ClubTrax data.  SRLV's office manager confirmed that ClubTrax is the only way to calculate the number of shifts a class member has worked and that no related paper records are generated.[35]

The only potential cause for any inaccurate shift data is if a class member works more than one shift.  De La Paz noted that if a day-shift class member works into the night shift, they are sometimes charged a "stay-over fee" using the Aloha point-of-sale system (which is used in the bar area) and the identity of the payor is not recorded.[36]  However, any such discrepancy is very minor – the total stay-over fees charged during the Class Period amounts to $10,040, which translates to roughly 348 stay-over shifts.[37]  In comparison to 660,000 Nevada shifts, it represents less than 7 shifts per 1,000.

## C.   Defendants Audited Its Electronic Database With Thousands of Paper Files To Improve Accuracy

Sharon Rosen, SRLV's office manager since March 2008, was deposed by Class Counsel to confirm the accuracy of the revised Nevada Settlement Class Member list and shift count.[38]  Rosen, a bookkeeper with twenty years experience, explained that all new exotic dancer hires at SRLV must complete a new hire packet that contains a copy of their Sheriff's card, a lease agreement, and a SCOPE background check.[39]

---

[33] De La Paz Depo, at 62.
[34] De La Paz Depo, at 62.
[35] Rosen Depo., at 72-73.
[36] De La Paz Depo, at 42, 44, 91.
[37] Each stay-over fee is $35. De La Paz Depo, at 92.
[38] Rosen Depo., at 5.
[39] Rosen Depo., at 7, 10.

1    Typically, either a club manager or a backdoor host provides the new hire

2    packet to the dancer and then forwards the packet to Rosen, who then sends a form to

3    the Sheriff.[40]   Before sending the packet to Rosen, the backdoor host enters the

4    dancer's pertinent contact information (including name, stage name, Sheriff's card

5    I.D. number, and mailing address) into ClubTrax.[41]

6    After reviewing the new hire packet and sending the form to the Sheriff's

7    department, Rosen files the packet in the "cage" – a locked and fenced-in file room

8    located within the garage at SRLV.[42]   After being hired in March 2008, Rosen was

9    tasked by SRLV's Director of Operations with creating a dancer paper file system

10   and organizing the 50-75 large cardboard boxes (containing 4-5,000 new hire

11   packets) in file cabinets by alphabetical order.[43]   The cage currently contains

12   approximately 28 four-drawer file cabinets containing 12-14,000 individual dancer

13   files arranged in alphabetical order.[44]   Rosen states that she is unsure as to the

14   completeness of the dancer files before she began her employment, but believes that

15   SRLV has a paper file for every dancer who began performing after her hire in

16   March 2008.[45] Furthermore, Rosen does not believe that any class members' paper

17   files have ever been shredded, destroyed, or relocated off-site.[46]

18   After Defendants learned that the number of Nevada Settlement Class

19   Members and shifts had been underreported and the new spreadsheet generated using

20   the correct query, Rosen was tasked with supplementing ClubTrax and the Nevada

21

22   _____

23   [40] Rosen Depo., at 12, 16-17.
     [41] Rosen Depo., at 18.

24   [42] Rosen Depo., at 19-20. Only Rosen, club managers, and maintenance employees have access to cage
     (Rosen Depo., at 80).  No class member is allowed access to the cage or the original copy of their paper files
     (Rosen Depo., at 83)

25   [43] Rosen Depo., at 22-24.
     [44] Rosen Depo., at 19, 54.

26   [45] Rosen Depo., at 27-28.
     [46] Rosen Depo., at 79-80.

27

28

spreadsheet with information from the class members' paper files.[47]   Rosen   was provided with a computer spreadsheet by Defendants' counsel by e-mail in August 2011, which she then had edited by Mr. De La Paz to remove certain columns (e-mail addresses and telephone numbers) so that it was printable.[48] In printed form, the spreadsheet was over 100 pages and contained more than 8,000 rows.[49]   Each row represented an individual exotic dancer who performed during the Class Period in SRLV's electronic records (including potential duplicates).[50]

Shortly thereafter, either in late August or early September 2011, Rosen hired 10-12 full-time temporary employees from Manpower to compare the electronic data with SRLV's paper files.[51]  Specifically, Rosen and the temporary workers compared the Nevada Settlement Class Members' complete mailing addresses, social security numbers, driver's license/identification number, and driver's license state of issue from SRLV's paper files (as written on the application) with the electronic data.[52] Rosen instructed the temporary employees to take one page of the spreadsheet, retrieve the corresponding paper file from the file storage area, remove the application from the file, and compare the specific information with the data contained in the spreadsheet.  If any errors were noted (a misspelled last name, for example), the temporary employee would initially note the correction on piece of paper so that two other temporary employees could update the ClubTrax database with the correct information.[53]  Over the course of a month, the temporary employees

---

[47] Rosen Depo., at 33.
[48] Rosen Depo., at 40.
[49] Rosen Depo., at 41.
[50] Rosen Depo., 68.
[51] Rosen Depo., 41-42 (Rosen reduced the number of temporary employees as the task approached completion).
[52] Rosen Depo., at 33-34, 43.
[53] Rosen Depo., at 44-45 (Rosen maintained copies of the handwritten corrections).

noted and corrected over 1,000 errors.[54]  Rosen audited this process by reviewing random ClubTrax records with the paper notations and found no errors.[55] During the course of the project, Rosen became aware that some of SRLV's paper files were incomplete and she estimates that Defendants do not have paper files for 100 – 1,000 class members (although these class members would be included in ClubTrax).[56] Rosen and the temporary employees completed their review in early October 2011, taking approximately one month to complete the project.[57]

On December 13, 2011, Rosen received an updated spreadsheet from Defendants' counsel (incorporating all of the edits she and her team made), and was tasked with completing a second review to fill in any empty fields in the spreadsheet.[58] This task included updating every Nevada Settlement Class Member with missing information and required re-reviewing approximately 500 paper files.[59] Again, Rosen hired two temporary employees to assist her with the task and she succeeded in finding some additional information, which she forwarded to Defendants' counsel.[60]

Based on her knowledge of SRLV's electronic records and procedures, Rosen testified that she is very confident that every Nevada Settlement Class Member is contained in the spreadsheet.[61] Similarly, Rosen testified that she is 98% confident that the information contained in the spreadsheet is accurate based on her efforts of comparing and correcting the electronic data with the paper files.[62]

---

[54] Rosen Depo., at 47.
[55] Rosen Depo., at 46.
[56] Rosen Depo., at 49.
[57] Rosen Depo., at 42, 52.
[58] Rosen Depo., at 52-53.
[59] Rosen Depo., at 58 - 59.
[60] Rosen Depo., at 60-61.
[61] Rosen Depo., at 89.
[62] Rosen Depo., at 85.

1

**D.     The ClubTrax Data and Resulting Spreadsheet Are Accurate**

2       Las Vegas-based Gig Computer, Inc. ("Gig") designed and developed

3  ClubTrax in 2003 and co-owns the resulting product.[63]  On January 19, 2012, Class

4  Counsel deposed Kyriacos Kalfas ("Kalfas"), the owner of Gig, and Mark Garnica

5  ("Garnica"), who is now self-employed but continues to work for Gig as an outside

6  contractor.[64]  Garnica was the original programmer who wrote ClubTrax and has also

7  written all of its software updates.

8       Garnica installed the software at the Las Vegas Spearmint Rhino ("SRLV") in

9  2005 where it remains in use today, encompassing the entire Nevada Class Period of

10  July 13, 2006 through April 4, 2011 (the "Class Period").[65]   ClubTrax runs on

11  Microsoft Windows installed on computer terminals throughout SRLV and connects

12  to a Microsoft SQL database server located onsite to store and access information.[66]

13  Access to ClubTrax is strictly controlled by requiring a username and password, each

14  with a different level of access.[67]  Only managers, hosts, and the front door cashier

15  (along with certain executives) are issued access credentials.[68]   In addition, the

16  ClubTrax help desk and programmers can remotely access the system.[69] Physical

17  access to the database server is highly restricted and requires entering an

18

19

---

20  [63] Garnica Depo., at 11.

21  [64] While neither witness is being tendered as an expert, Class Counsel believes that Kalfas and Garnica are highly qualified in the computing field. Like many computer and Internet entrepreneurs, Mr. Kalfas did not

22  attend college and is self-taught.  Mr. Garnica studied mechanical engineering at Texas A&M, taught himself programming by reading books, and has written other commercial software relating to biometric

23  security and labor timekeeping.  Given that Mr. Kalfas oversaw the function and design of the software and Mr. Garnica wrote the actual code, Class Counsel does not believe that any other computer expert could

24  understand ClubTrax the way they do based on their authorship, experience, and tacit knowledge.  Garnica Depo., at 7, 9, 11-12; Kalfas Depo., at 7.

25  [65] Garnica Depo., at 13; Kalfas Depo., at 12.

    [66] Garnica Depo., at 12.

26  [67] De La Paz Depo., at 28-29; Garnica Depo., at 18-19.

    [68] De La Paz Depo., at 28, 30; Garnica Depo., at 18-19.

27  [69] De La Paz Depo., at 31.

28

1   administrator's username and password.[70]  Gig has the ability to access and maintain

2   the server and terminals remotely.[71]

3       Numerous actions on ClubTrax terminals result in the creation of records in

4   specific tables of the SQL database.  For instance, when a SRLV backdoor host adds

5   a new exotic dancer to ClubTrax, the terminal sends that information to the SQL

6   server, which creates a new record (row) in the SQL database's dancer table.[72]

7       Garnica confirmed that each time an SRLV employee clocks in an exotic

8   dancer, a new record is created in the clock-in table.[73]  If the class member tenders or

9   defers payment of a house fee, it is accounted for but does not affect the creation of a

10   record in the clock-in table in any way.[74]  Thus, every time an SRLV employee

11   clocked in an exotic dancer, ClubTrax created a record of that clock-in (the

12   equivalent of a shift), including the exotic dancer's Sheriff's card ID number and the

13   date and time of the login.[75]  When an SRLV backdoor host clocks out an exotic

14   dancer on ClubTrax, the "shift record" in the database is updated with the date and

15   time she clocked out.[76]

16       Kalfas testified that the ClubTrax does not have the routine ability to create a

17   list of all exotic dancers who worked during a specific period of time.[77]  In addition

18   to printing thousands of individual reports, Kalfas said that he could run a custom

19   query (a database command or computer program) to assemble such lists.[78]  Once

20   the parties became aware of the underreporting, Defendants requested that Kalfas run

---

[70] Kalfas Depo., at 15-16.
[71] Kalfas Depo., at 32.
[72] Garnica Depo., at 21.
[73] Garnica Depo., at 21.
[74] Garnica Depo., at 21-22; Kalfas Depo., at 23.
[75] Garnica Depo., at 21; Kalfas Depo., at 22.
[76] Kalfas Depo., at 29.
[77] Kalfas Depo., at 60.
[78] Kalfas Depo., at 60.

such a query in late August 2011.[79]  Kalfas complied, using a "canned query" that Garnica had previously written for him and stored in his e-mail inbox.[80]  He modified the query to include all exotic dancers (both active and inactive) who worked at SRLV and clocked-in between midnight on July 13, 2006 and 11:59 p.m. on April 4, 2011 (the "Nevada class members").[81]  Garnica testified that Kalfas requested that he review the modified query and confirm that it would include all of the Nevada class members.[82]  Garnica reviewed the query and confirmed that its scope would include every Nevada Settlement Class Members and no one outside of those dates.[83]

In practice, Gig's custom SQL query searched for every shift record containing a clock-in date and time during the Class Period.  It then aggregated those records by unique Sheriff's ID, condensing 630,448 records (one per shift) into 8,503 records (total number of unique Sheriff's ID).[84]  During that process, SQL counted the total number of records (shifts) per ID.[85]  For example, if Class Member A had clocked in 2 times, SQL would output one row with her Sheriff's card ID number and note that 2 records (shifts) were associated that ID number during the Class Period.[86]  Next, SQL cross-referenced each unique Sheriff's ID with the corresponding record in the dancer table and merged both sets of information by joining the two tables at the right points.[87]  SQL then outputted all of the specified

---

[79] Kalfas Depo., at 33.
[80] Garnica Depo., at 25.
[81] Garnica Depo., at 25-26; Kalfas Depo., at 33-34.
[82] Garnica Depo., at 25-26.
[83] Garnica Depo., at 29.
[84] Garnica Depo., at 26.
[85] Garnica Depo., at 26.
[86] Garnica Depo., at 26.
[87] Garnica Depo., at 26.

information in a single table, which Kalfas saved as an Excel spreadsheet, a format that a lay person could access.[88]

Kalfas has completed such queries for Gig's customers, including SRLV on multiple occasions. In connection with the Amendment, Kalfas completed the query twice – first to create the initial spreadsheet for Rosen to use in auditing the electronic data and updating ClubTrax and second to create an updated version for use in creating a supplemental mailing list.[89] Garnica reviewed and approved of the query on both occasions. The second query confirms that Gig did not inadvertently count shifts after preliminary approval – the total number of shifts would have increased as time progressed. Rather, both queries produced identical results months apart. De La Paz conducted his own audit of the information, by running standard clock-in reports on individual dancers. Each report contained the same number of clock-ins as Gig's spreadsheets, confirming its accuracy and that the right dates were used.[90]

Both Kalfas and Garnica confirmed that, according to ClubTrax records and the spreadsheet they generated, a total of 8,503 potential class members had worked 630,448 shifts during the Settlement Class Period.[91]

Garnica also confirmed the integrity of the ClubTrax database. First, it is not possible for the managers or anyone at the club level to delete exotic dancers from ClubTrax.[92] Nor is it possible to delete or even modify a clock-in record from

---

[88] Kalfas Depo., at 38-39.

[89] Kalfas Depo., at 48.

[90] If the wrong dates were used in the new Nevada spreadsheet, the total shift count per class member would include fewer or additional shifts (i.e., if the query inadvertently included the present or went too far into the past, many additional shifts would have been added to individual class member counts). De La Paz's audit confirmed that Gig's scope was not too narrow or expansive.

[91] Garnica Depo., at 44-45; Kalfas Depo., at 52-53.

[92] Garnica Depo., at 20.

---

ClubTrax.[93]   Rather, both forms of tampering would have been completed using a custom query at the database server.[94]   After discussing the physical and virtual barriers protecting the SRLV database server, Garnica confirmed that any tampering of the ClubTrax records would be detectible.[95]

Garnica noted that every time a record (row) is added to the database, SQL assigns a "primary key" to the record.[96]   The primary key is an index number (similar to a page in a book).   Each time a new record is added, SQL assigns a primary key that is one integral higher than last one used.[97]   If a record is deleted from the database (or there is a hardware error), there would be a gap in the primary keys (i.e., Key10, Key11... Key13, if the Key12 record were deleted).[98]   SQL does not fill in any gaps – its internal counter assigns the next higher key automatically.[99]   A real world example would be if someone ripped a page out of a book.[100]   The information contained on the missing page would be lost and unknown.   Someone examining the book, however, would be able to tell that the page was missing because the page count would skip.   Garnica testified that any deletions would be detectible due to the primary keys and confirmed that he in fact searched for such gaps.[101]   His search resulted in one deletion, which was the result of him testing a new software feature that involved clocking in a "test" record and subsequently deleting the clock in so SRLV's records would be consistent with reality.[102]

---

[93] Garnica Depo., at 20.
[94] Garnica Depo., at 20, 29-30.
[95] Garnica Depo., at 30-31.
[96] Garnica Depo., at 15.
[97] Garnica Depo., at 15.
[98] Garnica Depo., at 31.
[99] Garnica Depo., at 33.
[100] For example, see Garnica Depo., at 33-35.
[101] Garnica Depo., at 31.   Garnica also confirmed that the use of any "journal sales removal software" (programs used to delete multiple sales from POS systems to show less revenue for improper purposes) would be detected in his database audit as its use would also result in primary key gaps. *Id.,* at 40-41.
[102] Garnica Depo., at 31-32, 39; Kalfas Depo., at 36-37.

Garnica testified that the only other way the ClubTrax database could be manipulated would be by changing the clock-in date and time for large batches of records.[103]   For example, a programmer could change every 2007 to 2004 – so that a 12/1/2007 entry would appear to be outside of the Class Period and related query.[104] Garnica noted that such a modification would be detectable because the various clock-in date and times would not ascend in sync with the primary keys.[105]   Garnica conducted a custom query to search for such modifications, and found several out-of-sync records.[106] Excluding the inconsistencies caused by daylight savings time (i.e., a clock in at 1:59 a.m., following by a clock-in at 1:01 a.m.), the remaining records were never out-of-sync by more than 5 minutes.[107]   Said remaining records are fully attributable to individual terminal computer clocks becoming out of sync with the ClubTrax server between time re-syncs.[108]   As a result, Garnica confirmed that no tampering with the dates and times in the clock-in records had occurred.[109]

## E.    The Resulting Nevada Subclass Spreadsheet Is Accurate

The final spreadsheet produced by Gig's custom query from the ClubTrax database and then provided to Defendants has been confirmed to be as accurate as the database itself.  The database, in turn, is as accurate as the real-world events that result in additions to its record.[110]   De La Paz's testimony confirms that SRLV's policies and procedures resulted in every class member being clocked in using ClubTrax during the Settlement Class Period.   In sum, the final spreadsheet is extremely accurate.

---

[103] Garnica Depo., at 30.
[104] Garnica Depo., at 35.
[105] Garnica Depo., at 35.
[106] Garnica Depo., at 36.
[107] Garnica Depo., at 37.
[108] Garnica Depo., at 37.
[109] Garnica Depo., at 37.
[110] Garnica Depo., at 47.

**F.     The Non-Nevada Nightclubs Confirmed The Original Class Member/Shift List Was Complete and Supplemented Its Database With Its Paper Records**

Juan Rivera, a SR Consulting systems analyst, has worked with the Aloha point-of-sale software for 15 years.[111]   Rivera confirmed that SR Consulting has access to every SR nightclub's Aloha system for dancers but not SRLV's ClubTrax system for dancers.[112]   Aloha records every shift an exotic dancer works at all of the non-Nevada nightclubs.[113]   Radiant Systems, the developer of Aloha, provided Rivera with a spreadsheet of every class member's clock-in for each of the 16 non-Nevada nightclubs, which were then condensed into a list of class members and their total number of shifts.[114]   Rivera audited this data multiple times to confirm its accuracy and the spreadsheet passed each inspection without any inconsistencies.[115] Lastly, Rivera confirmed that the non-Nevada class member lists and shift counts provided to the Settlement Administrator in April 2011 after preliminary approval were accurate.[116] An additional audit conducted by Rivera confirmed that the Aloha search parameters matched the relevant class periods without error.[117]

In an effort to locate additional contact information (other than what is stored in its Aloha database) for non-Nevada class members whose noticed was returned RUM (undeliverable without a forwarding address), SR Consulting cross-referenced all the affected class member's names with two sets of non-database files.[118]   First, SR Consulting reviewed its document imaging software, which contains thousands

---

[111] Rivera Depo., at 9.
[112] Rivera Depo., at 14, 21.
[113] Rivera Depo., at 21, 25.
[114] Rivera Depo., at 33-34.
[115] Rivera Depo., at 39-40.
[116] Rivera Depo., at 45, 56.
[117] Rivera Depo., at 51-55.
[118] Hernandez Depo., at 35.

of "modified I-9" forms.[119]   If corrected, updated, or additional information was contained in the I-9, SR Consulting updated the spreadsheet to reflect that information.[120]  Next, SR Consulting searched its paper files for the lease agreement completed by each remaining class member.[121]  The spreadsheet was then updated in similar fashion.  In sum, SR Consulting's accounting staff reviewed approximately 12,202 sources of information, a process that took six full time employees five weeks to complete.[122]  Hernandez estimates that SR Consulting possessed modified I-9s or lease agreements for approximately 98-99 percent of non-Nevada class members.[123]

## G.   The Settlement Administrator Updated and Supplemented Defendants' Records With Commercial Databases

The Settlement Administrator, Gilardi & Co. ("Gilardi"), assumed custody of the new Nevada spreadsheet and updated non-Nevada spreadsheet and began the process of preparing the lists for mailing.  After SRLV and SR Consulting prepared, supplemented, updated, and audited the spreadsheets, Gilardi further supplemented the spreadsheets using various methods. First, Gilardi supplemented the spreadsheets using the U.S. Postal Service's NCOA (National Change of Address) database.   In addition, Gilardi supplemented the spreadsheets by purchasing additional mailing addresses from LexisNexis' Accurint service and the databases it maintains.[124]

In short, the foregoing demonstrates that upon learning of the inadvertent error omitting certain Nevada subclass member's names and shifts from the settlement

---

[119] SR Consulting created the modified I-9 to comply with immigration laws but does not concede that exotic dancers are not independent contractors (I-9s are used for employees only).   SR Consulting's modified form requests the same information as the government-issued original. Hernandez Depo., at 24-26.
[120] Hernandez Depo., at 33.
[121] Hernandez Depo., at 34.
[122] Hernandez Depo., at 42, 98.
[123] Hernandez Depo., at 36.
[124] Accurint contains over 34 billion records assembled from over 10,000 data sources (vendor billing files, periodical subscriptions, voter registrations, etc.)  (http://www.accurint.com).

data, the parties worked diligently to correct the error, to identify all class members so they could receive notice and to confirm the accuracy of the entire project.   While the project took some time to complete, the procedures described above show that the parties worked as fast as possible to confirm all necessary facts and to ensure the integrity of the process.

## V.    OVERVIEW OF CLASS MEMBER AND SHIFT UNDERREPORTING

Based upon the parties' investigation and confirmatory discovery, it has been determined that 8,292 class members worked 630,448 shifts in Nevada during the Class Period.   Originally, Defendants reported that 4,893 class members worked 211,557 shifts.    Due to the structure and design of the settlement agreement, the number of class members does not affect its allocation, as the benefits are conferred on a per-shift basis.  As such, the Nevada subclasses' Net Settlement Amount needed to be increased by 298% (630,448 / 211,557) in order to preserve the previously calculated benefit of $7.09 per shift.   Upon learning of the error in Defendants' previous reports on August 28, 2011 Class Counsel demanded and secured a proportional increase in the Gross Settlement Amount to ensure that there was no dilution of any Settlement Class Members' settlement benefits.

## VI.    THE THIRD AMENDMENT TO CLASS ACTION SETTLEMENT PRESERVES THE CONSISTENCY OF THE SETTLEMENT

The original settlement allocated the benefits to each subclass based upon set percentages as of 70/20/10, reflecting each subclasses' relative strengths and share of the overall damages:[125]

---

[125] Third Amendment, at 1-2.

| DISTRIBUTION OF SETTLEMENT BENEFITS - ORIGINAL | | | | |
|---|---|---|---|---|
| Settlement Subclass | Subclass % | Net Settlement | Total Number of Shifts | Distribution Per Shift |
| California | 70% | $5,250,000 | 490,777 | $10.70 |
| Nevada | 20% | $1,500,000 | 211,557 | $7.09 |
| Florida, Idaho, Kentucky and Texas | 10% | $750,000 | 185,068 | $4.04 |
| Total | 100% | $7,500,000 | 888,068 | |

To account for the underreporting of Nevada class members, but also keep the remainder of the settlement intact, the parties multiplied the previous per-shift amount ($7.09) by the correct number of Nevada shifts (630,448), which equals $4,470,000.[126]   The new figure is 2.98 times greater than the previous allocation of $1,500,000, which mirrors the increased number of shifts (211,557 X 2.98 = 630,448).  The following table reflects the changes for Nevada subclass and confirms that the distributions to individual class members remain identical on a per-shift basis:

| DISTRIBUTION OF SETTLEMENT BENEFITS NEVADA SUBCLASS COMPARISON | | | | |
|---|---|---|---|---|
| | Total Class Members | Net Settlement | Total Shifts | Distribution Per Shift |
| Corrected | 8,292 | $4,470,000 | 630,448 | $7.09 |
| Original | 4,893 | $1,500,000 | 211,557 | $7.09 |
| Difference | 3,610 | + $2,970,000 (298%) | + 418,891 (298%) | $0.00 |

The parties then added the increased Nevada net settlement amount to the other subclasses, which did not change.   The overall Net Settlement Amount increased from the original $7,500,000 to $10,470,000.   Again, the difference of $2,970,000 can be traced from the previous table.  The result is that each subclasses' share of the overall Net Settlement Amount shifted (Nevada's share increased from

---

[126] Third Amendment, at ¶ E.

20% to 42.69%).[127]   Notably, the individual class members' per-shift amounts for each subclass remain identical to the original settlement.[128]   The following table reflects how the Third Amendment affects the distribution of settlement proceeds to the subclasses and to their respective class members on a per-shift basis (differences are noted in bold):

| DISTRIBUTION OF SETTLEMENT BENEFITS – THIRD AMENDMENT | | | | |
|---|---|---|---|---|
| Settlement Subclass | Subclass % | Net Settlement | Total Number of Shifts | Distribution Per Shift |
| California | **50.14%** | $5,250,000 | 490,777 | $10.70 |
| Nevada | **42.69%** | **$4,470,000** | **630,448** | $7.09 |
| Florida, Idaho, Kentucky, and Texas | **7.16%** | $750,000 | 185,068 | $4.04 |
| Total | 100.00% | $10,470,000 | 1,306,959 | |
| Original | 100.00% | $7,500,000 | 888,068 | |
| Difference | | + $2,970,000 | + 418,891 | |

To confirm that the Third Amendment's reallocation of the Net Settlement Amount does not fundamentally alter the fairness of the settlement, Plaintiffs have compared the new allocations with each subclass's potential damages.   In the interests of brevity, Plaintiffs incorporate the "blended minimum wage" ("BMW") discussion from pages 3 – 10 of their supplemental approval brief filed in December 2010 (Doc. 192).   Using the blended minimum wages from the date the settlement was originally executed, Plaintiffs computed the potential unpaid minimum wages for each of the three subclasses using the corrected shift numbers.   As noted in the table below, the unpaid minimum wages closely mirrors the settlement allocations, with a minor premium to California subclass members.[129]

---

[127] Third Amendment, at ¶ P.

[128] Third Amendment, at ¶ E.

[129] As discussed in greater detail on page 4 of the supplemental approval brief (Doc. 192), Plaintiffs believe that California class members have stronger claims than the remaining class members due to its lack of a tip credit, Labor Code § 350(e), and the unavailability of any equitable offset defense

| COMPARISON OF UNPAID MINIMUM WAGES AND THIRD AMENDMENT DISTRIBUTION | | | | | |
|---|---|---|---|---|---|
| Settlement Subclass | No. of Shifts | BMW 5/22/10 | Unpaid Minimum Wages | Share of Unpaid Minimum Wages | Share of Net Settlement |
| California | 490,777 | $7.38 | $18,109,671 | 43.69% | 50.14% |
| Nevada | 630,448 | $6.57 | $20,710,217 | 49.97% | 42.69% |
| Florida, Idaho, Kentucky, and Texas | 185,068 | $2.84 | $2,627,966 | 6.34% | 7.16% |

Because the Third Amendment did not increase attorneys' fees, costs, and only slightly increased the administrative fees, the parties increased the Gross Settlement Amount from $10 million to $12.97 million to incorporate the increased Nevada allocation.[130]   Similarly, the parties proportionately increased the non-reversionary amount to preserve the original non-reversionary floor of 21% to $2,723,700.[131]   The following table confirms that the Gross Settlement Amount and Non-Reversionary Amount were appropriately adjusted to incorporate the Nevada-related changes:

| GROSS SETTLEMENT AMOUNT – AGGREGATE COMPARISON | | | |
|---|---|---|---|
| | Gross Settlement Amount | Non-Reversionary Percentage | Non-Reversionary Amount |
| Original | $10,000,000 | 21% | $2,100,000 |
| Amendment | $12,970,000 | 21% | $2,723,700 |
| Difference | + $2,970,000 | N/A | + $623,700 |

In sum, the Third Amendment increases the Nevada net settlement amount by $2.97 million, the overall settlement by $2.97 million, the non-reversionary amount by $623,700, and reallocates the distributions to the three subclasses.[132]   The Amendment's distributions to individual class members, however, are identical to the original settlement.   Under the original settlement, a class member who worked

---

[130] Third Amendment, at ¶ C, Q.
[131] Third Amendment, at ¶ F, R.
[132] Third Amendment, at ¶ C, F, R.

full time[133] in California would be entitled to $10,700.  Under the Third Amendment, the same class member would also be entitled to $10,700.  Under both the original and amended settlement, a full time Nevada class member would be entitled $7,090 and a full time Florida, Idaho, Kentucky, or Texas class member would be entitled to $4,040.  From the perspective of an individual class member, the settlement remains unchanged.

## VII.   THE PARTIES' PROPROSED SUPPLEMENTAL NOTICE WILL ADEQUATELY APPRISE ALL PREVIOUSLY UNIDENTIFIED CLASS MEMBERS OF THE SETTLEMENT

This is not the first case where class members have been inadvertently omitted from the initial mailing of a class settlement notice, requiring a supplemental notice period.  In *Iorio v. Allianz Life Insurance Company of North America*, Case No.: 05-cv-00633-JLS-CAB  (S.D.  Cal.  2010),  the  parties  informed  the  court  that approximately 184 class members were improperly omitted from prior class notice mailings due to an administrative error (Doc. 433).  The Court in *Iorio* approved the parties' stipulation to mail omitted class members a special notice and extend applicable deadlines relating to them only (Order dated July 1, 2010, Doc. 438).

Here, the parties similarly propose mailing an updated version of the long-form notice ("Second Class Notice Documents")[134] to all available addresses for all Nevada class members previously excluded from the mailing list provided to the Settlement Administrator, as well as the supplemental contact information for non-Nevada class members whose original notice was returned undeliverable (the "Second Class Notice Recipients").[135]   In addition, the parties propose sending

---

[133] For the purposes of both examples, "full time" means someone who worked 5 days per week and 50 weeks per year for four years during the 5 ¾ year Class Period, which equals 1,000 shifts.
[134] True and correct copies of the Second Class Notice Documents are attached as Exhibit "G" to the Third Amendment.
[135] Third Amendment, at ¶ G.

supplemental notice to Settlement Class Members who previously submitted claims, providing a brief update as to the status of the Settlement.[136]

Defendants will bear the cost of having the Settlement Administrator update and refine the spreadsheets and mail supplemental notice, which has been estimated to cost $90,000.00 and this amount will be deducted from the Gross Settlement Amount.[137]

## VIII. CLASS MEMBERS WHO RECEIVED NOTICE AND DID NOT SUBMIT CLAIMS WILL NOT RECEIVE SUPPLEMENTAL NOTICE

In *Chavez v. Netflix, Inc.*, 162 Cal. App. 4th 43 (Cal. App. 1st Dist. 2008), the California Court of Appeals noted that when changes improve a settlement, no notice of the improvements are required. *Id.*, at 56 (citing *In re Integra Realty Resources, Inc.*, 262 F.3d 1089, 1111 (10th Cir. 2001) (no notice required of change expanding rights of class members) and *Denney v. Deutsche Bank AG*, 443 F.3d 253, 271 (2d Cir. 2006) (an additional opt-out period is not required with every shift in the marginal attractiveness of the settlement)).

The Gross Settlement Amount has been increased to $12.97 million and the non-reversionary amount has been increased by $623,700. No changes have been made to the injunctive relief. On an individual class member basis, the per-shift payments are equal to the amount contained in the original class noticed mailed on May 4, 2011. As such, the Third Amendment represents an "improved" settlement.

As the overall relief provided by the Third Amendment has been increased and the individual benefits under the settlement agreement have not changed on a per-class member basis, the parties do not believe that the law requires, nor is it necessary, to mail any additional notice to class members who received the prior

---

[136] Third Amendment, at ¶ H. A true and correct copy of the additional notice is attached as Exhibit "H" to the Third Amendment.
[137] Third Amendment, at ¶ O.

notice on May 4, 2011.   Defendants, however, have agreed that the Settlement
Administrator shall post copies of the Second Class Notice Documents on the
Settlement Administrator's website within five days of the Court's approval, which
will remain online through the Effective Date.[138]   In accordance with the Court's
Preliminary Approval Order, the parties believe that the supplemental notice
procedures provided by the Third Amendment satisfies due process and the
requirements of Federal Rule of Civil Procedure 23(e)(1).[139]

## IX.    THE PARTIES' PROPOSED CLASS ACTION SCHEDULE

Pursuant to the terms of the Third Amendment, the parties propose that the
Court set the following scheduling order:

| Event | Deadline | Proposed Date |
|---|---|---|
| *File Motion For Approval of Amendment and Supplemental Notice* | | *(January 31, 2012)* |
| *Hearing On Motion For Approval* | | *(March 5, 2012* |
| *[Approval] of Motion For Approval* | | *(March 5, 2012)* |
| Settlement Administrator to Post Supplemental Internet Notice | 15 Days After Supplemental Notice Approved | March 10, 2012 |
| Settlement Administrator to Mail Second Class Notice and Additional Notice | 15 Days After Supplemental Notice Approved | March 20, 2012 |
| Deadline To File Supplemental Motion For Attorneys Fees | 60 Days Prior to Final Fairness Hearing | April 5, 2012 |
| Deadline for Class Counsel to File Settlement Administrator Declaration Re: Mailing of Supplemental Class Notice | 30 days prior to Final Fairness Hearing | May 5, 2012 |
| Deadline For Objectors To Withdraw Objections Or File Pleading In Support | 30 Days Prior To Final Fairness Hearing | May 5, 2012 |
| Deadline To File Motion For Final Approval | 28 Days Prior To Final Fairness Hearing | May 7, 2012 |
| Deadline to File Motion For Incentive Awards | 28 Days Prior to Final Fairness Hearing | May 7, 2012 |
| Deadline for submission of opt-out requests by Second Class Notice Recipients | 60 Days After Supplemental Notice to Class | May 19, 2012 |

---

[138] Third Amendment, at ¶ I.
[139] Order (Doc. 203), at 45.

| Event | Deadline | Proposed Date |
|---|---|---|
| Deadline for objections by Second Class Notice Recipients | 60 Days After Supplemental Notice to Class | May 19, 2012 |
| Deadline For Submission Of Claims Forms by Second Class Notice Recipients | 60 Days After Supplemental Notice to Class | May 19, 2012 |
| Deadline to File Brief Responding to Objections by Second Class Notice Recipients | 5 days prior to Final Fairness Hearing | May 30, 2012 |
| Final Fairness Hearing | 90 Days After Supplemental Notice Approved | June 4, 2012 |

## X.    CONCLUSION

In the judgment of Plaintiffs and Class Counsel the proposed Third Amendment to the Settlement Agreement represents a fair, reasonable, and adequate resolution of the issue pertaining to the inadvertent underreporting of the Nevada Settlement Class Members and shifts.  The remainder of the Settlement remains fair, adequate and reasonable for the reasons set forth in Plaintiffs' previous motions for both preliminary and final approval of the settlement (Doc.159, 244), which for the sake of brevity are fully incorporated by reference herein.  Accordingly, Plaintiffs respectfully requests that the Court: (1) approve the proposed Third Amendment; (2) appoint Gilardi & Co. to mail the supplemental notice to relevant class members; and (3) enter a class action scheduling order governing the remainder of this action through Final Approval.

RIDOUT & LYON, LLP

Dated:  January 31, 2012      By:     /s/ Christopher P. Ridout
                                       Christopher P. Ridout, CA Bar No. 143931
                                       Caleb LH Marker, CA Bar No. 269721
                                       555 E. Ocean Boulevard, Suite 500
                                       Long Beach, CA  90802
                                       (562) 216-7380 Telephone
                                       (562) 216-7385 Facsimile

                                       Hart L. Robinovitch, AZ Bar No. 020910
                                       ZIMMERMAN REED, P.L.L.P.
                                       14646 N. Kierland Blvd., Suite 145
                                       Scottsdale, Arizona 85254
                                       (480) 348-6400
                                       (480) 348-6415 Facsimile
                                       (Admitted Pro Hac Vice)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Stephen M. Harris, CA Bar No. 110626
KNAPP, PETERSEN & CLARKE
550 North Brand Blvd., Suite 1500
Glendale, CA  91203-1922
(818) 547-5000
(818) 547-5329 Facsimile

Robert L. Starr, CA Bar No. 183052
LAW OFFICES OF ROBERT L. STARR
23277 Ventura Blvd.
Woodland Hills, CA 91364-1002
(818) 225-9040
(818) 225-9042 Facsimile

**Attorneys for Plaintiffs and the Class**