# EXHIBIT B

Page 1

```
 1                  UNITED STATES DISTRICT COURT
 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
    TRACY DAWN TRAUTH, CHRISTEEN   )
 4  RIVERA, JENNIFER BLAIR,        )
    VICTORIA OMLOR, JASMINE        )
 5  WRIGHT, ANICIA VINTIMILLA,     )
    MARSHA ELLINGTON, SELENA       )
 6  DENISE PELAEZ, NICOLE GARCIA,  )
    REAH NAVARRO, and TAMI         )
 7  SANCHEZ, individually, and on  )
    behalf of all others           )
 8  similarly situated,            )
                                   )
 9                 Plaintiffs,     )
                                   )
10           vs.                   ) Case No.
                                   ) EDCV09-1316VAP
11  SPEARMINT RHINO COMPANIES      ) (DTBx)
    WORLDWIDE, INC., SPEARMINT     )
12  RHINO CONSULTING WORLDWIDE,    )
    INC., THE OXNARD HOSPITALITY   )
13  SERVICES, LP, CITY OF INDUSTRY )
    HOSPITALITY VENTURE, INC.,     )
14  DOWNTOWN LA CLUB VENTURE,      )
    INC., FARMDALE HOSPITALITY     )
15  SERVICES, INC., HIGH           )
    EXPECTATIONS HOSPITALITY, LLC, )
16  INLAND RESTAURANT VENTURE I,   )
    INC., K-KEL, INC., KENTUCKY    )
17  HOSPITALITY VENTURE, LLC, LCM, )
    LLC, MIDNIGHT SUN ENTERPRISES, )
18  INC., OLYMPIC AVENUE VENTURE,  )
    INC., RIALTO POCKETS, INC.,    )
19  ROUGE GENTLEMEN'S CLUB, INC.,  )
20             DEPOSITION OF SHARON ROSEN
21          Taken on Monday, December 19, 2011
22
23      At 3763 Howard Hughes Parkway, Suite 300
24                 Las Vegas, Nevada
25  Reported by:  Katherine M. Silva, CCR #203
```

1          You understand the difference between

2    an estimate and a guess?

3          A.    Uh-huh, yes.

4          MR. COHON:  Don't be offended if we ask

5    you to verbalize a response, it's just human

6    nature to go uh-huh, unt-uh so --

7          Q.    (BY MR. MARKER)  Okay.  Where do you

8    currently work?

9          A.    Spearmint Rhino.

10         Q.    At a particular club?

11         A.    Las Vegas.

12         Q.    Okay.  And where is that club located,

13   what is the address?

14         A.    3340 South Highland Drive.

15         Q.    In Las Vegas, Nevada?

16         A.    Las Vegas, Nevada 89109.

17         Q.    Okay.  Do you know the name of the

18   business entity that owns that nightclub?

19         A.    Yes.

20         Q.    And what is that?

21         A.    K Kel, Inc.

22         Q.    Okay.  What is your position at -- and

23   if I refer to the club or nightclub, the

24   Spearmint Rhino, anything like that, I'll be

25   referring to K Kel, Inc. and the Las Vegas

1    Q.    I'm sorry?

2    A.    He was an optometrist.

3    Q.    Okay.   Other than Spearmint Rhino have

4    you ever worked for any other adult nightclub?

5    A.    No.

6    Q.    Okay.   What is your educational

7    background?

8    A.    High school.

9    Q.    Okay.

10    A.    And Suffolk Community College, two

11    years, Associate's degree.

12    Q.    In what major?

13    A.    Just general studies.

14    Q.    Okay.   How did you learn bookkeeping,

15    just on-the-job training?

16    A.    On-the-job training.

17    Q.    Okay.   And you've been a bookkeeper for

18    nearly 20 years, correct?

19    A.    If not more.

20    Q.    Okay.   And the entire time you've been

21    at Spearmint Rhino from March 2008 to the present

22    you've been the office manager?

23    A.    Yes.

24    Q.    Who do you report to?

25    A.    All the managers.

1          A.    SCOPE.

2          Q.    And SCOPE is the internal background

3     check?

4          A.    Yes.

5          Q.    Okay.  What else is in new-hire packet?

6          A.    New dancer checkoff list.

7          Q.    Are there copies of government I.D. or

8     sheriff's cards?

9          A.    Yes.

10         Q.    Anything else?

11         A.    No.

12         Q.    Who was the bookkeeper before you at

13    the Spearmint Rhino in Las Vegas?

14         A.    No clue.

15         Q.    Okay.  You don't know who your

16    predecessor was?

17         A.    No.

18         Q.    Do you know who is responsible for --

19              And actually when you said employment

20    packets are you responsible for preparing those

21    packets or filing those packets or processing the

22    packets?  What is your involvement?

23         A.    Are we talking employees or

24    entertainers?

25         Q.    Entertainers.

1        A.    No.

2        Q.    Do you have any direct interaction with

3    exotic dancers at Spearmint Rhino Las Vegas?

4        A.    No.

5        Q.    You don't -- you simply interface with

6    the managers?

7        A.    Once in a while they'll ask for an

8    employment verification.

9        Q.    Okay.

10       A.    Which obviously they are not employees,

11   we have a letter that states that they are

12   independent contractor and we can't validate

13   anything else besides the start date.

14       Q.    Okay.  And that would be for any

15   reason, maybe a new apartment or something like

16   that?

17       A.    Exactly.

18       Q.    Okay.  Do you have any other

19   interactions with exotic dancers as office

20   manager?

21       A.    No.

22       Q.    It's my understanding that the managers

23   and the back-door hosts are responsible for

24   interfacing with new exotic dancer applicants,

25   new hires and that the exotic dancer prepares

1   make the dancer inactive I normally walk it back

2   myself.

3       Q.   Okay.  If there's a problem where

4   something is not signed and you give it to the

5   manager and they give it to the door host, does

6   the door host hang onto it or just mark it into

7   the Club Trax software?

8       A.   I believe it's just marked into the

9   Club Trax software.

10       Q.   And the original files are returned to

11   you?

12       A.   Yes.

13       Q.   Okay.  How do you process the Sheriff's

14   card, what is that process like?

15       A.   Process the Sheriff's card?

16       Q.   I believe you said you send something

17   to the Sheriff department?

18       A.   Right.  In the new dancer hire packet

19   there's a sheet from the fingerprint bureau that

20   I sign after I look at it to make sure all the

21   information on it that's required such as name,

22   Sheriff's card number, date of hire basically it

23   says, their address and then I sign off.

24       Q.   Okay.  And then you send that to --

25           By fingerprint bureau you mean the

1     fingerprint bureau --

2          A.    At Las Vegas Metropolitan Department.

3          Q.    If you can wait until I finish.

4          A.    Sorry.

5          Q.    So the fingerprint bureau you mean the

6     fingerprint at the Las Vegas Metropolitan Police

7     Department?

8          A.    Yes.

9          Q.    And so if that form is filled out

10    correctly you would send that form to the

11    Las Vegas Metro PD, correct?

12         A.    Yes.

13         Q.    Do they return anything to you or not?

14         A.    No.

15         Q.    Okay.  Do you have access to Club Trax?

16         A.    Yes.

17         Q.    Okay.  Do you ever verify the

18    information in the packet with the information in

19    the Club Trax?

20              MR. GARRELL:  Well, I'll object, it's

21    overbroad and as part of her usual job duties or

22    part of this project?

23         Q.    (BY MR. MARKER)  I'm sorry.

24              Do you have a policy upon receiving a

25    new-hire packet in the course of your job to

1    verify the information that has been input into

2    Club Trax with the information that's contained

3    in the paper file?

4        A.   No.

5        Q.   Okay.  And it's your understanding that

6    the information -- let me strike that.

7             Is it your understanding that once a

8    dancer completes the paper new-hire packet that

9    the back-door host inputs some of that

10   information including name, stage name, Sheriff's

11   card I.D. number, Sheriff's card expiration date

12   and address information into Club Trax?

13       A.   Yes.

14       Q.   Okay.  And that's done at the same time

15   that a new dancer is hired?

16       A.   I believe so.

17       Q.   Okay.

18            MR. COHON:  Can I just ask one question

19   in this logical point here?  Do you input any of

20   the data from --

21            THE WITNESS:  No.

22            MR. COHON:  Let me just finish the

23   question.  I know you know the answer to the

24   question before I finish it.

25            THE WITNESS:  Sorry, I'm jumping ahead.

1          MR. COHON:  Do you input any of the

2     data from the new dancer packets?

3          THE WITNESS:  No.

4          MR. COHON:  Okay.  I'm sorry.

5     Q.   (BY MR. MARKER)  Once everything has

6     been done in terms of sending change of

7     employment information to the fingerprint bureau,

8     making sure everything has been signed, I's

9     dotted, T's crossed, what do you do with the

10    paper file?

11    A.   I then file it in the garage

12    alphabetically.

13    Q.   Do you scan or image them in any way?

14    A.   No.

15    Q.   Do you keep it in the same file folder

16    within which you received the file in your in

17    box?

18    A.   Yes.

19    Q.   Do you have a label or anything to the

20    file folder?

21    A.   No.

22    Q.   What is written on the tab of the

23    folder?

24    A.   The dancer's legal name and sometimes

25    the stage name.

1     Q.    Okay.  And that's it?

2     A.    That's it.

3     Q.    No Club Trax I.D. number or Sheriff's

4  card I.D. number?

5     A.    Unt-uh.

6           MR. GARRELL:  Is that no?

7           THE WITNESS:  No.

8     Q.    (BY MR. MARKER)  And where are they

9  filed again?

10     A.    In the garage in the cage.

11     Q.    And in the cage is a fenced-in area

12  within the vehicular garage at the Spearmint

13  Rhino Las Vegas, correct?

14     A.    Yes.

15     Q.    Okay.  There are a number of file

16  cabinets I assume in the cage?

17     A.    Yes.

18     Q.    Do you know approximately how many?

19     A.    Twenty-six, 28.

20     Q.    Four drawers deep or high?

21     A.    Four.

22     Q.    Okay.  Range A to Z by last name?

23     A.    Yes.

24     Q.    So if you wanted to find a file for

25  Jane Doe, you would go to the D cabinet and look

1   Q.   Okay.  And are these loose leafs

2   maintained in the cage as well?

3   A.   No, they are in the office.

4   Q.   Okay.  How many loose leafs are there?

5   A.   Four.

6   Q.   Okay.  And that loose leaf doesn't

7   contain any applications or leases, it just

8   contains supplemental information, correct?

9   A.   Correct.

10   Q.   Okay.  Did you devise this file system?

11   A.   Yes.

12   Q.   Was the cage there when you began your

13   employment at Spearmint Rhino?

14   A.   Somewhat.

15   Q.   Okay.  Were there file cabinets in the

16   cage when you began?

17   A.   Yes.

18   Q.   Okay.  And what type of --

19        Were dancer files maintained in that

20   cage when you started your employment?

21   A.   Somewhat.

22   Q.   Okay.  What is your opinion as to the

23   quality of the paper file system before you began

24   your employment at Spearmint Rhino?

25   A.   Disaster.

1       Q.    Could you elaborate?

2       A.    It was just in boxes in the cage not

3    alphabetized, no order, just thrown in boxes.

4       Q.    Just kind of as they came?

5       A.    As it was probably filled up a box, a

6    box was brought into the cage.

7       Q.    How many boxes were there?

8       A.    Fifty to 75.

9       Q.    Okay.  And bankers boxes?

10      A.    Yes.

11      Q.    Did you take it upon yourself to create

12   this new filing system or were you instructed to

13   do so?

14      A.    I was instructed.

15      Q.    By whom?

16      A.    Kekou.

17      MR. GARRELL:  Actually just for clarity

18   I've seen the boxes, when you say bankers box, I

19   know you and I and Jeff think of bankers boxes

20   are one thing.  What I saw were not bankers

21   boxes, they were actually much larger so you may

22   want to ask her that.

23      THE WITNESS:  Some of them were by

24   18-by-18 boxes, they were all different sizes.

25      Q.    (BY MR. MARKER)  Okay.  Just a variety

Page 24

1    of cardboard boxes?

2         A.    Absolutely.

3         Q.    Okay.  By Kekou do you mean Kevin

4    Kelly?

5         A.    No.

6         Q.    Who is Kekou?

7         A.    He is the director of operations, Kekou

8    Rosehill.

9              MR. GARRELL:  K-e-k-o-u.

10        Q.    (BY MR. MARKER)  What were your

11   instructions as it related to creating a new file

12   system for the Spearmint Rhino Las Vegas?

13        A.    To put in alphabetical order where it

14   would be easy for anybody to access.

15        Q.    All right.  How long did that take you

16   to accomplish that?

17        A.    Over a year.

18        Q.    Okay.  During the --

19              Did this process involve setting up a

20   row of file cabinets, pulling a file and then

21   putting it in the right place?

22        A.    Can you repeat that?

23        Q.    How did you accomplish your task of the

24   file system, can you walk me through it?

25        A.    Nothing was in order so As, Bs, Cs, I

1    completeness of the paper when you began your

2    employment at Spearmint Rhino?

3        A.   Can you rephrase that?

4        Q.   By completeness I mean do you have an

5    opinion as to the percentage of dancers that

6    actually had a paper file at Spearmint Rhino?

7        A.   I probably had no clue.

8        Q.   Okay.

9        A.   When I first started.

10       Q.   Did you check off the files against the

11   list of dancers or anything like that?

12       A.   No.

13       Q.   Okay.  And then the new-hire packet was

14   already in existence when you began your

15   employment in March 2008, correct?

16       A.   Yes.

17       Q.   Do you have any understanding as to how

18   long a new-hire packet or some form of the

19   new-hire packet had been in use?

20       A.   No.

21       Q.   Do you have an understanding based on

22   your review of files as to whether or not the

23   new-hire packets existed in July 2006?

24       A.   I don't think it did.

25       Q.   In July 2006 do you have an

1   understanding as to whether or not dancers were

2   required to complete a new-hire packet?

3             MR. GARRELL:  To the extent you know.

4             THE WITNESS:  I want to say yes.

5        Q.   (BY MR. MARKER)  Okay.  Since you began

6   your employment has every dancer -- every new

7   dancer completed a new-hire packet?

8        A.   Yes.

9        Q.   And every new-hire packet has been

10  provided to you?

11       A.   Yes.

12       Q.   And every new-hire packet you received

13  you then filed in the cage?

14       A.   Yes.

15       Q.   Okay.  So it's your opinion that for

16  any woman who has performed as an exotic dancer

17  at the Spearmint Rhino Nightclub since -- strike

18  that.

19             Is it your opinion that every new

20  dancer who has started after March 2008 has a

21  paper file at the Spearmint Rhino in Las Vegas?

22       A.   Yes.

23       Q.   Okay.  To the best of your knowledge do

24  any current dancers at the Spearmint Rhino

25  Nightclub not have a paper file?

Page 33

1          A.     Maybe I'm not understanding the

2    question.

3          Q.     In the past year were you asked to

4    create a list or a supplemental list of exotic

5    dancers at the Spearmint Rhino Nightclub in

6    connection with this case?

7          A.     For me to create a list, no.

8          Q.     Or a supplemental list?

9          A.     No.

10         Q.     Add anything to a list?

11               MR. GARRELL:   Spreadsheets.

12               THE WITNESS:   I thought he asked if I

13   created them.   The spreadsheets of all the

14   entertainers.

15         Q.     (BY MR. MARKER)   Okay.   What did you do

16   in connection with the spreadsheet of all the

17   entertainers, what was your role in that list?

18         A.     To fill in the blanks.

19         Q.     Do you have an understanding --

20         A.     As far as filling in the blanks with

21   the files, I directly did not do it.   We hired

22   Manpower because of the multitude of information

23   needed.   We had approximately about ten girls who

24   was pulling -- from the spreadsheet was pulling

25   every individual file and checking the

1    information.

2        Q.   Okay.  When did this process start?

3        A.   The end of August.

4        Q.   Okay.  Who instructed you to perform

5    these functions?

6             MR. GARRELL:  Object to the extent it's

7    attorney-client privilege but you can respond.

8             THE WITNESS:  I was told basically by

9    Charlie and our lawyer.

10       Q.   (BY MR. MARKER)  Okay.  Do you have an

11   understanding as to whether or not a list was

12   created prior to August 2011 of entertainers at

13   the Spearmint Rhino Nightclub in Las Vegas in

14   connection with this litigation?

15            MR. GARRELL:  Object, it falls outside

16   the scope of the testimony of this witness but

17   she may respond.

18            THE WITNESS:  No.

19       Q.   (BY MR. MARKER)  So August 2011 was the

20   first time that you were asked to have any

21   involvement with the list of entertainers for

22   this litigation, is that correct?

23       A.   Yes.

24       Q.   Okay.  What were your specific

25   instructions related to this list?

1    to?

2         A.   No.

3         Q.   Okay.  And you received this list

4    directly from Mr. Garrell?

5         A.   Yes.

6         Q.   You then forwarded it to Mr. De la Paz?

7         A.   Yes.

8         Q.   Okay.  He then made it so that you

9    could view it on your computer, is that correct?

10        A.   Correct.

11        Q.   He testified earlier today that he

12   deleted a column with e-mails and a column with

13   phone numbers on the list and changed the

14   margins, is that your understanding as well?

15        A.   Yes.

16        Q.   Okay.  He then, Mr. De la Paz, then

17   e-mailed this modified list back to you, is that

18   correct?

19        A.   Yes.

20        Q.   Okay.  And you received that list

21   sometime in August 2011?

22        A.   Yes.

23        Q.   By e-mail?

24        A.   Yes.

25        Q.   What did you do once you received that

1   list?

2        A.    I printed it out.

3        Q.    Okay.  Is it a big list, more than a

4   hundred pages or --

5        A.    It's more than a hundred pages.

6        Q.    Okay.  What did you do with that

7   printed list?

8        A.    That was the list that we used to cross

9   reference all the files in the cage.

10       Q.    Okay.  You printed the list on what?

11       A.    As I said, we had Manpower come in.

12       Q.    When did Manpower come in?

13       A.    I don't know if it was the end of

14   August or the beginning of September.

15       Q.    Okay.

16       A.    I instructed the girls to basically

17   pull -- we had to check every entertainer, the

18   spelling of their name, address, phone number if

19   we had, Social, driver's license and state to

20   make sure it was correct.

21       Q.    Did you check the Sheriff's card number

22   or the expiration date?

23       A.    No.

24       Q.    By --

25             You just stated that you requested that

1    the girls check the phone number.  It's my

2    understanding that the list Mr. De la Paz

3    provided you did not have that field anymore?

4         A.   I believe we still had it.  Maybe not.

5    I don't recall.

6         Q.   Okay.  And you began using these

7    temporary employees that you referred to as the

8    girls at the end of August or early September?

9         A.   Yes.

10        Q.   And what were the total number of

11   temporary employees?

12        A.   In the beginning I had probably about

13   ten to 12.

14        Q.   Okay.  How long did it take these

15   contract employees to perform this task?

16        A.   I want to say almost a month.

17        Q.   Did the ten to 12 contract employees

18   work full time?

19        A.   Yes.

20        Q.   Forty hours a week each?

21        A.   Forty hours a week each.

22        Q.   Okay.

23        A.   We did cut down as the lists were

24   getting smaller though.

25        Q.   At the end of this project how many

1    contract employees were working on the project?

2         A.    Three.

3         Q.    Okay.  Do you know what the cost was in

4    terms of hiring these contract employees to

5    perform this task?

6         A.    I believe it was $15 an hour.

7         Q.    Do you know what the total cost was for

8    all the employees for that month?

9         A.    Not off the top of my head, no.

10        Q.    Okay.  Who instructed these contract

11   employees on how to perform this task?

12        A.    I did.

13        Q.    Okay.  What type of instructions did

14   you provide to them?

15        A.    I gave them the list, I walked them

16   into the cage, I pulled the files, I showed them

17   which page I wanted the information pulled from.

18        Q.    Which page was that?

19        A.    The new-hire sheet.

20        Q.    Like an application?

21        A.    The application.

22        Q.    Okay.

23        A.    It's the page that goes to the

24   Sheriff's department.

25        Q.    Okay.  Do you know how they divided the

Page 44

1    work?

2         A.   Basically we were working against a

3    time limit so one girl would take As, one girl

4    would take Bs until those were completed and then

5    just keep going down the list.

6         Q.   Okay.  This spreadsheet or this list

7    that you provided in the printed form, was it

8    just a series of rows and columns?

9         A.   Yes.

10        Q.   Okay.  And it would contain the dancer

11   I.D. number, first name, middle name, last name,

12   street address, city, state, zip code, phone

13   number possibly, Social Security number, driver's

14   license number, I.D. number and the state in

15   which the I.D. was issued, is that correct?

16        A.   I don't believe the I.D. number was on

17   there.

18        Q.   Did it contain any other information?

19        A.   No.

20        Q.   Did it contain the total number of

21   shifts worked?

22        A.   No.

23        Q.   Okay.  All right.  Say there was an

24   issue with the accuracy of the list, that an

25   individual's last name was misspelled, what

1    procedure would a contract employee then follow

2    to rectify or correct the information?

3         A.    We were correcting it on the

4    spreadsheet and later on we were going to change

5    it in Club Trax.

6         Q.    By correcting it on the spreadsheet,

7    did they correct it by hand with a pen?

8         A.    With a pen, yes.

9         Q.    Okay.  Where did those corrected sheets

10   go?

11        A.    I have them all in the office.

12        Q.    Okay.  Did you then transcribe those

13   handwritten notes or modifications to the Excel

14   spreadsheet?

15        A.    Actually I didn't.  Two of the girls

16   from Manpower were changing it in Club Trax.

17        Q.    But not the spreadsheet?

18        A.    No.

19        Q.    Okay.  So the two girls that were

20   working on modifying the electronic data would

21   log into Club Trax, search for the particular

22   file or entry record, open that and then edit

23   that record on the computer, is that correct?

24        A.    Correct.

25        Q.    And then save it?

1      A.   And then save it.

2      Q.   Okay.  Was there any process to make

3  sure that all of the handwritten edits got into

4  Club Trax?

5      A.   We double checked a few but there was

6  such a numerous amount there was no way to check

7  them all.  Just every now and then we checked one

8  or two.

9      Q.   Selectively audited them?

10     A.   Right.

11     Q.   Okay.  Did you ever selectively audit

12  the list to make sure that, you know, they were

13  recording any kind of errors from the paper

14  files?

15     A.   No.

16     Q.   No?

17     A.   No.

18     Q.   So you never checked like a supposedly

19  correct entry with the relevant paper file to

20  make sure the contractor employees were --

21     A.   I'm sorry, yes, we did.

22     Q.   Okay.  How did you do that?

23     A.   We pulled -- I would pull a file and

24  check it against what Club Trax had.

25     Q.   Okay.  After the process had been

1    completed?

2          A.    After, right.

3          Q.    How many times did you do that?

4          A.    Maybe a dozen.

5          Q.    Okay.  Did you find any errors?

6          A.    No.

7          Q.    Okay.  How many edits were there to the

8    list?

9          A.    I'm sorry?

10         Q.    How many edits were there to the list,

11   thousands?

12         A.    Thousands.

13         Q.    Okay.  Did you ever run into the

14   situation where you had a paper file but there

15   was no relevant entry on the spreadsheet?

16         A.    Can you rephrase that?

17         Q.    Did you ever have a situation where

18   there was a file but there was no entry on the

19   spreadsheet?

20         A.    No.

21         Q.    Okay.  And would it be possible to know

22   that -- let me strike that.

23               Did anyone ever go through the actual

24   paper files in the cabinets to make sure there

25   was an entry for every single file on the

1    predated what's on the spreadsheet.

2         Q.   (BY MR. MARKER)   Okay.  I understand.

3              But that was never done, correct?

4    There was never a check to make sure there wasn't

5    a paper file that existed without a relevant

6    electronic entry, is that correct?

7         A.   Correct.

8         Q.   Okay.  Did you have instances where

9    there were records on the spreadsheet that did

10   not have a corresponding paper file?

11        A.   Yes.

12        Q.   How many times did that occur?

13        A.   I don't know the exact number.

14        Q.   Can you give me an estimate?

15        A.   No.

16        Q.   More than a hundred?

17        A.   Possibility.

18        Q.   More than a thousand?

19        A.   No.

20        Q.   Okay.  Was that lack of a paper file

21   noted on the spreadsheet in any way?

22        A.   Yes.

23        Q.   What then happened with that notation?

24        A.   We just put no file.

25        Q.   Was that entered into the notes in Club

1           MR. COHON:  Again for a second time --

2           MR. GARRELL:  He's the computer guy and

3    I didn't think he understood what I was saying.

4           MR. MARKER:  We'll have to address that

5    with the programmer.

6           MR. GARRELL:  Okay.

7        Q.  (BY MR. MARKER)  Did that end your

8    involvement in this list maintenance process, let

9    me call it that?

10       A.  I'm sorry?

11       Q.  Did this month long paper file search

12   end your involvement in this process of creating

13   this list?

14       A.  Yes.

15       Q.  And this process was completed in early

16   October?

17       A.  Yes.

18       Q.  Okay.  Since October have you been

19   involved in updating and maintaining this list in

20   any way?

21       A.  No, until recently.

22       Q.  And what have you done recently?

23       A.  I received another spreadsheet to just

24   double check filling in anything that might be

25   missing.  We hired again two girls from Manpower

Page 53

1    to just double check and recheck.

2        Q.    When did you receive this other

3    spreadsheet?

4        A.    Last Wednesday -- Tuesday, I'm sorry,

5    Tuesday of last week.

6        Q.    Do you know what the date was?

7        MR. COHON:  13th, 13 would be Tuesday

8    so last Tuesday?

9        THE WITNESS:  Right.

10       MR. COHON:  December 13th, 2011,

11   correct?

12       THE WITNESS:  Correct.

13       MR. COHON:  Okay.

14       Q.    (BY MR. MARKER)  So from early October

15   through December 13th, you had no involvement

16   with maintaining or updating or correcting this

17   list in any way, correct?

18       A.    Correct.

19       Q.    Okay.  Have you ever spoken to

20   Mr. Kyriacos?

21       A.    Once or twice.

22       Q.    In the last six months?

23       A.    Yes.

24       Q.    What did you talk about?

25       A.    We got a new laptop and I needed Club

1    number of names that remained on the list?

2         A.    As far as --

3         Q.    I'm sorry, that wasn't clear.  Strike

4    that.

5              This list you received, was it a list

6    of -- the entire list of all dancers or just the

7    list of dancers for which additional information

8    was required?

9         A.    All the dancers.

10        Q.    Okay.  Did you remove the surplus

11   dancers for which a complete record was

12   available?

13        A.    No.

14        Q.    Okay.  So you just had again this

15   lengthy list with holes throughout?

16        A.    Correct.

17        Q.    Okay.  Once Sean modified the

18   spreadsheet, what did you then do?

19        A.    Chong.

20        Q.    I'm sorry, who was the manager on duty?

21        A.    Chong, C-h-o-n-g.

22        Q.    Chong, I'm sorry.

23        A.    That's okay.

24        Q.    Once Chong modified the spreadsheet

25   what did you then do with the spreadsheet?

1        A.    I glanced at it, realized I couldn't do

2   it myself, spoke to Mr. Kelly who is the owner

3   and asked him if I could bring in Manpower people

4   again.

5        Q.    What was his response?

6        A.    Yes.

7        Q.    Okay.  Why did you determine you

8   couldn't do the project yourself?

9        A.    Because there was a short time frame.

10       Q.    What was the time frame?

11       A.    A few days.

12       Q.    Okay.

13       A.    Three days before I got it.

14       Q.    Did you have an estimate of the total

15  number of files that would need to be pulled to

16  complete that task?

17       A.    I just knew it was going to be a lot.

18       Q.    What do you mean by a lot?

19       A.    More than I could do by myself.

20       Q.    More than a hundred?

21       A.    Yes.

22       Q.    More than 500?

23       A.    Possibly around 500, if not more.

24       Q.    Okay.  How many people from Manpower

25  did you hire?

1     A.    I started with one, now I have two.

2     Q.    Okay.  What have those one and two

3  individuals been doing?

4     A.    They've been going through the

5  spreadsheet and where there's a blank they are re

6  looking for the files to see if we have the

7  necessary information.  If we do, again we are

8  writing it on a piece of paper and submitting it

9  to Peter, Mr. Garrell.

10    Q.    What have been the results of this

11 task?  Have you located additional files?

12    A.    A few.

13    Q.    How many, do you know?

14    A.    No, I don't know.

15    Q.    Less than a hundred?

16    A.    I really didn't look at it yet to

17 determine any amount.

18    Q.    Okay.  Once --

19          If they do locate a file for a record

20 with missing information, do they pull the entire

21 file or write the information down?

22    A.    Well, obviously they are pulling the

23 file that needs the information, they are writing

24 it down on a separate piece of paper.  The names

25 are numerically so we are putting down number and

1    what needs to be changed.

2        Q.   Okay.  And then this information is it

3    going into Club Trax again or is it just being

4    forwarded to Mr. Garrell or to someone else?

5        A.   It's just being forwarded to

6    Mr. Garrell.  I wasn't told to change anything.

7        Q.   Okay.  And the one or two contract

8    employees they are giving this information to you

9    and then you are forwarding it to Mr. Garrell?

10       A.   Correct.

11       Q.   Okay.  So throughout this process

12   there's been the electronic spreadsheet and then

13   the pulling of paper files.  Whenever there's an

14   issue that the corrected or updated information

15   is written down by hand on a piece of paper and

16   then updated into Club Trax, correct?

17       A.   Correct.

18       Q.   So there is a slight possibility that a

19   person transposing, you know, a street address or

20   something like that may write down the incorrect

21   number on a piece of paper, is that correct?

22       A.   That's correct.

23       Q.   And there's also a slight possibility

24   that a person taking information from the piece

25   of paper and putting it into Club Trax may also,

1   Nightclub in Las Vegas during a specific period

2   of time in which I'll tell you was July 13, 2006

3   through April 4th, 2011?

4        A.   Yes.

5        Q.   Okay.  Now, the spreadsheet that you

6   just received from Mr. Garrell in December, do

7   you have an understanding as to how many rows

8   were in that spreadsheet?

9        A.   Over 8,000.

10            MR. MARKER:  Let's go off the record

11   for a minute.

12                 (Discussion off the record.)

13        Q.   (BY MR. MARKER)  Okay.  We can go back

14   on the record.

15            Did the spreadsheet you received from

16   Mr. Garrell in December look substantially

17   similar to the spreadsheet that you received from

18   Mr. De la Paz in the end of August?

19        A.   It was similar but more blanks

20   obviously were filled.

21        Q.   Sure.

22            Did it contain additional columns?

23        A.   Yes.

24        Q.   What columns were added?

25        A.   Oh, added, no, we didn't add anything.

1      Q.    Okay.  As the bookkeeper, is there any

2  way you could calculate a total number of shifts

3  a dancer at Spearmint Rhino Nightclub had worked?

4      A.    Only upon request.

5      Q.    How would you do that?

6      A.    You go into Club Trax into reports and

7  you would have to look at a payment history and

8  physically I believe count it.

9      Q.    There's no total shown?

10     A.    Not to my knowledge.

11     Q.    Okay.  Do you think --

12            To your knowledge is there a way that

13  Club Trax vendor can calculate those totals on

14  its own using special scripts or something like

15  that?

16     A.    I would think so.

17     Q.    Okay.  Is there any way other besides

18  using the Club Trax to determine the number of

19  shifts that an exotic dancer has worked at your

20  nightclub?

21     A.    No.

22     Q.    There's no paper sheets or sign-in

23  sheets or anything like that?

24     A.    First of all, it would be nothing that

25  I have anything to do with so I really can't even

1    answer that question.

2        Q.    Okay.  To your knowledge -- to your

3    knowledge all checking in of dancers, all

4    checking out of dancers and all tracking of

5    dancers throughout the club during their tenure

6    at Spearmint Rhino is that done through Club

7    Trax?

8        A.    I believe so.

9        Q.    Okay.  There's no paper records used in

10   any of those processes?

11       A.    Not to my knowledge.  Again it's

12   nothing that I would be involved with.

13       Q.    Okay.  As your employees, your contract

14   employees are going through this new list that

15   you received in December, the one with the few

16   remaining blanks, have you checked that list to

17   determine whether or not that's a current

18   employee or not or current dancer or not?

19       A.    No.

20       Q.    Okay.  Do you think that if you do

21   check that list and if any of those were current

22   dancers you would be able to obtain the

23   information directly from the dancer?

24       A.    Directly -- I couldn't, no.

25       Q.    What I'm saying is if there's an entry

1    before August?

2        A.    No.

3        Q.    Are you aware that a list was

4    previously created and there was an error with

5    that list?

6            MR. GARRELL:  I'll object to the extent

7    it falls outside of the scope of the principle

8    deposition of this witness today to her scope of

9    knowledge but to the extent that she can answer

10   she can respond.

11           THE WITNESS:  You mean the August list?

12       Q.    (BY MR. MARKER)  Prior to August?

13       A.    No, nothing before August.

14       Q.    You are not aware of any other list

15   that was created?

16       A.    No.

17       Q.    Okay.  Does Spearmint Rhino Las Vegas

18   have a file retention policy?

19       A.    Not to my knowledge.

20       Q.    A written document dictates how long a

21   paper file is kept for any period of time?

22       A.    I think permanently.

23       Q.    Okay.  To your knowledge has any

24   dancer's paper file ever been shredded?

25       A.    No.

1      Q.    Ever been destroyed?

2      A.    No.

3      Q.    Ever been taken off premises?

4      A.    No, not to my knowledge.

5      Q.    Okay.  If a manager asked you to

6  retrieve a file --

7      A.    If a manage asked me --

8      Q.    To retrieve the file and you do and

9  give the file to the manager do you ensure that

10 the manager returns the file?

11     A.    No.

12     Q.    No?

13     A.    No.

14     Q.    Okay.  How often does a manager request

15 a file?

16     A.    Maybe twice a year.

17     Q.    Oh, okay.  Not very often?

18     A.    No.

19     Q.    Less than ten times since you began

20 working there?

21     A.    Yes.

22     Q.    Okay.  Who has access to the cage

23 besides you?

24     A.    All managers and the maintenance crew.

25     Q.    How many individuals are on the

1    A.   No.

2    Q.   Have you ever seen a dancer in the

3  cage?

4    A.   No.  Actually I want to go back and

5  make that three managers.

6    Q.   Three managers, okay.

7         MR. COHON:  And your answer to the

8  questions relating to the other two managers

9  apply equally to that third manager as well,

10  correct?

11        THE WITNESS:  Uh-huh.

12        MR. GARRELL:  Yes?

13        THE WITNESS:  Yes.

14   Q.   (BY MR. MARKER)  You've never seen a

15  dancer in the cage?

16   A.   No.

17   Q.   Have you ever seen a dancer in

18  possession of her own file?

19   A.   No.

20   Q.   Is a dancer ever asked to look at her

21  file?

22   A.   No.

23   Q.   Have you ever provided a copy --

24        You never provide a copy of a dancer's

25  file to a dancer, correct?

1    duplicates or any of that?

2        A.    No.

3        Q.    Okay.  And your auditing and cross

4    referencing and checking was solely related to

5    personal identification information such as name,

6    address, government I.D. number, expiration date,

7    Sheriff's card, Social Security number and

8    telephone number, correct?

9        A.    And driver's license and state.

10       Q.    Okay.  It had nothing to do with the

11   shift numbers, correct?

12       A.    Nothing at all.

13       Q.    Okay.  So you have no --

14             Based upon your efforts over the past

15   several months how confident are you that the

16   information that remains on the spreadsheet is

17   accurate?

18       A.    Ninety-eight percent.

19       Q.    What percent?

20       A.    Ninety-eight.

21       Q.    Okay.  Why do you say that?

22       A.    Computer is the way to go, you know,

23   for information nowadays.  We just rely on it

24   that it should be right.

25       Q.    But this is based on the fact also that

1    A.    And you would get it from wherever I

2  guess you are entertaining.

3    Q.    But I'm talking about the form you work

4  with and it's a change of employment form,

5  correct?

6    A.    Correct.

7    Q.    That goes to the Metropolitan Police

8  Department?

9    A.    I never get another one.

10    Q.    So you do it once and that's it?

11    A.    Exactly.

12    Q.    Okay.  Based on your involvement in

13  this project over the past several months do you

14  believe there are any individuals who have

15  performed as an exotic dancer at Spearmint Rhino

16  in Las Vegas from July 13th, 2006 through

17  April 4, 2011 that do not appear on the

18  spreadsheet?

19    A.    No.  They are all probably there.

20    Q.    By probably, how confident are you that

21  they appear on the spreadsheet?

22    A.    A hundred percent.

23    Q.    Okay.  And why do you say that?

24    A.    Because of the procedures how Spearmint

25  Rhino -- how they check the girls in.

1      Q.    Okay.  It's not possible for a woman to

2    check in and perform her shift without appearing

3    in the Club Trax database, correct?

4      A.    Exactly.

5      Q.    And to the best of your knowledge,

6    information and belief that's been the case since

7    July 13th, 2006, correct?

8      A.    Yes.

9      Q.    Who taught the contract employees how

10   to use Club Trax?

11     A.    Charlie taught me and then I wasn't

12   comfortable and he stood over all of us and

13   taught all of us -- the three of us at the same

14   time to use it.

15     Q.    Is it complicated?

16     A.    No.

17     Q.    Is it --

18           Did any contract employees have

19   questions or have problems with Club Trax after

20   that first instruction from Mr. De la Paz?

21     A.    No.

22     Q.    Okay.  Is it a function of your

23   position to cross reference the funds received by

24   the back-door host with the total number of house

25   fees charged as told by Club Trax?