O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRACY DAWN TRAUTH, et al., | Case No. EDCV 09-01316-VAP (DTBx) |
| Plaintiffs, | **ORDER GRANTING PLAINTIFFS' RENEWED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT (DOC. NO. 317) AND GRANTING IN PART PLAINTIFFS' RENEWED MOTION FOR ATTORNEYS' FEES (DOC. NO. 311)** |
| v. | |
| SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al. | |
| Defendants. | |

Plaintiffs' Renewed Motions for Final Approval of Class Action Settlement (Doc. No. 317) and for Attorneys' Fees and Incentive Awards (Doc. No. 311) came before the Court for hearing on August 30, 2012.  For the reasons to follow, the Court GRANTS the Motion for Final Approval and GRANTS the Motion for Attorneys' Fees IN PART.

## I. BACKGROUND

The Court has discussed the factual and procedural history of this matter at length, most recently in its June 21, 2012, Minute Order ("June 21 Order") (Doc. No. 305), in which it denied Plaintiffs' last attempt to procure the Court's approval of the proposed settlement of this class action.  The Court therefore offers only the barest recitation of the facts necessary to place the current Motions in context.

Plaintiffs Tracy Dawn Trauth, Christeen Rivera, Jennifer Blair, Victoria Omlor, Jasmine Wright, Anicia Vintimilla, Marsha Ellington, Selena Denise Pelaez, Nicole Garcia, Reah Navarro, Tami Sanchez, Rose Shakespeare, Ashley Malott King, and Connie Linne, as representatives of a nationwide class of "exotic dancers" (collectively, "Dancers"), are moving to settle a three-year old class action against Defendants, the operators of a group of "adult entertainment" venues ("Clubs"). The Dancers charge that the Clubs classify Dancers improperly as independent contractors, thereby depriving them of benefits that employees are guaranteed under federal law (i.e., the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, et seq.)  and various states' laws.

The Dancers and Clubs entered into a Settlement Agreement ("Agreement") (Ex. A to Decl. of Hart

1   Robinovitch ("Robinovitch Decl.") (Doc. No. 318-1)), the

2   relevant provisions of which are as follows:

3

4   •   Within six months, the Clubs will no longer treat

5       Dancers as independent contractors or lessees;

6       instead the Clubs will treat Dancers "as either

7       employees or owners (e.g. shareholder, limited

8       partner, partner, member or other type of ownership

9       stake)" of any Clubs in existence at the time of

10      settlement. (Doc. No. 318-1 ¶ 4.2.)  In California,

11      Dancers will no longer be charged stage fees (i.e.,

12      fees a Dancer pays for the privilege of performing at

13      a Club). (Id. ¶ 4.1.)

14

15  •   After deducting from the agreed-upon $12,970,000

16      gross settlement amount the cost of administering the

17      settlement (see id. ¶ 5.4), incentive payments for

18      class representatives (see id. ¶ 5.6.1), and any

19      attorneys' fees awarded to class counsel (see id. ¶

20      5.5.2), 50.14 percent of the remaining settlement

21      amount is allocated to California Dancers; 42.69

22      percent to Nevada Dancers, and 7.16 percent to

23      Kentucky, Idaho, Texas, Nevada, and Florida Dancers

24      (see id. ¶ 5.7.2).

25

26  •   Dancers' claims will be paid on a claims-made basis;

27      i.e., a Dancer who does not submit a written claim

28

1   against the settlement fund will not be paid, even

2   though she may still be bound by the settlement.

3   (See id. ¶ 5.7.1)  If the entire settlement is not

4   claimed, the remainder reverts to the Clubs – with

5   the exception of a non-reversionary amount of

6   $2,723,700.  (See id. ¶ 5.8.)

7

8   • Any portion of the non-reversionary amount remaining

9   after payment of Dancers' claims will be first used

10   towards incentive payments for most of the class

11   representatives (see id. ¶¶ 5.6.1, 5.6.2); if there

12   is still any portion of the non-reversionary amount

13   remaining, ten percent of that amount will be

14   distributed on a pro rata basis to Dancers who

15   submitted claims against the settlement fund, and the

16   rest "shall be distributed over a five year period"

17   to the Los Angeles County Bar Association Foundation

18   – Domestic Violence Project, Foundation for an

19   Independent Tomorrow, Women at Work – Job Resource

20   Center, and the National Association of Working Women

21   (see id. ¶ 5.8).

22

23   • The Clubs will not oppose the payment of incentive

24   awards to class representatives of up to $15,000 for

25   Tracy Dawn Trauth and up to $6,250 each for Jennifer

26   Blair, Christeen Rivera, Victoria Omlor, Jasmine

27   Wright, Anicia Vintimilla, Marsha Ellington, Selena

28

Denise Pelaez, Nicole Garcia, Reah Navarro, and Tami Sanchez.  (Id. ¶ 5.6.1.)  They also agree not to oppose awards of up to $1,000 each for Rose Shakespeare, Connie Linne, and Ashley Malott King; those awards, however, will not be paid from the $12,970,000 settlement fund.  (Id. ¶ 5.6.2.)

- Any Dancer who does not file a timely request to opt out of the class – whether or not she submitted a claim to settlement funds – will, by effect of the Agreement, be deemed to have released the Clubs "from any and all claims, liabilities, demands, causes of action, or lawsuits, known or unknown . . . whether legal, statutory, equitable or of any other type of form, whether under federal law (excluding any and all claims arising under the FLSA . . . ) or state law . . . that in any way relate to or arise out of or in connection with acts, omissions, facts, statements, matters, transactions, or occurrences that have been or could have been alleged in [this action], including but not limited to overtime, minimum wages, missed or inadequate meal periods and rest breaks, unpaid tip income, reimbursement for uniform costs, itemized wage statement violations, record keeping violations, and waiting time penalties . . . ."  (See, e.g., id. ¶ 7.1.)

1 • Any Dancer who does file a timely claim, however,
2   will be deemed to have opted-in to an FLSA collective
3   action, and will release any FLSA claim against the
4   Clubs, as well any of the state law claims discussed
5   above.  (See id. ¶ 7.7.)

6

7 • The Clubs agree not to oppose an award of attorneys'
8   fees, as long as the award is no greater than
9   $2,500,000, to be deducted from the gross settlement
10  amount of $12,970,000.  (See id. ¶¶ 5.5.1, 5.5.2.)

11

12  The Court considers the Dancers' Motion for Final
13 Approval, which would have the effect of settling both
14 their FLSA and state law claims, under the following
15 legal standards.

16

17                    **II. LEGAL STANDARD**
18  At the preliminary approval stage, the Court
19 considered whether the proposed settlement "(1)
20 appear[ed] to be the product of serious, informed, non-
21 collusive negotiations; (2) ha[d] no obvious
22 deficiencies; (3) d[id] not improperly grant preferential
23 treatment to class representatives or segments of the
24 class; and (4) f[ell] within the range of possible
25 approval," Harris v. Vector Mktg. Corp., No. C-08-5198
26 EMC, 2011 WL 1627973, at *7 (N.D. Cal. Apr. 29, 2011)
27 ("Harris II") - all through the lens of the same criteria
28

the Court applies now to determine whether the proposed
settlement should be approved finally.  The difference,
however, is the "[c]loser scrutiny," id., with which the
Court now considers the following factors.

## A.   Settling a Class Action Certified Under Federal Rule of Civil Procedure 23

Under Federal Rule of Civil Procedure 23, certifying
a class for the sole purpose of settling a class action
is a two-step process, requiring a court to "ratify both
the propriety of the certification and the fairness of
the settlement."  Staton v. Boeing Co., 327 F.3d 938, 952
(9th Cir. 2003).  First, the proposed class must meet the
familiar criteria for certification outlined in Federal
Rules of Civil Procedure 23(a) and (b) – e.g., numerosity
of claimants in the proposed class (Rule 23(a)(1)),
commonality of the questions of law and fact among them
(Rule 23(a)(2)), typicality of the claims they present
(Rule 23(a)(3)), and adequacy of their representation
before the court (Rule 23(a)(4)) – that would apply in
the absence of a settlement agreement.  Amchem Prods.,
Inc. v. Windsor, 521 U.S. 591, 619-22 (1997); see Narouz
v. Charter Commc'ns, LLC, 591 F.3d 1261, 1266 (9th Cir.
2010) (noting that "[t]o obtain class certification" for
settlement purposes, "a class plaintiff has the burden of
showing that the requirements of Rule 23(a) are met and
that the class is maintainable pursuant to Rule 23(b)");

<u>see</u> Fed. R. Civ. P. 23(a).  Indeed, a court must pay "undiluted, even heightened, attention" to Rule 23's requirements when certifying a case for settlement, because the court "will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold."  <u>Amchem Prods., Inc.</u>, 521 U.S. at 620.

In this case, the Dancers seek class certification pursuant to Rule 23(b)(3).  Thus, in addition to finding the proposed class meets Rule 23(a)'s numerosity, typicality, commonality, and adequacy requirements, a court must find either "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," Fed. R. Civ. P. 23(b)(3).  In making the requisite findings under Rule 23(b)(3), the court considers "the class members' interest in individually controlling the prosecution or defense of separate actions," Fed. R. Civ. P. 23(b)(3)(A), "the extent and nature of any litigation concerning the controversy already begun by or against class members," Fed. R. Civ. P. 23(b)(3)(B), and "the desirability or undesirability of concentrating the

 1  litigation of the claims in the particular forum," Fed.

 2  R. Civ. P. 23(b)(3)(C).[1]

 3

 4      If a settlement class meets Rule 23's criteria and

 5  the court approves preliminarily of the settlement of the

 6  case, the court turns to the second step:  it must hold a

 7  hearing to determine whether to finalize the settlement,

 8  thereby binding the entire class.  Fed. R. Civ. P.

 9  23(e)(2).  In carrying out its charge to determine

10  whether a settlement proposal is "fair, reasonable, and

11  adequate," id., the court considers a variety of factors,

12  including at least the following:

13

14      (1) the strength of the plaintiff's case; (2)

15      the risk, expense, complexity, and likely

16      duration of further litigation; (3) the risk of

17      maintaining class action status throughout the

18      trial; (4) the amount offered in settlement; (5)

19      the extent of discovery completed and the state

20      of the proceedings; (6) the experience and views

21      of counsel; (7) the presence of a governmental

22      participant; and (8) the reaction of the class

23      members of the proposed settlement.

24

25 _____

    [1] The inquiry made traditionally under Federal Rule
26  of Civil Procedure 23(b)(3)(D), i.e., whether trying the
    case as a class action "would present intractable
27  management problems," is unnecessary when a class is
    certified solely for the purpose of settlement.  Amchem
28  Prods., Inc., 521 U.S. at 620.

9

<u>In re Bluetooth Headset Prods. Liab. Litig.</u>, 654 F.3d 935, 946 (9th Cir. 2011) (quoting <u>Churchill Vill., L.L.C. v. Gen. Elec.</u>, 361 F.3d 566, 575 (9th Cir. 2004)).

The <u>Manual for Complex Litigation</u> suggests further inquiries for a court reviewing a proposed settlement, including:  asking "whether class or subclass members have the right to request exclusion from the settlement, and, if so, the number exercising that right"; inquiring about "the fairness and reasonableness of the procedure for processing individual claims under the settlement"; and evaluating whether "the named plaintiffs are the only class members to receive monetary relief or are to receive monetary relief that is disproportionately large." <u>Manual for Complex Litigation (Fourth)</u> § 21.62. (2004).

**B.  Settling an FLSA Collective Action**

Settling a Rule 23 class action requires the existence of a class; settling an FLSA collective action first requires the existence of an FLSA collective action.[2]  The FLSA authorizes "any one or more employees for and in behalf of himself or themselves and other employees similarly situated" to sue an employer for

_____

[2] The action prescribed by the FLSA is known commonly as a collective, rather than a class, action. <u>Sarviss v. Gen. Dynamics Info. Tech. Inc.</u>, 663 F. Supp. 2d 883, 902 (C.D. Cal. 2009).

1  unpaid minimum wages or unpaid overtime compensation,

2  provided that "[n]o employee shall be a party plaintiff

3  to any such action unless he gives his consent in writing

4  to become such a party and such consent is filed in the

5  court in which such action is brought."  29 U.S.C. §

6  216(b).  In other words, in an FLSA collective action

7  "each plaintiff must opt _into_ the suit," rather than out

8  of it (as in a Rule 23 class action).  McElmurry v. U.S.

9  Bank Nat'l Ass'n, 495 F.3d 1136, 1139 (9th Cir. 2007)

10  (emphasis in original).

11

12      Plaintiffs in a collective action must be "similarly

13  situated"; the meaning of that phrase, however, remains

14  undefined in the Ninth Circuit.  Mitchell v. Acosta

15  Sales, LLC, 841 F. Supp. 2d 1105, 1115 (C.D. Cal. 2011).

16  The typical approach of courts in the Central District of

17  California is to require the plaintiff who proposes a

18  collective action to meet the light burden of showing not

19  that she and her proposed class are identically

20  positioned, just similarly so – a test that reduces

21  typically to requiring the plaintiff to substantiate with

22  affidavits her "allegations that the putative class

23  members were together the victims of a single decision,

24  policy, or plan."  Id. (quoting Sarviss v. Gen. Dynamics

25  Info. Tech. Inc., 663 F. Supp. 2d 883, 903 (C.D. Cal.

26  2009) (internal quotation omitted)).

27

28

11

Before a putative collective action is tried, however, a court may – though it need not, absent argument that the employees are not situated similarly – take a second, more rigorous look at the class, enquiring as to "'(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendants with respect to the individual plaintiffs; and (3) fairness and procedural considerations.'"  Mitchell, 841 F. Supp. 2d at 1116 (quoting Edwards v. City of Long Beach, 467 F. Supp. 2d 986, 990 (C.D. Cal. 2006)); see Edwards, 467 F. Supp. 2d at 989-90 (noting that the FLSA contains no "certification" requirement or protocol to which courts must adhere; certification of a collective action is instead merely "an effective case management tool") (citing Hoffmann–La Roche Inc. v. Sperling, 493 U.S. 165, 170–72 (1989)).

Whatever role a court plays in certifying an FLSA class, it is not bound to exercise the same oversight of the settlement of a collective action as it must a class action under Federal Rule of Civil Procedure 23(e). Whereas the court's role in supervising the settlement of a class action "protects unnamed class members 'from unjust or unfair settlements affecting their rights,'" Amchem Prods., Inc., 521 U.S. at 623 (quoting 7B Charles Alan Wright, et al., Federal Practice & Procedure § 1797

1  (3d ed.)), members of an FLSA collective action have

2  opted-in affirmatively; a court's involvement in the

3  management of their action "has less to do with the due

4  process rights" of those to be bound by a settlement,

5  "and more to do with the named plaintiffs' interest in

6  vigorously pursuing the litigation and the district

7  court's interest in 'managing collective actions in an

8  orderly fashion,'" McElmurry, 495 F.3d at 1139 (quoting

9  Hoffmann-LaRoche Inc., 493 U.S. at 173).[3]

10

11     Having elaborated on the criteria it applies in

12  analyzing the Dancers' Motion, the Court now turns to

13  that task.

14

15                    **III. DISCUSSION**

16     The Court denied the Dancers' previous motion for

17  approval of settlement in this case for three discrete

18  reasons. (See June 21 Order at 15-16.)  First, the

19  Dancers failed to satisfy Rule 23(a)'s typicality and

20  adequacy requirements, because they offered no class

21  representatives for the subclasses comprised of Dancers

22  working at Clubs in Kentucky, Florida, Idaho, and Texas.

23  _____

24     [3] Moreover, it appears to be an open question whether
   and when members of an FLSA class who opt in may withdraw
25  from the collective action, and what effects their prior
   participation has after their withdrawal.  See Adams v.
26  Sch. Bd. of Hanover Cnty., No. 3:05CV310, 2008 WL
   5070454, at *17-*19 (E.D. Va. Nov. 26, 2008) (noting that
27  "[n]o published case discusses the procedures a court
   must undertake when a party who had opted-in seeks to
28  withdraw").

(See id. at 16-17.)   Second, the cy pres provision in the
Agreement's previous iteration defied the law of this
circuit.  (See id. at 18-19.)   Third, the Agreement
released the FLSA claims of even those class members who
did not opt in to the FLSA collective action.  (See id.
at 21-23.)   The Dancers have now rectified each of those
flaws, and as the Court noted, "[t]he Agreement otherwise
appears . . . to be fair, adequate, and reasonable."[4]
(Id. at 19.)

Thus, for the reasons set forth in the June 21 Order,
the Court finds that the Dancers satisfy Rule 23(a)'s
numerosity and commonality requirements, and as they now
have class representatives for each subclass, its
typicality and adequacy requirements.  The Court finds
further that the Dancers' choice of charitable
organizations to receive the otherwise unallocated
portion of the settlement fund's non-reversionary amount
satisfies the Ninth Circuit's requirements for cy pres
awards.  Finally, the language of the Agreement now makes
clear that only those Dancers who file claims will be
deemed to have opted in to an FLSA subclass, and thus

---

[4] Aside from the objections received before, and
addressed in, the Court's June 21 Order, the Court has
received an objection from a class member that states
simply that the class member believes the settlement is
unfair, with no further explanation.  The Court has
considered that objection, and determined that without
elaboration, it is an insufficient basis to disapprove
the settlement.

that only those Dancers will release their FLSA claims
against the Clubs.  Accordingly, the Court GRANTS the
Dancers' Motion for Final Approval of Class Action
Settlement, and turns to their Motion for Attorneys' Fees
and Incentive Awards.


**A.   Attorneys' Fees**

     In addition to costs, the Dancers seek $2,500,000 in
attorneys' fees for their counsel, either calculated as a
percentage of the $12,970,000 gross settlement amount or
using the lodestar method.  The Court calculates the
Dancers' attorneys' fees using the lodestar method, <u>see
Fischel v. Equitable Life Assurance Soc'y</u>, 307 F.3d 997,
1006 (9th Cir. 2002) ("the district court has the
discretion to apply either the lodestar method or the
percentage-of-the-fund method in calculating a fee
award").  The Court has conducted a line-item review of
the billing records submitted in this case from each of
the billing professionals.


     To apply the lodestar method, the Court must "first
calculat[e] the 'lodestar.'"  <u>Caudle v. Bristow Optical
Co., Inc.</u>, 224 F.3d 1014, 1028 (9th Cir. 2000) (citation
omitted).  The Court determines the 'lodestar' amount by
multiplying the number of hours reasonably expended on
the litigation by a reasonable hourly rate.  <u>Id.</u>; <u>McGrath
v. Cnty. of Nevada</u>, 67 F.3d 248, 252 (9th Cir. 1995)

1  (citing Hensley v. Eckerhart, 461 U.S. 424, 433 (1983)).

2  Next, the Court must decide whether to adjust the

3  'presumptively reasonable' lodestar figure based upon the

4  factors listed in Kerr v. Screen Extras Guild, Inc., 526

5  F.2d 67, 69-70 (9th Cir. 1975), cert. denied, 425 U.S.

6  951 (1976), that have not been subsumed in the lodestar

7  calculation.[5]  Caudle, 224 F.3d at 1028-29.

8

9       In determining a reasonable number of hours, the

10  Court must examine detailed time records to determine

11  whether the hours claimed are adequately documented and

12  whether any of them are unnecessary, duplicative, or

13  excessive.  Chalmers v. City of Los Angeles, 796 F.2d

14  1205, 1210 (9th Cir. 1986), reh'g denied, amended on

15  other grounds, 808 F.2d 1373 (9th Cir. 1987) (citing

16  Hensley, 461 U.S. at 433-34).  To determine a reasonable

17  rate for each attorney, the Court must look to the rate

18  _____

19       [5] Kerr was decided before the lodestar approach was
     adopted by the Supreme Court in Hensley, 461 U.S. at 433,

20  as the starting point for determining reasonable fees.
     In Kerr, the Ninth Circuit adopted the 12-factor test

21  articulated in Johnson v. Georgia Highway Express, Inc.,
     488 F.2d 714 (5th Cir. 1974); this analysis identified

22  the following factors for determining reasonable fees:
     (1) the time and labor required, (2) the novelty and

23  difficulty of the questions involved, (3) the skill
     requisite to perform the legal service properly, (4) the

24  preclusion of other employment by the attorney due to
     acceptance of the case, (5) the customary fee, (6)

25  whether the fee is fixed or contingent, (7) time
     limitations imposed by the client or the circumstances,

26  (8) the amount involved and the results obtained, (9) the
     experience, reputation, and ability of the attorneys,

27  (10) the "undesirability" of the case, (11) the nature
     and length of the professional relationship with the

28  client, and (12) awards in similar cases.

prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation.  Id. at 1210-11 (citing Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984)).

To the extent that the Kerr factors are not addressed in the calculation of the lodestar, they may be considered in determining whether the fee award should be adjusted upward or downward, once the lodestar has been calculated.  Id. at 1212 (citing Hensley, 461 U.S. at 434).  There is a strong presumption that the lodestar figure represents a reasonable fee.  Jordan v. Multnomah Cnty., 815 F.2d 1258, 1262 (9th Cir. 1987) (citing Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 565 (1986)).

The Dancers seek to adjust their lodestar upward using the multiplier method.  A court may adjust the lodestar upward or downward using a multiplier.  An upward adjustment of the lodestar is appropriate only in extraordinary cases, such as when the attorneys faced exceptional risks of not prevailing or not recovering any fees.  Chalmers, 796 F.2d at 1212.  See also Blum, 465 U.S. at 903 (Brennan, J., concurring); Hensley, 461 U.S. at 448 (Brennan, J., concurring in part, dissenting in part); Pennsylvania, 478 U.S. at 565 (upward adjustments are "proper only in certain 'rare' and 'exceptional'

cases").   This case is not an extraordinary, rare, or exceptional case, and therefore, application of a multiplier to adjust the lodestar upward is inappropriate and unwarranted.

The party seeking attorneys' fees bears the burden of "submitting evidence supporting the hours worked and the rates claimed." Hensley, 461 U.S. at 433.  A fee applicant can meet this basic requirement by listing the hours worked by each person at the firm and identifying the general subject matter of his or her time expenditures.  See Fische v. SJB-P.D. Inc., 214 F.3d 1115, 1121 (9th Cir. 2000).

In addition to the voluminous materials the Dancers submitted to justify the $2,500,000 in attorneys' fees they seek, the Court considers the amount of time it took the parties to manage the logistics of settling this litigation.  The Court notes that in the course of this case:

• Five days before the hearing on a Motion for Preliminary Approval (Doc. No. 119), the Dancers submitted to the Court a revised settlement agreement, and a declaration of counsel that it was substantially the same as the agreement the Court was already evaluating.  Instead, the revised agreement

made various substantive changes to the agreement
then before the Court, including in the relief to
which the Dancers would be entitled and the amount of
fees their attorneys would receive.  (See June 21
Order at 7.)

- The Dancers then filed an Amended Motion for
  Preliminary Approval (Doc. No. 132), which "failed in
  many respects . . . to set forth the necessary
  elements for the Court to certify a settlement
  class."  (See June 21 Order at 7.)  The motion was
  denied.

- Next, the Dancers filed a Second Motion for
  Preliminary Approval (Doc. No. 159) that accompanied
  an agreement purporting to bind Clubs who were not
  parties to the litigation.  (See June 21 Order at 8.)
  The Court therefore denied that motion, too.

- The Dancers filed their first Motion for Final
  Approval of Class Action Settlement (Doc. No. 244)
  slightly over a year ago; however, after realizing a
  number of Dancers had been excluded inadvertently
  from the parties' calculations in reaching their
  settlement, the Dancers and Clubs returned to the
  drawing board.  (See June 21 Order at 9.)

- The Dancers submitted a new settlement agreement, for which they sought the Court's approval. (<u>See</u> Doc. No. 265.)  Again, there were deficiencies in the Motion, which the Court therefore denied. (<u>See</u> Doc. No. 268; <u>see generally</u> June 21 Order at 9.)

- The Dancers filed a "Third Amended Motion for Final Approval of Class Action Settlement" (Doc. No. 288); the Court denied that for the reasons set forth at the beginning of Section III of this Order. (<u>See also</u> June 21 Order at 9, 15-16.)

     The Court therefore considers the bills submitted by the Dancers' counsel against this background. Plaintiffs' counsel argued at the August 30 hearing of this Motion that most of the false steps in the course of this litigation were the result of the defense's mistakes or oversights, a contention that appears well-taken as to some of the history of the resubmission of the motions for settlement agreement approval.

     After careful review of the billing records, the Court concludes that plaintiffs' request for fees incurred is reasonable, after deductions for certain amounts as described below. <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 433 (1983) ("The most useful starting point for determining the amount of a reasonable fee is the number

of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.")  Plaintiffs have represented that the fees charged by plaintiff's counsel are "more than reasonable when compared to the billing rates for persons with similar experience and background in the Southern California marketplace."  (Robinovitch Decl. at ¶ 35; see also Declaration of Christopher P. Ridout ("Ridout Decl.") at ¶ 20 ("rates charges . . . are reasonable and within the range of rates awarded to attorneys practicing within the Central District of California"); Declaration of Caleb Marker ("Marker Decl.") at ¶ 36.)  Based on the Court's familiarity with the rates charged by other firms in the Southern California legal community, the hourly rates of between $475-700 for partners (See Robinovitch Decl. at ¶ 26-27; Ridout Decl. at ¶ 11; Declaration of Stephen M. Harris at ¶ 8); $350 for of counsel (See Marker Decl. at ¶ 23); $250-495 for other attorneys (See Ex. B to Robinovitch Decl.); and $150 for law clerk and paralegal fees (Ridout Decl. at ¶ 11; Robinovitch Decl. at ¶ 28) are reasonable. Plaintiffs also represent that the hours spent on the litigation were reasonable.  (Robinovitch Decl. at ¶ 30; Ridout Decl. at ¶ 10; Marker Decl. at ¶ 21.)  In addition, after reviewing the costs requested by plaintiffs, the Court concludes that they were reasonably incurred in prosecuting the case.

1    After reviewing each billing entry, the Court finds
2  it necessary and appropriate to reduce the fees requested
3  by the Dancers for (1) time spent on irrelevant issues or
4  tasks upon which excessive time was spent or billed,
5  e.g., preparation of pro hac vice applications, (2) other
6  unnecessary, excessive, or duplicative entries, and (3)
7  time charged for clerical or secretarial tasks.  For
8  example, several of the billing attorneys billed time for
9  analyzing the Court's notices regarding their own filing
10 deficiencies.  The bills submitted from at least two of
11 the Dancers' attorneys also contain repeated billings for
12 excessive time spent for reviewing minute orders from the
13 Court that stated nothing more than a hearing was
14 conducted, and the matter taken under submission.  The
15 Court finds it indefensible that an attorney who had
16 attended the hearing would then charge for 24 minutes of
17 his time to review the clerk's two or three sentence
18 minute order, or even six minutes to do so.
19
20    Several attorneys engaged regularly in the practice
21 of splitting among many billing entries activities that
22 should be consolidated in one.  For example, on January
23 26, 2010, Mr. Ridout appears to have engaged in a
24 correspondence with Mr. Garrell, to which he devoted
25 seven separate line items, each one taking one-tenth or
26 two-tenths of an hour.  It thus appears that each message
27 in the correspondence warranted its own line item.
28

1  Presumably Mr. Ridout rounds up from zero minutes to six
2  minutes (one-tenth of an hour) each time he undertakes a
3  task.   Thus, if Mr. Ridout takes one minute to read a
4  message from Mr. Garrell, then takes three minutes to
5  read a subsequent message, rather than billing for six
6  minutes (four minutes rounded up to the nearest tenth of
7  an hour), he bills for 12 minutes (one minute rounded up
8  to the nearest tenth of an hour plus three minutes
9  rounded up to the nearest tenth of an hour).   These are
10 but a few examples of the type of billing for which the
11 Court has deducted time when it reviewed the fees sought
12 in this case.
13
14      The amount of fees and costs requested, as well as
15 the reduction in fees, is listed below.
16
17 Rideout and Lyons, LLP (not including Caleb Marker)
18 •   Amount of Fees Requested: $591,465.00
19      •   Deductions: $40,095.00
20      •   Balance: $551,370.00
21 •   Amount of Costs Requested: $5,687.30
22
23 Ridout and Lyons, LLP (Caleb Marker only)
24 •   Amount of Fees Requested: $622,072.50
25      •   Deductions: $78,480.00
26      •   Balance: $543,592.50
27 •   Amount of Costs Requested: $5,668.76
28

Zimmerman Reed, PLLP

• Amount of Fees Requested: $729,642.50

   • Deductions: $26,425.00

   • Balance: $703,217.50

• Amount of Costs Requested: $35,287.88


Knapp, Petersen & Clarke

• Amount Requested: $484,987.00

   • Deductions: $53,697.50

   • Balance: $431,289.50

• Amount of Costs Requested: $23,441.83


The Law Offices of Robert L. Starr

• Amount Requested: $88,935.00

   • Deductions: $17,380

   • Balance: $71,555.00

• Amount of Costs Requested: $3,185.00


**B.   Incentive Awards**

Given the time they invested in this matter, and the professional and personal risk to which being named plaintiffs subjected them, the Dancers also seek incentive awards for their class representatives as follows:

1   •   For Tracy Dawn Trauth, $15,000 for "over 163.5 hours"
2       of "time for the benefit of the [Dancers]." (See
3       Decl. of Tracy Dawn Trauth (Doc. No. 314-4) ¶ 27.)
4

5   •   For Jennifer Blair, $6,250 for 30 hours of time spent
6       aiding in the litigation of this matter. (See Decl.
7       of Jennifer Blair (Doc. No. 314-6) ¶ 19.)
8

9   •   For Christeen Rivera, $6,250 for 60 hours of time
10      spent aiding in the litigation of this matter. (See
11      Decl. of Christeen Rivera (Doc. No. 314-5) ¶ 35.)
12

13  •   For Victoria Omlor, $6,250 for 35 hours of time spent
14      in connection with this litigation. (See Decl. of
15      Victoria Omlor (Doc. No. 314-9) ¶ 20.)
16

17  •   For Jasmine Wright, $6,250 for 40 hours of time spent
18      aiding in the litigation of this matter. (See Decl.
19      of Jasmine Wright (Doc. No. 314-14) ¶ 31.)
20

21  •   For Anicia Vintimilla, $6,250 for 35 hours spent
22      aiding in the litigation of this matter. (See Decl.
23      of Anicia Vintimilla (Doc. No. 314-13) ¶ 20.)
24

25  •   For Marsha Ellington, $6,250 for 25 hours spent
26      aiding in the litigation of this matter. (See Decl.
27      of Marsha Ellington (Doc. No. 314-8) ¶ 20.)
28

- For Selena Denise Pelaez, $6,250 for 25 hours spent aiding in the litigation of this matter. (<u>See</u> Decl. of Selena Denise Pelaez (Doc. No. 314-10) ¶ 20.)

- For Nicole Garcia, $6,250 for 20 hours spent aiding in the litigation of this matter. (<u>See</u> Decl. of Nicole Garcia (Doc. No. 314-7) ¶ 20.)

- For Reah Navarro, $6,250 for 20 hours spent aiding in the litigation of this matter. (<u>See</u> Decl. of Reah Navarro (Doc. No. 314-12) ¶ 20.)

- For Tami Sanchez, $6,250 for 20 hours spent aiding in the litigation of this matter. (<u>See</u> Decl. of Tami Sanchez (Doc. No. 314-11) ¶ 20.)

- For Rose Shakespeare, $1,000 for 15 hours spent aiding in the litigation of this matter. (<u>See</u> Decl. of Rose Shakespeare (Doc. No. 314-15) ¶ 29.)

- For Connie Linne, $1,000 for 15 hours spent aiding in the litigation of this matter. (<u>See</u> Decl. of Connie Linne (Doc. No. 314-16) ¶ 29.)

1    •    For Ashley Malott King, $1,000 for 15 hours spent

2         aiding in the litigation of this matter.  (<u>See</u> Decl.

3         of Ashley Malott King (Doc. No. 314-17) ¶ 29.)

4

5         In determining whether and how much to award class

6    representatives in incentive payments, courts are to

7    consider the representatives' actions in protecting the

8    interests of the class, the degree to which those actions

9    benefitted the class, the amount of time and effort the

10   representatives spent pursuing the litigation, and the

11   representatives' reasonable fear of being retaliated

12   against for their visible participation.  <u>Staton</u>, 327

13   F.3d at 977 (citing <u>Cook v. Niedert</u>, 142 F.3d 1004, 1016

14   (7th Cir. 1998)).  Courts also consider the number of

15   representatives being awarded incentive payments, the

16   proportion of the payments to the settlement amount, and

17   the size of each payment.  <u>Staton</u>, 327 F.3d at 977.

18

19        Here, the Court observes that while the total amount

20   of the proposed incentive payments is a small fraction of

21   the total settlement amount, awarding some of the

22   proposed payments would mean giving the named

23   representatives as much as $312.50 per hour for their

24   time on the basis of boilerplate declarations.  Moreover,

25   there is scant evidence that any representative faced a

26   real risk of retaliation; as to the one representative

27   who claimed to have been retaliated against, the Clubs

28

offered a declaration indicating that she was banned from
their premises because she appeared there while not
working and disrupted the workplace activities of others
to carry on social conversations.  (<u>See</u> Omlor Decl. ¶ 13;
<u>but see</u> Decl. of Kathy Vercher (Doc. No. 325-1) ¶ 2.)
Accordingly, the Court will allow incentive payments as
follows:

- Tracy Dawn Trauth:  $10,000

- Jennifer Blair:  $5,000

- Christeen Rivera:  $5,000

- Victoria Omlor:  $5,000

- Jasmine Wright:  $5,000

- Anicia Vintimilla:  $5,000

- Marsha Ellington:  $2,500

- Selena Denise Pelaez:  $2,500

- Nicole Garcia:  $2,500

- Reah Navarro:  $2,500

1

2 •     Tami Sanchez:  $2,500

3

4 •     Rose Shakespeare:  $1,000

5

6 •     Connie Linne:  $1,000

7

8 •     Ashley Malott King:  $1,000

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IV. CONCLUSION**

For the foregoing reasons, the Court GRANTS the Dancers' Motion for Final Approval of Class Action Settlement and their Motion for Attorneys' Fees and Incentive Awards.  The Dancers are hereby awarded $2,301,024.50 in fees, $73,270.77 in costs, and incentive payments as enumerated in the preceding section.

Dated: October 5, 2012

_____
VIRGINIA A. PHILLIPS
United States District Judge