O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| TRACY DAWN TRAUTH, et al., | ) ) ) | Case No. EDCV 09-01316-VAP (DTBx) |
| Plaintiffs, | ) ) | **AMENDED** ORDER GRANTING PLAINTIFFS' RENEWED MOTION |
| v. | ) ) | FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT (DOC. NO. |
| SPEARMINT RHINO COMPANIES WORLDWIDE, INC., et al. | ) ) ) ) | 317) AND GRANTING IN PART PLAINTIFFS' RENEWED MOTION FOR ATTORNEYS' FEES |
| Defendants. | ) ) | (DOC. NO. 311) |
| _____ | ) | |

     Plaintiffs' Renewed Motions for Final Approval of
Class Action Settlement (Doc. No. 317) and for Attorneys'
Fees and Incentive Awards (Doc. No. 311) came before the
Court for hearing on August 30, 2012.  For the reasons to
follow, the Court GRANTS the Motion for Final Approval
and GRANTS the Motion for Attorneys' Fees IN PART.

## I. BACKGROUND

The Court has discussed the factual and procedural history of this matter at length, most recently in its June 21, 2012, Minute Order ("June 21 Order") (Doc. No. 305), in which it denied Plaintiffs' last attempt to procure the Court's approval of the proposed settlement of this class action.  The Court therefore offers only the barest recitation of the facts necessary to place the current Motions in context.

Plaintiffs Tracy Dawn Trauth, Christeen Rivera, Jennifer Blair, Victoria Omlor, Jasmine Wright, Anicia Vintimilla, Marsha Ellington, Selena Denise Pelaez, Nicole Garcia, Reah Navarro, Tami Sanchez, Rose Shakespeare, Ashley Malott King, and Connie Linne, as representatives of a nationwide class of "exotic dancers" (collectively, "Dancers"), are moving to settle a three-year old class action against Defendants, the operators of a group of "adult entertainment" venues ("Clubs"). The Dancers charge that the Clubs classify Dancers improperly as independent contractors, thereby depriving them of benefits that employees are guaranteed under federal law (_i.e._, the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, _et seq._)  and various states' laws.

The Dancers and Clubs entered into a Settlement Agreement ("Agreement") (Ex. A to Decl. of Hart

Robinovitch ("Robinovitch Decl.") (Doc. No. 318-1)), the relevant provisions of which are as follows:

- Within six months, the Clubs will no longer treat Dancers as independent contractors or lessees; instead the Clubs will treat Dancers "as either employees or owners (e.g. shareholder, limited partner, partner, member or other type of ownership stake)" of any Clubs in existence at the time of settlement. (Doc. No. 318-1 ¶ 4.2.)  In California, Dancers will no longer be charged stage fees (i.e., fees a Dancer pays for the privilege of performing at a Club). (Id. ¶ 4.1.)

- After deducting from the agreed-upon $12,970,000 gross settlement amount the cost of administering the settlement (see id. ¶ 5.4), incentive payments for class representatives (see id. ¶ 5.6.1), and any attorneys' fees awarded to class counsel (see id. ¶ 5.5.2), 50.14 percent of the remaining settlement amount is allocated to California Dancers; 42.69 percent to Nevada Dancers, and 7.16 percent to Kentucky, Idaho, Texas, Nevada, and Florida Dancers (see id. ¶ 5.7.2).

- Dancers' claims will be paid on a claims-made basis; i.e., a Dancer who does not submit a written claim

1   against the settlement fund will not be paid, even
2   though she may still be bound by the settlement.
3   (See id. ¶ 5.7.1)  If the entire settlement is not
4   claimed, the remainder reverts to the Clubs – with
5   the exception of a non-reversionary amount of
6   $2,723,700.  (See id. ¶ 5.8.)

8   •   Any portion of the non-reversionary amount remaining
9       after payment of Dancers' claims will be first used
10      towards incentive payments for most of the class
11      representatives (see id. ¶¶ 5.6.1, 5.6.2); if there
12      is still any portion of the non-reversionary amount
13      remaining, ten percent of that amount will be
14      distributed on a pro rata basis to Dancers who
15      submitted claims against the settlement fund, and the
16      rest "shall be distributed over a five year period"
17      to the Los Angeles County Bar Association Foundation
18      – Domestic Violence Project, Foundation for an
19      Independent Tomorrow, Women at Work – Job Resource
20      Center, and the National Association of Working Women
21      (see id. ¶ 5.8).

23  •   The Clubs will not oppose the payment of incentive
24      awards to class representatives of up to $15,000 for
25      Tracy Dawn Trauth and up to $6,250 each for Jennifer
26      Blair, Christeen Rivera, Victoria Omlor, Jasmine
27      Wright, Anicia Vintimilla, Marsha Ellington, Selena
28

4

Denise Pelaez, Nicole Garcia, Reah Navarro, and Tami
Sanchez.  (Id. ¶ 5.6.1.)  They also agree not to
oppose awards of up to $1,000 each for Rose
Shakespeare, Connie Linne, and Ashley Malott King;
those awards, however, will not be paid from the
$12,970,000 settlement fund.  (Id. ¶ 5.6.2.)

- Any Dancer who does not file a timely request to opt
out of the class – whether or not she submitted a
claim to settlement funds – will, by effect of the
Agreement, be deemed to have released the Clubs "from
any and all claims, liabilities, demands, causes of
action, or lawsuits, known or unknown . . . whether
legal, statutory, equitable or of any other type of
form, whether under federal law (excluding any and
all claims arising under the FLSA . . . ) or state
law . . . that in any way relate to or arise out of
or in connection with acts, omissions, facts,
statements, matters, transactions, or occurrences
that have been or could have been alleged in [this
action], including but not limited to overtime,
minimum wages, missed or inadequate meal periods and
rest breaks, unpaid tip income, reimbursement for
uniform costs, itemized wage statement violations,
record keeping violations, and waiting time penalties
. . . ."  (See, e.g., id. ¶ 7.1.)

1  •   Any Dancer who does file a timely claim, however,

2      will be deemed to have opted-in to an FLSA collective

3      action, and will release any FLSA claim against the

4      Clubs, as well any of the state law claims discussed

5      above.  (See id. ¶ 7.7.)

6

7  •   The Clubs agree not to oppose an award of attorneys'

8      fees, as long as the award is no greater than

9      $2,500,000, to be deducted from the gross settlement

10     amount of $12,970,000.  (See id. ¶¶ 5.5.1, 5.5.2.)

11

12     The Court considers the Dancers' Motion for Final

13 Approval, which would have the effect of settling both

14 their FLSA and state law claims, under the following

15 legal standards.

16

17                   **II. LEGAL STANDARD**

18     At the preliminary approval stage, the Court

19 considered whether the proposed settlement "(1)

20 appear[ed] to be the product of serious, informed, non-

21 collusive negotiations; (2) ha[d] no obvious

22 deficiencies; (3) d[id] not improperly grant preferential

23 treatment to class representatives or segments of the

24 class; and (4) f[ell] within the range of possible

25 approval," Harris v. Vector Mktg. Corp., No. C-08-5198

26 EMC, 2011 WL 1627973, at *7 (N.D. Cal. Apr. 29, 2011)

27 ("Harris II") – all through the lens of the same criteria

28

the Court applies now to determine whether the proposed settlement should be approved finally.  The difference, however, is the "[c]loser scrutiny," id., with which the Court now considers the following factors.

## A.   Settling a Class Action Certified Under Federal Rule of Civil Procedure 23

Under Federal Rule of Civil Procedure 23, certifying a class for the sole purpose of settling a class action is a two-step process, requiring a court to "ratify both the propriety of the certification and the fairness of the settlement."  Staton v. Boeing Co., 327 F.3d 938, 952 (9th Cir. 2003).  First, the proposed class must meet the familiar criteria for certification outlined in Federal Rules of Civil Procedure 23(a) and (b) – e.g., numerosity of claimants in the proposed class (Rule 23(a)(1)), commonality of the questions of law and fact among them (Rule 23(a)(2)), typicality of the claims they present (Rule 23(a)(3)), and adequacy of their representation before the court (Rule 23(a)(4)) – that would apply in the absence of a settlement agreement.  Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 619-22 (1997); see Narouz v. Charter Commc'ns, LLC, 591 F.3d 1261, 1266 (9th Cir. 2010) (noting that "[t]o obtain class certification" for settlement purposes, "a class plaintiff has the burden of showing that the requirements of Rule 23(a) are met and that the class is maintainable pursuant to Rule 23(b)");

1  <u>see</u> Fed. R. Civ. P. 23(a).  Indeed, a court must pay

2  "undiluted, even heightened, attention" to Rule 23's

3  requirements when certifying a case for settlement,

4  because the court "will lack the opportunity, present

5  when a case is litigated, to adjust the class, informed

6  by the proceedings as they unfold."  <u>Amchem Prods., Inc.</u>,

7  521 U.S. at 620.

8

9      In this case, the Dancers seek class certification

10  pursuant to Rule 23(b)(3).  Thus, in addition to finding

11  the proposed class meets Rule 23(a)'s numerosity,

12  typicality, commonality, and adequacy requirements, a

13  court must find either "that the questions of law or fact

14  common to class members predominate over any questions

15  affecting only individual members, and that a class

16  action is superior to other available methods for fairly

17  and efficiently adjudicating the controversy," Fed. R.

18  Civ. P. 23(b)(3).  In making the requisite findings under

19  Rule 23(b)(3), the court considers "the class members'

20  interest in individually controlling the prosecution or

21  defense of separate actions," Fed. R. Civ. P.

22  23(b)(3)(A), "the extent and nature of any litigation

23  concerning the controversy already begun by or against

24  class members," Fed. R. Civ. P. 23(b)(3)(B), and "the

25  desirability or undesirability of concentrating the

26

27

28

litigation of the claims in the particular forum," Fed.
R. Civ. P. 23(b)(3)(C).[1]

If a settlement class meets Rule 23's criteria and
the court approves preliminarily of the settlement of the
case, the court turns to the second step:  it must hold a
hearing to determine whether to finalize the settlement,
thereby binding the entire class.  Fed. R. Civ. P.
23(e)(2).  In carrying out its charge to determine
whether a settlement proposal is "fair, reasonable, and
adequate," id., the court considers a variety of factors,
including at least the following:

> (1) the strength of the plaintiff's case; (2)
> the risk, expense, complexity, and likely
> duration of further litigation; (3) the risk of
> maintaining class action status throughout the
> trial; (4) the amount offered in settlement; (5)
> the extent of discovery completed and the state
> of the proceedings; (6) the experience and views
> of counsel; (7) the presence of a governmental
> participant; and (8) the reaction of the class
> members of the proposed settlement.

---

[1] The inquiry made traditionally under Federal Rule
of Civil Procedure 23(b)(3)(D), i.e., whether trying the
case as a class action "would present intractable
management problems," is unnecessary when a class is
certified solely for the purpose of settlement.  Amchem
Prods., Inc., 521 U.S. at 620.

In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 946 (9th Cir. 2011) (quoting Churchill Vill., L.L.C. v. Gen. Elec., 361 F.3d 566, 575 (9th Cir. 2004)).

The Manual for Complex Litigation suggests further inquiries for a court reviewing a proposed settlement, including:  asking "whether class or subclass members have the right to request exclusion from the settlement, and, if so, the number exercising that right"; inquiring about "the fairness and reasonableness of the procedure for processing individual claims under the settlement"; and evaluating whether "the named plaintiffs are the only class members to receive monetary relief or are to receive monetary relief that is disproportionately large." Manual for Complex Litigation (Fourth) § 21.62. (2004).

**B.   Settling an FLSA Collective Action**

Settling a Rule 23 class action requires the existence of a class; settling an FLSA collective action first requires the existence of an FLSA collective action.[2]  The FLSA authorizes "any one or more employees for and in behalf of himself or themselves and other employees similarly situated" to sue an employer for

_____

[2] The action prescribed by the FLSA is known commonly as a collective, rather than a class, action. Sarviss v. Gen. Dynamics Info. Tech. Inc., 663 F. Supp. 2d 883, 902 (C.D. Cal. 2009).

unpaid minimum wages or unpaid overtime compensation, provided that "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."  29 U.S.C. § 216(b).  In other words, in an FLSA collective action "each plaintiff must opt _into_ the suit," rather than out of it (as in a Rule 23 class action).  McElmurry v. U.S. Bank Nat'l Ass'n, 495 F.3d 1136, 1139 (9th Cir. 2007) (emphasis in original).

Plaintiffs in a collective action must be "similarly situated"; the meaning of that phrase, however, remains undefined in the Ninth Circuit.  Mitchell v. Acosta Sales, LLC, 841 F. Supp. 2d 1105, 1115 (C.D. Cal. 2011). The typical approach of courts in the Central District of California is to require the plaintiff who proposes a collective action to meet the light burden of showing not that she and her proposed class are identically positioned, just similarly so – a test that reduces typically to requiring the plaintiff to substantiate with affidavits her "allegations that the putative class members were together the victims of a single decision, policy, or plan."  Id. (quoting Sarviss v. Gen. Dynamics Info. Tech. Inc., 663 F. Supp. 2d 883, 903 (C.D. Cal. 2009) (internal quotation omitted)).

1    Before a putative collective action is tried,
2  however, a court may – though it need not, absent
3  argument that the employees are not situated similarly –
4  take a second, more rigorous look at the class, enquiring
5  as to "'(1) the disparate factual and employment settings
6  of the individual plaintiffs; (2) the various defenses
7  available to the defendants with respect to the
8  individual plaintiffs; and (3) fairness and procedural
9  considerations.'"  Mitchell, 841 F. Supp. 2d at 1116
10  (quoting Edwards v. City of Long Beach, 467 F. Supp. 2d
11  986, 990 (C.D. Cal. 2006)); see Edwards, 467 F. Supp. 2d
12  at 989-90 (noting that the FLSA contains no
13  "certification" requirement or protocol to which courts
14  must adhere; certification of a collective action is
15  instead merely "an effective case management tool")
16  (citing Hoffmann-La Roche Inc. v. Sperling, 493 U.S. 165,
17  170-72 (1989)).

18

19    Whatever role a court plays in certifying an FLSA
20  class, it is not bound to exercise the same oversight of
21  the settlement of a collective action as it must a class
22  action under Federal Rule of Civil Procedure 23(e).
23  Whereas the court's role in supervising the settlement of
24  a class action "protects unnamed class members 'from
25  unjust or unfair settlements affecting their rights,'"
26  Amchem Prods., Inc., 521 U.S. at 623 (quoting 7B Charles
27  Alan Wright, et al., Federal Practice & Procedure § 1797
28

1  (3d ed.)), members of an FLSA collective action have

2  opted-in affirmatively; a court's involvement in the

3  management of their action "has less to do with the due

4  process rights" of those to be bound by a settlement,

5  "and more to do with the named plaintiffs' interest in

6  vigorously pursuing the litigation and the district

7  court's interest in 'managing collective actions in an

8  orderly fashion,'" <u>McElmurry</u>, 495 F.3d at 1139 (quoting

9  <u>Hoffmann-LaRoche Inc.</u>, 493 U.S. at 173).[3]

10

11      Having elaborated on the criteria it applies in

12  analyzing the Dancers' Motion, the Court now turns to

13  that task.

14

15                    **III. DISCUSSION**

16      The Court denied the Dancers' previous motion for

17  approval of settlement in this case for three discrete

18  reasons.  (<u>See</u> June 21 Order at 15-16.)  First, the

19  Dancers failed to satisfy Rule 23(a)'s typicality and

20  adequacy requirements, because they offered no class

21  representatives for the subclasses comprised of Dancers

22  working at Clubs in Kentucky, Florida, Idaho, and Texas.

23  _____

24      [3] Moreover, it appears to be an open question whether
    and when members of an FLSA class who opt in may withdraw
25  from the collective action, and what effects their prior
    participation has after their withdrawal.  <u>See</u> <u>Adams v.</u>
26  <u>Sch. Bd. of Hanover Cnty.</u>, No. 3:05CV310, 2008 WL
    5070454, at *17-*19 (E.D. Va. Nov. 26, 2008) (noting that
27  "[n]o published case discusses the procedures a court
    must undertake when a party who had opted-in seeks to
28  withdraw").

1   (See id. at 16-17.)   Second, the cy pres provision in the

2   Agreement's previous iteration defied the law of this

3   circuit.   (See id. at 18-19.)   Third, the Agreement

4   released the FLSA claims of even those class members who

5   did not opt in to the FLSA collective action.   (See id.

6   at 21-23.)   The Dancers have now rectified each of those

7   flaws, and as the Court noted, "[t]he Agreement otherwise

8   appears . . . to be fair, adequate, and reasonable."[4]

9   (Id. at 19.)

10

11        Thus, for the reasons set forth in the June 21 Order,

12   the Court finds that the Dancers satisfy Rule 23(a)'s

13   numerosity and commonality requirements, and as they now

14   have class representatives for each subclass, its

15   typicality and adequacy requirements.   The Court finds

16   further that the Dancers' choice of charitable

17   organizations to receive the otherwise unallocated

18   portion of the settlement fund's non-reversionary amount

19   satisfies the Ninth Circuit's requirements for cy pres

20   awards.   Finally, the language of the Agreement now makes

21   clear that only those Dancers who file claims will be

22   deemed to have opted in to an FLSA subclass, and thus

23

24        [4] Aside from the objections received before, and

25   addressed in, the Court's June 21 Order, the Court has
     received an objection from a class member that states

26   simply that the class member believes the settlement is
     unfair, with no further explanation.   The Court has

27   considered that objection, and determined that without
     elaboration, it is an insufficient basis to disapprove

28   the settlement.

1  that only those Dancers will release their FLSA claims

2  against the Clubs.  Accordingly, the Court GRANTS the

3  Dancers' Motion for Final Approval of Class Action

4  Settlement, and turns to their Motion for Attorneys' Fees

5  and Incentive Awards.

6

7  **A.   Attorneys' Fees**

8       In addition to costs, the Dancers seek $2,500,000 in

9  attorneys' fees for their counsel, either calculated as a

10  percentage of the $12,970,000 gross settlement amount or

11  using the lodestar method.  The Court calculates the

12  Dancers' attorneys' fees using the lodestar method, <u>see</u>

13  <u>Fischel v. Equitable Life Assurance Soc'y</u>, 307 F.3d 997,

14  1006 (9th Cir. 2002) ("the district court has the

15  discretion to apply either the lodestar method or the

16  percentage-of-the-fund method in calculating a fee

17  award").  The Court has conducted a line-item review of

18  the billing records submitted in this case from each of

19  the billing professionals.

20

21       To apply the lodestar method, the Court must "first

22  calculat[e] the 'lodestar.'"  <u>Caudle v. Bristow Optical</u>

23  <u>Co., Inc.</u>, 224 F.3d 1014, 1028 (9th Cir. 2000) (citation

24  omitted).  The Court determines the 'lodestar' amount by

25  multiplying the number of hours reasonably expended on

26  the litigation by a reasonable hourly rate.  <u>Id.</u>; <u>McGrath</u>

27  <u>v. Cnty. of Nevada</u>, 67 F.3d 248, 252 (9th Cir. 1995)

28

1  (citing <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 433 (1983)).

2  Next, the Court must decide whether to adjust the

3  'presumptively reasonable' lodestar figure based upon the

4  factors listed in <u>Kerr v. Screen Extras Guild, Inc.</u>, 526

5  F.2d 67, 69-70 (9th Cir. 1975), <u>cert. denied</u>, 425 U.S.

6  951 (1976), that have not been subsumed in the lodestar

7  calculation.[5]  <u>Caudle</u>, 224 F.3d at 1028-29.

8

9      In determining a reasonable number of hours, the

10  Court must examine detailed time records to determine

11  whether the hours claimed are adequately documented and

12  whether any of them are unnecessary, duplicative, or

13  excessive.  <u>Chalmers v. City of Los Angeles</u>, 796 F.2d

14  1205, 1210 (9th Cir. 1986), <u>reh'g denied</u>, <u>amended on</u>

15  <u>other grounds</u>, 808 F.2d 1373 (9th Cir. 1987) (citing

16  <u>Hensley</u>, 461 U.S. at 433-34).  To determine a reasonable

17  rate for each attorney, the Court must look to the rate

18  _____

19      [5] <u>Kerr</u> was decided before the lodestar approach was
adopted by the Supreme Court in <u>Hensley</u>, 461 U.S. at 433,
20  as the starting point for determining reasonable fees.
In <u>Kerr</u>, the Ninth Circuit adopted the 12-factor test
21  articulated in <u>Johnson v. Georgia Highway Express, Inc.</u>,
488 F.2d 714 (5th Cir. 1974); this analysis identified
22  the following factors for determining reasonable fees:
(1) the time and labor required, (2) the novelty and
23  difficulty of the questions involved, (3) the skill
requisite to perform the legal service properly, (4) the
24  preclusion of other employment by the attorney due to
acceptance of the case, (5) the customary fee, (6)
25  whether the fee is fixed or contingent, (7) time
limitations imposed by the client or the circumstances,
26  (8) the amount involved and the results obtained, (9) the
experience, reputation, and ability of the attorneys,
27  (10) the "undesirability" of the case, (11) the nature
and length of the professional relationship with the
28  client, and (12) awards in similar cases.

1 prevailing in the community for similar work performed by
2 attorneys of comparable skill, experience, and
3 reputation. <u>Id.</u> at 1210-11 (citing <u>Blum v. Stenson</u>, 465
4 U.S. 886, 895 n.11 (1984)).

5

6    To the extent that the <u>Kerr</u> factors are not addressed
7 in the calculation of the lodestar, they may be
8 considered in determining whether the fee award should be
9 adjusted upward or downward, once the lodestar has been
10 calculated. <u>Id.</u> at 1212 (citing <u>Hensley</u>, 461 U.S. at
11 434). There is a strong presumption that the lodestar
12 figure represents a reasonable fee. <u>Jordan v. Multnomah
13 Cnty.</u>, 815 F.2d 1258, 1262 (9th Cir. 1987) (citing
14 <u>Pennsylvania v. Delaware Valley Citizens' Council for
15 Clean Air</u>, 478 U.S. 546, 565 (1986)).

16

17    The Dancers seek to adjust their lodestar upward
18 using the multiplier method. A court may adjust the
19 lodestar upward or downward using a multiplier. An
20 upward adjustment of the lodestar is appropriate only in
21 extraordinary cases, such as when the attorneys faced
22 exceptional risks of not prevailing or not recovering any
23 fees. <u>Chalmers</u>, 796 F.2d at 1212. <u>See also</u> <u>Blum</u>, 465
24 U.S. at 903 (Brennan, J., concurring); <u>Hensley</u>, 461 U.S.
25 at 448 (Brennan, J., concurring in part, dissenting in
26 part); <u>Pennsylvania</u>, 478 U.S. at 565 (upward adjustments
27 are "proper only in certain 'rare' and 'exceptional'
28

cases").  This case is not an extraordinary, rare, or
exceptional case, and therefore, application of the
multiplier method to adjust the lodestar upwards is
inappropriate and unwarranted.

    The party seeking attorneys' fees bears the burden of
"submitting evidence supporting the hours worked and the
rates claimed."  <u>Hensley</u>, 461 U.S. at 433.  A fee
applicant can meet this basic requirement by listing the
hours worked by each person at the firm and identifying
the general subject matter of his or her time
expenditures.  <u>See</u> <u>Fische v. SJB-P.D. Inc.</u>, 214 F.3d
1115, 1121 (9th Cir. 2000).

    In addition to the voluminous materials the Dancers
submitted to justify the $2,500,000 in attorneys' fees
they seek, the Court considers the amount of time it took
the parties to manage the logistics of settling this
litigation.  The Court notes that in the course of this
case:

•   Five days before the hearing on a Motion for
    Preliminary Approval (Doc. No. 119), the Dancers
    submitted to the Court a revised settlement
    agreement, and a declaration of counsel that it was
    substantially the same as the agreement the Court was
    already evaluating.  Instead, the revised agreement

made various substantive changes to the agreement then before the Court, including in the relief to which the Dancers would be entitled and the amount of fees their attorneys would receive.  (<u>See</u> June 21 Order at 7.)

- The Dancers then filed an Amended Motion for Preliminary Approval (Doc. No. 132), which "failed in many respects . . . to set forth the necessary elements for the Court to certify a settlement class."  (<u>See</u> June 21 Order at 7.)  The motion was denied.

- Next, the Dancers filed a Second Motion for Preliminary Approval (Doc. No. 159) that accompanied an agreement purporting to bind Clubs who were not parties to the litigation.  (<u>See</u> June 21 Order at 8.) The Court therefore denied that motion, too.

- The Dancers filed their first Motion for Final Approval of Class Action Settlement (Doc. No. 244) slightly over a year ago; however, after realizing a number of Dancers had been excluded inadvertently from the parties' calculations in reaching their settlement, the Dancers and Clubs returned to the drawing board.  (<u>See</u> June 21 Order at 9.)

- The Dancers submitted a new settlement agreement, for which they sought the Court's approval. (<u>See</u> Doc. No. 265.)  Again, there were deficiencies in the Motion, which the Court therefore denied. (<u>See</u> Doc. No. 268; <u>see generally</u> June 21 Order at 9.)

- The Dancers filed a "Third Amended Motion for Final Approval of Class Action Settlement" (Doc. No. 288); the Court denied that for the reasons set forth at the beginning of Section III of this Order. (<u>See also</u> June 21 Order at 9, 15-16.)

The Court therefore considers the bills submitted by the Dancers' counsel against this background. Plaintiffs' counsel argued at the August 30 hearing of this Motion that most of the false steps in the course of this litigation were the result of the defense's mistakes or oversights, a contention that appears well-taken as to some of the history of the resubmission of the motions for settlement agreement approval.

After careful review of the billing records, the Court concludes that plaintiffs' request for fees incurred is reasonable, after deductions for certain amounts as described below.  <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 433 (1983) ("The most useful starting point for determining the amount of a reasonable fee is the number

1  of hours reasonably expended on the litigation multiplied

2  by a reasonable hourly rate.")   Plaintiffs have

3  represented that the fees charged by plaintiff's counsel

4  are "more than reasonable when compared to the billing

5  rates for persons with similar experience and background

6  in the Southern California marketplace."  (Robinovitch

7  Decl. at ¶ 35; see also Declaration of Christopher P.

8  Ridout ("Ridout Decl.") at ¶ 20 ("rates charges . . . are

9  reasonable and within the range of rates awarded to

10  attorneys practicing within the Central District of

11  California"); Declaration of Caleb Marker ("Marker

12  Decl.") at ¶ 36.)   Based on the Court's familiarity with

13  the rates charged by other firms in the Southern

14  California legal community, the hourly rates of between

15  $475-700 for partners (See Robinovitch Decl. at ¶ 26-27;

16  Ridout Decl. at ¶ 11; Declaration of Stephen M. Harris at

17  ¶ 8); $350 for of counsel (See Marker Decl. at ¶ 23);

18  $250-495 for other attorneys (See Ex. B to Robinovitch

19  Decl.); and $150 for law clerk and paralegal fees (Ridout

20  Decl. at ¶ 11; Robinovitch Decl. at ¶ 28) are reasonable.

21  Plaintiffs also represent that the hours spent on the

22  litigation were reasonable.  (Robinovitch Decl. at ¶ 30;

23  Ridout Decl. at ¶ 10; Marker Decl. at ¶ 21.)   In

24  addition, after reviewing the costs requested by

25  plaintiffs, the Court concludes that they were reasonably

26  incurred in prosecuting the case.

27

28

After reviewing each billing entry, the Court finds
it necessary and appropriate to reduce the fees requested
by the Dancers for (1) time spent on irrelevant issues or
tasks upon which excessive time was spent or billed,
e.g., preparation of pro hac vice applications, (2) other
unnecessary, excessive, or duplicative entries, and (3)
time charged for clerical or secretarial tasks.  For
example, several of the billing attorneys billed time for
analyzing the Court's notices regarding their own filing
deficiencies.  The bills submitted from at least two of
the Dancers' attorneys also contain repeated billings for
excessive time spent for reviewing minute orders from the
Court that stated nothing more than a hearing was
conducted, and the matter taken under submission.  The
Court finds it indefensible that an attorney who had
attended the hearing would then charge for 24 minutes of
his time to review the clerk's two or three sentence
minute order, or even six minutes to do so.

Several attorneys engaged regularly in the practice
of splitting among many billing entries activities that
should be consolidated in one.  For example, on January
26, 2010, Mr. Ridout appears to have engaged in a
correspondence with Mr. Garrell, to which he devoted
seven separate line items, each one taking one-tenth or
two-tenths of an hour.  It thus appears that each message
in the correspondence warranted its own line item.

1   Presumably Mr. Ridout rounds up from zero minutes to six
2   minutes (one-tenth of an hour) each time he undertakes a
3   task.   Thus, if Mr. Ridout takes one minute to read a
4   message from Mr. Garrell, then takes three minutes to
5   read a subsequent message, rather than billing for six
6   minutes (four minutes rounded up to the nearest tenth of
7   an hour), he bills for 12 minutes (one minute rounded up
8   to the nearest tenth of an hour plus three minutes
9   rounded up to the nearest tenth of an hour).   These are
10  but a few examples of the type of billing for which the
11  Court has deducted time when it reviewed the fees sought
12  in this case.

13

14      The amount of fees and costs requested, as well as
15  the reduction in fees, is listed below.

16

17  Rideout and Lyons, LLP (not including Caleb Marker)
18  •   Amount of Fees Requested: $591,465.00
19      •   Deductions: $40,095.00
20      •   Balance: $551,370.00
21  •   Amount of Costs Requested: $5,687.30

22

23  Ridout and Lyons, LLP (Caleb Marker only)
24  •   Amount of Fees Requested: $622,072.50
25      •   Deductions: $78,480.00
26      •   Balance: $543,592.50
27  •   Amount of Costs Requested: $5,668.76

28

23

Zimmerman Reed, PLLP

- Amount of Fees Requested: $729,642.50
  - Deductions: $26,425.00
  - Balance: $703,217.50
- Amount of Costs Requested: $35,287.88

Knapp, Petersen & Clarke

- Amount Requested: $484,987.00
  - Deductions: $53,697.50
  - Balance: $431,289.50
- Amount of Costs Requested: $23,441.83

The Law Offices of Robert L. Starr

- Amount Requested: $88,935.00
  - Deductions: $17,380
  - Balance: $71,555.00
- Amount of Costs Requested: $3,185.00

There are two fee agreements between counsel, both of which were previously disclosed to the Court:

- Attorney Joint Prosecution and Fee Sharing Agreement (Doc. No. 312-4) ("Fee Agreement 1") between 1) Zimmerman Reed, PLLP, Ridout & Lyon, LLP, and Consumer Law Center, PLLC, (collectively, "Group A") on the one hand, and 2) Knapp, Petersen & Clarke, and

1    the Law Offices of Robert L. Starr, (collectively,

2    "Group B") on the other hand.  Paragraph F of the

3    agreement specifies the fee division which states

4    that attorneys fees shall be divided as follows: i)

5    63.5% of the total attorneys' fees obtained shall be

6    paid to Group A; and ii) 36.5% of the total

7    attorneys' fees obtained shall be paid to Group B.

8  • Agreement to Resolve Fee Dispute (Doc. No. 315-6)

9    ("Fee Agreement 2") between Rusing Lopez & Lizardi,

10   PLLC ("Rusing"); Christensen Law ("Christensen"); the

11   Law Offices of Robert L. Starr ("Starr"); and Knapp,

12   Petersen & Clarke ("KPC").[6]  Pursuant to this

13   agreement:

14        •    If the fee award to KPC and Starr is

15             $400,000 or less, then KPC shall be entitled

16             to 80% of any such fee award while Starr

17             shall be entitled to 20% of any such fee

18             award.  If the fee award is greater than

19             $400,000, then KPC shall be entitled to 70%

20             of any such fee award and Starr shall be

21             entitled to 30% of any such fee award.

22

23   _____

24        [6]Rusing, Christensen, and Starr are co-counsel for
     plaintiff in an action pending in the District Court of
25   the State of Nevada, Clark County, a class action lawsuit
     against Spearmint Rhino Companies Worldwide concerning
26   the alleged violation of wage and hour laws by Spearmint
     Rhino entitles that classify exotic dancers as
27   independent contractors, but treat them as employees.
     The Nevada action was stayed, pending a proposed
28   settlement in this case.  (See Fee Agreement 2.)

- Rusing/Christensen shall be paid one-half of the fee award payable to Starr.
- Rusing/Christensen shall be paid ten percent of the fee award payable to KPC or $10,000, whichever is less.

These agreements are the product of co-counsel's efforts to resolve their fee dispute and reach an agreement regarding fee distribution.  The agreements are reasonable, and they do not offend the principles under which the Court awards attorneys' fees.  The Court finds that these agreements should be honored.

**B.   Incentive Awards**

Given the time they invested in this matter, and the professional and personal risk to which being named plaintiffs subjected them, the Dancers also seek incentive awards for their class representatives as follows:

- For Tracy Dawn Trauth, $15,000 for "over 163.5 hours" of "time for the benefit of the [Dancers]." (See Decl. of Tracy Dawn Trauth (Doc. No. 314-4) ¶ 27.)

- For Jennifer Blair, $6,250 for 30 hours of time spent aiding in the litigation of this matter. (See Decl. of Jennifer Blair (Doc. No. 314-6) ¶ 19.)

- For Christeen Rivera, $6,250 for 60 hours of time spent aiding in the litigation of this matter. (<u>See</u> Decl. of Christeen Rivera (Doc. No. 314-5) ¶ 35.)

- For Victoria Omlor, $6,250 for 35 hours of time spent in connection with this litigation. (<u>See</u> Decl. of Victoria Omlor (Doc. No. 314-9) ¶ 20.)

- For Jasmine Wright, $6,250 for 40 hours of time spent aiding in the litigation of this matter. (<u>See</u> Decl. of Jasmine Wright (Doc. No. 314-14) ¶ 31.)

- For Anicia Vintimilla, $6,250 for 35 hours spent aiding in the litigation of this matter. (<u>See</u> Decl. of Anicia Vintimilla (Doc. No. 314-13) ¶ 20.)

- For Marsha Ellington, $6,250 for 25 hours spent aiding in the litigation of this matter. (<u>See</u> Decl. of Marsha Ellington (Doc. No. 314-8) ¶ 20.)

- For Selena Denise Pelaez, $6,250 for 25 hours spent aiding in the litigation of this matter. (<u>See</u> Decl. of Selena Denise Pelaez (Doc. No. 314-10) ¶ 20.)

1 • For Nicole Garcia, $6,250 for 20 hours spent aiding
2   in the litigation of this matter.  (<u>See</u> Decl. of
3   Nicole Garcia (Doc. No. 314-7) ¶ 20.)

4

5 • For Reah Navarro, $6,250 for 20 hours spent aiding in
6   the litigation of this matter.  (<u>See</u> Decl. of Reah
7   Navarro (Doc. No. 314-12) ¶ 20.)

8

9 • For Tami Sanchez, $6,250 for 20 hours spent aiding in
10   the litigation of this matter.  (<u>See</u> Decl. of Tami
11   Sanchez (Doc. No. 314-11) ¶ 20.)

12

13 • For Rose Shakespeare, $1,000 for 15 hours spent
14   aiding in the litigation of this matter.  (<u>See</u> Decl.
15   of Rose Shakespeare (Doc. No. 314-15) ¶ 29.)

16

17 • For Connie Linne, $1,000 for 15 hours spent aiding in
18   the litigation of this matter.  (<u>See</u> Decl. of Connie
19   Linne (Doc. No. 314-16) ¶ 29.)

20

21 • For Ashley Malott King, $1,000 for 15 hours spent
22   aiding in the litigation of this matter.  (<u>See</u> Decl.
23   of Ashley Malott King (Doc. No. 314-17) ¶ 29.)

24

25   In determining whether and how much to award class
26 representatives in incentive payments, courts are to
27 consider the representatives' actions in protecting the
28

interests of the class, the degree to which those actions
benefitted the class, the amount of time and effort the
representatives spent pursuing the litigation, and the
representatives' reasonable fear of being retaliated
against for their visible participation.  <u>Staton</u>, 327
F.3d at 977 (citing <u>Cook v. Niedert</u>, 142 F.3d 1004, 1016
(7th Cir. 1998)).  Courts also consider the number of
representatives being awarded incentive payments, the
proportion of the payments to the settlement amount, and
the size of each payment.  <u>Staton</u>, 327 F.3d at 977.

Here, the Court observes that while the total amount
of the proposed incentive payments is a small fraction of
the total settlement amount, awarding some of the
proposed payments would mean giving the named
representatives as much as $312.50 per hour for their
time on the basis of boilerplate declarations.  Moreover,
there is scant evidence that any representative faced a
real risk of retaliation; as to the one representative
who claimed to have been retaliated against, the Clubs
offered a declaration indicating that she was banned from
their premises because she appeared there while not
working and disrupted the workplace activities of others
to carry on social conversations.  (<u>See</u> Omlor Decl. ¶ 13;
<u>but see</u> Decl. of Kathy Vercher (Doc. No. 325-1) ¶ 2.)
Accordingly, the Court will allow incentive payments as
follows:

- Tracy Dawn Trauth:  $10,000

- Jennifer Blair:  $5,000

- Christeen Rivera:  $5,000

- Victoria Omlor:  $5,000

- Jasmine Wright:  $5,000

- Anicia Vintimilla:  $5,000

- Marsha Ellington:  $2,500

- Selena Denise Pelaez:  $2,500

- Nicole Garcia:  $2,500

- Reah Navarro:  $2,500

- Tami Sanchez:  $2,500

- Rose Shakespeare:  $1,000

- Connie Linne:  $1,000

- Ashley Malott King:  $1,000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# IV. CONCLUSION

For the foregoing reasons, the Court GRANTS the Dancers' Motion for Final Approval of Class Action Settlement and their Motion for Attorneys' Fees and Incentive Awards.  The Dancers are hereby awarded $2,301,024.50 in fees and $73,270.77 in costs, to be allocated pursuant to Fee Agreement 1 and Fee Agreement 2, and incentive payments as enumerated in the preceding section.

Dated: <u>November 6, 2012 </u>

<u>                                   </u>
VIRGINIA A. PHILLIPS
United States District Judge

32